**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville Division**

| | |
|---|---|
| L.W., by and through her parents and next friends, Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through his parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; RYAN ROE, by and through his parent and next friend, Rebecca Roe; REBECCA ROE; and SUSAN N. LACY, on behalf of herself and her patients,<br><br>        Plaintiffs,<br><br>    v.<br><br>JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter; TENNESSEE DEPARTMENT OF HEALTH; RALPH ALVARADO, in his official capacity as the Commissioner of the Tennessee Department of Health; TENNESSEE BOARD OF MEDICAL EXAMINERS; MELANIE BLAKE, in her official capacity as the President of the Tennessee Board of Medical Examiners; STEPHEN LOYD, in his official capacity as Vice President of the Tennessee Board of Medical Examiners; RANDALL E. PEARSON, PHYLLIS E. MILLER, SAMANTHA MCLERRAN, KEITH G. ANDERSON, DEBORAH CHRISTIANSEN, JOHN W. HALE, JOHN J. MCGRAW, ROBERT ELLIS, JAMES DIAZ-BARRIGA, and JENNIFER CLAXTON, in their official capacities as members of the Tennessee Board of Medical Examiners; and LOGAN GRANT, in his official capacity as the Executive Director of the Tennessee Health Facilities Commission,<br><br>        Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>    Civil No. _____ |

Plaintiffs,[1] by and through their attorneys, bring this Complaint against the above-named Defendants, and state the following in support thereof:

## PRELIMINARY STATEMENT

1.     On March 2, 2023, Tennessee Governor Bill Lee signed into law Senate Bill 1, codified in Tennessee Code Annotated § 68-33-101 *et seq*. (hereinafter the "Health Care Ban" or "Ban"), which bans the provision of medically necessary and potentially lifesaving healthcare to transgender adolescents.  The law was passed over the sustained and robust opposition of medical experts in Tennessee and across the country.  It was also passed over the pleas of families across Tennessee who urged lawmakers not to interfere in the medical decision-making of parents, their minor children, and their doctors.  Absent intervention by this Court, the law will go into effect on July 1, 2023, disrupting or preventing medical care for hundreds of adolescents across Tennessee. The Heath Care Ban violates the constitutional rights of Tennessee adolescents and their parents, and—if it goes into effect—will cause severe and irreparable harm.

2.     Gender dysphoria is a serious medical condition characterized by clinically significant distress caused by incongruence between a person's gender identity and the sex they were designated at birth.  All of the major medical associations in the United States recognize that adolescents with gender dysphoria may require medical interventions to treat severe distress.  For instance, puberty-delaying treatment and hormone therapy are medically indicated to alleviate severe distress associated with gender dysphoria, and for some older adolescents, chest surgery may be medically necessary.  In providing this medically necessary healthcare, sometimes referred

_____

[1] Plaintiffs John Doe, Jane Doe, James Doe, Ryan Roe, and Rebecca Roe have filed a separate motion to proceed using these pseudonyms, rather than their legal names, in order to protect their privacy regarding the minor plaintiffs' transgender status and their medical condition and treatment.

to as "gender-affirming care," medical providers are guided by widely accepted protocols for assessing and treating transgender adolescents.

3.      The Health Care Ban interferes with the ability of doctors to follow these evidence-based protocols by prohibiting any "medical procedure"—including prescribing, administering, or dispensing any puberty blocker or hormone—from being performed "for the purpose of… [e]nabling a minor to identify with" a gender identity different from the sex they were designated at birth or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1)(A)–(B) (2023). In so doing, the Health Care Ban denies adolescents medically necessary treatment and prevents parents from exercising their fundamental rights to obtain medically necessary care for their adolescent children. It further prohibits doctors from treating their patients in accordance with well-established standards of care and subjects doctors to potential civil liability and regulatory discipline.

4.      While the Health Care Ban purports to protect young people from risks allegedly associated with the prohibited health care, decades of clinical experience and research have shown that gender-affirming health care is safe, effective, and improves the health and well-being of adolescents with gender dysphoria. Moreover, all of the treatments prohibited by the Health Care Ban are permitted when undertaken for any reason *other* than to affirm a gender identity that differs from a patient's sex designated at birth.

5.      If the Health Care Ban goes into effect, it will have devastating consequences for transgender youth and their families in Tennessee. Transgender adolescents with gender dysphoria will be unable to obtain medical care that those who understand their medical needs—their doctors and parents—agree is medically necessary. Untreated gender dysphoria is associated with severe

harm including anxiety, depression, and suicidality. Cutting vulnerable adolescents off from treatment or withholding necessary care will inevitably cause significant harm.

6. Some parents of transgender children are making plans to flee the State to protect their children's health and safety and to obtain the medical treatment their children need. Those with the resources to do so will have to leave their jobs, businesses, extended families, and communities. Others will have to shoulder the hardship of disruptive and expensive travel to secure medical care for their children, often at the expense of the child's time in school and the parents' time at work. Other families that do not have the resources or are otherwise unable to leave or travel are terrified about what will happen if the law takes effect. For these parents and hundreds of others across Tennessee, the Ban is creating a sense of desperation at the prospect of watching their children's suffering resume and symptoms possibly worsen as they lose access to the care that has transformed their lives.

7. Plaintiffs urgently seek relief from this Court.

## THE PARTIES

### A. The Minor Plaintiffs and Their Families

#### 1. The Williams Family

8. Plaintiffs L.W., Samantha Williams, and Brian Williams live in Tennessee. Samantha and Brian are the parents of L.W., their fifteen-year-old daughter. L.W. is transgender and is currently receiving medically necessary care that would be prohibited by the Health Care Ban.

#### 2. The Roe Family

9. Plaintiffs Ryan Roe and Rebecca Roe live in Tennessee. Rebecca is the parent of Ryan Roe, her fifteen-year-old son. Ryan Roe is transgender and is currently receiving medically necessary care that would be prohibited by the Health Care Ban.

3. *The Doe Family*

10.    Plaintiffs John Doe, Jane Doe, and James Doe live in Tennessee.  Jane and James Doe are the parents of John Doe, their twelve-year-old son.  John Doe is transgender and is currently receiving medically necessary care that would be prohibited by the Health Care Ban.

11.    Plaintiffs L.W., Ryan Roe, and John Doe are collectively referred to herein as the "Minor Plaintiffs."  Their parents, Samantha Williams, Brian Williams, Rebecca Roe, Jane Doe, and James Doe are collectively referred to herein as the "Parent Plaintiffs."

**B.    Provider Plaintiff**

12.    Plaintiff Dr. Susan Lacy (the "Provider Plaintiff") is a physician licensed to practice medicine in Tennessee.  Dr. Lacy operates a private practice in Memphis, Tennessee, and she provides gender-affirming care that would be prohibited by the Health Care Ban.  She is bringing her claims on behalf of herself and her patients.

**C.    Defendants**

13.    Defendant Jonathan Skrmetti is the Attorney General and Reporter of the State of Tennessee.  The Attorney General/Reporter is headquartered at 500 Dr. Martin Luther King Jr. Blvd., Nashville, TN 37219, and has additional offices throughout Tennessee.  Under the Health Care Ban, Defendant Skrmetti is tasked with bringing legal actions against any "healthcare provider that knowingly violates [the Health Care Ban]." Tenn. Code Ann. § 68-33-106(b).  He is also authorized to "establish a process by which violations of [the Health Care Ban] may be reported." Tenn. Code Ann. § 68-33-106(a).  Defendant Skrmetti is sued in his official capacity.

14.    Defendant Tennessee Department of Health (the "DOH") is the primary agency of the State of Tennessee responsible for all aspects of public health and provides health services to many Tennesseans across the state.  The DOH is headquartered at 710 James Robertson Parkway, Nashville, TN 37243.  Each county in Tennessee has a county health department, which operates

under the direct supervision of the DOH. In 2014, roughly 1.4 million people were served by these county health departments in Tennessee's 89 rural/suburban counties and six metropolitan counties. The DOH is a "health program or activity" within the meaning of section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557"), and it is a recipient of federal financial assistance, including grants, contracts, and other financial assistance from the United States Department of Health and Human Services, as well as federal Medicare and Medicaid funds. The Health Care Ban provides that any violation of the statute "requires emergency action by an alleged violator's appropriate regulatory authority," which expressly includes "[t]he department of health." Tenn. Code Ann. §§ 68-33-102(2)(A), 107.

15. Defendant Ralph Alvarado, MD, FACP is the Commissioner of the DOH. Defendant Alvarado oversees and directs the functions of the DOH, including the activities of licensure regulation entities, such as the Tennessee Board of Medical Examiners, which is "attached" to the DOH. Tenn. Code Ann. § 68-33-102. Defendant Alvarado is sued in his official capacity.

16. Defendant Tennessee Board of Medical Examiners (the "Medical Board") is a "board…attached to the" DOH, Tenn. Code Ann. § 68-33-102(2)(B), with the power to license, regulate and discipline health care providers within the State of Tennessee. The Medical Board is headquartered at 710 James Robertson Parkway, Nashville, TN 37243. The Health Care Ban provides that any violation of the statute "requires emergency action by an alleged violator's appropriate regulatory authority," which expressly includes any "agency, board, council, or committee attached to the department of health." Tenn. Code Ann. §§ 68-33-102(2)(B), 107.

17. Defendant Melanie Blake, MD is the President of the Medical Board. Defendant Stephen Loyd, MD is the Vice President of the Medical Board. Defendants Randall E. Pearson,

MD; Phyllis E. Miller, MD; Samantha McLerran, MD; Keith G. Anderson, MD; Deborah Christiansen, MD; John W. Hale, MD; John J. McGraw, MD; Robert Ellis; James Diaz-Barriga; and Jennifer Claxton (collectively and together with Defendants Blake and Loyd, the "Medical Board Defendants") are members of the Medical Board. The Medical Board Defendants are sued in their official capacities.

18.     Defendant Logan Grant is the Executive Director of the Tennessee Health Facilities Commission (the "Health Facilities Commission"). The Health Facilities Commission is headquartered at 665 Mainstream Drive, 2nd Floor, Nashville, TN 37243, and has additional offices throughout Tennessee. The Health Facilities Commission is an agency of the State of Tennessee with responsibility for, among other things, conducting investigations of health care facilities in Tennessee to ensure compliance with state and federal regulations. The Health Care Ban provides that any violation of the statute "requires emergency action by an alleged violator's appropriate regulatory authority," which expressly includes "[t]he health facilities commission." Tenn. Code Ann. §§ 68-33-102(2)(C), 107. Defendant Grant is sued in his official capacity.

19.     Defendant Skrmetti, Defendant Alvarado, the Medical Board Defendants, and Defendant Grant (collectively, the "State Official Defendants") are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment. Defendants are therefore liable for both their violation of the right to equal protection and for their violation of Parent Plaintiffs' fundamental rights under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

20.     This action arises under the U.S. Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 18116(a).

21.     This Court has subject matter jurisdiction pursuant to Article III of the U.S. Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

22.     This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

23.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), because one or more Defendants reside in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### A.     Standards of Care for Treating Adolescents with Gender Dysphoria

24.     Gender identity refers to a person's core sense of belonging to a particular gender, such as male or female.  Every person has a gender identity.

25.     Living in a manner consistent with one's gender identity is critical to the health and well-being of any person, including transgender people.

26.     Although the precise origin of gender identity is unknown, a person's gender identity is a fundamental aspect of human development.  There is a general medical consensus that there are significant biological roots to gender identity.

27.     A person's gender identity cannot be altered voluntarily or changed through medical intervention.

28.     A person's gender identity usually matches the sex they were designated at birth based on the appearance of their external genitalia.  The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because all of the physiological aspects of a person's sex are not always aligned with each other.  For these reasons, the Endocrine Society, an international medical organization representing over 18,000 endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.

29.     Most boys are designated male at birth based on their external genital anatomy, and most girls are designated female at birth based on their external genital anatomy. But transgender people have a gender identity that differs from the sex they were designated at birth. A transgender boy or man is someone who has a male gender identity but was designated a female sex at birth. A transgender girl or woman is someone who has a female gender identity but was designated a male sex at birth.

30.     Gender dysphoria is the clinical diagnosis for the significant distress that results from the incongruity between one's gender identity and sex they were designated at birth. It is a serious medical condition, and it is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR) (DSM-5 released in 2013 and DSM-5-TR released in 2022).

31.     Being transgender is not itself a medical condition to be cured. But gender dysphoria is a serious medical condition that, if left untreated, can result in debilitating anxiety, severe depression, self-harm, and suicide.

32.     The World Professional Association for Transgender Health ("WPATH") has issued Standards of Care for the Health of Transgender and Gender Diverse People ("WPATH Standards of Care" or "SOC 8") since 1979. The current version is SOC 8, published in 2022. The WPATH Standards of Care provide guidelines for multidisciplinary care of transgender individuals, including children and adolescents, and describe criteria for medical interventions to treat gender dysphoria—including puberty-delaying medication, hormone treatment, and surgery when medically indicated—for adolescents and adults. Every major medical organization in the United States recognizes that these treatments can be medically necessary to treat gender dysphoria.

33.     The SOC 8 is based upon a rigorous and methodological evidence-based approach. Its recommendations are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options, as well as expert consensus.  The SOC 8 incorporates recommendations on clinical practice guideline development from the National Academies of Medicine and the World Health Organization. SOC 8's recommendations were graded using a modified GRADE (Grading of Recommendations, Assessment, Development, and Evaluations) methodology considering the available evidence supporting interventions, risks and harms, and feasibility and acceptability.

34.     A clinical practice guideline from the Endocrine Society (the "Endocrine Society Guideline") provides protocols for the medically necessary treatment of gender dysphoria similar to those outlined in the WPATH Standards of Care.

35.     The guidelines for the treatment of gender dysphoria outlined in the WPATH Standards of Care and in the Endocrine Society Guideline are comparable to guidelines that medical providers use to treat other conditions.

36.     Doctors in Tennessee and throughout the country follow these widely accepted guidelines to diagnose and treat people with gender dysphoria.

37.     Medical guidance to clinicians differs depending on whether the treatment is for a pre-pubertal child, an adolescent, or an adult.  In all cases, the precise treatment recommended for gender dysphoria will depend upon each person's individualized needs.

38.     Before puberty, gender-affirming care does not include any pharmaceutical or surgical intervention.  Care for pre-pubertal children may include "social transition," which means supporting a child living consistently with the child's persistently expressed gender identity.  Such

care might include support around adopting a new name and pronouns, wearing clothes that feel more appropriate to a particular gender, and changing one's hairstyle.

39.     Under SOC 8 and the Endocrine Society Guideline, medical interventions may become medically necessary and appropriate as transgender youth reach puberty. In providing medical treatments to adolescents, pediatric endocrinologists and other clinicians work with qualified mental health professionals experienced in diagnosing and treating gender dysphoria.

*1.     Puberty-Delaying Treatment*

40.     For many transgender adolescents, going through puberty in accordance with the sex designated to them at birth can cause extreme distress. For these adolescents, puberty-delaying medication—known as gonadotropin-releasing hormone ("GnRH") agonists—can minimize and potentially prevent the heightened gender dysphoria and permanent, unwanted physical changes that puberty would cause.

41.     Under the Endocrine Society Guideline, transgender adolescents may be eligible for puberty-delaying treatment if:

- A qualified mental health professional has confirmed that:

  o   the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria;

  o   gender dysphoria worsened with the onset of puberty;

  o   any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and

  o   the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment.

- The adolescent:

  o has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility; and

  o has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable law) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

  o agrees with the indication for GnRH agonist treatment;

  o has confirmed that puberty has started in the adolescent; and

  o has confirmed that there are no medical contraindications to GnRH agonist treatment.

42. Puberty-delaying treatment has been shown to be safe and effective at treating gender dysphoria in adolescents.

43. Puberty-delaying treatment works by pausing a person's endogenous puberty at the stage of pubertal development that the person is in at the time of treatment. For transgender girls, this treatment pauses the physiological changes typical of male puberty and prevents the development of associated secondary sex characteristics like facial hair and a pronounced "Adam's apple." It also prevents the deepening of the young person's voice and genital growth. For transgender boys, puberty-delaying treatment prevents the development of breasts and menstruation. The use of these interventions after the onset of puberty can eliminate or reduce the need for surgery later in life. If gender-affirming hormones are prescribed to initiate hormonal puberty consistent with gender identity after puberty-delaying treatment, transgender adolescents will develop secondary sex characteristics typical of peers with their gender identity.

44. On its own, puberty-delaying treatment does not permanently affect fertility.

45.     Because puberty-delaying treatment followed by gender-affirming hormone therapy can affect fertility, patients are counseled about the risks and benefits of treatment and provided information about fertility preservation.

46.     Puberty-delaying treatment is reversible.  If puberty-delaying treatment is stopped and no gender-affirming hormone therapy is provided, there are no lasting effects of treatment. Endogenous puberty resumes and patients undergo puberty in a timeline typical of their peers.

47.     If gender-affirming hormone treatment is provided after puberty-delaying treatment, patients undergo puberty consistent with their gender identity on a timeline typical of their peers.

### 2.     Hormone Therapy

48.     For some adolescents, it may be medically necessary and appropriate to treat their gender dysphoria with gender-affirming hormone therapy (testosterone for transgender boys, and testosterone suppression and estrogen for transgender girls).

49.     Under the Endocrine Society Guideline, transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A qualified mental health professional has confirmed:

    o   the persistence of gender dysphoria; and

    o   any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment.

- The adolescent:

    o   has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);

- o the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to the treatment; and

- o has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable laws) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

  - o agrees with the indication for sex hormone treatment; and

  - o has confirmed that there are no medical contraindications to sex hormone treatment.

50.     For transgender boys, hormone therapy involves treatment with testosterone and for transgender girls, treatment with testosterone suppression and estrogen.

51.     Through decades of clinical experience and research, gender-affirming hormone therapy has been shown to be safe and effective at treating gender dysphoria in adolescents.

52.     Side effects from gender-affirming hormone therapy are rare when treatment is provided under clinical supervision.

53.     Puberty-delaying medications and gender-affirming hormones are prescribed only after a comprehensive psychosocial assessment by a qualified health professional who: (i) assesses for the diagnosis of gender dysphoria and any other co-occurring diagnoses, (ii) ensures the child can assent and the parents/guardians can consent to the relevant intervention after a thorough review of the risks, benefits, and alternatives of the intervention, and (iii) ensures that, if co-occurring mental health conditions are present, they do not interfere with the accuracy of the diagnosis of gender dysphoria or impair the ability of the adolescent to assent to care.

**B.  The General Assembly's Passage of the Health Care Ban**

54.    On February 23, 2023, the Tennessee General Assembly passed the Health Care Ban, prohibiting healthcare providers from performing or administering medical procedures "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity."  Tenn. Code Ann. § 68-33-103(a)(1).  The Ban also prohibits "any person" from "knowingly" providing "hormone therapy" or "puberty blocker[s]" to a minor in any manner not in compliance with the provisions of the Ban.  Tenn. Code Ann. § 68-33-104.  The Ban defines "medical procedure" broadly, such that the term means: "(A) Surgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being; or (B) Prescribing, administering, or dispensing any puberty blocker or hormone to a human being."  Tenn. Code Ann. § 68-33-102(5).  It further defines "sex" to "mean[] a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth."  Tenn. Code Ann. § 68-33-102(9).

55.    The Ban includes a phase-out period, which allows health care providers to continue to provide medical procedures proscribed in the Ban if "the medical procedure on the minor began prior to the effective date of this act [July 1, 2023] and concludes on or before March 31, 2024."  Tenn. Code Ann § 68-33-103(b)(1)(B).  The Ban does not allow the initiation of new gender-affirming care during that period.

56.    The Ban states that healthcare professionals who provide or offer to provide such procedures are subject to professional discipline by the appropriate regulatory agency, Tenn. Code Ann. § 68-33-107, and may be sued by the Attorney General and Reporter or private parties, Tenn. Code Ann. §§ 68-33-105, 106.

57. The General Assembly declared that the Ban was necessary to "protect the health and welfare of minors," Tenn. Code Ann. § 68-33-101(a), despite the banned medical treatment being part of well-established standards of care for the treatment of gender dysphoria in adolescents.

58. The General Assembly rejected an amendment to the Ban that would have banned surgical procedures, but not gender-affirming medication, for minors for the purpose of "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity."

59. The General Assembly also rejected amendments to the Ban that would have banned all cosmetic surgeries conducted on minors, regardless of the purpose for which the minor and/or their parent sought the surgery.

60. The General Assembly passed the Ban despite hearing testimony from Tennessee doctors about the lifesaving benefits of the banned care for their patients and the grave harm to their patients' health and well-being if they are prohibited from receiving this care. This included testimony about the high rate of suicide attempts by transgender adolescents as well as detailed explanations of the rigorous standards of diagnosis and treatment doctors follow when providing gender-affirming treatment to minors.

61. Not a single doctor with experience treating transgender youth testified in support of the bill. The only doctor who did testify in support likened "greater awareness of and education around gender identity" to "intentional grooming" and "psychological manipulation." He also compared gender-affirming care for transgender youth to removing the leg and an eye of a minor who identified as a pirate.

62.     The General Assembly passed the Ban despite hearing testimony from transgender Tennesseans who shared their experiences of years of struggle, feelings of hopelessness, and desire to end their lives prior to receiving gender-affirming care and the positive and transformational impact that gender-affirming medical treatment had on their health and overall well-being.

63.     The General Assembly also passed the Ban despite hearing testimony of parents of transgender children with gender dysphoria, who pleaded with lawmakers not to risk their children's health by stripping them of the medical care that enables them to thrive.  Multiple parents spoke about the torture in wondering whether their child would die by suicide prior to gender-affirming treatment, and then the relief that came from watching their child's despair lessen with gender-affirming treatment.

64.     At various points during legislative debates, proponents of the Ban within the General Assembly defended the bill based on general criticisms and stereotypes of transgender people.  The sponsor of the House companion bill described practitioners who provide gender-affirming care as "indulging the child's perception of his or her sex."  A co-sponsor of the House bill expressed that being transgender was a "fiction" and a "fantasy."  Addressing trans youth in Tennessee, one House member referenced the views of his preacher, stating: "If you don't know what you are, a boy or girl, male or female, just go in the bathroom and take your clothes off and look in the mirror and you'll find out."

65.     The Health Care Ban is just one piece of a robust discriminatory legislative agenda targeting transgender persons.  In addition to the Health Care Ban, the Senate has already passed three other bills this legislative session that focused on transgender people; the House has passed one of these bills, and the other two are pending.  The bill that passed in both bodies of the General Assembly and will go into effect if signed into law by Governor Lee, SB1237/HB0306, allows

private schools to ban transgender students from participation in athletic activities. Another bill pending in the General Assembly, SB1440, defines "sex" in the Tennessee Code to be the "immutable biological sex as determined by anatomy and genetics existing at the time of birth" and the "sex listed on the person's original birth certificate." SB466, also being considered, states that teachers are not required to use a transgender student's preferred pronouns. Both chambers are also considering bills (HB1215 and SB1339) that would block TennCare, Tennessee's Medicaid program, from reimbursing providers for gender-affirming care for all transgender people in the state.

### C. The Banned Treatment Is Permitted for Other Purposes

66. The Health Care Ban prohibits the use of well-established treatments for gender dysphoria in transgender adolescents—including puberty-delaying treatment, hormone therapy (testosterone for transgender boys, and estrogen and testosterone suppressants for transgender girls), and chest surgery—because these treatments are provided "for the purpose of" "[e]nabling a minor to identify with" a gender identity different from the sex they were designated at birth or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1). The Ban permits the use of these same treatments for any other purpose. Tenn. Code Ann. § 68-103(b)(1)(A).

67. For instance, puberty-delaying medication is commonly used to treat central precocious puberty. Central precocious puberty is the premature initiation of puberty by the central nervous system—before 8 years of age in people designated female at birth and before 9 years of age in people designated male. When untreated, central precocious puberty can lead to the impairment of final adult height as well as antisocial behavior and lower academic achievement. The Health Care Ban permits puberty-delaying treatment for central precocious puberty because it is not provided for purposes of "[e]nabling a minor to identify with" a gender identity different

from the sex designated at birth or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1).

68.     Likewise, the Health Care Ban prohibits hormone therapy when the treatment is used to treat transgender adolescents with gender dysphoria but allows that same hormone therapy when prescribed to non-transgender patients. For example, non-transgender boys with delayed puberty may be prescribed testosterone if they have not begun puberty by 14 years of age. Without testosterone, for most of these patients, puberty would eventually initiate naturally. However, testosterone is prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as their peers. Likewise, non-transgender girls with primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop) may be treated with estrogen. Moreover, non-transgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants.

69.     The side effects of the proscribed treatments are comparable when used to treat gender dysphoria and when used to treat other conditions. In each circumstance, doctors advise patients and their parents about the risks and benefits of treatment and tailor recommendations to the individual patient's needs. For adolescents, parents consent to treatment and the patient gives their assent.

### D.     There Are No Legitimate Justifications for the Health Care Ban

70.     In passing the Health Care Ban, the General Assembly's findings cited a purported need to "protect[] minors from physical and emotional harm," "protect[] the ability of minors to

develop into adults who can create children of their own," "promot[e] the dignity of minors," "encourage[e] minors to appreciate their sex, particularly as they undergo puberty," and "protect[] the integrity of the medical profession." Tenn. Code Ann. § 68-33-101(m).

71. These purported concerns do not justify prohibiting medical procedures—including prescribing, administering, or dispensing any puberty blocker or hormone—only when used to provide gender-affirming care to treat transgender adolescents when the same care is allowed for other purposes.

72. The banned treatment is supported by a substantial body of research and clinical evidence and is not experimental.

73. The body of research supporting the safety and efficacy of the banned care is comparable to the research supporting other treatments, but only gender-affirming medical care for adolescents is banned.

74. Clinicians, including clinicians in Tennessee, have documented the safety and efficacy of treatment for gender dysphoria in adolescents over decades.

75. Even if the banned treatments were "experimental in nature" (which they are not), experimental treatments are permitted in Tennessee and are not banned. Wrongly labelling gender-affirming care as "experimental" cannot justify categorically banning only this one form of allegedly "experimental" treatment.

76. The law bans the only evidence-based treatments for gender dysphoria in adolescents.

77. The General Assembly's purported interest in protecting minors from potential physical and emotional risks associated with the prohibited medical care likewise cannot justify the Health Care Ban. The majority of potential risks and side effects related to puberty-delaying

treatment, hormone therapy, and chest surgeries for gender dysphoria are comparable to those risks and side effects when such treatments are used for other indications. Further, Tennessee does not ban other forms of care carrying similar risks, such as treatments that carry fertility risks.

78. Every medical intervention carries potential risks and potential benefits. Weighing the potential benefits and risks of the treatment for gender dysphoria is a prudential judgment similar to other judgments made by healthcare providers, adolescent patients, and their parents. Adolescent patients and their parents often make decisions about treatments with less evidence and/or greater risks than the treatments prohibited by the Health Care Ban.

79. The current standards of care for treating gender dysphoria in minors are consistent with general ethical principles of informed consent. Existing clinical practice guidelines for providers extensively discuss the potential benefits, risks, and alternatives to treatment, and providers' recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the adolescent's decision-making capacity.

80. There is nothing unique about any of the medically accepted treatments for adolescents with gender dysphoria that justify singling out these treatments for prohibition based on the concern about adolescents' inabilities to assent or their parents' inabilities to consent.

81. The Health Care Ban subjects medical care for transgender adolescents with gender dysphoria to a double standard. The law singles out such care for sweeping prohibitions while permitting the same medical treatments carrying the same potential risks when prescribed to treat non-transgender patients for any other purpose.

**E.    The Health Care Ban Will Cause Severe Harm to Transgender Youth**

82. Withholding gender-affirming medical treatment from adolescents with gender dysphoria when it is medically indicated puts them at risk of severe irreversible harm to their health and well-being.

83.     Adolescents with untreated gender dysphoria can suffer serious medical consequences, including possible self-harm and suicidal ideation.  In one survey, more than half of transgender youth who participated had seriously contemplated suicide.  Studies have found that as many as 40% of transgender people have attempted suicide at some point in their lives.

84.     When adolescents are able to access puberty-delaying medication and hormone therapy, their distress recedes and their mental health improves.  Both clinical experience and medical studies confirm that, for many young people, this treatment is transformative, and they go from experiencing pain and suffering to thriving.

85.     The effects of undergoing one's endogenous puberty may not be reversible even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in adolescent patients who are unable to access gender-affirming medical care.  For instance, bodily changes from puberty as to stature, bone structure, genital growth, voice, and breast development can be impossible or more difficult to counteract.

86.     Medical treatment in adolescence can reduce life-long gender dysphoria, possibly eliminating the need for surgical intervention in adulthood, and can improve mental health outcomes significantly.

87.     Gender-affirming medical care can be a lifesaving treatment for minors experiencing gender dysphoria.  The major medical and mental health associations support the provision of such care and recognize that the mental and physical health benefits to receiving this care outweigh the risks.  These groups include the American Academy of Pediatrics, American Medical Association, the Endocrine Society, the Pediatric Endocrine Society, the American Psychological Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the National Association of Social Workers, and WPATH.

**F.      The Impact of the Health Care Ban on Plaintiffs**

      *1.      The Minor Plaintiffs and Their Families*

           (1)      The Williams Family

88.      L.W. is a fifteen-year-old girl, a freshman in high school, and has lived in Tennessee her entire life.  When she is not at school, she likes playing video games, listening to music, and building with Legos.

89.      Here is a photo of L.W. with her mother Samantha Williams, and her father Brian Williams.



90.      L.W. is transgender.  She is a girl with a female gender identity, but when she was born, she was designated as male.

91.      Growing up, L.W. felt uncomfortable in her body.  She remembers feeling like she was drowning and trapped in the wrong body.  She avoided changing clothes in front of anyone, tried to hide her body behind baggy clothing, and was not comfortable hugging her family.

92.     Before she understood what she was feeling, L.W. experienced significant stress and anxiety.  The discomfort of using the boys' restroom at school would cause her to avoid using the restroom altogether and led to her developing urinary tract infections.  She had trouble focusing at school.  She could not connect with her friends.  Her anxiety was constant.

93.     In 2019, an extended family member came out as transgender, and L.W. began to realize she was feeling the same way as her family member described feeling.  L.W. started doing her own research about what it meant to be transgender and began her social transition by telling a close friend in her neighborhood that she was a girl.

94.     It took L.W. a little while to build up the courage to talk to her parents about being transgender.  She was incredibly nervous about what their reaction would be.  She first told her mother in November 2020.  L.W.'s mother had a lot of questions, but was supportive of her daughter and told L.W. that she and L.W.'s father would always love her.  L.W. came out to her father and brother shortly after.  She finally felt like she could talk about and be who she was with them.

95.     At first, L.W. asked her family to use "they" and "them" pronouns because she thought she might be non-binary, a term commonly used by individuals whose gender identity is neither male nor female.  However, after exploring her gender identity more, she asked her family to use "she" and "her."  At this time, she began growing her hair long and wore girls' clothes, which made her feel better about her appearance.

96.     A few months after L.W. came out as transgender to her parents, she asked them to take her to see a doctor to talk about being transgender and medical treatments that might help address her dysphoria.  L.W.'s parents first found her a therapist so that she could discuss what she was feeling with a mental health professional.  In December 2020, L.W. started seeing a

therapist, who conducted a mental health assessment and diagnosed her with gender dysphoria. L.W. started seeing the therapist once a month thereafter.

97.     In June 2021, at the recommendation of L.W.'s pediatrician and therapist, L.W.'s parents took her to Vanderbilt Children's Hospital, where she met with a team of doctors who informed L.W. and her parents about medications L.W. could take to stop male puberty. This was a relief to L.W., who worried that her gender dysphoria would get worse if she were to undergo male puberty. After undergoing various tests and learning about the risks and possible side effects, L.W. and her parents consented to L.W. starting to take puberty-delaying medications.

98.     The medication made a big difference for L.W. She no longer felt fear and anxiety about her body changing in ways inconsistent with her gender, which greatly improved her mental health.

99.     L.W. told her classmates and teachers in January 2022 that her name is "L.," that she is a girl, and that her pronouns are "she" and "her." L.W.'s school is very supportive of her.

100.    After taking puberty-delaying medication for more than a year, undergoing additional evaluations, and assessing the potential risks and side effects of treatment with her family, L.W. began estrogen hormone therapy so that her body would undergo feminine pubertal changes. L.W.'s family monitors her physical and mental health and brings her to Vanderbilt for routine follow-up evaluations.

101.    Since beginning gender-affirming treatment, L.W. no longer experiences the "near-constant feeling" of gender dysphoria, feels more confident and comfortable, and gives and accepts hugs from her family. Her mother has noticed a huge change in her daughter, who is now outgoing and thriving. L.W. looks forward to a future where she continues receiving the treatment she needs and feels comfortable and at home in her body.

102.    L.W. and her family are afraid of the impact the Health Care Ban will have on L.W. and her family if it goes into effect.  L.W. is scared that losing access to her medication, which she has been taking for almost two years, will mean that her body will undergo unwanted, permanent changes that are inconsistent with her gender identity.  Her mother worries about the debilitating stress and anxiety associated with L.W.'s gender dysphoria returning if she loses access to gender-affirming care.  Beginning on July 1, 2023, if L.W. is to receive medication in Tennessee, her medication will be titrated down in preparation for the cutoff imposed by the Ban.

103.    L.W. has spent her entire life in Tennessee; her school, friends, and family are in Tennessee.  Her parents have jobs that they love in Tennessee.  However, L.W. and her family are concerned about L.W.'s health and well-being if she can no longer receive the medical care she needs in Tennessee.  They have discussed needing to leave Tennessee so that L.W. can get the medical care she needs.

(2)    The Roe Family

104.    Ryan Roe is fifteen years old and in his freshman year of high school, where his favorite subjects are math and science.  Outside school, he likes exploring cafes and coffee shops with his friends, and he hopes to become a lawyer.

105.    Ryan is a boy.  Ryan is also transgender.  He has a male gender identity, but when he was born, he was designated as female.

106.    Ryan knew from a young age that he did not feel comfortable with his designation as a girl.  As he approached puberty, Ryan experienced more anxiety about his body changing in feminine ways.

107.    In fifth grade, when Ryan started to go through puberty, he tried to find ways to cover up his body by wearing baggy clothes.  He chose to wear boys' clothes and cut his hair short.  His depression and anxiety got worse.

108.    When Ryan got his period in fifth grade, he had a panic attack because "everything felt wrong about living in [his] body." His anxiety and distress confirmed for him that he is transgender, and he came out to his parents.

109.    When Ryan told his mother, Rebecca Roe, that he was transgender, she did not understand what it meant to be transgender, but she was scared that her son would be discriminated against or even physically attacked as a transgender person in the world.

110.    Rebecca wanted to make sure Ryan had appropriate mental health support, and he began to see the therapist at his pediatrician's office.

111.    Although Ryan met with his therapist, he continued to experience anxiety and discomfort about his body. It reached the point that he barely spoke in public and would not participate in school because of distress over the sound of his voice.

112.    His anxiety grew so severe that he went through a period of time when he would vomit every day before school.

113.    In the summer before eighth grade, Ryan's therapist diagnosed him with gender dysphoria. With his distress worsening, Rebecca took Ryan to Vanderbilt Children's Hospital to meet with doctors about treatment options for his gender dysphoria. During his first visit to Vanderbilt, the doctors determined that he was too far into puberty for puberty-delaying medication. He was prescribed medication to stop his period, which was a source of significant distress.

114.    The doctors at Vanderbilt also provided Rebecca and Ryan with information about gender-affirming testosterone treatment. At home, the Roes discussed the treatment, including all of the potential side effects and risks, as a family.

115.    In January 2022, Rebecca and Ryan went back to Vanderbilt for a follow-up appointment to discuss the initiation of testosterone. At that appointment, the Vanderbilt providers discussed the risks and benefits of treatment with the Roes, conducted tests, and determined that Ryan would benefit from the initiation of testosterone. Rebecca consented to the treatment and Ryan began testosterone after that visit. In Rebecca's words, the process of beginning testosterone "was the most deliberate and careful medical process" that the Roes had ever been through for Ryan.

116.    In Ryan's words, beginning testosterone "changed [his] life."

117.    Ryan has been receiving hormone therapy for more than a year. This treatment has given him hope and a positive outlook on the world. As his body has undergone physiological changes that align with who he is, his confidence and comfort have grown. He participates in class again and no longer feels anxious by the sound of his own voice. As a result of the hormone therapy, Ryan feels more comfortable in his own skin and likes looking at himself in the mirror and in photos.

118.    Due to the Health Care Ban, Rebecca and Ryan were informed by Vanderbilt that they would no longer be providing treatment to current patients under the age of 18 beginning on July 1, 2023. If Ryan is to receive medication in Tennessee after July 1, 2023, his medication will be titrated down in preparation for the cutoff imposed by the statute.

119.    Rebecca began to call around to providers in other states, but many have long waitlists, and traveling out of state to continue treatment will be costly and difficult.

120.    It is not an option for Ryan to discontinue the medical treatment that has saved his life. He is terrified of going back to a time when he does not have access to this care. The prospect of losing access to gender-affirming medical care has caused both Ryan and his parents enormous

stress. Ryan's biggest fear is that losing access to gender-affirming healthcare will have a serious negative effect on his mental health. He is not sure if he will survive not being able to continue receiving the treatment that allows him to live in a way consistent with his gender.

121. To enable Ryan's access to the medical care that has changed his life, Ryan and his family have discussed traveling, or even moving, out of state if the Health Care Ban goes into effect. Ryan feels terrible that his family would need to move so that he could continue his care and feels like he is losing his childhood by constantly needing to worry about how to access gender-affirming care.

(3)    The Doe Family

122. John Doe is twelve years old, and has lived in Tennessee for his entire life. He is in sixth grade and enjoys playing guitar, baseball, and virtual reality games.

123. John is a boy. He is also transgender. John has a male gender identity, but when he was born, he was designated as female.

124. From a very early age, John remembers getting very upset when people treated him as a girl. He cried when his parents tried to make him wear dresses, he did not want to play with dolls or dress-up like girls his age, and he wanted to wear the boys' costumes in his dance recitals. John repeatedly told his mother, Jane Doe, that he wanted to be a boy.

125. Before John began second grade, John's mother contacted a local LGBTQ resource center who connected them with a therapist. This therapist diagnosed John with gender dysphoria. John has regularly seen this therapist for sessions over the past five years.

126. By second grade, John had begun his social transition. John had chosen a typically male name for himself when he was younger. Having his parents use his chosen name made John feel amazing, and he knew he wanted things to stay that way forever. As part of his transition,

John also told his classmates and teachers that he is a boy. Subsequently, John's parents obtained a court order updating John's legal name to reflect his chosen name.

127. As John learned about female puberty, he became upset thinking about the possibility of those changes happening to his body. His mother told him about medication that could prevent these changes, and John told her he wanted to explore receiving this medication.

128. John's pediatrician referred him to Vanderbilt Children's Hospital to begin discussing treatment options for his gender dysphoria. For two years, the doctors at Vanderbilt monitored John and discussed the risks, benefits, and side effects of medication with John and his family.

129. Eventually, doctors prescribed John with medication to delay puberty. John says that taking this medication has made him much more comfortable at school and around others. As soon as his doctors decide he is ready, John will begin taking testosterone so that he can continue developing through puberty like other boys.

130. The idea of losing access to his medication is horrifying to John. He cannot imagine losing control of his life for the next six years and fears permanent changes to his body if he undergoes the wrong puberty. His parents fear for John's safety as a transgender individual should he lose access to this important healthcare.

131. John's endocrinologist has informed his family that despite the phase-out provision in the law, she cannot continue providing the same puberty-delaying care that he currently receives after July 1, 2023. She informed the family that her understanding is that the law allows her to do nothing more than wean patients off their care beginning July 1, 2023. Because the endocrinologist believes that reducing the dosage of John's medication would be inappropriate and harmful to him, she will not continue to treat him after July 1.

132.     John's parents have begun researching out-of-state options for John to receive care, but are concerned about cost, disruption, and insurance coverage issues should they need to resort to these drastic options to ensure their child receives necessary medical care.  They have considered moving out of state, but do not want to uproot their lives, and John's, and move away from the only home he has known.

2.     *Provider Plaintiff – Dr. Lacy*

133.     Dr. Lacy is a physician licensed to practice medicine in Tennessee.  She graduated from Johns Hopkins Medical School in 1993.  Following medical school, Dr. Lacy completed residency in Obstetrics and Gynecology in 1997 at the University of Tennessee in Memphis.

134.     Dr. Lacy is bringing her claims on behalf of herself and her patients.

135.     Dr. Lacy operates a private practice in Memphis, Tennessee, which provides healthcare services to cisgender and transgender people.  As part of her practice, Dr. Lacy provides a variety of comprehensive healthcare services to transgender patients, including hormone therapy for patients with gender dysphoria, fertility services, and reproductive healthcare.  Dr. Lacy treats post-pubertal, transgender patients from ages 16 and up with hormone therapy.  For transgender children who have not yet started puberty, she refers parents to a pediatric endocrinologist that specializes in providing that care.

136.     Dr. Lacy currently treats 350-400 transgender patients.  Of those 350-400 patients, twenty patients are currently under age 18.  Sixteen other patients were minors when Dr. Lacy started treating them but are now over age 18.

137.     Dr. Lacy treats minor transgender patients in accordance with well-established standards of care.

138.     Between 2016 and 2019, Dr. Lacy worked at a clinic providing similar services to her current practice where she treated between 100-200 transgender patients with gender

dysphoria. When Dr. Lacy began to treat patients with hormone therapy for gender dysphoria in 2016, she had over 15 years of experience prescribing the same hormones to cisgender patients as part of her gynecologic practice.

139. At Dr. Lacy's current practice, she prescribes and administers the same medications she provides to her transgender patients—testosterone, estrogen, testosterone suppressants, and hormonal contraception—to her cisgender patients. For example, Dr. Lacy provides hormonal contraception, which can be used to control one's menstrual cycle and/or for ovulation suppression, to cisgender patients who might have heavy periods. To treat hormonal issues in cisgender women who are pre-menopausal or cisgender men who are approaching andropause (declining levels of testosterone), Dr. Lacy also utilizes hormone therapy to maintain hormones within the typical range for the patient's gender. Additionally, medications used to suppress testosterone can be used to address symptoms of polycystic ovarian syndrome, which can include unwanted facial hair and body hair, excessive sweating, and body odor in cisgender woman.

140. If the Health Care Ban takes effect, Dr. Lacy will be prohibited from proving these treatments to her transgender patients because they relate to "discordance between the minor's sex and asserted identity," but she will be able to continue providing the same treatments to her non-transgender patients.

141. If the Health Care Ban takes effect, Dr. Lacy will be required to either fully comply with the law and therefore abandon her patients, or risk losing her medical license, which will deprive her of the ability to care for all of her patients and negatively impact her livelihood. Moreover, the Ban will place Dr. Lacy in direct conflict with the accepted, evidence-based guidelines for treating her transgender patients with gender dysphoria.

142. As a medical provider of patients who experience gender dysphoria, Dr. Lacy has developed a close relationship with both her patients and their families. Seeking and receiving treatment for gender dysphoria is a profoundly personal and informed decision based on a person's innermost sense of self and individual needs. It is also a subject that remains very misunderstood by the public at large. Many of her patients therefore require complete privacy, and Dr. Lacy believes that, as a medical provider, it is her duty and obligation to advocate on behalf of her patients who are unable to publicly advocate for themselves.

143. Dr. Lacy knows from personal experience in treating hundreds of adolescents with gender dysphoria that the Health Care Ban, if permitted to take effect, will significantly compromise the health and well-being of her patients. Dr. Lacy is concerned that if transgender youth cannot access hormone therapy through healthcare providers, some may resort to other methods of accessing care that include buying medication from unauthorized suppliers and using medication that they get from friends. This can lead to transgender adolescents taking the incorrect dosage, and some will not have their hormone levels monitored through lab work, which is vital for patient safety.

144. Dr. Lacy is already seeing the impact of the Health Care Ban on access to hormone therapy. She has observed firsthand the Health Care Ban placing undue stress and pressure on transgender adolescents and their families looking to begin medical treatment, since patients fear that if they have not begun care by the law's arbitrary deadline, they will be cut off from access altogether. If the Health Care Ban goes into effect on July 1, 2023, Dr. Lacy will be barred from providing hormone therapy to treat gender dysphoria in her adolescent patients. In addition, she will be required to stop providing hormone therapy to her adolescent patients who are already receiving treatment for gender dysphoria as of March 31, 2024.

145.    Dr. Lacy is deeply concerned for her young transgender patients because her experience leads her to believe that denying her patients access to gender-affirming hormone therapy can lead to depression, increased anxiety, and suicidal ideation.

## CAUSES OF ACTION

146.    The Health Care Ban violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates on the basis of sex and transgender status by prohibiting certain medical treatments *only* for transgender patients and *only* when those treatments are performed "for the purpose of . . . [e]nabling a minor to identify with, or live as," a gender identity other than the sex designated at birth.  Tenn. Code Ann. § 68-33-103(a)(1).  This discrimination cannot be justified under heightened scrutiny—or, indeed, under any level of scrutiny applicable to equal protection claims.  The Health Care Ban also infringes on the fundamental rights of parents guaranteed by the Due Process Clause of the Fourteenth Amendment by preventing parents from seeking appropriate medical care for their children.  None of the statute's purported justifications for infringing on parents' fundamental rights withstands heightened scrutiny or even rational basis review.

147.    The Health Care Ban also runs afoul of Section 1557 of the ACA in two distinct ways.  *First*, the Health Care Ban conflicts with the ACA.  The ACA prohibits healthcare providers from discriminating on the basis of sex.  But the Health Care Ban requires that providers discriminate on the basis of sex.  The result is that providers such as Dr. Lacy must choose between violating federal law (by failing to provide care) and violating state law (by providing care).  The Health Care Ban is therefore preempted by the ACA and the State Official Defendants should be enjoined from enforcing it.  *Second*, the ACA bars entities which receive federal financial assistance, such as the DOH (and its sub-agencies, such as the Medical Board), from engaging in discrimination on the basis of sex.  But the Health Care Ban requires that the DOH and the Medical

Board take "emergency action" to remedy any violation of the Health Care Ban, thus requiring them to engage in discrimination on the basis of sex to the substantial detriment of the Plaintiffs who are unable to receive or provide medical care. The Plaintiffs are therefore entitled to an order prohibiting the DOH and the Medical Board from complying with the Health Care Ban unless and until the DOH stops receiving federal financial assistance.

<u>**COUNT ONE**</u>
**THE HEALTH CARE BAN VIOLATES THE**
**FOURTEENTH AMENDMENT'S GUARANTEE OF**
**EQUAL PROTECTION UNDER THE LAW**
**(ALL PLAINTIFFS AGAINST STATE OFFICIAL DEFENDANTS)**

148.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 147 as if fully set forth herein.

149.    State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

150.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

151.    The Health Care Ban bars the provision of various forms of medically necessary care only when the care is "for the purpose of…[e]nabling a minor to identify with, or live as," a gender identity different from their sex designated at birth or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1). It permits the use of these same treatments for any other purpose. Tenn. Code Ann. § 68-33-103(b)(1)(A).

152.    In doing so, the Ban explicitly discriminates against transgender adolescents, including the Minor Plaintiffs and the patients cared for by the Provider Plaintiff, based on their transgender status and sex, including their failure to conform to stereotypes and expected behavior

associated with their sex designated at birth. The Ban also discriminates against the parents of Minor Plaintiffs, denying them the same ability to secure urgently-needed medical care for their children that other parents can obtain, and does so on the basis of transgender status- and sex-based grounds.

153. In addition to facially discriminating based on sex and transgender status, the Ban was also passed because of its effects on transgender people, not in spite of it.

154. Discrimination based on transgender status and sex is subject to heightened scrutiny under the Equal Protection Clause and is therefore presumptively unconstitutional, placing a demanding burden of justification upon the State to provide at least an exceedingly persuasive justification for the differential treatment.

155. Transgender people have obvious, immutable, and distinguishing characteristics that define that class as a discrete group. These characteristics bear no relation to transgender people's abilities to perform in, or contribute to, society.

156. Transgender people have historically been subject to discrimination in Tennessee and across the country and remain a very small minority of the American population that lacks political power.

157. Gender identity is a core, defining trait, that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

158. The Ban does nothing to protect the health or well-being of minors. To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying them access to necessary care.

159.     The Ban's discriminatory treatment of healthcare for transgender adolescents is not adequately tailored to any sufficiently important government interest, nor is it even rationally related to any legitimate government interest.

160.     The asserted justifications for the Ban make no sense in light of how other medical treatments are regulated by the State.

161.     The Ban's targeted prohibition on medically necessary care for transgender adolescents is based on generalized fears, negative attitudes, stereotypes, and moral disapproval of transgender people, which are not legitimate bases for unequal treatment under any level of scrutiny.

162.     The ban violates the equal protection rights of the Minor Plaintiffs and their parents, and the equal protection rights of Dr. Lacy's current and future adolescent patients.

**<u>COUNT TWO</u>**
**THE HEALTH CARE BAN VIOLATES THE RIGHT TO**
**PARENTAL AUTONOMY GUARANTEED BY THE**
**FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE**
**(PARENT PLAINTIFFS AGAINST STATE OFFICIAL DEFENDANTS)**

163.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 147 as if fully set forth herein.

164.     State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

165.     The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

166.     That fundamental right of parents includes the right to seek and to follow medical advice to protect the health and well-being of their minor children.

167. Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on an appropriate course of medical treatment.

168. The Health Care Ban's prohibition against well-accepted medical treatments for adolescents with gender dysphoria deprives Tennessee parents of their fundamental right to make decisions concerning the care of their children. The Ban also discriminates against the Parent Plaintiffs with respect to the exercise of this fundamental right.

169. The Ban does nothing to protect the health or well-being of minors. To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying their parents the ability to obtain necessary medical care for them.

170. The Ban's prohibition against the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling government interest, nor is it rationally related to any legitimate government interest.

171. The Health Care Ban violates the fundamental rights of the parent plaintiffs.

## <u>COUNT THREE</u>
### THE HEALTH CARE BAN IS PREEMPTED BY SECTION 1557
### OF THE AFFORDABLE CARE ACT
### (PROVIDER PLAINTIFF AGAINST STATE OFFICIAL DEFENDANTS)

172. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 147 as if fully set forth herein.

173. Federal courts have equity jurisdiction to issue injunctive and declaratory relief upon finding a state regulatory action is preempted by federal law.

174. Under Section 1557 of the ACA, "an individual shall not, on [any] ground prohibited under . . . Title IX of the Education Amendments of 1972 (20 U.S.C. 1681, *et seq.*),"— which includes discrimination "on the basis of sex"—"be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)." 42 U.S.C. § 18116(a); 45 C.F.R. § 92.3.

175.    Provider Plaintiff is engaged in a health program or activity, i.e., providing medical care as a licensed physician to transgender persons.

176.    Provider Plaintiff receives federal financial assistance as contemplated under Section 1557, including reimbursement under the federal Medicaid and Medicare programs.

177.    The Health Care Ban prohibits Provider Plaintiff from performing or administering medical procedures performed "for the purpose of . . . [e]nabling a minor to identify with" a gender identity different from the sex they were designated at birth or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1)(A)–(B).

178.    The Ban thus requires Provider Plaintiff to discriminate against adolescents on the basis of their sex. This places Provider Plaintiff in the untenable position of either violating Section 1557 of the *federal* ACA by refusing to provide care to transgender adolescents or violating the *Tennessee* Health Care Ban by continuing to provide care for transgender adolescents. If the Provider Plaintiff refuses to provide care, she will be subject to civil liability for discrimination under Section 1557; and if she provides care, she will be subject to civil liability under the Health Care Ban. This conflict is resolved by the U.S. Constitution. The Supremacy Clause within Article VI of the Constitution dictates that federal law is the "supreme law of the land."

179.     The Health Care Ban is thus preempted by the ACA, and the Provider Plaintiff is entitled to declaratory and injunctive relief enjoining the State Official Defendants from enforcing the Health Care Ban.

**COUNT FOUR**
**THE HEALTH CARE BAN VIOLATES SECTION 1557**
**OF THE AFFORDABLE CARE ACT**
**(ALL PLAINTIFFS AGAINST DEFENDANTS TENNESSEE DEPARTMENT OF**
**HEALTH AND TENNESSEE BOARD OF MEDICAL EXAMINERS)**

180.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 147 as if fully set forth herein.

181.     Section 1557 of the ACA is enforceable through a private right of action.

182.     Under Section 1557, "an individual shall not, on the ground prohibited under…Title IX of the Education Amendments of 1972 (20 U.S.C. 1681, *et seq.*),"—which includes discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)."  42 U.S.C. § 18116(a); 45 C.F.R. § 92.3.

183.     The prohibition on sex discrimination in Section 1557 protects transgender individuals from discrimination by healthcare programs and activities.

184.     Defendant DOH is engaged in a health program or activity in that it is responsible for many aspects of public health in Tennessee and provides health services to many Tennesseans across the state.

185.     Defendant Medical Board is a "board . . . attached to the" DOH, Tenn. Code Ann. § 68-33-102(2)(B), with the power to license, regulate and discipline health care providers within the State of Tennessee and is therefore engaged in a health program or activity.

- 40 -

186.     Defendant DOH receives federal financial assistance, including grants, contracts, and other financial assistance from the United States Department of Health and Human Services, as well as federal Medicare and Medicaid funds.  By virtue of its attachment to the Defendant DOH, Defendant Medical Board also receives federal financial assistance.

187.     Minor Plaintiffs and their parents seek the benefits of healthcare regulated by the state, and the Provider Plaintiff seeks to provide those benefits.

188.     Minor Plaintiffs will be denied those benefits and subjected to discrimination on account of their sex because the Health Care Ban requires the DOH and agencies, boards, councils, and committees attached to the DOH, including the Medical Board, to take emergency action against healthcare providers who perform or administer medical procedures "for the purpose of…[e]nabling a minor to identify with" a gender identity different from the sex they were designated at birth or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity."

189.     The Health Care Ban necessarily requires the DOH and the Medical Board to violate Section 1557 by requiring that it discriminate on the basis of sex and transgender status, to the substantial injury of the Minor Plaintiffs who will be deprived of medical care, the Parent Plaintiffs who are unable to obtain care for their children, and the Provider Plaintiff who is unable to provide care.

190.     The Plaintiffs are therefore entitled to declaratory and injunctive relief prohibiting the DOH and the Medical Board from complying with the Health Care Ban.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

i.     Enter a judgment declaring that the Health Care Ban violates the Equal Protection Clause; violates the fundamental rights of parents guaranteed by the Due Process

Clause; is preempted by Section 1557 of the Affordable Care Act; and violates Section 1557 of the Affordable Care Act;

ii.   Issue preliminary and permanent injunctions enjoining Defendants, their employees, agents, and successors in office from enforcing the Health Care Ban;

iii.  Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 18116(a); and

iv.   Grant such other relief as the Court deems just and proper.

Dated: April 20, 2023                      Respectfully submitted,

s/ Stella Yarbrough
Stella Yarbrough, BPR No. 033637
Lucas Cameron-Vaughn, BPR No. 036284**
Jeff Preptit, BPR No. 038451**
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org
*Attorneys for the Plaintiffs*

Joshua A. Block*
Chase Strangio*
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel.: 212-549-2593
jblock@aclu.org
cstrangio@aclu.org
*Attorneys for the Plaintiffs*

Sruti J. Swaminathan*
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Tel.: 212-809-8585
sswaminathan@lambdalegal.org
*Attorney for the Plaintiffs*

Avatara A. Smith-Carrington*
Lambda Legal Defense and Education Fund, Inc.
1776 K Street N.W., 8th Floor
Washington DC 20006
Tel.: 202-804-6245
asmithcarrington@lambdalegal.org
*Attorney for the Plaintiffs*

Tara Borelli*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Ste. 105
Decatur, GA 30030
Tel.: 404-897-1880
tborelli@lambdalegal.org
*Attorney for the Plaintiffs*

Joseph L. Sorkin*
Dean L. Chapman, Jr.*
Kristen W. Chin*
Richard J. D'Amato*
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Tel.: 212-872-1000
jsorkin@akingump.com
dchapman@akingump.com
kristen.chin@akingump.com
rdamato@akingump.com
*Attorneys for the Plaintiffs*

Elizabeth D. Scott*
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Tel.: 214-969-2800
edscott@akingump.com
*Attorney for the Plaintiffs*

Christopher J. Gessner*
David Bethea*
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street N.W.
Washington, DC 20006
Tel.: 202-887-4000
cgessner@akingump.com
dbethea@akingump.com
*Attorneys for the Plaintiffs*

*motions to appear pro hac vice pending
**application for admission pending