IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville Division

| | |
|---|---|
| L.W., by and through her parents and next friends, Samantha Williams and Brian Williams, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, et al., <br><br> *Defendants*. | Civil No. 3:23-cv-00376 |

# DECLARATION OF SAMANTHA WILLIAMS

I, Samantha Williams, pursuant to 28 U.S.C §1746, declare as follows:

1. I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2. I am 40 years old. My husband, Brian Williams, and I are the parents of L.W., our fifteen-year-old daughter, and O.W., our twelve-year-old son. Our family lives in Nashville, Tennessee.

3. My daughter L.W. has always been a smart and curious kid—she was putting together one-hundred-piece puzzles and watching science shows at age three. She carried that curiosity into her adolescence. She loves music and playing video games, and she enjoys building with Legos, specifically Star Wars Legos. She is very interested in politics and debate and excels at her academic magnet school, taking honors classes and advanced math.

1

4. L.W. is transgender. She was assigned a male sex at birth, but I noticed things over the years that made me think she was not comfortable in her body. For example, she was very uncomfortable and embarrassed to change clothes in front of me. She was not comfortable with hugs and she wore baggy clothes to hide her body. She would not make eye contact with our family or her friends.

5. In July of 2017, at the end of her third grade, L.'s teacher in the Gifted & Talented Section at her school encouraged me and Brian to take L. for an evaluation at Vanderbilt Children's Hospital. L.W. was diagnosed with High-Functioning Autism Spectrum Disorder, but was told that her diagnosis was not pronounced enough to require extra support at school, nor was she prescribed any medication. We didn't notice many effects on L.W.'s functioning. We had observed some perseverating, where L.W. would talk about something at length but not notice when she lost the attention of whomever she was talking to. Otherwise, it was simply helpful to name the diagnosis.

6. In Spring of 2018, when L.W. was ten years old and in the fourth grade, she started getting sick at school, and Brian and I ultimately found out that she was not using the restroom at school and would routinely develop urinary tract infections. At this time, we did not realize why L.W. was refusing to use the school bathroom, but we knew that she was struggling with something that she was afraid to talk to us about.

7. In November of 2020, L.W. told me that she was struggling with some feelings, and she was going to talk to one of her oldest friends in the neighborhood about those feelings. I could tell that she was upset.

8. Within a couple of days, L.W. shared with me the intense feelings she was having. One night, we spent hours after dinner talking about what was bothering her – specifically, she

2

said that she did not want to be a guy, and that she might be transgender. She told me that she was not comfortable in her body and that there had to be a better option for her life – another way to make her feel more herself. When she brought this up with me, I first listened and then asked a lot of questions in order to help her process the feelings she was having. That was when she first expressed that she might be transgender. I ended the conversation by telling her that her dad and I supported her and would love her no matter what.

9. Within a week of that first conversation, and after having several more conversations throughout that week, L.W. and I told Brian that L.W. is transgender, and a few days after that, we told her brother O.W. That very evening, we went to Target to look for new clothes for L.W. When I asked L.W. how she imagined herself looking and presenting, she would draw Anime cartoons of girls and show me the outfits she liked.

10. After she was able to name her feelings to me, I could see that she was more comfortable at home. At first, L.W. asked us to use "they" and "them" pronouns, and a gender-neutral version of her birth name. After exploring her gender further in the winter of 2021, L.W. asked that her dad, her brother, and I call her L.W., and use "she" and "her" pronouns when talking about her at home. We all agreed to do so.

11. Once we started acknowledging L.W. as a girl within our family, Brian and I noticed a further decrease in her stress and anxiety levels. It was truly a "night and day" difference in her mood and demeanor. I remember taking L.W. to Macy's where they have make-up counters, and L.W. had a make-over done with yellow eyeshadow. She was so full of joy and all about the eyeliner.

3

12. I could tell that the steps we took as a family to affirm L.W.'s gender identity were helpful, but not a full solution. L.W. continued to let us know that she was not comfortable in her body, and we thought she would benefit from talking to someone other than Brian and I.

13. In December of 2020, we took L.W. to see a counselor who specializes in working with transgender children like L.W. Brian and I felt that therapy was an important way for L.W. to talk about the feelings that she was having and we knew we needed someone to help us all navigate this journey. L.W.'s therapist conducted a mental health assessment and diagnosed L.W. with gender dysphoria in December of 2020.

14. While it was easy for Brian and me to support L.W. in her social transition as she continued to see her counselor—we wanted L.W. to feel loved and supported—it took us a few months to start being open to exploring medical care. We were initially skeptical and had concerns about whether medical care was the right step. We spent those months researching treatment for transgender youth and we realized we needed the guidance of a medical professional to help us understand the care L.W. needed. I also spoke to my niece, who is transgender, about how being unable to access the medical care she needed brought her to the point of self-harm and suicidal ideation as an adolescent. I did not want L.W. to have to struggle in the way my niece did, and Brian and I planned to take L.W. to her pediatrician to see what medical care was appropriate.

15. When Brian and I took L.W. to her pediatrician for her annual appointment in March of 2021, she recommended that we take L.W. to see Dr. Cassandra Brady at Vanderbilt Children's Hospital ("Vanderbilt"). We could not get an appointment until the summer, but L.W. continued to see her counselor throughout the spring and was eager to start exploring medical care.

4

16. We had our first visit at Vanderbilt on June 7, 2021, when L.W. was 13 years old, and the Vanderbilt team was thorough and helpful. Dr. Brady and her team of professionals (including a nurse and a social worker) explained the existing treatment protocols and the data available about treatment for adolescents with gender dysphoria. They evaluated L.W. and confirmed her gender dysphoria diagnosis, and they also conducted a blood test and x-ray scan to examine L.W.'s growth plates. During that visit, Dr. Brady determined that L.W. had begun puberty and was between Tanner Stage 3 and Tanner Stage 4.

17. Given that L.W. had long-standing gender dysphoria and significant distress at the onset of puberty, Dr. Brady explained that it would be appropriate for L.W. to begin medication to delay her endogenous puberty. Before L.W. could begin taking medication, Dr. Brady required Brian, L.W., and me to have a discussion on the risks associated with puberty-delaying treatment and the quality of evidence supporting the medication. She told us that the medication was "off-label," but that it has been used for decades to treat precocious puberty. She thoroughly explained the potential side effects, including potential impacts on fertility and bone density, and answered all of my questions on how they would monitor L.W.'s care through routinely scheduled blood tests and other check-ups.

18. In August of 2021, we had our second visit which was focused on providing informed consent. Brian and I provided our informed consent, and L.W. provided her assent, to begin treatment, and Dr. Brady began providing L.W. with puberty-delaying treatment.

19. L.W. was relieved to start puberty-delaying treatment so that she would not have to continue going through her endogenous puberty and experiencing the associated physical changes. L.W. told me that continuing to go through a male puberty would seriously impact her mental health. Once L.W. started treatment, I could immediately see the heavy weight being lifted off her

shoulders. L.W. has been on puberty-delaying treatment for about 20 months now. L.W. has not experienced any negative side-effects due to the treatment. We continuously monitor L.W.'s mental and physical health and bring her to Vanderbilt for routine follow-up evaluations, including regular blood tests.

20. By winter of 2021, L.W. shared her gender identity, new name, and use of "she" and "her" pronouns with Brian's extended family. By Christmas that year, she was also comfortable telling my extended family, and my mom bought L.W. a bag with a symbol of her new name on it as a holiday present.

21. In September of 2021, at the beginning of her eighth grade, L.W. told Brian and I that she would like people at school to use to use "they" and "them" pronouns, and a gender-neutral version of her birth name. The school was extremely supportive in doing so. In January of 2022, in the middle of her eighth-grade year, L.W. told me and Brian that she wanted her teachers at school to call her L.W. and to use "she" and "her" pronouns when speaking about her as well. She told us that she had come out as transgender to a few close friends at school before talking to us, and that they gave her the courage to be more open at school. L.W.'s friends, teachers and administrators supported her. The Gender and Sexuality Alliance (GSA) at school has become a place where L.W. can really be herself. She has even taken on leadership and is currently the vice-president of the club.

22. L.W. had follow-up appointments with her team of doctors at Vanderbilt every three months. During those visits, Dr. Brady and her team evaluated her physical and mental health and found that L.W. is doing well both physically and mentally, and Dr. Brady communicated to us that the medication was addressing her gender dysphoria appropriately. Although L.W. was eager to start estrogen therapy and communicated that, Dr. Brady informed

6

L.W., Brian and me that it was not her standard practice to start hormone therapy until L.W. was closer to 14 ½ years old to 15 years old. Eventually, after L.W. turned 14 ½ and Dr. Brady determined she was eligible for home therapy, Dr. Brady again communicated the risks and potential side effects associated with estrogen therapy, and answered our questions on which changes would be irreversible and potential impact on fertility. In September of 2022, Dr. Brady advised us that, in accordance with treatment protocols, L.W. was ready to begin estrogen hormone therapy in addition to the puberty-delaying medication. We again provided our informed consent, and L.W. provided her assent and began treatment.

23. Since L.W. began treatment, she looks me in the eyes when we speak, she has more confidence, she is fully present, and not only does she accept hugs, but she also gives hugs. Brian and I feel confident that L.W. is receiving medical care that supports her physical and mental health and that is ensuring she can thrive, which is the most important thing to us as parents.

24. It's hard to describe the difference that L.W.'s medical treatment has made in L.W.'s life and our family life. We have a confident, happy daughter now, who is free to be herself. I noticed a huge change at her fourteenth birthday party in February of 2022, the first party we threw for her after she had come out. My daughter was the belle of the ball and was very outgoing and had a huge group of friends attend. I knew this change was due to the care she was receiving, which has allowed her to live authentically.

25. The positive changes that I have seen in L.W. are a large part of the reason I am so afraid of what this legislation will mean for her. The stress and anxiety L.W. experiences because of her gender dysphoria are debilitating, and I do not want to see her go back to the dark place she was in prior to coming out and receiving the life-saving treatment she needs.

26.     I have already heard from L.W.'s providers at Vanderbilt that L.W. will no longer be able to receive treatment beginning July 1, 2023. Not only would there be devastating harm to L.W.'s mental health from the loss of access to her medication and healthcare, but there would also be irreversible physical harm as she would experience a puberty completely foreign to her and inconsistent with her gender. As a mother, I could not bear watching my child go through physical changes that would destroy her well-being and cause her life-long pain.

27.     Brian and I have also discussed what this law could mean for our family's future. I have been living in Tennessee for almost 20 years, I met my husband in Tennessee, and gave birth to my two beautiful children in Tennessee. My husband's entire family lives in Tennessee, including his aging parents. This is where our children have lived for their entire lives, and this is their home where all their friends and close family are.

28.     This legislation has been so difficult on my youngest child as well. If we had to move out of state, O.W. would be devastated to leave his school and his close group of friends. In fact, he told me what he would say to our state legislature if he had the chance – that these laws don't just harm transgender kids, but also their entire family.

29.     Both Brian and I have jobs we love and have created community in the state we love. We want do not want to leave Tennessee, but this legislation would force us to either routinely leave our state to get our daughter the medical care she desperately needs (traveling hours to access care while sacrificing work and personal time), or uproot our entire lives and leave Tennessee. No family should have to make this kind of choice.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: April 18, 2023

_Samantha Williams_
Samantha Williams