IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville Division

L.W., by and through her parents and next friends, Samantha Williams and Brian Williams, et al.,

    *Plaintiffs*

    v.

JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, et al.,

    *Defendants*.

Civil No. 3:23-cv-00376

## DECLARATION OF SUSAN N. LACY, MD, FACOG

I, Susan N. Lacy, MD, FACOG, pursuant to 28 U.S.C §1746, declare as follows:

1. I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2. I graduated from Johns Hopkins Medical School in 1993 and completed a residency in Obstetrics and Gynecology in 1997 at the University of Tennessee in Memphis.

3. I am a physician licensed to practice medicine in the state of Tennessee. I am board-certified by the American Board of Obstetrics and Gynecology, which also qualifies me to be designated as a Fellow of The American Congress of Obstetricians and Gynecologists ("FACOG").

4. I have been practicing medicine in Tennessee for over 25 years.

5. I operate a private practice in Memphis, Tennessee. At my practice we deliver a comprehensive range of reproductive health services and meet the unique needs of both transgender and cisgender people by providing accessible, quality care in gynecology, hormone

1

therapy, transgender care (including providing gender-affirming hormone treatment for gender dysphoria in both adolescent and adult patients), wellness programs, and aesthetic services.

6. Between 2016 and 2019, I worked at clinic providing services similar to my current practice. Before that, I was a general practice obstetrician and gynecologist ("Ob/Gyn") for over a decade.

7. When I began to treat patients with hormone therapy for gender dysphoria in 2016, I had over 15 years of experience prescribing the same hormones to cisgender patients as part of my gynecologic practice.

8. While providing gender-affirming care at the clinic where I worked from 2016 to 2019, I typically treated transgender people ages 16 and up. In addition to hormone therapy, I also provided contraceptive management, general gynecologic care, STI screenings, and HIV prevention. During that time, I treated between 100-200 transgender patients with gender dysphoria.

9. While I was working at the clinic prior to my current practice, my transgender patients often shared with me how hormone therapy helped them start to feel more like themselves. Because I come from a family of scientists, seeing the same, repetitive results across socio-economic and racial backgrounds crystallized how integral gender-affirming care is to patients' mental and physical health.

10. When I founded my current practice, I knew that I wanted to continue providing gender-affirming care and ensure that the delivery of this healthcare is at the forefront of my practice because of the significant unmet need in the community. I knew that providing gender-affirming care to my transgender patients with gender dysphoria was something I could do to improve the health and wellbeing of transgender community members within Memphis.

11. I currently provide a variety of comprehensive healthcare services to transgender patients, including hormone therapy for patients with gender dysphoria, fertility services, and reproductive healthcare.

12. I treat post-pubertal, transgender patients with hormone therapy from ages 16 and up. For transgender children who have not yet started puberty, I refer parents to a pediatric endocrinologist that specializes in providing that care.

13. When treating transgender patients under 18, I require that they have a gender dysphoria diagnosis and evaluation from a psychotherapist prior to initiating hormone therapy. Additionally, the intake process with transgender patients under 18 always includes the patient's parents who are required to provide consent on behalf of their child for all medical treatment after being informed of the risks and benefits of treatment.

14. I treat my minor transgender patients in accordance with the standards of care developed by the World Professional Association for Transgender Health ("WPATH") and the University of California, San Francisco Guidelines for the Primary Care of Transgender and Gender Nonbinary People.

15. For my transgender patients who are receiving hormone therapy, I regularly monitor their bloodwork to assess hormone levels, blood count, and liver and kidney function. This type of monitoring helps ensure that patients are generally healthy and also minimizes the risk of any adverse side effects from treatment.

16. At my current practice, the same medications I provide to my transgender patients—testosterone, estrogen, testosterone suppressants, and hormonal contraception—I also provide to cisgender patients. For example, I provide hormonal contraception, which can be used to control one's cycle and/or for ovulation suppression, to cisgender patients who might have

heavy periods. To treat hormonal issues in cisgender women who are pre-menopausal or cisgender men who are approaching andropause (declining levels of testosterone), I also utilize hormone therapy to maintain hormones within the typical range for the patient's gender. Additionally, the medications that are used to suppress testosterone can be used to address symptoms of polycystic ovarian syndrome, which can include unwanted facial hair and body hair, excessive sweating, and body odor in cisgender woman.

17. I currently treat 350-400 transgender patients. Of the 350-400 patients I treat, twenty patients are currently under age 18. Sixteen other patients were minors when I started treating them, but are now over age 18. Treating transgender adolescents and continuing to provide treatment for them into adulthood has shown me how access to gender-affirming care, which reduces dysphoria, allows these young adults to thrive.

18. To date, none of my transgender patients have expressed to me that they regret seeking gender-affirming care. I have had a handful of patients who have discontinued hormone therapy but none regretted treatment and all continued to identify as transgender or nonbinary.

19. If Senate Bill 1 ("the Health Care Ban" or "the Ban") takes effect, I will be required to either fully comply with the law and therefore abandon my patients or risk losing my medical license, which will not only deprive me of the ability to provide medical care to all of my patients but also negatively impact my livelihood. I understand that unless enforcement of the law is enjoined, beginning July 1, 2023, I will be barred from providing hormone therapy to treat gender dysphoria in my adolescent patients. Furthermore, it is my understanding that I must stop providing hormone therapy to adolescent patients who are already receiving treatment for gender dysphoria as of March 31, 2024. I anticipate that some of my current minor patients will be able to continue to receive care outside Tennessee after March 31, 2024, but for those who are unable

4

to do so, I will have to modify the course of treatment I would otherwise provide to prepare them for the termination of medically necessary care.

20. I am deeply concerned about the prospect of no longer being able to provide my patients with medically necessary, gender-affirming care. Moreover, the Ban will place me in direct conflict with the accepted, evidence-based guidelines for treating my transgender patients with gender dysphoria. Being prohibited from treating my patients in accordance with existing evidence and clinical guidelines is an awful scenario that no medical provider should be forced to face.

21. The impact of the Ban will lead to delays in transgender adolescents being able to access potentially life-saving healthcare. In my experience, transgender adolescents significantly benefit from having access to compassionate and comprehensive gender-affirming care, including hormone therapy. I am concerned that if transgender adolescents cannot access hormone therapy through healthcare providers, some may resort to other methods of accessing care that include buying medication from unauthorized suppliers and using medication that they get from friends. This can lead to transgender adolescents taking the incorrect dosage and some will not have their hormone levels monitored through lab work. It is vital to have this care administered through a relationship with a qualified medical professional so that it includes ongoing monitoring of hormone levels for patient safety.

22. I am already seeing the impact of the Health Care Ban on access to hormone therapy. Recently, I had a conversation with an adolescent patient and their parents about the impact the Health Care Ban will have on initiating hormone therapy to treat the patient's gender dysphoria. As this conversation illustrated, the law is placing undue stress and pressure for some

on the timeline for initiating care, since patients fear that if they have not begun care by the law's arbitrary deadline, they will be cut off from access altogether.

23. As a medical provider of minor patients who experience gender dysphoria, I have developed a close relationship with both my patients and their families. Seeking and receiving treatment for gender dysphoria is a profoundly personal and informed decision based on a person's innermost sense of self and individual needs. It is also a subject that remains very misunderstood by the public at large. As a result, many of my patients require complete privacy, and I believe that as a medical provider it is my duty and obligation to advocate on behalf of those patients who are unable to publicly advocate for themselves.

24. I am deeply concerned for my young transgender patients because my experience leads me to believe that denying my patients access to gender-affirming hormone therapy can lead to depression, increase anxiety, and possibly lead to suicidal ideation.

25. Being forced to essentially desert patients who have come to trust me and depend on me for this critically-important care runs contrary to the commitment I made as a physician—to not deny my patients access to medically necessary care that can be lifesaving for some.

\* \* \*

I declare under penalty of perjury the foregoing is true and correct.

Executed this 18, day of April 2023 in Memphis, Tennessee.

*[signature]*

Dr. Susan N. Lacy, MD, FACOG