**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**Nashville Division**

| | |
|---|---|
| L.W., by and through her parents and next friends Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through his parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; RYAN ROE, by and through his parent and next friend, Rebecca Roe; REBECCA ROE; and SUSAN N. LACY, on behalf of herself and her patients, | |
| *Plaintiffs,* | |
| *v.* | **Civil No. 3:23-cv-00376** |
| JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter; TENNESSEE DEPARTMENT OF HEALTH; RALPH ALVARADO, in his official capacity as the Commissioner of the Tennessee Department of Health; TENNESSEE BOARD OF MEDICAL EXAMINERS; MELANIE BLAKE, in her official capacity as the President of the Tennessee Board of Medical Examiners; STEPHEN LOYD, in his official capacity as Vice President of the Tennessee Board of Medical Examiners; RANDALL E. PEARSON, PHYLLIS E. MILLER, SAMANTHA MCLERRAN, KEITH G. ANDERSON, DEBORAH CHRISTIANSEN, JOHN W. HALE, JOHN J. MCGRAW, ROBERT ELLIS, JAMES DIAZ-BARRIGA, and JENNIFER CLAXTON, in their official capacities as members of the Tennessee Board of Medical Examiners; and LOGAN GRANT, in his official capacity as the Executive Director of the Tennessee Health Facilities Commission, | **District Judge Eli J. Richardson** **Magistrate Judge Alistair Newbern** |
| *Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................2

    A.    Medical Protocols for the Treatment of Transgender Adolescents with Gender Dysphoria .........................................................................................2

    B.    The Health Care Ban.................................................................................5

    C.    The Health Care Ban Inflicts Severe and Irreparable Harms ..................7

ARGUMENT ......................................................................................................11

    I.    Preliminary Injunction Standard ...........................................................11

    II.    Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim .....................................................................................................11

        A.    The Health Care Ban Is Subject to Heightened Equal Protection Scrutiny Because It Discriminates Based on Transgender Status and Sex.............................................................................................12

            1.    The Ban Explicitly Discriminates Based on Transgender Status and Sex. ......................................................................12

            2.    The Health Care Ban Was Passed for the Purpose of Drawing Sex- and Transgender Status-Based Distinctions. .........................15

        B.    The Health Care Ban Fails Heightened Equal Protection Scrutiny ...........16

            1.    The Ban's Legislative Findings Are Erroneous and Unsupported by Evidence. ..................................................16

            2.    Treating Gender-Affirming Care Differently from Medical Treatments With Comparable Risks, Benefits, and Scientific Support Is Unjustifiable. ..................................................17

        C.    The Health Care Ban Fails Any Level of Review....................................19

    III.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Health Care Ban Violates Parents' Fundamental Right to Parental Autonomy. ...........................................................................................20

        A.    Strict Scrutiny Applies to Plaintiffs' Due Process Claims. ......................20

        B.    The Health Care Ban Cannot Survive Strict Scrutiny ..............................21

    IV.    A Preliminary Injunction Is Necessary. ..................................................22

        A.    Plaintiffs Will Suffer Immediate and Irreparable Harm If the Health Care Ban Takes Effect.............................................................................22

        B.    The Balance of Equities Weigh in Plaintiffs' Favor and Issuance of the Preliminary Injunction is in the Public Interest ..................................24

        C.    A Facial Statewide Injunction Is Necessary.............................................25

CONCLUSION.................................................................................................25

Case 3:23-cv-00376   Document 33   Filed 04/21/23   Page 2 of 33 PageID #: 412

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*37712, Inc. v. Ohio Dep't of Liquor Control,*
   113 F.3d 614 (6th Cir. 1997) ....................................................................12

*ACLU Fund of Mich. v. Livingston Cnty.,*
   796 F.3d 636 (6th Cir. 2015) .............................................................11, 25

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
   531 U.S. 356 (2001)..................................................................................19

*Bernal v. Fainter,*
   467 U.S. 216 (1984)..................................................................................22

*Bostock v. Clayton Cnty.,*
   140 S. Ct. 1731 (2020)........................................................................13, 14

*Boyden v. Conlin,*
   341 F. Supp. 3d 979 (W.D. Wis. 2018) ...................................................14

*Brandt by & through Brandt v. Rutledge,*
   47 F.4th 661 (8th Cir. 2022) ............................................................ *passim*

*Brandt v. Rutledge,*
   551 F. Supp. 3d 882 (E.D. Ark. 2021)......................................20, 21, 22

*Califano v. Yamasaki,*
   442 U.S. 682 (1979)..................................................................................25

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985)..................................................................................19

*D.T. v. Sumner Cnty. Schs.,*
   942 F.3d 324 (6th Cir. 2019) ...................................................................11

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019)..............................................................................25

*Dodds v. U.S. Dep't of Educ.,*
   845 F.3d 217 (6th Cir. 2016) (per curiam)...............................................13

*Eisenstadt v. Baird,*
   405 U.S. 438 (1972)..................................................................................19

*Eknes-Tucker v. Marshall*,
603 F. Supp. 3d 1131 (M.D. Ala. 2022), *appeal filed*, No. 22-11707 (11th Cir. May 18, 2022) ............................................................................................ *passim*

*FemHealth USA, Inc. v. City of Mt. Juliet*,
458 F. Supp. 3d 777 (M.D. Tenn. 2020) .................................................................24

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) .............................................................................14

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ..............................................................................................16

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) .................................................................................12

*Kadel v. Folwell*,
446 F. Supp. 3d 1 (M.D.N.C. 2020) .......................................................................14

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
927 F.3d 396 (6th Cir. 2019) ...........................................................................20, 21

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ...............................................................................12

*Martin-Marietta Corp. v. Bendix Corp.*,
690 F.2d 558 (6th Cir. 1982) .................................................................................24

*Middleton v. City of Flint*,
92 F.3d 396 (6th Cir. 1996) ...................................................................................20

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) .................................................................................23

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
305 F.3d 566 (6th Cir. 2002) ...........................................................................22, 23

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ..............................................................................................15

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) ..................................................................12

*Reed v. Presque Isle Cnty.*,
594 F. Supp. 3d 884 (E.D. Mich. 2022) .................................................................22

*Romer v. Evans*,
517 U.S. 620 (1996) ..............................................................................................19

iii

*Santosky v. Kramer*,
455 U.S. 745 (1982) ...................................................................................21

*Schall v. Martin*,
467 U.S. 253 (1984) ...................................................................................21

*Seger v. Ky. High Sch. Ath. Ass'n*,
453 F. App'x 630 (6th Cir. 2011) ..............................................................12

*Smith v. Salem*,
378 F.3d 566 (6th Cir. 2004) .....................................................................14

*United States v. Virginia*,
518 U.S. 515 (1996) ............................................................................12, 16

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ...................................................................................15

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ...................................................................................20

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017) ...................................................................14

**Statutes**

Tenn. Code Ann. § 68-33-101 .....................................................15, 16, 17, 22

Tenn. Code Ann. § 68-33-102 ..........................................................5, 13, 14

Tenn. Code Ann. § 68-33-103 ................................................................ *passim*

Tenn. Code Ann. § 68-33-104 ........................................................................5

**Other Authorities**

Bill History, H.B. 1, 113th Gen. Assemb., 2023 Sess. (Tenn. 2023) .............5

H.B. 1215, 113th Gen. Assemb., 2023 Sess. (Tenn. 2023) .........................15

H.B. 1269, 113th Gen. Assemb., 2023 Sess. (Tenn. 2023) .........................15

*Hearing on H.B. 1 Before the H. Health Subcomm. of the H. Health Comm.*, 113th
Sess. (Tenn. Jan. 31, 2023) .................................................................6, 15

*Hearing on S.B. 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn.
Feb. 1, 2023) .........................................................................................6, 7

*Hearing on S.B. 1 Before the S. Jud. Comm.*, 113th Sess. (Tenn. Feb. 7, 2023)............................7

iv

*Hearing on H.B. 1 Before the H. Health Comm.*, 113th Sess. (Tenn. Feb. 8, 2023) ...................6, 7

*Hearing on H.B. 1 Before the H. Civ. J. Comm.*, 113th Sess. (Tenn. Feb. 15, 2023)...............7, 15

*Hearing on H.B. 1 Before House Floor*, 113th Sess. (Tenn. Feb. 23, 2023) .................................6

## PRELIMINARY STATEMENT[1]

Senate Bill 1, codified in Tennessee Code Annotated § 68-33-103 *et seq.*, (hereinafter the "Health Care Ban" or the "Ban") categorically prohibits the provision of medically necessary and lifesaving healthcare to transgender adolescents. The law was passed over the sustained and robust opposition of medical experts in Tennessee and across the country. It was passed over the pleas of families across Tennessee who urged lawmakers not to interfere in the medical decision-making of parents, their minor children and expert doctors. Indeed, lawmakers passed the law *because of* its impact on transgender Tennesseans, not in spite of it. Absent intervention by this Court, the law will go into effect on July 1, 2023, disrupting—or preventing the initiation of—medical care for hundreds of adolescents across Tennessee.

All relevant considerations strongly weigh in favor of preliminary injunctive relief. *First*, Plaintiffs are likely to succeed on the merits of their constitutional claims. The Ban discriminates against transgender adolescents on the basis of both their transgender status and sex in violation of the Equal Protection Clause and also deprives parents of their fundamental right to seek appropriate medical care for their children in violation of the Due Process Clause.

*Second*, the Ban will cause immediate and irreparable harm to all the Plaintiffs. The Minor Plaintiffs will experience anxiety, distress, and potentially permanent physiological changes if they are cut off from the critical gender-affirming medical care they rely on to treat gender dysphoria. The Parent Plaintiffs will have their parental judgment and decision-making authority usurped by the government, and they will either have to disrupt their lives at great costs to enable their children to receive critical medical care out of state, or else endure watching their children suffer without

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Complaint [ECF No. 1].

the medical treatment they need.  And the Provider Plaintiff will have to choose between abandoning her patients or losing her medical license and livelihood.

*Third*, the balance of the equities and the public interest both weigh heavily in favor of a preliminary injunction.  The Ban will cause immediate and irreparable harm if allowed to take effect, but the State will not incur any harm if the *status quo* is maintained while this case proceeds.

In lawsuits challenging similar bans, federal courts have issued preliminary injunctions to preserve the *status quo* and protect plaintiffs from irreparable harm.  *See Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022) (affirming preliminary injunction against similar ban from Arkansas), *reh'g en banc denied*, 2022 WL 16957734 (8th Cir. Nov. 16, 2022); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1151 (M.D. Ala. 2022) (preliminary injunction against similar ban in Alabama), *appeal filed*, No. 22-11707 (11th Cir. May 18, 2022).  This Court should do the same.

## STATEMENT OF FACTS

### A. Medical Protocols for the Treatment of Transgender Adolescents with Gender Dysphoria

"Gender identity" refers to a person's core sense of belonging to a particular gender. Janssen Decl. ¶ 24.  A person's gender identity, which has biological roots, cannot be changed voluntarily, by external forces, or through medical or mental health intervention.  Janssen Decl. ¶¶ 25–26; Adkins Decl. ¶¶ 16, 20.  Everyone has a gender identity.  Adkins Decl. ¶ 17.  People whose gender identity matches the sex they were designated at birth are cisgender (or non-transgender).  *Id.* ¶ 18.  People whose gender identity differs from their sex designated at birth are transgender.  *Id.* ¶ 19.  Being transgender is not itself a condition to be cured.  Janssen Decl. ¶ 31; Adkins Decl. ¶ 22.  But it is common for clinically significant distress—called "gender

dysphoria"—to arise from the incongruence transgender people experience between their gender identity and the sex they were designated at birth. Adkins Decl. ¶¶ 21–23.

Gender dysphoria is a serious medical condition that, if left untreated, can result in severe anxiety and depression, self-harm, and suicidality. Janssen Decl. ¶ 27; Adkins Decl. ¶ 22. Treatment for gender dysphoria is provided in accordance with evidence-based clinical guidelines. The Endocrine Society and the World Professional Association for Transgender Health ("WPATH") have published widely-accepted clinical standards and guidelines for diagnosing and treating gender dysphoria. Adkins Decl. ¶ 25; Janssen Decl. ¶ 32. Every major medical organization in the United States agrees with WPATH and the Endocrine Society that gender-affirming medical treatments—which, for adolescents and adults, can include puberty-delaying medication, hormone treatment, and surgery—can be medically necessary to treat gender dysphoria. Janssen Decl. ¶ 35.

Under the WPATH Standards of Care and the Endocrine Society Guideline (the "Protocols"), gender-affirming medical care is only provided when a patient has: (i) gender incongruence that is both marked and sustained over time; (ii) a diagnosis of gender dysphoria; (iii) sufficient emotional and cognitive maturity to provide informed consent; (iv) the actual presence of such informed consent, including information regarding reproductive side effects; and (v) the absence or mitigation of any countervailing mental health concerns. *Id.* ¶ 40.

Treatment for gender dysphoria depends on a patient's stage of pubertal development. Under the Protocols, no medical treatments are provided before the onset of puberty. Adkins Decl. ¶ 31; Janssen Decl. ¶ 37. If medically indicated, adolescents with gender dysphoria who have entered puberty may be prescribed puberty-delaying medications (called GnRH agonists) to prevent the distress of developing permanent, physical characteristics that do not align with their gender identity. Adkins Decl. ¶ 32; Janssen Decl. ¶ 38. Puberty-delaying medications allow the

adolescent time to better understand their gender identity, while delaying distress from the development of secondary sex characteristics such as breasts or facial hair. *Id.*

Pubertal suppression is prescribed only with parental consent and when certain diagnostic criteria are met, including "a long-lasting and intense pattern of gender nonconformity or gender dysphoria [that has] worsened with the onset of puberty," "sufficient mental capacity to give informed consent," and a detailed assessment from a pediatric endocrinologist or other clinician experienced in pubertal assessment. Adkins Decl. ¶ 34. Pubertal suppression is reversible, and if the treatment is discontinued, endogenous puberty will resume. *Id.* ¶ 32.

In some cases, a healthcare provider may determine it is medically necessary for adolescent patients to be treated with gender-affirming hormone therapy. *Id.* ¶ 35. These treatments—testosterone for adolescent transgender boys and testosterone suppression and estrogen for adolescent transgender girls—alleviate distress by facilitating physiological changes consistent with the adolescent's gender identity. *Id.* ¶ 35. Under the Protocols, treatment is advised only after a rigorous assessment of the minor's gender dysphoria, and capacity to understand the risks and benefits of treatment. Adkins Decl. ¶ 36; Janssen Decl. ¶ 40. In the United States, parental consent is required to prescribe these medical treatments to minors. Adkins Decl. ¶ 36.

Gender-affirming medical treatments in adolescence can drastically minimize dysphoria later in life and may eliminate the need for surgery. *Id.* ¶ 65. A delay in treatment, on the other hand, can result in significant distress, including anxiety and escalating suicidality, as well as permanent physical changes from puberty that can require surgical treatment to reverse later in life. *Id.* ¶¶ 66–69. The safety and efficacy of gender-affirming medical care in improving mental health outcomes for adolescents suffering from gender dysphoria is supported by "a substantial body of

evidence," including cross-sectional and longitudinal studies, as well as the clinical expertise of providers over decades.  Turban Decl. ¶ 14.

**B.  The Health Care Ban**

The Health Care Ban was the first piece of legislation filed in the 2023 general session. Bill History, H.B. 1, 113th Gen. Assemb., 2023 Sess. (Tenn. 2023).[2]  The Ban moved rapidly through both chambers, and was signed into law by Governor Lee on March 2, 2023.  *Id.*  As enacted, the Ban prohibits any healthcare provider from knowingly performing or administering— *or offering to perform or administer*—any "medical procedure"[3] for the purpose of "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth[4]]" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity."  Tenn. Code Ann. § 68-33-103(a)(1)(A)–(B).  The Ban also prohibits any "person" from "knowingly" providing any of the banned treatments to minors by any means. Tenn. Code Ann. § 68-33-104.

The Ban explicitly exempts from prohibition any treatment of "a physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex [designated at birth], including abnormalities caused by a medically verifiable disorder of sex development," but excludes gender dysphoria and related conditions.  Tenn. Code Ann. § 68-33-102(1).  During the debate over the Ban, the General Assembly rejected amendments

---

[2] *Available at* https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB0001.

[3] "Medical procedure" is defined broadly, to include "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being [or] [p]rescribing, administering, or dispensing any puberty blocker or hormone to a human being."  Tenn. Code Ann. § 68-33-102(5)(A)–(B).

[4] Although the operative prohibition uses the word "sex," the Health Care Ban elsewhere defines "sex" as "a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics *existing at the time of birth*."  Tenn. Code Ann. § 68-33-102(9) (emphasis added).

5

that would have narrowed the prohibition to cover only gender-transition surgery or banned cosmetic or nonessential surgery for all minors.[5] The General Assembly voted instead to categorically ban all medical treatments for adolescents with gender dysphoria without restricting medical care for any other purpose.

The Ban allows treatment to continue until March 31, 2024, to phase out the medication for patients who (1) have initiated treatment prior to the effective date of the Ban; and (2) whose physicians certify in writing that "in the physician's good-faith medical judgment, based upon the facts known to the physician at the time, ending the medical procedure would be harmful to the minor." Tenn. Code Ann. § 68-33-103(b)(1)(B), (b)(3). The temporary "continuation of treatment" provision does not permit a health provider to initiate any new treatments, medications, or procedures. As described by legislators, the phase-out period was designed to permit providers to slowly withdraw medication from existing patients, not to extend treatment generally.[6]

The General Assembly passed the Ban despite testimony from Tennessee doctors about the lifesaving benefits of the banned care and the grave harm cutting off treatment would cause.[7] This included testimony about the high rate of suicide attempts by transgender adolescents, as well as details of the rigorous standards doctors follow in providing gender-affirming care to minors.[8] Not a single doctor with experience treating transgender youth testified in support of the bill, leaving

---

[5] *See Hearing on H.B. 1 Before the H. Health Subcomm. of the H. Health Comm.*, 113th Sess. (Tenn. Jan. 31, 2023) (statement of Rep. Bo Mitchell, Member, H. Health Comm.); *Hearing on S.B. 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. Feb. 1, 2023) (statement of Sen. Jeff Yarbro, Member, S. Health & Welfare Comm.); *Hearing on H.B. 1 Before House Floor*, 113th Sess. (Tenn. Feb. 23, 2023) (statements of Rep. John Ray Clemmons and Rep. Bo Mitchell, Members, Tenn. House of Reps.).

[6] *Hearing on H.B. 1 Before the H. Health Comm.*, 113th Sess. (Tenn. Feb. 8, 2023) (statement of Rep. William Lamberth, Bill Sponsor).

[7] *See, e.g.*, *Hearing on S.B. 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. Feb. 1, 2023) (statement of Dr. Alison Stiles).

[8] *Id.*

6

only one physician witness in support of the Ban—a witness who compared gender-affirming care to removing a leg and eye from a minor who identified as a pirate.[9]  In addition to medical experts in the field, the General Assembly heard testimony from transgender people of all ages, many of whom described years of struggle, feelings of hopelessness, and desire to end their lives prior to receiving gender-affirming care.[10]  The law's proponents were likewise unmoved by the testimony of parents pleading with the General Assembly not to risk their children's lives by stripping them of the medical care that has enabled them to thrive.[11]

In the months since the Ban has passed, the largest provider of gender-affirming care to minors in Tennessee has notified patients that, because of the Ban, treatment will no longer be prescribed beginning on July 1, 2023.  S. Williams Decl. ¶ 26; Jane Doe Decl. ¶ 23; Rebecca Roe Decl. ¶ 31.  As panicked parents have tried to identify alternative treatment options for their children, waitlists to see providers in neighboring states have extended into the Summer of 2024. *See, e.g.*, Rebecca Roe Decl. ¶ 32.

### C. The Health Care Ban Inflicts Severe and Irreparable Harms

By cutting off access to treatment that adolescent Tennesseans rely on for their health and well-being and limiting future access to treatment, the Ban causes immediate, severe, and irreparable harm to all the plaintiffs.

---

[9] *Id.* (statement of Dr. Omar Hamada).

[10] *See Hearing on H.B. 1 Before the H. Health Comm.*, 113th Sess. (Tenn. Feb. 8, 2023) (statements of Vaniel Simmons and Elliot Atwood); *Hearing on S.B. 1 Before the S. Jud. Comm.*, 113th Sess. (Tenn. Feb. 7, 2023) (statements of Gene Morrison and Josephine Parker); *Hearing on H.B. 1 Before the H. Civ. J. Comm.*, 113th Sess. (Tenn. Feb. 15, 2023) (statement of Eli Givens).

[11] *See Hearing on S.B. 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. Feb. 1, 2023) (statement of Heather Thomas); *Hearing on H.B. 1 Before the H. Health Comm.*, 113th Sess. (Tenn. Feb. 8, 2023) (statement of Greg Schwager); *Hearing on S.B. 1 Before the S. Jud. Comm.*, 113th Sess. (Tenn. Feb. 7, 2023) (statement of Greg Atwood); *Hearing on H.B. 1 Before the H. Civ. J. Comm.*, 113th Sess. (Tenn. Feb. 15, 2023) (statements of Erica Bowden and Samantha Williams).

***L.W. and Samantha Williams***:  *L.W.* is a fifteen-year-old girl who is transgender.  S. Williams Decl. ¶¶ 2–4.  A photo of L.W. and her parents, Brian and Samantha Williams, is included in the Complaint at 23.  They have lived together in Tennessee for all of L.W.'s life.  S. Williams Decl. ¶ 27.  When L.W. first realized she was not a boy, she felt like she was drowning, trapped in the wrong body.  L.W. Decl. ¶ 4.  She experienced constant anxiety, could not connect with her friends, and felt sick from the discomfort of using the boys' bathroom at school.  *Id.*  L.W. came out to her parents as transgender when she was twelve years old.  S. Williams Decl. ¶¶ 8–9.  She was subsequently diagnosed with gender dysphoria and, after speaking with her pediatrician and a therapist over a period of months, L.W. and her parents met with a team at Vanderbilt Children's Hospital.  L.W. Decl. ¶¶ 13–14; S. Williams Decl. ¶¶ 16–17.  L.W. underwent multiple tests and, with her parents, learned about the potential side effects of puberty-delaying medication before making the decision to begin treatment.  S. Williams Decl. ¶¶ 16–17.  After more than a year of pubertal suppression, L.W. also began estrogen hormone therapy to induce feminine pubertal changes.  *Id.* ¶ 22.

Since beginning gender-affirming treatment, L.W. no longer experiences the "near-constant feeling" of gender dysphoria, feels more confident and comfortable, and gives and accepts hugs from her family.  L.W. Decl. ¶ 19; S. Williams Decl. ¶ 23.  Her mother has noticed a huge change in her daughter, who is now outgoing and thriving.  S. Williams Decl. ¶¶ 23–24.

If the Ban takes effect on July 1, 2023, L.W.'s medication will either be cut off or titrated down in preparation for the cutoff imposed by the statute.  *Id.* ¶ 26.  Though the entirety of their lives is in Tennessee, L.W. and her family are concerned about L.W.'s health and well-being if she can no longer receive the medical care she needs in Tennessee.  *Id.*  If the Ban goes into effect on July 1, L.W. and her family will be forced to incur the ongoing costs of travel—and even

8

potentially moving—out of state to continue L.W.'s medical care. *Id.* ¶ 29. L.W. has been incredibly stressed about losing access to the care that has allowed her to live as the girl she is, and she "would not be able to think about anything else in [her] life except when [she] could get [her] medication again" should this law go into effect. L.W. Decl. ¶ 21.

**_Ryan and Rebecca Roe_**: Ryan Roe is a fifteen-year-old boy who is transgender. Rebecca Roe Decl. ¶¶ 3–4. He has lived with his father and his mother, Rebecca Roe, in Tennessee for his entire life. Ryan came out as transgender when he was in fifth grade. *Id.* ¶¶ 6–8. Ryan was vocal and outgoing as a young child, but when puberty started he became depressed, anxious, and withdrawn as a result of gender dysphoria. *Id.* ¶ 5. His anxiety was so bad that he would vomit every morning before school. *Id.* ¶ 13.

After years of therapy and escalating distress, Ryan met with doctors at Vanderbilt when he was thirteen years old. *Id.* ¶ 18. He was too far along in puberty to be treated with puberty blockers but was assessed for hormone therapy. *Id.* ¶¶ 18–20. Ryan and his parents researched and discussed all of the potential side-effects of testosterone and, in January 2022, when Ryan was fourteen, he was prescribed testosterone to treat his gender dysphoria. *Id.* ¶¶ 24–25. Since beginning treatment, Ryan's mental health has improved dramatically. Before treatment, Ryan barely spoke because of his anxiety and distress over his voice and his body, but after he began testosterone and his voice deepened, he has found his confidence to speak again. *Id.* ¶¶ 22, 27.

As a result of the Ban, Vanderbilt will no longer prescribe Ryan's medication to him beginning in July of 2023. *Id.* ¶ 31. Remaining in Tennessee means either having his treatment cut off in July or finding another provider to titrate it down in accordance with the Ban. *Id.* Neither option is tenable and Rebecca is prepared to incur significant expense and disruption as she

searches across the country for ways to continue the care her son needs to survive. *Id.* ¶ 32. Without the treatment, Ryan doesn't think he could survive. Ryan Roe Decl. ¶ 25.

**_John and Jane Doe_**: John Doe is a twelve-year-old boy who is transgender. Jane Doe Decl. ¶¶ 2, 4. He lives in Tennessee with his father and mother, Jane Doe. *Id.* ¶ 2. John knew from an early age that he was a boy, and remembers getting upset when people treated him as a girl. *Id.* ¶ 5; John Doe Decl. ¶ 5. John chose a typically male name for himself around the age of four, and began his social transition by second grade. Jane Doe Decl. ¶¶ 6, 12. He told his classmates and teachers he was a boy, and John's parents subsequently obtained a court order legally updating John's legal name to reflect his chosen name. *Id.* ¶¶ 6–13; John Doe Decl. ¶ 6.

John became concerned by the prospect of female puberty, and after multiple years of testing and monitoring, John began a course of pubertal suppression under the supervision of doctors at Vanderbilt Children's Hospital. Jane Doe Decl. ¶¶ 15–17. John is not yet a candidate for hormone therapy, but intends to begin testosterone when his doctors decide he is ready. John relies on pubertal suppression, and the prospect of having to stop (and thus commence female puberty) would be extremely emotionally damaging to him. *Id.* ¶ 22.

As a result of the Ban, Vanderbilt will no longer prescribe John's medication beginning in July of 2023 because the Ban requires providers wean patients off of treatment, which is not possible with pubertal suppression. *Id.* ¶ 23. Being taken off of treatment and being forced to undergo a female puberty would "wreck" John, and Jane worries that without treatment John might harm himself. *Id.* ¶¶ 22, 25. The family will have to incur the significant costs of ongoing travel or disrupt their lives to move somewhere John can get the healthcare he needs. *Id.* ¶¶ 26–27.

**_Dr. Lacy_**: Dr. Lacy is a physician licensed to practice medicine in Tennessee. Lacy Decl. ¶ 3. Her private practice in Memphis provides healthcare services to both cisgender and

transgender people.  *Id.* ¶ 5.  As part of her practice, Dr. Lacy treats post-pubertal, transgender patients from ages sixteen and up with hormone therapy.  *Id.* ¶ 12.  For transgender children who have not yet started puberty, she refers parents to a pediatric endocrinologist that specializes in providing that care.  *Id.*  Dr. Lacy currently treats 350–400 transgender patients, including twenty patients currently under age eighteen in accordance with the WPATH Standards of Care, which includes providing transgender patients with the same medications she uses to treat cisgender patients.  *Id.* ¶¶ 14, 16–17.

Under the Ban, Dr. Lacy will be prohibited from providing these treatments to her transgender patients.  *Id.* ¶ 19.  Dr. Lacy will be required to fully comply with the law or risk losing her license, which will place Dr. Lacy in direct conflict with the accepted, evidence-based guidelines for treating her transgender patients with gender dysphoria.  *Id.* ¶¶ 19–20.

## ARGUMENT

### I.  Preliminary Injunction Standard

Four factors guide this Court's consideration of whether to grant a preliminary injunction: "(1) whether the [Plaintiffs are] facing immediate, irreparable harm, (2) the likelihood that the [Plaintiffs] will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019).  "A district court must balance [the] four factors in determining whether to grant a preliminary injunction . . . ."  *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015).  All four factors weigh in favor of a preliminary injunction here.

### II.  Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim

Transgender adolescents in Tennessee are currently able to access medical care for the treatment of gender dysphoria.  The Health Care Ban will change that, singling out transgender adolescents for a categorical prohibition on medical treatments that remain available to others.

11

The Ban classifies based on transgender status and sex, thereby triggering heightened equal protection scrutiny. The Ban cannot survive this "exacting" test. *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 555 (1996). Indeed, it fails even the most deferential standard of review.

### A. The Health Care Ban Is Subject to Heightened Equal Protection Scrutiny Because It Discriminates Based on Transgender Status and Sex

Under the Equal Protection Clause, different "degree[s] of scrutiny" apply depending on the nature of the classification imposed by the law, or according to the right burdened by the law. *Seger v. Ky. High Sch. Ath. Ass'n*, 453 F. App'x 630, 633–34 (6th Cir. 2011). A law that "uniquely affects a 'quasi-suspect' class" is subject to heightened equal protection scrutiny and may survive only if it is "substantially related to a sufficiently important governmental interest." *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 621 (6th Cir. 1997).

Because the Health Care Ban facially discriminates based on transgender status and sex, and because it was passed with a discriminatory purpose, it is subject to at least heightened equal protection scrutiny. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611–13 (4th Cir. 2020) (applying heightened scrutiny to discrimination based on sex and transgender status); *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (applying heightened scrutiny to discrimination based on transgender status); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020) (collecting cases).

### 1. The Ban Explicitly Discriminates Based on Transgender Status and Sex.

The Ban expressly classifies patients for differential treatment based on transgender status. A transgender person is, by definition, someone whose sex designated at birth is different from their gender identity. Janssen Decl. ¶ 23; Adkins Decl. ¶ 19. By prohibiting medical treatments based on whether they "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth]," Tenn. Code Ann. § 68-33-103(a)(1)(A)—

12

that is, to undergo gender transition—the Health Care Ban expressly and exclusively targets transgender people. *See Eknes-Tucker*, 603 F. Supp. 3d at 1147 (explaining that Alabama's ban on gender-affirming care for minors "places a special burden on transgender minors because their gender identity does not match their birth sex").

The Ban also inherently draws a classification based on sex. If the legislature cannot "writ[e] out instructions" for determining whether treatment is permitted "without using the words man, woman, or sex (or some synonym)," the law classifies on the basis of sex. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746 (2020). Here, the Ban prohibits medically necessary care when the care is provided in a manner the state deems "inconsistent with the minor's sex" designated at birth. Tenn. Code Ann. § 68-33-103(a)(1)(A). It then compounds this distinction by defining "sex" in a way that writes transgender adolescents out of that term. Tenn. Code Ann. § 68-33-102(9) (defining sex solely in terms of sex designated at birth). "By discriminating against transgender persons," the Health Care Ban "unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock*, 140 S. Ct. at 1746; *see Brandt*, 47 F.4th at 669 (by relying on "the minor's sex at birth," Arkansas' ban on gender-affirming care for minors "discriminates on the basis of sex").

The Health Care Ban likewise discriminates based on a person's failure to conform to sex stereotypes or expectations associated with a particular sex designated at birth. Under "settled law" in this Circuit, "[s]ex stereotyping based on a person's gender non-conforming behavior"— including a person's "fail[ure] to act and/or identify with his or her" sex designated at birth—"is impermissible discrimination" under both federal civil rights statutes and the Equal Protection Clause. *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (per curiam) (quoting

13

*Smith v. Salem*, 378 F.3d 566, 575 (6th Cir. 2004)) (second alteration in original) (quotation marks omitted).

"By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *accord Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011). When the government "penalizes a person identified as male at birth for traits or actions that it tolerates in" people "identified as female at birth,"—here, for example, receiving medical treatment to live in accordance with a female gender identity—the person's "sex plays an unmistakable and impermissible role." *Bostock*, 140 S. Ct. at 1741–42.

The Ban also explicitly enforces sex stereotypes and gender conformity by targeting health care for exclusion if the purpose of the care is to "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth]." Tenn. Code Ann. § 68-33-103(a)(1)(A). Conversely, the Ban contains an explicit exception allowing for irreversible surgical interventions on infants with differences of sex development if the purpose of the surgery is to make the infant's body conform to their sex designated at birth. Tenn. Code Ann. § 68-33-102(1).[12] By allowing and disallowing care based on sex designated at birth, the Ban is an impermissible "form of sex stereotyping where an individual is required effectively to maintain [their] natal sex characteristics." *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018); *cf. Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020) (rule discriminates based on sex if it "tethers [people] to sex stereotypes which, as a matter of medical necessity, they seek to reject").

---

[12] These surgeries have been widely criticized in the scientific literature and have far less evidence of efficacy than the procedures outlawed by the Ban. Antommaria Decl. ¶ 57.

14

2. <u>The Health Care Ban Was Passed for the Purpose of Drawing Sex- and Transgender Status-Based Distinctions.</u>

Even if the Health Care Ban did not explicitly discriminate based on transgender status and sex, it would still be subject to heightened scrutiny as a law passed "because of," not "in spite of," its effects on transgender youth. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The legislature openly declared its purpose to treat transgender adolescents differently in the statutory "findings" by asserting that Tennessee has "a legitimate, substantial, and compelling interest in encouraging minors to appreciate their sex" and in prohibiting procedures "that might encourage minors to become disdainful of their sex." Tenn. Code Ann. § 68-33-101(m). Enforcing state-mandated gender conformity was not an incidental effect of the statute—it was the purpose.

Tennessee's intent to treat transgender patients differently also pervades the legislative history. And while bias is not required to show intent, throughout the legislative process, legislators and their invited guests made statements suggesting a bias against transgender people, referring to gender dysphoria as a "fantasy,"[13] and expressing fear of transgender people as a vector of "social contagion."[14] *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) ("contemporary statements by members of the decisionmaking body" are relevant to assessing legislative purpose). Moreover, the Ban was only one part of a larger legislative strategy to discriminate against individuals on the basis of their transgender status including by restricting access to gender-affirming medical treatment for people of all ages.[15]

---

[13] *Hearing on H.B. 1 Before the H. Civ. J. Comm.*, 113th Sess. (Tenn. Feb. 15, 2023) (statement of Rep Gino Bulso, Member, H. Civ. J. Comm.).

[14] *Hearing on H.B. 1 Before the H. Health Subcomm. of the H. Health Comm.*, 113th Sess. (Tenn. Jan. 31, 2023) (statement of Rep. William Lamberth, Bill Sponsor).

[15] H.B. 1215, 113th Gen. Assemb., 2023 Sess. (Tenn. 2023); *see also* H.B. 1269, 113th Gen. Assemb., 2023 Sess. (Tenn. 2023) (authorizing school officials to ignore students' pronouns).

15

**B. The Health Care Ban Fails Heightened Equal Protection Scrutiny**

To survive the heightened scrutiny required here, Tennessee must, at a minimum, provide an "exceedingly persuasive justification" for the Ban's classifications. *VMI*, 518 U.S. at 531. When evaluating whether the Ban is substantially related to an important governmental interest, "[t]he Court retains an independent constitutional duty to review [legislative] factual findings when constitutional rights are at stake." *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007). The "burden of justification is demanding"—not "deferential"—and it "rests entirely on the State." *VMI*, 518 U.S. at 533, 555. As discussed below, the government cannot possibly carry its demanding burden because the Ban's factual assertions are either demonstrably false or unsupported by evidence. And, even if those allegations were true, they would not justify treating gender-affirming health care differently from all other healthcare posing similar risks and benefits or supported by comparable evidence of efficacy.

1. The Ban's Legislative Findings Are Erroneous and Unsupported by Evidence.

The legislative findings assert that gender-affirming medical care is "not consistent with professional medical standards," that guidelines governing gender-affirming care are changing too rapidly, and that the care is "unsupported by high-quality or long-term studies." Tenn. Code Ann. § 68-33-101(b), (c), (m). But as the attached expert Declarations show, the proffered justifications for the Ban are riddled with factual errors, unsupported by evidence, or greatly exaggerate claims about the effects of the proscribed care.

Contrary to the Ban's legislative findings, the provision of gender-affirming medical care is consistent with professional medical standards. *See Brandt*, 47 F.4th at 671 (rejecting same argument by Arkansas); *Eknes-Tucker*, 603 F. Supp. 3d at 1145 (Alabama). The widely-accepted Protocols were developed based on rigorous review of existing evidence and are comparable to the types of guidelines used to treat other conditions. Antommaria Decl. ¶¶ 27–36. Rather than

16

changing "too rapidly," these guidelines were developed over decades and are updated to respond to evolving scientific understandings of care and the needs of the patient population, which is typical with clinical guidelines in medicine. *See id.* ¶¶ 28–29.

The legislative findings also incorrectly assert that gender-affirming medical care for adolescents is "harmful," "immoral," and "experimental." Tenn. Code Ann. § 68-33-101(b), (c), (m). None of these assertions is accurate. *See Brandt*, 47 F.4th at 671. The medical interventions prohibited by the Ban to treat gender dysphoria in adolescents are safe, effective, and are supported by peer-reviewed longitudinal and cross-sectional studies. Turban Decl. ¶ 14. Further, the treatment is not experimental in the colloquial or the scientific sense, and the legislative findings greatly exaggerate the risks associated with the care. Antommaria Decl. ¶¶ 27, 44.

Rather than "harming" children, gender-affirming medical care greatly improves the health and well-being of adolescent patients with gender dysphoria. Adkins Decl. ¶ 45; Turban Decl. ¶¶ 15–18; Janssen Decl. ¶ 54. Practitioners' clinical experience is bolstered by the nearly two decades of research—including published, peer-reviewed, cross-sectional, and longitudinal studies— likewise demonstrating that the proscribed care reduces symptoms of anxiety, depression, and suicidality and improves health outcomes for adolescent patients. Turban Decl. ¶¶ 15–18; Janssen Decl. ¶ 52. The personal experiences of the Williams, Doe, and Roe families illustrates how this treatment positively transforms the lives of the adolescents who need it. *See, e.g.*, L.W. Decl. ¶ 19; John Doe Decl. ¶¶ 11–13; Ryan Roe Decl. ¶¶ 22–23. Rather than harming them, gender-affirming care has enabled them to thrive.

      2.   <u>Treating Gender-Affirming Care Differently from Medical Treatments With Comparable Risks, Benefits, and Scientific Support Is Unjustifiable.</u>

Even if Tennessee's factual assertions regarding gender-affirming care were accurate—and they are not—the Ban would still fail heightened scrutiny, because Tennessee can provide no

17

justification for treating gender-affirming care differently from other medical treatments with similar risks and benefits and comparable scientific support. There is nothing uniquely risky about the care provided to transgender minors to treat gender dysphoria when compared to any other type of health care. All of the endocrine treatments—pubertal suppression, testosterone, estrogen and testosterone suppression—prohibited by the Ban are used to treat other conditions and carry comparable risks and side effects regardless of the indication for which they are prescribed. Adkins Decl. ¶ 57. "[T]he risks related to hormone therapy and puberty suppression generally do not vary based on the condition they are being prescribed to treat, and the same hormones are used for a variety of indications in addition to gender dysphoria." Adkins Decl. ¶ 57. Moreover, "[t]he fact that gender-affirming medical care has risks does not distinguish it from other forms of treatment." Antommaria Decl. ¶ 44.

Although the legislative findings focus on a purported risk to fertility, no such risk applies to some of the banned procedures and, for those for which the risk exists, it is not unique to gender-affirming care. Puberty blockers on their own do not affect fertility, and many patients treated with hormone therapy are able to biologically conceive children. Adkins Decl. ¶ 59. Chest masculinization surgery also has no effect on fertility. *Id.* ¶ 59. For treatment that can affect fertility, there are ways to adjust the treatment to protect fertility if that is important to the patient and their family. *Id.* ¶¶ 58–59. Moreover, gender-affirming medical care is not the only type of medical care that can affect fertility, but it is the only care banned under the law. *Id.* ¶ 60.

The evidence supporting the safety and efficacy of the banned care is comparable to the evidence supporting treatment for permitted conditions. The Ban explicitly permits the use of puberty-delaying medication to treat precocious puberty, but bans the same medication to treat gender dysphoria even though the evidence base supporting the treatment is the same. Antommaria

18

Decl. ¶ 33. As discussed above, puberty-delaying medication and gender-affirming hormone therapy to treat gender dysphoria in adolescents are not experimental. But even if they were, Tennessee does not ban the use of experimental treatments solely on that basis.

These justifications for the Ban cannot provide an "exceedingly persuasive" explanation for why gender-affirming care should be treated differently from all other medical treatment.

### C. The Health Care Ban Fails Any Level of Review

Although the Ban is properly subject to heightened scrutiny, it ultimately fails any level of review. What the law does is "so far removed from [the asserted] justifications that . . . it [is] impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996). As outlined above, rather than protect children, the Ban harms them.

There is no rational basis to conclude that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten legitimate interests of [Tennessee] in a way that" allowing other types of care "would not." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people while allowing access for married people). Even under rational basis review, the justifications for the Ban "ma[k]e no sense in light of how the [statute] treat[s] other [procedures] similarly situated in relevant respects." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001).

Finally, an improper motive for legislation "rises not from malice or hostile animus alone" but "may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Id.* at 374 (Kennedy, J., concurring). That is precisely the case here, and is another reason the Ban fails any level of review.

19

**III.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Health Care Ban Violates Parents' Fundamental Right to Parental Autonomy.**

The Ban triggers strict scrutiny because it burdens the fundamental rights of parents to seek appropriate medical care for their minor children.  As discussed above, the Ban cannot survive any level of constitutional scrutiny, let alone the most stringent review required for intrusions into fundamental rights.  Accordingly, the Parent Plaintiffs are likely to succeed on the merits of their substantive due process claim.  *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021) (holding that plaintiffs' parents were likely to succeed on similar claims because they "have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary"), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *Eknes-Tucker*, 603 F. Supp. 3d at 1146 (holding that plaintiffs were likely to succeed on similar claims against Alabama).

**A.  Strict Scrutiny Applies to Plaintiffs' Due Process Claims.**

The Due Process Clause protects "against government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997).  Where a fundamental right is burdened, the government carries the burden to show "that [they] had a compelling state interest when [they] enacted [their] plan, and that the plan is narrowly tailored to further that compelling state interest."  *Middleton v. City of Flint*, 92 F.3d 396, 404 (6th Cir. 1996).

The Sixth Circuit has explicitly recognized that strict scrutiny applies to "parents' substantive due process right . . . to direct their children's medical care."  *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019).  To be sure, in some instances, "the State must play its part as parens patriae," and "the juvenile's liberty interest may . . . be subordinated to the State's 'parens patriae interest in preserving and promoting the welfare of the

20

child.'" *Schall v. Martin*, 467 U.S. 253, 265 (1984) (citation omitted); *see also Kanuszewski*, 927 F.3d at 419–20 (strict scrutiny would apply to mandatory neonatal blood draws to "screen[] for life-threatening diseases," but such requirement "may well" satisfy strict scrutiny "provided that the state operates the program for purely benevolent motives"). Here, the Ban has no application when a parent and child are at odds. There is no situation where a minor will access the care subject to the Ban without the consent of their legal guardian, and there certainly is no world where a parent may decide *for* their child that gender-affirming care is needed over the minor's objection. *See* Adkins Decl. ¶¶ 34, 36. Thus, every application of the Ban necessarily substitutes the judgment of the State for the aligned wishes of the parent and child. *See Brandt*, 551 F. Supp. 3d at 892 (finding similar statute infringed "right to seek medical care for their children . . . in conjunction with their adolescent child's consent and their doctor's recommendation").

When the parent's and child's liberty interests in pursuing a course of medical care align, the strength of those interests is at its apex against state interference. *Cf. Santosky v. Kramer*, 455 U.S. 745, 760–61 (1982) (heightened evidentiary standards required where the "vital interest" of the parent and child in preserving their relationship "coincide"). The Ban deprives the Minor Plaintiffs and their parents of the right to seek what every major medical association has recognized is safe, effective, and necessary care, and in so doing it *endangers* children against their wishes and the wishes of their parents. "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether [gender-affirming] medications are in a child's best interest on a case-by-case basis." *Eknes-Tucker*, 603 F. Supp. 3d at 1146.

**B.  The Health Care Ban Cannot Survive Strict Scrutiny**

As discussed above, the Ban cannot survive any level of review, and thus necessarily fails the strict scrutiny that intrusions into fundamental rights require of the court. In addition to the reasons discussed above, the Ban fails strict scrutiny because the means chosen by Tennessee to

21

address their purported concerns about the banned care are nowhere near the "least restrictive." *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

Nothing about the Ban is narrowly tailored to ***any*** interest, compelling or not. Rather than address the Generally Assembly's purported concerns, the Ban simply rules out ***all*** medical treatment for gender dysphoria in adolescents—including for research purposes. The legislative findings specifically point to the standards governing care in Sweden, Finland, and the United Kingdom, *see* Tenn. Code Ann. § 68-33-101(e), none of which has banned treatment as Tennessee has. Antommaria Decl. ¶¶ 59–60. As the court noted in enjoining a similar Alabama law, "[t]he Act, unlike the cited European regulations, does not even permit minors to take transitioning medications for research purposes, [despite Defendants' position] that more research on them is needed. Because Defendants themselves offer several less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored." *Eknes-Tucker*, 603 F. Supp. at 1146. Moreover, the legislature's stated goal of protecting children "is pretextual because [the statute] allows the same treatments for cisgender minors that are banned for transgender minors as long as the desired results conform with the stereotype of the minor's biological sex." *Brandt*, 551 F. Supp. 3d at 893. "Based on these findings, the State could not withstand either heightened scrutiny or rational basis review." *Id.*

## IV.    A Preliminary Injunction Is Necessary.

### A.    Plaintiffs Will Suffer Immediate and Irreparable Harm If the Health Care Ban Takes Effect.

If permitted to go into effect, the Ban will inflict on Plaintiffs severe and irreparable harm for which no adequate remedy at law exists. *See, e.g.*, *Reed v. Presque Isle Cnty.*, 594 F. Supp. 3d 884, 888 (E.D. Mich. 2022). As discussed above, the Ban violates the constitutional rights of adolescents and their parents, which is itself irreparable harm. *Overstreet v. Lexington-Fayette*

*Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."). But the irreparable harm here is far greater than just the deprivation of the Plaintiffs' constitutional rights. By enforcing the Ban, Defendants will immediately deny patients life-saving medical care by preventing the initiation of treatment, cutting patients off from treatment, or causing patients to have their therapeutic dose of treatment titrated down in anticipation of being withdrawn altogether; force families to watch their children suffer while incurring the significant expense of regular travel or relocation out-of-state to access care; and compel medical providers to abandon their patients while also threatening their medical licenses.

**Patients:** As a result of the Ban, L.W., Ryan Roe, John Doe, and Dr. Lacy's patients are at risk of losing the medical treatment that has allowed them to thrive. They are already experiencing severe anxiety and distress at the prospect of losing care and in the coming months, their providers will be forced to either titrate their treatment down or discontinue it altogether. L.W. Decl. ¶ 21; John Doe Decl. ¶ 12; Ryan Roe Decl. ¶¶ 25–26. For John Doe, this could mean being forced into his endogenous puberty that has been paused for over a year, causing him to develop physiological characteristics inconsistent with the gender he has lived as since he was three years old. John Doe Decl. ¶ 12. For L.W., this could mean being forced to develop secondary sex characteristics typical of men and catastrophic to her identification as a young woman. L.W. Decl. ¶ 21. For Ryan Roe, it would mean losing his voice—both literally and figuratively—and being forced to fight for his life again. Rebecca Roe Decl. ¶ 27. As the Minor Plaintiffs describe, losing this treatment after finally feeling relief and confidence is unimaginable. The law will also irreparably harm Dr. Lacy's minor patients who will have their medical treatment terminated (or titrated down during the phase-out period). Without treatment, her patients could face worsening dysphoria, anxiety,

23

distress, and suicidality.  Lacy Decl. ¶ 24; Adkins Decl. ¶¶ 22–23, 49.  Here, the emotional distress the Minor Plaintiffs will face upon potentially losing care will be compounded by undergoing physiological changes that may be irreversible or later require surgery to reverse.  Adkins Decl. ¶ 69.

**Parents:** If the Ban is permitted to go into effect, the Parent Plaintiffs will have their parental decision-making displaced by the state, forcing them either to watch their minor children suffer immense and possibly deadly pain or disrupt their lives and families to travel or move out of state for treatment.  Rebecca Roe Decl. ¶ 32; Jane Doe Decl. ¶¶ 26–27; S. Williams Decl. ¶ 29.

**Dr. Lacy:** The Ban also irreparably harms Dr. Lacy by requiring her to make the untenable decision to either follow the law (and in so doing violate her professional obligations by sacrificing the health of her patients) or provide life-saving, medically necessary care to her patients (and in so doing risk the loss of her medical license and her livelihood).  Lacy Decl. ¶¶ 19–20.

In light of the severe and irreparable harms that the Ban will inflict if it is permitted to go into effect, a preliminary injunction is warranted and necessary.

### B. The Balance of Equities Weigh in Plaintiffs' Favor and Issuance of the Preliminary Injunction is in the Public Interest

The balance of equities weighs heavily in favor of Plaintiffs.  The harms to them far outweigh any potential harms that Defendants might face if injunctive relief is granted, as Defendants only stand to temporarily lose the ability to disrupt the status quo with a new law that does not advance any legitimate state interest and is likely to be held unconstitutional.  *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *FemHealth USA, Inc. v. City of Mt. Juliet*, 458 F. Supp. 3d 777, 805 (M.D. Tenn. 2020).

Granting an injunction in this case will undoubtedly serve the public interest.  As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates

24

in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *ACLU Fund of Mich.*, 796 F.3d at 649 (alteration in original) (internal quotation marks omitted).

### C. A Facial Statewide Injunction Is Necessary

"[T]he scope of injunctive relief is dictated by the extent of the violation established," which here is statewide. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction for just the named Plaintiffs is insufficient because patients are not able to receive health care without an injunction allowing third parties to provide it to them. The Ban impacts a broad swath of medical providers, pharmacists, parents, and adolescents across Tennessee in addition to the individual Plaintiffs. The law's prohibition on "providing" or "offering" the banned treatment extends at least to pharmacists and any other individual charged with prescribing, dispensing, and administering the medication. Even if the law technically permits the continuation of some care until March of 2024, "third parties will likely react in predictable ways . . . even if they do so unlawfully," such that the breadth and scope of harm from the Ban is immediate and statewide. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Indeed, providers across the state have informed the Plaintiff families that care will not be provided after July 1, 2023, even for those patients currently receiving treatment. S. Williams Decl. ¶ 26; Rebecca Roe Decl. ¶ 31; Jane Doe Decl. ¶ 23. With a lack of clarity as to the scope and effective date of the law, facial relief is necessary to protect the individual plaintiffs from irreparable harm. *See Brandt*, 47 F.4th at 672 ("Arkansas has failed to offer a more narrowly tailored injunction that would remedy Plaintiffs' injuries.").

### CONCLUSION

For all these reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

25

Dated: April 21, 2023                    Respectfully submitted,

s/ Stella Yarbrough
Stella Yarbrough, BPR No. 033637
Lucas Cameron-Vaughn, BPR No. 036284**
Jeff Preptit, BPR No. 038451**
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org
*Attorneys for the Plaintiffs*

Joshua A. Block*
Chase Strangio*
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel.: 212-549-2593
jblock@aclu.org
cstrangio@aclu.org
*Attorneys for the Plaintiffs*

Sruti J. Swaminathan*
Lambda Legal Defense and Education Fund,
Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Tel.: 212-809-8585
sswaminathan@lambdalegal.org
*Attorney for the Plaintiffs*

Avatara A. Smith-Carrington*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street N.W., 8th Floor
Washington DC 20006
Tel.: 202-804-6245
asmithcarrington@lambdalegal.org
*Attorney for the Plaintiffs*

*motions to appear pro hac vice pending
**application for admission pending

Tara Borelli*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Ste. 105
Decatur, GA 30030
Tel.: 404-897-1880
tborelli@lambdalegal.org
*Attorney for the Plaintiffs*

Joseph L. Sorkin*
Dean L. Chapman, Jr.*
Kristen W. Chin*
Richard J. D'Amato*
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Tel.: 212-872-1000
jsorkin@akingump.com
dchapman@akingump.com
kristen.chin@akingump.com
rdamato@akingump.com
*Attorneys for the Plaintiffs*

Elizabeth D. Scott*
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Tel.: 214-969-2800
edscott@akingump.com
*Attorney for the Plaintiffs*

Christopher J. Gessner*
David Bethea*
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street N.W.
Washington, DC 20006
Tel.: 202-887-4000
cgessner@akingump.com
dbethea@akingump.com
*Attorneys for the Plaintiffs*

26

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on April 21, 2023, a true and correct copy of the foregoing has been served on all defendants via in-person service on the Tennessee Attorney General at the following address:

500 Dr MLK Jr Blvd
Nashville, TN 37219

s/ Stella Yarbrough
Stella Yarbrough