## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| L.W., by and through her parents and next friends, Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through his parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; RYAN ROE, by and through his parent and next friend, Rebecca Roe; REBECCA ROE; and SUSAN N. LACY, on behalf of herself and her patients,<br><br>               Plaintiffs,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>           Plaintiff-Intervenor,<br><br>    v.<br><br>JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter; TENNESSEE DEPARTMENT OF HEALTH; RALPH ALVARADO, in his official capacity as the Commissioner of the Tennessee Department of Health; TENNESSEE BOARD OF MEDICAL EXAMINERS; MELANIE BLAKE, in her official capacity as the President of the Tennessee Board of Medical Examiners; STEPHEN LOYD, in his official capacity as Vice President of the Tennessee Board of Medical Examiners; RANDALL E. PEARSON, PHYLLIS E. MILLER, SAMANTHA MCLERRAN, KEITH G. ANDERSON, DEBORAH CHRISTIANSEN, JOHN W. HALE, JOHN J. MCGRAW, ROBERT ELLIS, JAMES DIAZ-BARRIGA, and JENNIFER CLAXTON, in their official capacities as members of the Tennessee Board of Medical Examiners; and LOGAN GRANT, in his official capacity as the Executive Director of the Tennessee Health Facilities Commission,<br><br>              Defendants. | Case No. 3:23-cv-00376<br><br>District Judge Richardson<br><br>Magistrate Judge Newbern |

**COMPLAINT IN INTERVENTION**

Plaintiff-Intervenor, the United States of America ("United States"), alleges:

**PRELIMINARY STATEMENT**

1.      This lawsuit challenges a state statute that denies necessary medical care to children based solely on who they are.

2.      All people, including transgender youth, deserve to be treated with dignity and respect. And the Fourteenth Amendment demands that Tennessee not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

3.      The United States accordingly files this complaint in intervention to enforce the Constitution's guarantee of equal protection, and to challenge certain provisions in Act No. 2023-SB0001, Senate Bill 1, codified at Tenn. Pub. Acts § 68-33-101, *et seq.* (2023) ("SB 1"): §§ 68-33-103, 104, 106, and 107.

4.      SB 1 prohibits certain forms of medically necessary care for transgender minors with a diagnosis of gender dysphoria. Specifically, SB 1 bans certain medical procedures and treatments for minors, including puberty blockers and hormones, if performed for the purpose of enabling a minor to identify with or live with an identity inconsistent with the minor's sex as assigned at birth, or treating discomfort or distress from discordance between the minor's sex assigned at birth and their asserted identity.

5.      While prohibiting certain forms of medically necessary gender-affirming care for transgender minors, SB 1 permits all other minors to access the same procedures and treatments. For example, SB 1 excepts the same medical procedures when they are used "to treat a minor's congenital defect, precocious puberty, disease, or physical injury." The statute specifically excludes gender dysphoria and related conditions from the definition of disease. The legislative

2

history of the statute also makes clear that the statute does not prohibit non-transgender minors from accessing the same procedures and treatments for any other reason.

6. The law thus discriminates against transgender minors by unjustifiably denying them access to certain forms of medically necessary care to treat a diagnosis of gender dysphoria.

7. If health care providers violate SB 1's prohibitions, they can be subject to civil suits by the state Attorney General for up to twenty years after the violation and private suits by the minors who received care or parents who did not consent to the procedure for up to thirty years after the minor turns 18. Health care providers can also be subject to licensing sanctions.

8. SB 1's ban on various forms of medically necessary care only for transgender minors with a diagnosis of gender dysphoria discriminates on the basis of both sex and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

10. The United States is authorized to intervene in this action pursuant to 42 U.S.C. § 2000h-2. The Attorney General of the United States has certified that this case is of general public importance.

11. Venue is proper pursuant to 28 U.S.C. §§ 81(b) and 1391(b).

12. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

13. Plaintiff-Intervenor is the United States of America.

14. Defendant Jonathan Skrmetti is the Attorney General and Reporter of the State of Tennessee. The Attorney General and Reporter is headquartered in Nashville. Under SB 1, Attorney General Skrmetti is tasked with bringing legal actions against any health care provider "that knowingly violates [SB 1]." Tenn. Pub. Acts § 68-33-106(b). He is also authorized to "establish a process by which violations of [SB 1] may be reported." Tenn. Pub. Acts § 68-33-106(a). Attorney General Skrmetti is sued in his official capacity.

15. Defendant Ralph Alvarado, MD, FACP is the Commissioner of the Tennessee Department of Health, the primary agency of the State of Tennessee responsible for all aspects of public health. The Department of Health is headquartered in Nashville. SB 1 provides that any violation of the statute "requires emergency action by an alleged violator's appropriate regulatory authority," which expressly includes "[t]he department of health." Tenn. Pub. Acts §§ 68-33-102(2)(A), 107. Defendant Alvarado oversees and directs the functions of the Department of Health, including the activities of licensure regulation entities, such as the Tennessee Board of Medical Examiners, which is "attached" to the Department of Health. Tenn. Pub. Acts § 68-33-102. Defendant Alvarado is sued in his official capacity.

16. Defendant Melanie Blake, MD is the President of the Tennessee Board of Medical Examiners ("Medical Board"), a "board . . . attached to the" Department of Health, Tenn. Pub. Acts § 68-33-102(2)(B), with the power to license, regulate and discipline health care providers within the State of Tennessee. The Medical Board is headquartered in Nashville. Defendant Stephen Loyd, MD is the Vice President of the Medical Board. Defendants Randall E. Pearson, MD; Phyllis E. Miller, MD; Samantha McLerran, MD; Keith G. Anderson, MD;

4

Deborah Christiansen, MD; John W. Hale, MD; John J. McGraw, MD; Robert Ellis; James Diaz-Barriga; and Jennifer Claxton are members of the Medical Board. SB 1 provides that any violation of the statute "requires emergency action by an alleged violator's appropriate regulatory authority," which expressly includes any "agency, board, council, or committee attached to the department of health." Tenn. Pub. Acts §§ 68-33-102(2)(B), 107. The Medical Board Defendants are sued in their official capacities.

17.     Defendant Logan Grant is the Executive Director of the Tennessee Health Facilities Commission (the "Health Facilities Commission"). The Health Facilities Commission is headquartered in Nashville. The Health Facilities Commission is an agency of the State of Tennessee with responsibility for, among other things, conducting investigations of health care facilities in Tennessee to ensure compliance with state and federal regulations. SB 1 provides that any violation of the statute "requires emergency action by an alleged violator's appropriate regulatory authority," which expressly includes "[t]he health facilities commission." Tenn. Pub. Acts §§ 68-33-102(2)(C), 107. Defendant Grant is sued in his official capacity.

18.     Defendant Skrmetti, Defendant Alvarado, the Medical Board Defendants, and Defendant Grant are all governmental actors and/or employees acting under color of State law.

**FACTUAL ALLEGATIONS**

19.     Gender identity refers to a person's core sense of belonging to a particular gender, such as male or female. Every person has a gender identity.

20.     Transgender people are people whose gender identity does not align with the sex they were assigned at birth.

21.     The American Psychiatric Association has stated "[b]eing transgender or gender diverse implies no impairment in judgment, stability, reliability, or general social or vocational

5

capabilities."

**A.     Standards of Care for Treating Transgender Youth**

22.     According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V-TR"), an authoritative source for psychiatric conditions, "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.

23.     As the DSM-V-TR explains, to be diagnosed with gender dysphoria, an individual must experience the incongruence for at least six months and experience clinically significant distress or impairment in social, occupational, or other important areas of functioning.

24.     The American Psychiatric Association recognizes that not all transgender persons have gender dysphoria. A diagnosis of gender dysphoria is currently required in order to receive many forms of gender-affirming care, including puberty blockers and hormone therapy.

25.     The DSM-V-TR notes that medical treatment for gender dysphoria addresses the clinically significant distress created by gender dysphoria by helping people who are transgender and diagnosed with gender dysphoria live in alignment with their gender identity.

26.     Standards of care for treating transgender youth diagnosed with gender dysphoria have been published by several well-established medical organizations, including the World Professional Association for Transgender Health ("WPATH"), the Endocrine Society, and the American Academy of Pediatrics ("AAP"). The standards of care published by these organizations provide a framework that is widely accepted and endorsed for the treatment of gender dysphoria in children and adolescents.

27.     The most recent WPATH Standards of Care (SOC version 8) were published in

6

2022 and represent expert consensus for clinicians related to medical care for transgender people, based on the best available science and clinical experience.[1]

28.    WPATH's recommendations differ depending on whether the treatment is for a pre-pubertal child, an adolescent (i.e., minors who have entered puberty), or an adult.

29.    For children younger than pubertal age, WPATH's recommended treatments do not involve any medications. For prepubertal children with gender dysphoria, treatments may include supportive therapy, encouraging support from loved ones, and assisting the young person through elements of a social transition. Social transition may evolve over time and can include a number of different actions, such as a name change, pronoun change, bathroom and locker use, personal expression, and communication of affirmed gender to others.

30.    WPATH's guidelines for children recommend that parents and health care professionals respond supportively to children who desire to be acknowledged as the gender that matches their internal sense of gender identity and to support them as they continue to explore their gender throughout the pre-pubescent years.

31.    For transgender adolescents, WPATH's guidelines recommend a multidisciplinary approach to gender-affirming medical care that includes key disciplines such as adolescent medicine/primary care, endocrinology, psychology, psychiatry, speech/language pathology, social work, and support staff.

32.    WPATH's guidelines note that studies indicate a general improvement in the lives of transgender adolescents who, following careful assessment, receive medically necessary gender-affirming medical treatment. Conversely, allowing irreversible puberty to progress in

---

[1] The previous version (SOC version 7) was published in 2012. SOC version 7 was similar to version 8 in the basic tenets of management for transgender adolescents; however, version 8 further reinforces these guidelines with data published since the release of SOC version 7.

adolescents who experience gender dysphoria may have immediate and lifelong harmful effects for the transgender young person.

33.     Accordingly, for some adolescents diagnosed with gender dysphoria, WPATH recommends that additional treatments involving medications may be appropriate in some circumstances. Options for treatment after the onset of puberty include the use of gonadotropin-releasing hormone agonists for purposes of preventing progression of pubertal development and hormonal interventions such as testosterone and estrogen administration. WPATH's guidelines emphasize that an individualized approach to clinical care for adolescents is both ethical and necessary.

34.     WPATH's guidelines make clear that gender-affirming medical care for transgender adolescents diagnosed with gender dysphoria should only be recommended when certain criteria are met and certain steps have been taken. These criteria include: when the adolescent meets the diagnostic criteria of gender dysphoria as confirmed by a qualified mental health professional; when the experience of gender dysphoria is marked and sustained over time; when the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; when the adolescent's other mental health concerns (if any) have been addressed; and when the adolescent has been informed of any risks.

35.     In 2017, the Endocrine Society published clinical practice guidelines on treatment recommendations for the medical management of gender dysphoria. The Endocrine Society developed these guidelines in collaboration with the Pediatric Endocrine Society, the European Societies for Endocrinology and Pediatric Endocrinology, and WPATH, among others.

36.     Like WPATH, the Endocrine Society's recommendations differ for pre-pubertal children and adolescents.

37.     The Endocrine Society recommends against puberty blockers and hormone treatment for pre-pubertal children with gender dysphoria.

38.     The Endocrine Society also acknowledges that gender dysphoria may worsen with the onset of puberty. For adolescents who meet the diagnostic criteria for gender dysphoria, fulfill the criteria for treatment, and are requesting treatment, the Endocrine Society recommends that they initially undergo treatment to suppress pubertal development. The Endocrine Society further recommends hormone therapy using a gradually increasing dose schedule after a multidisciplinary team of medical and mental health providers has confirmed the persistence of gender dysphoria and there is sufficient mental capacity to give informed consent, which most adolescents have by age 16.

39.     Similar to WPATH, the Endocrine Society sets forth certain criteria that must be met before a transgender adolescent is eligible for puberty blockers or hormones, including that a qualified health care professional has confirmed the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed); gender dysphoria worsened with the onset of puberty; and any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment. The adolescent must be informed of the effects and side effects of treatment and options to preserve fertility, and must give informed consent (or have their parents' informed consent if they have not reached the age of legal medical consent). The Endocrine Society's criteria also require a pediatric endocrinologist or other clinician experienced in pubertal assessment to agreement with the treatment and to confirm that there are no medical contraindications to treatment.

9

40. Like WPATH, the Endocrine Society emphasizes that family support is an essential component of gender-affirming care.

41. AAP's 2018 policy statement titled *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents* further codifies the treatment options outlined in the WPATH SOC and the Endocrine Society's Clinical Practice Guideline. AAP notes that most protocols for gender-affirming interventions incorporate WPATH and Endocrine Society recommendations.

42. AAP reinforces that valuing a child for who they are, even at a young age, fosters secure attachment and resilience, not only for the child but for the whole family.

43. AAP's policy statement also emphasizes a multidisciplinary approach to the provision of gender-affirming care, which may include a pediatric provider, a mental health provider, social and legal supports, and a pediatric endocrinologist or adolescent-medicine specialist, if available.

44. AAP agrees that puberty blockers can reduce the distress that may occur with the development of secondary sexual characteristics and allow for gender-affirming care, including mental health support for the adolescent and family. It states that the available data reveal that pubertal suppression for transgender youth generally leads to improved psychological functioning in adolescence and young adulthood. AAP also recognizes that hormone therapy from early adolescence onward can be part of the process of gender affirmation.

**B.    Senate Bill 1**

**i.    Legislative History**

45. During the legislative debate preceding the passage of SB 1, several legislators made comments reflecting moral disapproval or disbelief of youth who identify as transgender

and their need for gender-affirming care.

46.     For example, Representative William Lamberth, who sponsored the SB 1
companion bill in the Tennessee House of Representatives (HB 1), characterized the increase in
the number of youth who identify as transgender as "a growing social contagion of gender
dysphoria" driven in part by "social media glorifying the process of transitioning." *Hearing on
HB 1 Before the H. Health S. Comm.*, 113th Sess. (Tenn. 2023).

47.     At the same hearing, Representative Paul Sherrell said: "If you don't know what
you are—a boy or girl, male or female—just go in the bathroom and take your clothes off and
look in the mirror, and you'll find out." *Id.*

48.     In the House Civil Justice Committee hearing, Representative Gino Bulso referred
broadly to being transgender and to gender-affirming care for transgender people to live in
alignment with their gender identity as "fiction" and "fantasy." *Hearing on HB 1 Before the H.
Civ. Just. Comm.*, 113th Sess. (Tenn. 2023) (statement of Rep. Gino Bulso).

49.     Statements made during the legislative debate also reveal the legislators' intention
that SB 1 limit access to medical care solely based on the individual's transgender or non-
transgender status.

50.     For example, Senator Johnson and Representative Lamberth each confirmed that
SB 1 and HB 1 do not apply to non-transgender minors who use the same treatments the bills
prohibit. *See Hearing on SB 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. 2023);
*Hearing on HB 1 Before the H. Health Comm.*, 113th Sess. (Tenn. 2023). Specifically, when
Senator Jeff Yarbro asked Senator Johnson about whether the bill prevents a boy with
gynecomastia from getting a double mastectomy or children diagnosed with precocious puberty
from using puberty blockers, Senator Johnson said "that treatment would be allowed" and

11

confirmed broadly that "[t]he bill only applies to these [medical] procedures . . . when it is for the purpose of allowing that child to transition to a purported identity other than the child's sex at birth." *Hearing on SB 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. 2023).

51. During hearings, legislators opposing the bill highlighted that intersex and non-transgender youth are still permitted access to these medical procedures. For example, Representative Torrey C. Harris highlighted that the bill excludes "intersex people, cosmetic surgeries, and other practices." *House of Rep. F. Sess.* (Tenn. 2023). Additionally, Representative Gloria Johnson specifically drew her colleagues' attention to the differential treatment, stating, "[t]he reality is, we're targeting a group . . . And we are determining that a certain group of folks cannot have care." *House of Rep. F. Sess.* (Tenn. 2023).

52. Following these comments, the bills passed without change.

**ii.    Bill Text**

53. S.B. 1 was signed into law by Governor Bill Lee on March 2, 2023. The law will become effective on July 1, 2023.  Generally, SB 1 prohibits:

> [a] healthcare provider [from] knowingly perform[ing] or offer[ing] to perform on a minor, or administer[ing] or offer[ing] to administer to a minor, a medical procedure if the performance is for the purpose of:
> (A) [e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or
> (B) [t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

SB 1, § 68-33-103(a)(1).

54. The statute defines "medical procedure" as "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being; or . . . [p]rescribing, administering, or dispensing any puberty blocker or hormone to a human being." *Id.* § 68-33-102(5).

12

55.     The statute defines "sex" as "a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth." *Id.* § 68-33-102(9).

56.     The statute also prohibits a person (not restricted to medical providers) from "knowingly provid[ing] a hormone or puberty blocker by any means to a minor if the provision of the hormone or puberty blocker is not in compliance with this chapter." *Id.* § 68-33-104.

57.     Legislative findings contained in SB 1 characterize gender-affirming medical procedures and treatments as "experimental in nature;" "not supported by high-quality, long-term medical studies;" "harmful;" "unethical;" "immoral;" and encouraging "minors to become disdainful of their sex." *Id.* § 68-33-101(b), (m). In addition, the legislative findings identify several purported interests for adopting this law, including: "protecting minors from physical and emotional harm;" "protecting the ability of minors to develop into adults who can create children of their own;" "promoting the dignity of minors;" "encouraging minors to appreciate their sex, particularly as they undergo puberty;" and "protecting the integrity of the medical profession, including by prohibiting medical procedures that are harmful, unethical, immoral, experimental, or unsupported by high-quality or long-term studies, or that might encourage minors to become disdainful of their sex." *Id.* § 68-33-101(m).

58.     SB 1 specifically exempts from liability under the statute any "medical procedure [provided] to a minor if . . . [t]he performance or administration of the medical procedure is to treat a minor's congenital defect, precocious puberty, disease, or physical injury." *Id.* § 68-33-103(b)(1)(A). "'Congenital defect' means a physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex, including abnormalities caused by a medically verifiable disorder of sex development, but does not include

13

gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality." *Id.* § 68-33-102(1). The term "disease" also excludes "gender dysphoria, gender identity disorder, gender incongruence, or any mental condition disorder, disability, or abnormality." *Id.* § 68-33-103(b)(2).

59.     The bill also exempts conduct for one year, if "performance or administration of the medical procedure on the minor began prior to the effective date of this act and concludes on or before March 31, 2024." *Id.* § 68-33-103(b)(1)(B). In order to permit tapering medication rather than immediate cessation, the minor's treating physician must satisfy a number of conditions, including a certification in writing that ending the medical procedure would be harmful to the minor. *Id.* § 68-33-103(b)(3).

60.     SB 1 allows the state Attorney General to bring an action against a health care provider "that knowingly violates [this law] within twenty (20) years of the violation . . . and to recover a civil penalty of twenty-five thousand dollars ($25,000) per violation." *Id.* § 68-33-106(b).[2]

61.     SB 1 requires regulatory authorities to take "emergency action" when notified about an alleged violation of § 68-33-103 and can subject health care providers to licensing sanctions. *Id.* § 68-33-107.

62.     Consent of the minor or a parent of the minor "is not a defense [for a health care provider] to any legal liability incurred as the result of a violation of this section . . ." *Id.* § 68-33-103(c)(1).

---

[2] SB 1 also establishes a private right of action for minors or parents of minors under certain conditions, *id.* § 68-33-105, and these private rights of action are available within 30 years from the date the minor reaches 18 years or age or within 10 years of the minor's death, if the minor dies. *Id.* § 68-33-105(e).

### iii. Impact of SB 1

63.     SB 1's ban on various forms of gender-affirming care prohibits transgender minors with a diagnosis of gender dysphoria from accessing certain medical procedures or treatment if they will be used to affirm a gender identity inconsistent with the sex assigned at birth.

64.     The law discriminates against transgender minors by unjustifiably denying them access to certain forms of medically necessary care. SB 1 prohibits transgender minors from obtaining care that is widely recognized within the medical community as medically appropriate and necessary, while imposing no comparable limitation on medically necessary care by non-transgender minors.

65.     SB 1 permits a doctor to prescribe testosterone for a non-transgender male minor suffering from delayed pubertal development or a condition such as hypogonadism, but the law prohibits the same doctor from prescribing the same testosterone to a transgender male youth to affirm his gender identity.

66.     In other words, the sex a minor was assigned at birth determines the legality and availability of medically necessary treatments.

67.     SB 1's prohibition on any procedure or treatment that would affirm a minor's gender identity different from the sex assigned at birth requires Tennessee medical professionals to choose between withholding medically necessary treatment from their minor transgender patients or children, on the one hand, or exposing themselves to civil liability and sanctions on the other.

68.     The penalties imposed by SB 1 are far more onerous than typical health care liability actions or other civil actions in Tennessee. Tennessee has a separate statutory scheme

15

for health care liability actions when a person alleges that a health care provider caused an injury related to the provision of, or failed to provide, health care services to a person. Tenn. Code Ann. § 29-26-101. This statute provides only for a one-year statute of limitations. Tenn. Code Ann. § 29-26-116(1). While more time is permitted to file suit if the alleged injury is not discovered in the one-year period, the maximum amount of time an injured person has to file a health care liability claim is three years after the date on which the negligent act or omission occurred. *Id.* at (2)-(3).[3]

69.     By contrast, under SB 1, the statute of limitations is twenty years.  The Attorney General may impose an injunction, require disgorgement, and levy penalties of up to $25,000 per individual violation on any health care professional who provided gender-affirming care to a transgender minor consistent with well-established standards of care, even if no injury resulted.

70.     Further, SB 1 prevents transgender minors with a diagnosis of gender dysphoria from accessing gender-affirming care that is widely recognized within the medical community as the only effective treatment for some individuals diagnosed with gender dysphoria. SB 1 prevents health care providers from considering the recognized standard of care for gender dysphoria and from providing medically necessary gender-affirming care for improving the physical and mental health of their patients.

**CAUSE OF ACTION**

**COUNT ONE**
**Violation of Equal Protection**
**U.S. Constitution, Amendment XIV**

---

[3] Tennessee also limits other civil actions to a one-year statute of limitations, such as actions for injuries to a person, false imprisonment, or cases brought under the federal civil rights statutes. Tenn. Code Ann. § 28-3-104. Tennessee's health care liability statute also limits damages to actual economic losses suffered, but only to the extent such costs are not paid for by insurance or other governmental benefits. Tenn. Code Ann. § 29-26-119.

16

**Against Defendant Skrmetti, Defendant Alvarado, the Medical Board Defendants, and Defendant Grant**

71.     The United States re-alleges and re-pleads all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporates them herein by reference.

72.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits state and local governments from denying to any person within their jurisdiction the equal protection of the laws.

73.     Through this action, the United States challenges four sections of SB 1, 2023 Tenn. Pub. Acts §§ 68-33-103, 104, 106, and 107, which discriminate on the basis of sex and on the basis of transgender status in violation of the Equal Protection Clause.

74.     Under the Equal Protection Clause, government classifications based on sex or on transgender status are subject to heightened scrutiny and are presumptively unconstitutional.

75.     A statute that classifies on the basis of sex or on transgender status is one that: (1) facially discriminates; (2) is facially neutral but was motivated by an intent to discriminate; or (3) is facially neutral but is administered in a discriminatory manner.

76.     These sections of SB 1 classify based on sex or on transgender status, and therefore, are subject to heightened scrutiny.

77.     These sections of SB 1 cannot survive heightened scrutiny because they are not substantially related to achieving Tennessee's asserted interests.

78.     In the alternative, these sections of SB 1 could not survive any level of scrutiny because they are not rationally related to a legitimate government interest.

79.     The above conduct of Defendants has been taken under color of state and local law.

17

# PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

a. Enter a judgment declaring that SB 1, §§ 68-33-103, 104, 106, and 107 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

b. Temporarily restrain, and issue a preliminary and permanent injunction restraining, Defendants from enforcing SB 1, §§ 68-33-103, 104, 106, and 107; and

c. Grant such additional relief as the needs of justice may require.

Dated: April 26, 2023

HENRY C. LEVENTIS
United States Attorney
Middle District of Tennessee

s/*Ellen Bowden McIntyre*
ELLEN BOWDEN MCINTYRE
B.P.R. #023133
Assistant United States Attorney
719 Church Street, Suite 3300
Nashville, TN 37203
Telephone: (615) 736-5151
Facsimile: (615) 401-6626
Email: Ellen.Bowden2@usdoj.gov

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief
Federal Coordination and
Compliance Section

COTY MONTAG (DC Bar No. 498357)*
Deputy Chief, Federal Coordination and
Compliance Section

s/*Tamica Daniel*
TAMICA DANIEL (DC Bar No. 995891)*
Trial Attorney
Housing and Civil Enforcement Section
GLORIA YI (NY Bar No. 4873824)*
ALYSSA C. LAREAU (NY Bar No. 516359)*
Trial Attorneys
Federal Coordination and Compliance Section
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 305-2222
Tamica.Daniel@usdoj.gov
Gloria.Yi@usdoj.gov
Alyssa.Lareau@usdoj.gov

18

*Attorneys for Plaintiff-Intervenor United States of America*

*\*Pro hac vice motions pending*

19