# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

L.W., by and through her parents and next friends, Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through his parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; RYAN ROE, by and through his parent and next friend, Rebecca Roe; REBECCA ROE; and SUSAN N. LACY, on behalf of herself and her patients,

                 Plaintiffs,

and

UNITED STATES OF AMERICA,

                 Plaintiff-Intervenor,

    v.

JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter; TENNESSEE DEPARTMENT OF HEALTH; RALPH ALVARADO, in his official capacity as the Commissioner of the Tennessee Department of Health; TENNESSEE BOARD OF MEDICAL EXAMINERS; MELANIE BLAKE, in her official capacity as the President of the Tennessee Board of Medical Examiners; STEPHEN LOYD, in his official capacity as Vice President of the Tennessee Board of Medical Examiners; RANDALL E. PEARSON, PHYLLIS E. MILLER, SAMANTHA MCLERRAN, KEITH G. ANDERSON, DEBORAH CHRISTIANSEN, JOHN W. HALE, JOHN J. MCGRAW, ROBERT ELLIS, JAMES DIAZ-BARRIGA, and JENNIFER CLAXTON, in their official capacities as members of the Tennessee Board of Medical Examiners; and LOGAN GRANT, in his official capacity as the Executive Director of the Tennessee Health Facilities Commission,

                 Defendants.

Case No.
3:23-cv-00376

District Judge Richardson

Magistrate Judge Newbern

## MEMORANDUM IN SUPPORT OF PLAINTIFF-INTERVENOR UNITED STATES' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

This lawsuit challenges a state statute that denies necessary medical care to children based solely on who they are. Tennessee Senate Bill 1, 2023 Tenn. Pub. Acts § 68-33-101, *et seq.* (2023) ("SB 1"), conditions whether a minor can consider and receive certain forms of medical care on the sex that person was assigned at birth." SB 1 prohibits certain forms of medically necessary care for transgender minors with a diagnosis of gender dysphoria, while leaving non-transgender minors free to receive the same procedures and treatments.

By denying transgender minors—and only transgender minors—access to medically necessary and appropriate care, SB 1 violates the Equal Protection Clause of the Fourteenth Amendment. SB 1 discriminates on the basis of both sex and transgender status. It fails heightened scrutiny, as a ban on medically necessary care for transgender minors diagnosed with gender dysphoria is not substantially related to serving an important government objective. To the contrary, the law is premised on scientifically inaccurate information, harms the health of transgender youth, blocks parents from making individual determinations regarding the appropriate care of their transgender children, and threatens health care providers with extraordinary civil liability and licensing sanctions simply for treating minor transgender patients consistent with medical standards of care. SB 1 would not even survive rational-basis review.

Implementation of SB 1 will have immediate, drastic, and often traumatic physical and psychological impacts on vulnerable transgender youth diagnosed with gender dysphoria and will cause irreparable harm to medical professionals, parents and caregivers, transgender minors, and the interests of the United States. The balance of the equities and the public interest also

justify preliminary relief. Therefore, the United States respectfully requests that this Court grant this motion.

**BACKGROUND**

**I.**    **<u>Transgender Youth and Their Need for Medically Necessary and Appropriate Gender-Affirming Care</u>**

Transgender people are individuals whose gender identity does not conform with the sex they were assigned at birth. A transgender boy is a child or youth who was assigned a female sex at birth but whose gender identity is male; a transgender girl is a child or youth who was assigned a male sex at birth but whose gender identity is female. By contrast, a non-transgender child has a gender identity that corresponds with the sex the child was assigned at birth. A person's gender identity is innate.

According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders,[1] "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.[2] To be diagnosed with gender dysphoria, the incongruence between sex assigned at birth and gender identity must persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning.[3] The inability of transgender youth to live consistent with their gender identity due to irreversible physical changes in their

---

[1] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2022), https://perma.cc/FM78-QMZ [hereinafter *DSM-5-TR*].
[2] Expert Declaration of Deanna Adkins, MD (ECF No. 29) ¶ 21 [hereinafter Adkins Decl.]; Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C (ECF No. 30) ¶ 42 [hereinafter Antommaria Decl.]; Declaration of Aron Janssen, M.D. (ECF No. 31) ¶ 27 [hereinafter Janssen Decl.].
[3] Adkins Decl. ¶ 21; Janssen Decl. ¶ 28-30.

2

bodies that accompany puberty can have significant negative impacts on their overall health and wellbeing.[4] Thus, the delay or denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality.[5]

Standards of care for treating transgender youth diagnosed with gender dysphoria have been published by several well-established medical organizations, including the World Professional Association for Transgender Health ("WPATH"), the Endocrine Society, and the American Academy of Pediatrics ("AAP").[6] The standards of care published by these organizations provide a framework that is based on the best available science and clinical experience, and are widely accepted and endorsed for the treatment of gender dysphoria in children and adolescents.[7] Generally, these organizations recommend that pre-pubertal children with gender dysphoria receive treatments that may include supportive therapy, encouraging

---

[4] Adkins Decl. ¶¶ 32, 66-69; Antommaria Decl. ¶ 43; Janssen Decl. ¶¶ 38, 48, 51; Declaration of Jack Turban, M.D. (ECF No. 32) ¶¶ 15-16 [hereinafter Turban Decl.].

[5] Adkins Decl. ¶¶ 22, 62, 66-69; Antommaria Decl. ¶¶ 43, 51-52; Janssen Decl. ¶¶ 51, 55; Turban Decl. ¶¶ 12, 22; *see* Substance Abuse and Mental Health Services Administration (SAMHSA), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGTBQI+ Youth*, SAMHSA Publication No. PEP22-03-12-001 (2023), at 14, https://perma.cc/2SJU-8K66 [hereinafter *SAMHSA Report*] ("Withholding timely gender-affirming medical care when indicated . . . can be harmful because these actions may exacerbate and prolong gender dysphoria.") (footnotes omitted).

[6] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2022), https://perma.cc/V639-K6FQ [hereinafter *WPATH Standards*]; Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) Pediatrics 1 (2018), https://perma.cc/D4R6-GP6C [hereinafter *AAP Statement*]; Wylie Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017), https://perma.cc/8R3P-6NQY [hereinafter *ES Standards*]. For a more detailed discussion of each guideline, *see* Pl. U.S.' Compl. in Intervention at ¶¶ 22-44.

[7] Adkins Decl. ¶ 25; Antommaria Decl. ¶ 29; Janssen Decl. ¶ 32.

3

support from loved ones, and assisting the young person through elements of a social transition.[8] Social transition may evolve over time and can include a number of different actions, such as a name change, pronoun change, bathroom and locker use, personal expression, and communication of affirmed gender to others.[9]

The organizations recommend that additional treatments involving medications may be appropriate for some adolescents.[10] Options for treatment after the onset of puberty include the use of gonadotropin-releasing hormone agonists to prevent progression of pubertal development and hormonal interventions such as testosterone and estrogen administration using a gradually increasing dosage schedule.[11] The guidelines make clear that gender-affirming medical care for transgender adolescents diagnosed with gender dysphoria should only be recommended when certain criteria are met and certain steps have been taken.[12] These criteria include: when the adolescent meets the diagnostic criteria of gender dysphoria as confirmed by a qualified mental health professional; when the experience of gender dysphoria is marked and sustained over time; when gender dysphoria worsens with the onset of puberty; when the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; when the adolescent's other mental health concerns (if any) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and when the adolescent has been informed of any risks.[13] All of the guidelines emphasize that family support is an essential component of gender-affirming care.[14] WPATH's guidelines also emphasize that

---

[8] *See WPATH Standards* at S75-76; *AAP Statement* at 4-6; *see also* Adkins Decl. ¶ 31.
[9] *See WPATH Standards* at S76; *AAP Statement* at 6; *see also* Adkins Decl. ¶ 31.
[10] Adkins Decl. ¶¶ 32-36; Janssen Decl. ¶ 35.
[11] Adkins Decl. ¶¶ 32, 35; Janssen Decl. ¶¶ 38-39; *WPATH Standards* at S116.
[12] *See WPATH Standards* at S59-S66; *ES Standards* at 3878; *AAP Statement* at 4-5.
[13] *See id.*
[14] *See WPATH Standards* at S75-76; *ES Standards* at 3885; *AAP Statement* at 5.

4

an individualized approach to clinical care for transgender adolescents is both ethical and necessary and recommends a multidisciplinary approach.[15] The guidelines state that the available data reveal that pubertal suppression for transgender youth generally leads to improved psychological functioning in adolescence and young adulthood.[16]

## II.    **The Legislative History of SB 1**

During the legislative debate preceding the passage of SB 1, several legislators made comments reflecting moral disapproval or disbelief of youth who identify as transgender and their need for gender-affirming care. For example, Representative William Lamberth, who sponsored the SB 1 companion bill in the Tennessee House of Representatives ("HB 1"), characterized the increase in the number of youths who identify as transgender as "a growing social contagion of gender dysphoria" driven in part by "social media glorifying the process of transitioning."[17] At the same hearing, Rep. Paul Sherrell said: "[O]ur preacher would say, if you don't know what you are—a boy or girl, male or female—just go in the bathroom and take your clothes off and look in the mirror, and you'll find out."[18] At a different hearing, Rep. Gino Bulso also referred broadly to transgender status and gender-affirming care as "fiction" and "fantasy."[19]

Statements made during the legislative debate also reveal the legislators' intention that SB 1 limits access to the medical procedures solely based on the individual's transgender or non-transgender status. SB 1's sponsor, Sen. Jack Johnson, and HB 1's Sponsor, Rep. Lamberth, each

---

[15] *See WPATH Standards* at S45 and S56.

[16] *See WPATH Standards* at S47; *ES Standards* at 3882; *AAP Statement* at 5. *See also SAMHSA Report* at 37 ("Access to gender affirmation can reduce gender dysphoria and improve mental and physical health outcomes among transgender and gender-diverse people . . . .").

[17] *Hearing on HB 1 Before the H. Health S. Subcomm.*, 113th Sess. (Tenn. 2023) (statement of Rep. William Lamberth, Sponsor of HB 1).

[18] *Id.* (statement of Rep. Paul Sherrell questioning HB 1's sponsor).

[19] *Hearing on HB 1 Before the H. Civ. Just. Comm.*, 113th Sess. (Tenn. 2023).

5

confirmed that the respective bills do not impact non-transgender minors who use the same treatments the bills prohibit.[20] After Senator Johnson confirmed that the bill allows a boy with gynecomastia to get a double mastectomy or children diagnosed with precocious puberty to use puberty blockers, Senator Yarbro warned that banning medical procedures for some individuals and not others is not prohibiting conduct, but "outlawing what [people] think . . . what they believe."[21] After highlighting that the bill excludes "intersex people, cosmetic surgeries, and other practices," Representative Torrey C. Harris noted that the bill was "becoming something that's . . . not only weird but suspect."[22] Additionally, Representative Gloria Johnson specifically drew her colleagues' attention to the differential treatment, stating, "[t]he reality is, we're targeting a group . . . And we are determining that a certain group of folks cannot have care."[23] Following these comments, the bills passed without change.

## III.   Text of SB 1

SB 1 was signed into law by Governor Bill Lee on March 2, 2023. The law will become effective on July 1, 2023. Generally, SB 1 prohibits:

> [a] healthcare provider [from] knowingly perform[ing] or offer[ing] to perform on a minor, or administer[ing] or offer[ing] to administer to a minor, a medical procedure if the performance is for the purpose of:
> (A) [e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or
> (B) [t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

SB 1, 2023 Tenn. Pub. Acts § 68-33-103(a)(1). The statute defines "medical procedure" as "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a

---

[20] *See Hearing on SB 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. 2023); *Hearing on HB 1 Before the H. Health Comm.*, 113th Sess. (Tenn. 2023).
[21] *Hearing on SB 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. 2023).
[22] *House of Rep. Floor Sess. on HB 1* (Tenn. Feb. 23, 2023) (statement of Rep. Torrey C. Harris).
[23] *House of Rep. Floor Sess. on HB 1* (Tenn. Feb. 23, 2023) (statement of Rep. Gloria Johnson).

human being; or . . . [p]rescribing, administering, or dispensing any puberty blocker or hormone to a human being." *Id.* § 68-33-102(5). The statute defines "sex" as "a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth." *Id.* § 68-33-102(9). The statute also prohibits a person (not restricted to medical providers) from "knowingly provid[ing] a hormone or puberty blocker by any means to a minor if the provision of the hormone or puberty blocker is not in compliance with this chapter." *Id.* § 68-33-104.

Legislative findings contained in SB 1 characterize gender-affirming medical procedures and treatments as "experimental in nature;" "not supported by high-quality, long-term medical studies;" "harmful;" "unethical;" "immoral;" and encouraging "minors to become disdainful of their sex." *Id.* § 68-33-101(b), (m). In addition, Tennessee identifies in the findings several interests for adopting this law, including: "protecting minors from physical and emotional harm;" "protecting the ability of minors to develop into adults who can create children of their own;" "promoting the dignity of minors;" "encouraging minors to appreciate their sex, particularly as they undergo puberty;" and "protecting the integrity of the medical profession, including by prohibiting medical procedures that are harmful, unethical, immoral, experimental, or unsupported by high-quality or long-term studies, or that might encourage minors to become disdainful of their sex." *Id.* § 68-33-101(m).

SB 1 specifically exempts from liability under the statute any "medical procedure [provided] to a minor if . . . [t]he performance or administration of the medical procedure is to treat a minor's congenital defect, precocious puberty, disease, or physical injury." *Id.* § 68-33-103(b)(1)(A). "'Congenital defect' means a physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex, including

abnormalities caused by a medically verifiable disorder of sex development, but does not include gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality . . . ." *Id.* § 68-33-102(1). The term "disease" also excludes "gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality." *Id.* § 68-33-103(b)(2). The bill also exempts conduct for one year, if "performance or administration of the medical procedure on the minor began prior to the effective date of this act and concludes on or before March 31, 2024." *Id.* § 68-33-103(b)(1)(B). In order to permit tapering medication rather than immediate cessation, the minor's treating physician must satisfy a number of conditions, including a certification in writing that ending the medical procedure would be harmful to the minor. *See id.* § 68-33-103(b)(3).

SB 1 allows the state Attorney General to bring an action against a health care provider or any person "that knowingly violates this [law] within twenty (20) years of the violation . . . and to recover a civil penalty of twenty-five thousand dollars ($25,000) per violation." *Id.* § 68-33-106(b).[24] SB 1 requires regulatory authorities to take "emergency action" when notified about an alleged violation of § 68-33-103 and can subject health care providers to licensing sanctions. *Id.* § 68-33-107. Consent of the minor or a parent of the minor "is not a defense [for a health care provider or individual] to any legal liability incurred as the result of a violation of this section . . ." *Id.* § 68-33-103(c)(1).

**ARGUMENT**

For a court to issue a preliminary injunction, the plaintiff must establish:

---

[24] SB 1 also establishes a private right of action for minors or parents of minors under certain conditions, *id.* § 68-33-105, and these private rights of action are available within 30 years from the date the minor reaches 18 years of age or within 10 years of the minor's death, if the minor dies. *Id.* § 68-33-105(e).

8

> (1) whether the movant has a substantial likelihood of success on the merits; (2) whether there is a threat of irreparable injury to the movant without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief.

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 860 (S.D. Ohio 2016) (citing *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010)). When, as here, a party seeks a preliminary injunction on the basis of a constitutional violation, the likelihood of success on the merits "often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citing *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). Here, SB 1 violates constitutional equal protection rights, and the United States can satisfy all four factors to warrant a preliminary injunction.

## I.      <u>The United States Is Likely to Succeed on the Merits of its Equal Protection Claim</u>.

The United States is likely to succeed on the merits because SB 1 violates the Equal Protection Clause by discriminating against transgender minors on the basis of their sex and their membership in a quasi-suspect class. Not only does SB 1 fail to satisfy the heightened scrutiny applicable to such laws; it would fail even rational basis review.

### A.      SB 1's Ban on Gender-Affirming Medical Care Warrants Heightened Scrutiny Under the Equal Protection Clause.

SB 1 is subject to heightened scrutiny because, in forbidding only transgender youth to obtain medically necessary gender-affirming care while leaving all other minors eligible for such care, it discriminates on the basis of both sex and transgender status.

#### 1.      SB 1's Ban on Gender-Affirming Medical Care Discriminates on the Basis of Sex and Therefore Triggers Heightened Scrutiny.

SB 1 discriminates on the basis of sex because the medical treatments available to a minor under SB 1 depend on the sex that minor was assigned at birth. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (school

9

policy requiring students to use bathroom in accordance with the sex on student's birth certificate "is inherently based upon a sex-classification"), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022) (Alabama's felony gender-affirming care ban "constitutes a sex-based classification for purposes of the Fourteenth Amendment"), *appeal filed sub nom. Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707 (11th Cir. May 18, 2022); *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021) ("[H]eightened scrutiny applies to Plaintiff's Equal Protection claims because [a law banning gender-affirming care for minors] rests on sex-based classifications . . . ."), *aff'd sub nom. Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022). The medical treatments available to a minor under SB 1 depend on "a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth." SB 1, § 68-33-102(9). For example, under SB 1, if a minor was assigned female at birth, that minor cannot receive testosterone to treat gender dysphoria. By contrast, a non-transgender minor who was assigned male at birth can receive testosterone to treat low hormone production because the treatment is consistent with the sex the minor was assigned at birth. *Id.* § 68-33-103(a)(1)(A), (B).[25]

---

[25] SB 1's carve-out for intersex minors, *see* SB 1, §§ 68-33-102(1), 103(b)(1), (2), reinforces the conclusion that SB 1 discriminates on the basis of sex. The provisions exempt minors from SB 1's prohibitions if they have a "congenital defect, precocious puberty, disease, or physical injury" and defines "congenital defect" as a "physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex, including abnormalities caused by a medically verifiable disorder of sex development." *Id.* Under SB 1, it is legally permissible for a medical provider to offer the same medical care to intersex minors that would be deemed impermissible when prescribed by a medical professional to affirm a transgender adolescent's gender identity. The distinction under SB 1 is that procedures performed on intersex minors conform their appearance to expectations associated with the sex they were assigned at birth. *See id.*

10

SB 1 also discriminates on the basis of sex because it conditions the availability of particular medical procedures on a sex stereotype: that an individual's gender identity should match the sex that individual was assigned at birth. The clear import of *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746 (2020), is that sex discrimination "unavoidably" occurs when an individual is treated differently because the individual had "one sex identified at birth" but identifies with a different sex "today." In addition, even prior to *Bostock*, the Sixth Circuit held that discrimination based on gender nonconformity of transgender individuals is sex discrimination.[26] Indeed, in a case later consolidated with *Bostock* before the Supreme Court, the Sixth Circuit relied on *Smith v. City of Salem,* 378 F.3d 566, among other precedents, to find that "[d]iscrimination on the basis of transgender and transitioning status is necessarily discrimination on the basis of sex." *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018) (holding that terminating transgender employee because she informed employer that she would begin transitioning at work is sex discrimination).[27] Other circuits have held the same.[28] Given that the Sixth Circuit has repeatedly

---

[26] *See Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 220-22 (6th Cir. 2016) (relying on "settled law in this Circuit" to state that transgender discrimination is sex discrimination); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (using analysis of sex stereotypes from *Smith* to support conclusion that transgender officer had standing to bring sex-discrimination claim under Equal Protection Clause); *Smith v. City of Salem*, 378 F.3d 566, 572, 577 (6th Cir. 2004) (holding that transgender employee whose employment the City sought to terminate because of their transgender status, stated sex-discrimination claim under Title VII and Equal Protection Clause); *see also Avery v. Nelson*, No. 1:23-cv-160, 2023 WL 2399830, at *3-4 (W.D. Mich. Mar. 8, 2023) (citing to *Smith* and *Bostock* in holding that Plaintiff set forth plausible equal protection claims against employers for discriminating against and terminating plaintiff's employment because of gender dysphoria and related gender non-conforming behavior and appearance).

[27] In *R.G. & G.R. Harris Funeral Homes, Inc.*, the Sixth Circuit also relied on *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), where a plurality of the Supreme Court held that discrimination because of a failure to conform with gender stereotypes is sex discrimination.

[28] *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611-13 (4th Cir. 2020) (concluding that school board's restroom policy prohibiting transgender students from using restrooms that

11

held that transgender discrimination is sex discrimination, heightened scrutiny applies.

### 2. SB 1's Ban on Gender-Affirming Medical Care Discriminates Against Transgender Individuals, a Quasi-Suspect Class, and Therefore Triggers Intermediate Scrutiny.

SB 1 also warrants heightened scrutiny because it discriminates on the basis of transgender status. SB 1's text demonstrates an intent to target only transgender minors. The statute penalizes medical practices performed upon a minor "for the purpose of: [e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or [t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." SB 1, § 68-33-103(a)(1). A transgender person is, by definition, someone whose gender identity is inconsistent with their sex assigned at birth. In addition, the statute allows minors to receive the treatments banned by the law in order to treat certain diseases, but not to treat "gender dysphoria, gender identity disorder, gender incongruence," *id.* §§ 68-33-102(1), 103(b)(2), which are medical diagnoses only potentially applicable to transgender people.

To determine whether a classification warrants heightened scrutiny, the Supreme Court has analyzed whether the class at issue: (1) has historically been subjected to discrimination, *see Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986); (2) has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41(1985); (3) has "obvious, immutable, or distinguishing

---

match their gender identity constitutes sex-based discrimination and transgender persons constitute quasi-suspect class); *Whitaker,* 858 F.3d at 1051 (finding school policy requiring students to use bathroom in accordance with sex on student's birth certificate is "inherently based upon a sex-classification"); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender.").

characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) is a minority

lacking political power, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).

While no court within the Sixth Circuit has explicitly examined the question of whether a

classification based on transgender status warrants heightened scrutiny, both the Fourth and

Ninth Circuits have recognized transgender people as a quasi-suspect class under the Equal

Protection Clause. *See Grimm*, 972 F.3d at 611, 613 (concluding that transgender persons

constitute a quasi-suspect class after finding "[e]ach factor is readily satisfied" with regards to

transgender people); *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (upholding the

district court's application of strict scrutiny after applying factors to determine transgender

people are, at least, a quasi-suspect class). Several district courts have concluded the same.[29]

An analysis of each of the four factors supports a finding that a classification based on

transgender status warrants heightened scrutiny. First, transgender individuals, as a class, have

historically been subject to discrimination and continue to "face discrimination, harassment, and

violence because of their gender identity."[30] Second, no "data or argument suggest[s] that a

transgender person, simply by virtue of transgender status, is any less productive than any other

member of society."[31] The American Psychiatric Association has stated that "[b]eing transgender

or gender diverse implies no impairment in judgment, stability, reliability, or general social or

vocational capabilities."[32]

---

[29] *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wisc. 2018); *Highland*, 208 F. Supp. 3d at 873-74.
[30] *Whitaker*, 858 F.3d at 1051 (recognizing transgender people as a quasi-suspect class); *see also Grimm*, 972 F.3d at 611-612 (same); *Ray*, 507 F. Supp. 3d at 937 (same).
[31] *Adkins v. N.Y.C.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *see also Grimm*, 972 F.3d at 611-12; *Ray*, 507 F. Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874.
[32] APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2018), https://perma.cc/4LZB-BVMK.

13

Third, transgender individuals share "obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen,* 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638). Specifically, transgender individuals' "gender identity does not align with the gender they were assigned at birth." *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 721 (D. Md. 2018). Multiple courts have held that transgender status is immutable, and "being transgender is not a choice[,] [r]ather, it is as natural and immutable as being cisgender."[33]

Fourth, people who are transgender lack political power. *See Grimm*, 972 F.3d at 613 ("Even considering the low percentage of the population that is transgender, transgender persons are underrepresented in every branch of government."). While the number of openly transgender elected officials is growing, they still represent a fraction of office holders. *Id*. The proliferation of enacted legislation aimed at restricting the rights of transgender individuals, particularly transgender minors, is further evidence of the limited political power of the transgender community. *See M.A.B.*, 286 F. Supp. 3d at 721 (noting that courts have had to block a number of laws because they violated rights of transgender individuals). This "targeting [of] a group," as Representative Johnson noted, demonstrates this lack of political power.

Because SB 1 discriminates against transgender persons and they constitute a quasi-suspect class, the statute is subject to intermediate scrutiny.

**B.     SB 1's Ban on Gender-Affirming Care Cannot Survive Heightened Scrutiny Because it is not Substantially Related to Achieving Tennessee's Articulated Governmental Interests.**

To survive a heightened scrutiny analysis, the government actor must show that the action in question "serves important governmental objectives" and that the "discriminatory

---

[33] *Grimm*, 972 F.3d at 612-13; *see also*, *Ray*, 507 F. Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874 (quoting *Lyng*, 477 U.S. at 638).

means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (requiring an "exceedingly persuasive justification" for a sex-based classification) (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."). "The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533. The required inquiry provides an enhanced measure of protection in circumstances where there is a greater danger that the legal classification results from impermissible prejudice or stereotypes. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

Moreover, where intermediate scrutiny applies, the "justification must be genuine, not hypothesized or invented post hoc in response to litigation," and "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533.[34] A classification does not withstand heightened scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Mississippi Univ. for Women,* 458 U.S. at 730.

SB 1's ban on medically necessary gender-affirming care for transgender youth cannot survive heightened scrutiny for two reasons. First, the State's articulated objective of protecting youth from physical and emotional harm is a pretextual justification lacking accurate scientific or medical basis. Indeed, this proffered objective is belied by SB 1's legislative history, which demonstrates that its real interest is to attack a vulnerable and marginalized group." *United States*

---

[34] *See also Glenn*, 663 F.3d at 1321; *SmithKline Beecham Corp. v. Abbott Lab'ys.*, 740 F.3d 471, 482 (9th Cir. 2014) ("[The court] must examine [the law's] actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.").

15

*Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). That interest is not legitimate, let alone important or exceedingly persuasive. Second, even assuming Tennessee's asserted interest of protecting youth is genuine, SB 1 is not substantially related to that interest because bans on various forms of well-established, medically necessary, gender-affirming care are harmful, not beneficial.

### 1. Tennessee's Primary Stated Interest of Protecting Youth is Pretextual.

SB 1's primary stated purpose is protecting youth from physical and emotional harm. The legislation's text and its legislative history, however, belie Tennessee's stated purpose. If the purported health-driven concerns regarding the risks of the procedures undertaken as part of gender-affirming care were genuine, SB 1 would prohibit those same procedures for all minors, whether they are transgender or non-transgender. But instead, the law prohibits the treatments only when provided to a specific class of people: transgender minors.

SB 1's targeting of transgender minors, as well as their parents and health care providers, was no accident. Several of the law's proponents made comments reflecting moral disapproval of transgender persons and hostility toward the medical needs of transgender youth.[35] During hearings by the Tennessee House and Senate, legislators opposing the bill highlighted that non-transgender youth are still permitted access to these medical procedures,[36] noted that this bill is "suspect,"[37] and warned that it is not prohibiting conduct but "targeting a group."[38] Yet, the bill

---

[35] *See, e.g.*, *Hearing on HB 1 Before the H. Health Subcomm.*, 113th Sess. (Tenn. 2023) (statement of Rep. William Lamberth) (calling increase in youth identifying as transgender a "social contagion").

[36] *See, e.g.*, *Hearing on SB 1 Before the S. Health & Welfare Comm.*, 113th Sess. (Tenn. 2023).

[37] *House of Rep. Floor Sess. on HB 1,* (Tenn. Feb. 23, 2023) (statement of Rep. Torrey Harris).

[38] *Id.* (statement of Rep. Gloria Johnson) ("The reality is here, we're targeting a group.").

still passed without amendments that would eliminate these identified disparities between groups of minors.

The rejection of the cosmetic surgery amendment to the bill underscores that the genuine purpose for SB 1 cannot be grounded in health or medical concerns.[39] The State claims it is prohibiting gender-affirming care for transgender minors with a medical diagnosis of gender dysphoria because there are insufficient long-term medical studies to demonstrate that these procedures are effective treatments. In contrast, by rejecting the cosmetic surgery amendment, the State is explicitly permitting non-transgender minors to access the same procedures without having to produce studies about elective surgeries that, by their definition, have no medical purpose. The actual purpose for SB 1, therefore, cannot be the lack of studies demonstrating the effectiveness of the procedures at treating a medical diagnosis, as non-transgender minors can still receive these procedures without a medical diagnosis at all. Thus, the difference between these two groups of minors is not the quality of the medical studies supporting their medical care; it is whether the minors are transgender. This singling out of transgender minors reveals that the purported neutral health-related justification is pretextual. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("A law cannot be regarded as protecting an interest . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (internal quotations omitted).

Further, the statute's use of "*purported* identity" and "*purported* discomfort or distress from a discordance between the minor's sex and *asserted* identity"[40] demonstrate a moral

---

[39] *Proposed Amendment No. 5 to HB 1,* 113th Sess. (Tenn. 2023) (proposed by Rep. Bo Mitchell, failed); *see also House of Rep. Floor Sess. on HB 1,* (Tenn. Feb. 23, 2023) (vote on Amendment No. 5 to HB 1).

[40] SB 1, § 68-33-103(a)(1)(A), (B) (emphases added).

17

disapproval and lack of belief in the legitimacy of transgender identity and gender dysphoria. This is underscored when the main sponsor of the House bill calls gender dysphoria "a growing social contagion" driven in part by "social media glorifying the process of transitioning;"[41] when a Representative declares that people "who support this fiction and this fantasy that a person can change their sex who are causing the harm that we see in children across this entire state;"[42] and when another legislator commands transgender youth to "take [their] clothes off and look in the mirror"[43] to determine their gender identity. The text of the statute and legislative history reflect a fundamental disapproval of people who have a gender identity inconsistent with the sex they were assigned at birth. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean" that the desire to express moral disapproval of "a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534. *See also Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) (admonishing that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

> ### 2. SB 1 is Not Substantially Related to Tennessee's Stated Interest of Protecting Youth.

Even if Tennessee's asserted interest of protecting youth was genuine, SB 1's ban on certain forms of gender-affirming care would violate the Equal Protection Clause because it is not "substantially related" to achieving that objective. *See VMI*, 518 U.S. at 533 ("The State must show at least that the challenged classification serves important governmental objectives and that

---

[41] *Hearing on HB 1 Before the H. Health Subcomm.*, 113th Sess. (Tenn. 2023) (statement of Rep. William Lamberth, Sponsor of HB 1).
[42] *Hearing on HB 1 Before the H. Civ. Just. Comm.*, 113th Sess. (Tenn. 2023) (questioning of witness by Rep. Gino Bulso).
[43] *Hearing on HB 1 Before the H. Health Subcomm.,* 113th Sess. (Tenn. 2023) (statement of Rep. Paul Sherrell, questioning HB 1's sponsor).

18

the discriminatory means employed are substantially related to the achievement of those objectives.") (internal quotation marks and modification brackets omitted). In fact, banning these forms of gender-affirming care will have devastating effects on many transgender youths while providing no countervailing benefit to them or anyone else. *See Kirchberg v. Feenstra*, 609 F.2d 727, 734 (5th Cir. 1979) (courts must "weigh[] the state interest sought to be furthered against the character of the discrimination caused by the statutory classification").

First, it is well-established that the provision of gender-affirming care to treat gender dysphoria is helpful, not harmful, to transgender youth. Contrary to the State's assertion that gender-affirming care for transgender youth is "harmful," SB 1, § 68-33-101(b), every major medical association, including the American Psychiatric Association, WPATH, the Endocrine Society, and AAP, have all recognized that gender-affirming care is safe, effective, and medically necessary treatment for the health and wellbeing of some youth diagnosed with gender dysphoria.[44] In fact, the medical evidence shows that trying to "cure" a transgender person with a diagnosis of gender dysphoria by forcing them to live in alignment with their sex assigned at birth, and not their gender identity, is severely harmful and ineffective.[45] Transgender minors who do not receive gender-affirming care face increased rates of victimization, substance abuse, depression, anxiety, and suicidality.[46] The medical community is in overwhelming accord that

---

[44] Adkins Decl. ¶¶ 27-28; Janssen Decl. ¶ 6.
[45] Janssen Decl. ¶¶ 9, 26; Turban Decl. ¶ 20.
[46] *See* Jack L. Turban, et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, 17(1) PLoS ONE 1, 1-15 (2022); Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) Pediatrics 1, 1-8 (2020); Nat'l Academies Scis, Eng'g, and Med, *Understanding the Well-Being of LGBTQI+ Populations* 363-64 (2020); *AAP Statement*; *see also* Adkins Decl. ¶¶ 22, 68; Janssen Decl. ¶ 51.

gender-affirming care is clinically indicated for some transgender youth.[47]

Second, the medical research supporting gender-affirming care is substantial. Contrary to the assertions in SB 1, gender-affirming medical treatment for patients diagnosed with gender dysphoria is far from "experimental in nature," and, instead, has been long-recognized as part of the standards of care by major medical associations.[48] The American Medical Association recognizes that "standards of care and accepted medically necessary services that affirm gender or treat gender dysphoria may include mental health counseling, non-medical social transition, gender-affirming hormone therapy, and/or gender-affirming surgeries," and that "[e]very major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people."[49] Clinicians have used these standards of care, which are peer-reviewed and based on reviews of scientific literature, for over forty years.[50]

---

[47] *See, e.g.*, Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care,* 5(2) Pediatrics 1 (2022); Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones,* 7(3) Clinical Practice in Pediatric Psychology 302 (2019); *see also* Antommaria Decl. ¶ 29; Janssen Decl. ¶ 35.

[48] Antommaria Decl. ¶¶ 27-29; Turban Decl. ¶ 14.

[49] James L. Madara, *AMA to States: Stop Interfering in Health Care of Transgender Children,* AMA (April 26, 2021), https://perma.cc/7JYQ-FW2P (letter from CEO); *see also* American Academy of Family Physicians et al., *Frontline Physicians Call on Politicians to End Political Interference in the Delivery of Evidence Based Medicine*, (May 15, 2019) www.aafp.org/news/media-center/more-statements/physicians-call-on-politicians-to-end-political-interference-in-the-delivery-of-evidence-based-medicine.html (statement issued on behalf of American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians, American Osteopathic Association, and American Psychiatric Association).

[50] *See* Meredith McNamara, M.D., M.S., et al., "A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria," at 5 (July 8, 2022), https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.pdf; *see also* Janssen Decl. ¶¶ 32-33; Turban Decl. ¶ 15-16.

SB 1's justification that gender-affirming care is unsupported by "high-quality, long-term" studies misses the point. SB 1, § 68-33-101(b). In general, only randomized controlled trials (RCTs), which are studies that divide patients randomly into a control group (no treatment) and a treatment group, are coded as "high quality."[51] In contrast, observational studies that record patients in real-world settings, such as a cohort of patients seen at a clinic, are coded as "low quality."[52] "RCTs are not, and cannot be, the gold standard for medical research on gender dysphoria."[53] This is because, given medical consensus in support of gender-affirming care,[54] it would be unethical to deny a patient enrolled in an RCT gender-affirming care.[55] "It is thus simply a mistake—and a mischaracterization of medical research across fields of medicine—to conclude that the absence of RCTs means that there is 'no evidence' for the efficacy of medical treatment for gender dysphoria."[56] In fact, medical professionals have prescribed and observed the types of gender-affirming care at issue in this litigation for decades.[57] Hormone treatment for gender dysphoria began soon after estrogen and testosterone became commercially available in the 1930s, and doctors have long used hormone therapies for patients whose natural hormone levels are below normal range.[58] Puberty blockers have been prescribed to treat gender

---

[51] *See id.* at 13-14 ("The key point is that 'low quality' in this context is a technical term and not a condemnation of the evidence, because 'low quality' studies regularly guide important aspects of clinical practice."); Ursula Kaiser, *Letter to Health Care Administration RE: General Medicaid Policy*, 3 (July 8, 2022), https://perma.cc/GAE3-T68M (noting that "'low-quality' studies are typical for much of medical care"); *see also* Antommaria Decl. ¶¶ 16-26.
[52] McNamara *et al.*, *supra* note 50, at 13.
[53] *Id.* at 14.
[54] Madara, *supra* note 49; *see also* APA Assembly and Board of Trustees, *supra* note 32 ("Significant and long-standing medical and psychiatric literature exists that demonstrates clear benefits of medical and surgical interventions to assist gender diverse individuals seeking transition.").
[55] *See* McNamara *et al.*, *supra* note 50, at 14; Antommaria Decl. ¶ 35.
[56] *Id.*
[57] Adkins Decl. ¶ 47; Antommaria Decl. ¶¶ 28, 32-33.
[58] Brandy Schillace, *The World's First Trans Clinic*, Scientific American, Aug. 1, 2021, at 74.

21

dysphoria for over 20 years, and for several decades to treat medical conditions such as precocious puberty, a condition in which a child enters puberty at a young age.[59] Thus, it is simply incorrect that gender-affirming care is "experimental in nature" and unsupported by "high-quality, long-term" studies. SB 1, § 68-33-101(b).

Thus, the medical evidence demonstrates that SB 1's prohibition on transgender minors diagnosed with gender dysphoria receiving care that their physicians and parents agree is appropriate and medically necessary simply does not substantially achieve the interest of protecting youth. The weak and misleading justifications defendants have advanced for prohibiting the treatments at issue only for transgender minors, combined with the legislative history of SB 1 taken as a whole, strongly suggests that the justifications for SB 1 are a pretext for discrimination and the statute violates the Equal Protection Clause.

**C.     SB 1's Ban on Gender-Affirming Care for Transgender Youths Should Not Survive Even Rational Basis Review.**

SB 1's ban on gender-affirming medical care would not survive even if a court declined to apply heightened scrutiny. To survive rational basis review, there must be a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). The relationship between the classification and the asserted goal may not be "so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446; *see also Ray*, 507 F. Supp. 3d at 939 (rejecting Ohio's justifications for disallowing transgender people to change sex marker on birth certificate under rational basis review, "because there is no logical connection between the Policy and proffered justifications").

By limiting the receipt of specified forms of health care only to those minors whose

---

[59] Adkins Decl. ¶ 47; Antommaria Decl. ¶¶ 28, 33.

gender identify differs from their sex assigned at birth, SB 1 imposes "a broad and undifferentiated disability on a single named group." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Despite the law's lack of use of the term transgender, its passage indeed "seems inexplicable by anything but animus toward" transgender people. *See id.* The treatments prohibited by SB 1, which the statute inaccurately describes as "experimental," "not supported by high-quality, long-term medical studies," and "harmful," SB 1, § 68-33-101(b), are prohibited only for transgender minors, while the law permits the same treatments for non-transgender minors.

SB 1's restrictions on transgender minors' ability to receive medically necessary care on the basis of their sex and gender identity fails because, as stated above, the legislature's stated purpose for enacting the statute is pretextual and its provisions fail to further that purported purpose. The medical community overwhelmingly recognizes that the treatments prohibited by SB 1 are medically necessary for some transgender minors and there is significant evidence that withholding or ceasing ongoing medically necessary treatments can cause significant harm. The statute's legislative history evinces opprobrium towards transgender minors who receive gender-affirming care. A law motivated by prejudice towards a particular group bearing no rational relationship to the law's stated purpose cannot survive even the lowest level of review. *See Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534 ("[A] bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). Thus, the United States is likely to succeed on its equal protection claim, regardless of the level of scrutiny applied.

## II.     SB 1 Will Cause Irreparable Harm Absent an Injunction.

A party's harm from the denial of a preliminary injunction "is irreparable if it is not fully compensable by monetary damages." *Husted*, 697 F.3d at 436 (quoting *Certified Restoration Dry*

*Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007)). When constitutional rights or civil rights are threatened or impaired, as they are here, irreparable injury is presumed. *Husted*, 697 F.3d at 436; *Highland*, 208 F. Supp. 3d at 878.

SB 1 will cause immense and irreparable physical and psychological harm to many transgender minors diagnosed with gender dysphoria by terminating their access to necessary medical treatment and impose harm on their parents and medical providers. As one district court explained, the following forms of irreparable harm can ensue: (1) transgender youths face "high risk of gender dysphoria and lifelong physical and emotional pain," (2) parents must choose between watching their children suffer or uprooting their family to move to another state, and (3) physicians must choose between violating the law and providing appropriate medical care. *Brandt*, 551 F. Supp. 3d at 892; *see also Eknes-Tucker*, 603 F. Supp. 3d at 1150 (finding that irreparable harm was established due to the severe medical harm plaintiffs would suffer from Alabama law banning gender-affirming care); *Blaine v. N. Brevard Cnty. Hosp. Dist.*, 312 F. Supp. 3d 1295, 1306-07 (M.D. Fla. 2018). Given that these harms cannot be compensated with monetary damages and involve constitutional and civil rights, the United States can satisfy the irreparable harm factor.[60]

---

[60] SB 1's nine-month tapering period for transgender minors to wind down treatment, *see* SB 1, § 68-33-103(b)(1)(B), does not diminish the irreparable harm they will face if a preliminary injunction is not granted. It is a short window of time for affected individuals to make alternative arrangements outside of Tennessee to receive the medically necessary care, or to wind down any treatment already in course and identify alternative, potentially less effective, treatment for their gender dysphoria. Regardless, the exemption does nothing to mitigate the imminent, irreparable harm to transgender adolescents need the proscribed treatments to address gender dysphoria.

24

III. **The Balance of the Equities and the Public Interest Both Weigh in the United States' Favor.**

The final two factors—the balance of equities and the public interest—merge where the federal government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]he [government's] harm and the public interest are one and the same, because the government's interest is the public interest."). Here, these factors manifestly favor the United States. The United States has a strong and legitimate interest in ensuring that states respect their obligations under the Constitution, and in fulfilling the United States' responsibilities under Federal law. *See Jones*, 569 F.3d at 278 ("[B]ecause the public as a whole has a significant interest in ensuring equal protection of the laws . . . the public interest would be advanced by issuance of a preliminary injunction . . . ."). If this Court does not grant preliminary relief, the lives of many transgender youth and their families will be upended while the Court continues to evaluate the lawfulness of SB 1 during the pendency of the litigation. *See Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1290 (M.D. Ala. 2013) (finding that the public interest is served to preserve status quo and give the court an opportunity to fully evaluate the lawfulness of the contested statute without subjecting the public to its potential harms). In contrast, because SB 1 fails to protect minors and instead harms transgender youth, Tennessee will suffer no harm if the preliminary injunction is granted. *See Eknes-Tucker*, 603 F. Supp. 3d at 1151 (finding severe harm from denying access to gender-affirming care outweighs State's harms).

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a preliminary injunction.

25

Dated: April 26, 2023

Respectfully submitted,

HENRY C. LEVENTIS
United States Attorney
Middle District of Tennessee

s/*Ellen Bowden McIntyre*
ELLEN BOWDEN MCINTYRE
B.P.R. #023133
Assistant United States Attorney
719 Church Street, Suite 3300
Nashville, TN 37203
Telephone: (615) 736-5151
Facsimile: (615) 401-6626
Email: Ellen.Bowden2@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief
Federal Coordination and
Compliance Section

COTY MONTAG (DC Bar No. 498357)*
Deputy Chief, Federal Coordination and
Compliance Section

s/*Tamica Daniel*
TAMICA DANIEL (DC Bar No. 995891)*
Trial Attorney
Housing and Civil Enforcement Section
GLORIA YI (NY Bar No. 4873824)*
ALYSSA C. LAREAU (NY Bar No. 516359)*
Trial Attorneys
Federal Coordination and Compliance Section
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 305-2222
Tamica.Daniel@usdoj.gov
Gloria.Yi@usdoj.gov
Alyssa.Lareau@usdoj.gov

*Attorneys for Plaintiff-Intervenor United States of America*

*\*Pro hac vice motions pending*

## CERTIFICATE OF SERVICE

I certify that on April 26, 2023, a true and correct copy of the foregoing was served via the Court's CM/ECF system, if registered. A service copy also was served via both certified mail and personal service on the parties listed below.

| | |
|---|---|
| Avatara A. Smith-Carrington, Esq.<br>Lambda Legal Defense and Education Fund, Inc.<br>1776 K Street NW, Suite 722<br>Washington, DC 20006<br>Email: asmithcarrington@lambalegal.org | Dean L. Chapman Jr.<br>Joseph L. Sorkin, Esq.<br>Kristen W. Chin, Esq.<br>Richard J. D'Amato, Esq.<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Email: dchapman@akingump.com<br>Email: jsorkin@akingump.com<br>Email: Kristen.chin@askingump.com<br>Email: rdamato@askingump.com |
| Tara L. Borelli, Esq.<br>Lambda Legal Defense and Education Fund, Inc.<br>1 West Court Square, Suite 105<br>Decatur, GA 30030<br>Email: tborelli@lambalegal.org | Elizabeth D. Scott<br>Akin Gump Strauss Hauer & Feld LLP<br>2300 N. Field Street, Suite 1800<br>Dallas, TX 75201<br>Email: edscott@askingump.com |
| Chase Strangio, Esq.<br>Joshua A. Block, Esq.<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br>Email: cstrangio@aclu.org<br>Email: jblock@aclu.org | Jeff Preptit, Esq.<br>Lucas Cameron-Vaughn, Esq.<br>ACLU (Nashville Office)<br>P.O. Box 120160<br>Nashville, TN 37212<br>Email: jpreptit@aclu-tn.org<br>Email: lucas@aclu-tn.org |
| Christopher J. Gessner, Esq.<br>David Bethea, Esq.<br>Akin, Gump, Strauss, Hauer & Feld LLC (DC Office)<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Email: cgessner@askingump.com<br>Email: dbethea@askingump.com | Stella Yarbrough<br>American Civil Liberties of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>Email: syarbrough@aclu-tn.org |

| | |
|---|---|
| Sruti J. Swaminathan, Esq.<br>Lambda Legal Defense and Education Fund, Inc.<br>120 Wall Street, 19th Floor<br>New York, NY 10005<br>Email: sswaminathan@lamblegal.org | Jonathan Skrmetti, in his official capacity as the Tennessee Attorney General and Reporter<br>General Reporter Attorney and Reporter<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and*<br>Office of the Tennessee Attorney General<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 |
| Tennessee Department of Health<br>c/o General Reporter Attorney and Reporter<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and*<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 | Ralph Alvarado, in his capacity as the Commissioner of the Tennessee Department of Health<br>c/o General Reporter Attorney and Reporter<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and*<br>Office of the Tennessee Attorney General<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 |
| Tennessee Board of Medical Examiners<br>c/o General Reporter Attorney and Reporter<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and*<br>Office of the Tennessee Attorney General<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 | Melanie Blake, in her official capacity as the President of the Tennessee Board of Medical Examiners<br>c/o General Reporter Attorney and Reporter<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and*<br>Office of the Tennessee Attorney General<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 |
| Stephen Loyd, in his capacity as Vice President of the Tennessee Board of Medical Examiners<br>c/o General Reporter Attorney and Reporter<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and* | Phyllis E. Miller, Samantha McLerran, Deborah Christiansen, John W. Hale, Robert Ellis, James Diaz-Barriga, and Jennifer Claxton, in their official capacities as members of the Tennessee Board of Medical Examiners |

28

| | |
|---|---|
| Office of the Tennessee Attorney General<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 | c/o General Reporter Attorney and Reporter<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and*<br>Office of the Tennessee Attorney General<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 |
| Logan Grant, in his official capacity as the<br>Executive Director of the Tennessee Health<br>Facilities Commission<br>c/o General Reporter Attorney and Reporter<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>*and*<br>Office of the Tennessee Attorney General<br>John Sevier Building, 4th Floor<br>500 Dr. Martin L. King, Jr. Blvd.,<br>Nashville, TN 37243 | |

s/*Ellen Bowden McIntyre*
Ellen Bowden McIntyre
Assistant United States Attorney

29