IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

L.W., *by and through her parents and next friends,*
*Samantha Williams and Brian Williams*, et al.

   *Plaintiffs,*

v.

JONATHAN SKRMETTI, *in his official capacity*
*as the Tennessee Attorney General and Reporter*, et
al.,

   *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:23-cv-00376
JUDGE RICHARDSON
JUDGE NEWBERN

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................................ii

Introduction ..................................................................................................................................1

Legal Standard .............................................................................................................................3

Argument .......................................................................................................................................3

    I.   Plaintiffs have not demonstrated a clear likelihood of success on the merits. ..........................3

        A.    Parents possess no fundamental right to have the proscribed surgeries and hormone treatments performed on their children. .......................................................3

        B.    The Act equally protects all minors from the proscribed treatments. ....................4

               1.    The Act equally protects minors of both sexes. ...........................................5

               2.    Transgender individuals are not a quasi-suspect class. ...............................7

               3.    The Act survives any level of review. ...........................................................9

        C.    Plaintiffs lack standing for many of their claims. ..................................................16

    II.  Plaintiffs cannot show irreparable harm. ...............................................................................17

        A.    Plaintiffs' alleged harms are not caused by the lack of a preliminary injunction. ..17

        B.    Plaintiffs' alleged harms are not imminent. ...........................................................20

        C.    Plaintiffs' alleged harms are not proven with nonspeculative evidence. ..............20

    III. The balance of equities and public interest favor Defendants. ...................................................22

    IV. Plaintiffs' requested relief is overbroad. .................................................................................23

    V.  The Court cannot grant Plaintiffs' motion without holding an evidentiary hearing. ...............25

Conclusion ...................................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) (en banc) .................................................................................4

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc) ......................8

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) .................................................. 18, 21

*Alvarez v. Corr. Med. Servs., Inc.*, 2011 WL 768880 (D. Md. Feb. 25) ..........................................21

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851 (11th Cir. 2013) ....................24

*Anand v. Indep. Blue Cross*, 2023 WL 1927993 (E.D. Pa. Feb. 10) ...................................... 18, 21

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022) .........................................................................23

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) ....................................................19

*Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196 (11th Cir. 2003) ................................25

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006) ........................................25

*Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) .......................................................8

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ..............................................14

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ............................................................5, 6

*Brakebill v. Jaeger*, 932 F.3d 671 (8th Cir. 2019) ...................................................................24

*Brandt v. Rutledge*, 2022 WL 16957734 (8th Cir. Nov. 16) .........................................................5

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ..................................................8

*Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478 (6th Cir. 2021) (en banc) ...........................9

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ..................................................................... 8, 23

*California v. Texas*, 141 S. Ct. 2104 (2021) ........................................................... 23, 24, 25

*Cape v. TSSAA*, 563 F.2d 793 (6th Cir. 1977) ..........................................................................6

*CASA de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020) ........................................................24

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007) .............25

*Chandrasekaran v. Wolf*, 2021 WL 1137992 (E.D. Mich. Mar. 25) ..............................................18

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) .................................................6

*Clark v. Jackson*, 2023 WL 2787325 (6th Cir. 2023) ............................................................3, 4

*Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023) ..............................................................23

*Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811 (3d Cir. 1978) ............................................20

*D.H. v. Williamson Cnty.*, 2022 WL 16639994 (M.D. Tenn. Nov. 2) .............................................7

*D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324 (6th Cir. 2019) .................................... 17, 19, 20, 22

*Dekker v. Marstiller*, 2022 WL 19394894 (N.D. Fla. Oct. 24) ...................................................21

Case 3:23-cv-00376   Document 112   Filed 05/19/23   Page 3 of 34 PageID #: 921

*Dist. Brewing Co., Inc. v. CBC Rest.*, LLC, 2016 WL 1366230 (S.D. Ohio Apr. 6) ....................................17

*Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022) .............1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 25

*Dobbs-Weinstein v. Vanderbilt Univ.*, 2022 WL 860450 (M.D. Tenn. Mar. 22).........................................17

*Dodds v. U.S. Department of Education*, 845 F.3d 217 (6th Cir. 2016) (per curiam)...................................7

*Doe v. Lee*, 2022 WL 17650484 (M.D. Tenn. Dec. 13) ...........................................................................4

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982)..........................................................................................19

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532 (6th Cir. 2020) ...................3

*Geduldig v. Aiello*, 417 U.S. 484 (1974)........................................................................................5, 7, 8

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)........................................................................................23, 25

*Ginsberg v. New York*, 390 U.S. 629 (1968)........................................................................................14

*Hennessy-Waller v. Snyder*, 28 F.4th 103 (9th Cir. 2022) .......................................................................6

*Hennessy-Waller v. Snyder*, 529 F.Supp.3d 1031 (D. Ariz. 2021) ...........................................................6

*In re Baker*, 2017 WL 6015380 (E.D. Mich. Dec. 5) ...........................................................................20

*Johnson v. Williams*, 568 U.S. 289 (2013) .........................................................................................19

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396 (6th Cir. 2019)................................4

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ..........................................................................................16

*Lichtenstein v. Hargett*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020)..........................................................22

*Loc. Spot, Inc. v. Cooper*, 2020 WL 7554247 (M.D. Tenn. Dec. 21)......................................................23

*Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673 (M.D. Tenn. 2020) ...........................17

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)............................................................................9

*MetroBanc v. Fed. Home Loan Bank Bd.*, 666 F. Supp. 981 (E.D. Mich. 1987)........................................21

*Mitchell v. Cincinnati*, 2022 WL 4546852 (6th Cir. Sept. 29) ...............................................................20

*Morrissey v. United States*, 871 F.3d 1260 (11th Cir. 2017) ...................................................................4

*Nat'l Pork Producers Council v. Ross*, 2023 WL 3356528 (U.S. May 11) ................................................11

*Nguyen v. INS*, 533 U.S. 53 (2001) ...............................................................................................6, 9

*Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514 (D. Del. 1984) ...............................................................22

*Nova Health Sys. v. Edmondson*, 373 F. Supp. 2d 1234 (N.D. Okla. 2005) ............................................21

*Ohio v. Yellen*, 539 F. Supp. 3d 802 (S.D. Ohio 2021)....................................................................17, 20

*Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015) .......................................................................7

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002) .....................................21

*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021) ....................................................................5

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ...........................................................................8

*Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) ................................................................................24

*Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019) (en banc) ............................ 16

*Preterm-Cleveland v. McCloud*, 994 F.3d 512 (6th Cir. 2021) (en banc) ................................ 11, 15

*Raich v. Gonzales*, 500 F.3d 850 (9th Cir. 2007) ................................................................. 4

*Reed v. Reed*, 404 U.S. 71 (1971) ..................................................................................... 5

*Roddy Mfg. Co. v. Olsen*, 661 S.W.2d 868 (Tenn. 1983) ...................................................... 25

*Rutherford v. United States*, 616 F.2d 455 (10th Cir. 1980) .................................................. 4

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ................................................................ 21

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) ........................................................... 7

*Thompson v. DeWine*, 976 F.3d 610 (6th Cir. 2020) ............................................................. 22

*United States v. Salerno*, 481 U.S. 739 (1987) .................................................................... 24

*United States v. Virginia*, 518 U.S. 515 (1996) .......................................................... 5, 6, 9

*Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) (en banc) .................................. 23, 24

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ........................................................ 3, 4, 12

*Whalen v. Roe*, 429 U.S. 589 (1977) .................................................................................. 3

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) ............................................. 19, 24

*Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483 (1955) ............................................... 14

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) ................................................................. 9

*Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020) ............................................................... 22

*Women's Emergency Network v. Bush*, 191 F. Supp. 2d 1356 (S.D. Fla. 2002) .......................... 20

**Statutes**

18 U.S.C. § 116 ................................................................................................................ 7

42 U.S.C. § 2000e-2(a)(1) ................................................................................................. 5

H.B. 1215, 113th Gen. Assem. (2023) ................................................................................. 9

S.B. 1, 113th Gen. Assem. (2023, prefiled Nov. 9, 2022), codified at Tenn. Code Ann. § 68-33-101, et seq. (D.E. 33-1) ............................................... 1, 5, 8, 9, 11, 14, 15, 16, 17, 18, 19, 20, 25

**Other Authorities**

Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ........................................ 23

Sears, *Arresting Dress* (2013) ............................................................................................ 6

*Whipping & Castration as Punishments for Crime*, 8 Yale L.J. 371 (1899) ............................... 7

**Rules**

Fed. R. Civ. P. 23(b)(2) ..................................................................................................... 23

## INTRODUCTION

Plaintiffs say the Constitution requires Tennessee to stand by while vulnerable children, who cannot give truly informed consent, are permanently sterilized. Nothing could be more living constitutionalist than the idea that the Fourteenth Amendment, ratified in 1868, deprived Tennessee of its police power to protect these children from dangerous and unproven treatments. Plaintiffs' arguments regarding substantive due process and equal protection cannot withstand recent decisions of the Supreme Court and Sixth Circuit, not least of them *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022). *Dobbs* held that the States retain broad authority to regulate medical treatments, including the prohibition of treatments that apply only to patients of one sex. Plaintiffs do not even cite *Dobbs* or address how it can coexist with their expansive views of the Fourteenth Amendment.

A local scandal was the catalyst for change in Tennessee. In September 2022, the public learned that Vanderbilt University Medical Center was engaged in a widespread and profit-motivated practice of prescribing hormones to and conducting surgeries on the State's children. *See* Kruesi, *Social media posts spark calls to investigate Tenn.'s VUMC*, AP News (Sept. 21, 2022) [Ex. 1-A.] "We have some individuals who have started gender affirming hormones at 13 or 14" years old, declared the VUMC doctor who treats all the minor patients in this case. [Ex. 1-B 45:41-45:45 (Dr. Brady).] VUMC performed "top surgery," *i.e.*, double mastectomies, on gender dysphoric minors as young as 16. [Ex. 1-C 15 (Dr. Brady and others).] The creator and lead clinician of the Vanderbilt Clinic for Transgender Health boasted that, despite VUMC's nonprofit status, "top surgeries" and "routine hormone treatment" would "make a lot of money." [Ex. 1-D 0:11-0:47 (quoting Dr. Taylor).] A VUMC administrator warned its "conscientious" objectors that, "[i]f you don't want to do this kind of work, don't work at Vanderbilt." [Ex. 1-E 0:01-0:08, 1:10-1:14.] Tennessee legislators responded with the Act. *See* S.B. 1, 113th Gen. Assem. (2023, prefiled Nov. 9, 2022), codified at Tenn. Code Ann. § 68-33-101, et seq. (D.E. 33-1).

Plaintiffs appeal to "widely-accepted" "professional medical standards" from WPATH and the Endocrine Society. Mem.3,16. True, radical gender ideology has captured an entire alphabet of American medical organizations; but WPATH's board is not the People's Legislature, and the Endocrine Society's annual meeting is not a Constitutional Convention. Recall that the "mainstream" American medical community also told everyone how medically important abortion is in *Dobbs*. 142 S.Ct. at 2344 & n.22 (Breyer, J., dissenting) (citing amici). At bottom, Plaintiffs propose living constitutionalism fused with scientific populism. They hope this Court will ignore the dissenters from American medical orthodoxy and the consensus of several other advanced democracies and instead rule that WPATH is our lawgiver. Defendants' asks are much more modest: This Court should acknowledge divergent views and hold that the responsibility to choose between them rests with the People acting through their elected representatives.

As but one example of the other side of the debate, Sweden led the vanguard for these transition therapies in previous decades. Just before Plaintiffs filed this case, Sweden's most renowned psychiatrists and government completed another in a growing list of comprehensive, systematic reviews by European health authorities. That review concluded that the "long-term effects of hormone therapy on psychosocial and somatic health are unknown, except that [puberty blockers] see[m] to delay bone maturation." Landén et al., *A systematic review of hormone treatment for children with gender dysphoria and recommendations for research*, Acta Paediatrica, 2023;00:1,12 (Apr. 18, 2023) (Ex. 2). They emphasized that "[t]he absence of long-term studies is worrying because many individuals start treatment as minors (<18 years) and [cross-sex hormone therapy] is lifelong." *Id.* at 10. Tennessee does not have to "Buy American" when it comes to medical policy; it can recognize that the national health services of the UK, Sweden, and Finland have effectively barred access to these treatments for minors and choose to do the same. [Cantor (Ex. 3) ¶¶16-35; Hruz, (Ex. 4) ¶¶131-134; Levine (Ex. 5) ¶¶ 77, 229; (Ex. 6) Román ¶¶14-20, 35-37.]

Beyond their inability to demonstrate a clear likelihood of success on the merits, Plaintiffs' motion defies Article III's limits on standing and the requirement to demonstrate irreparable harm. In so doing, Plaintiffs ask the Court for statewide relief for nonparties, running afoul of controlling Sixth Circuit and Supreme Court precedent. Plaintiffs' entire case is an invitation to error.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). To do so, a plaintiff "must establish" four things: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 535-36. Plaintiffs fail all four.

## ARGUMENT

### I. Plaintiffs have not demonstrated a clear likelihood of success on the merits.

Plaintiffs' failure to establish a "likelihood of success on the merits" is "fatal." *Enchant Christmas Light Maze*, 958 F.3d at 539 (cleaned up). The Act neither violates parents' fundamental rights nor denies equal protection. Plaintiffs also lack standing.

#### A. Parents possess no fundamental right to have the proscribed surgeries and hormone treatments performed on their children.

"To validly assert a substantive due process claim, a petitioner must provide a 'careful description' of" the claimed liberty interest. *Clark v. Jackson*, 2023 WL 2787325, at *5 (6th Cir. 2023). That right "must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs*, 142 S.Ct. at 2242 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). A parent's "claim is derivative from, and therefore no stronger than," the child's right to treatment. *Whalen v. Roe*, 429 U.S. 589, 604 (1977). Yet Plaintiffs make no effort to prove that a fundamental right to these treatments existed in 1868 when the Fourteenth Amendment was ratified. Plaintiffs

concede there is, at best, "nearly two decades of research." Mem.17. Twenty-first-century medical fads cannot be sufficiently deeply rooted.

Plaintiffs therefore fudge the *Glucksberg* test and define the contested right "at a high level of generality," exactly as the Supreme Court discourages. *Dobbs*, 142 S. Ct. at 2258. They say that parents have a sweeping "substantive due process right . . . to direct their children's medical care." Mem.30 (quoting *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019)). But *Kanuszewski* asked whether parents could *refuse* the drawing and long-term storage of their children's blood. 927 F.3d at 408, 418-20. *Glucksberg* rejected the idea that "the right to refuse unwanted medical treatment could be some-how transmuted into a right to" get a specific treatment, such as assisted suicide. 521 U.S. at 725-26.[1] Any right to refuse treatment is not itself limitless, as the Sixth Circuit ruled last month in *Clark*. *See* 2023 WL 2787325, at *5-6 (applying rational-basis review and upholding vaccine mandate).

Rational-basis review applies here as well. "[G]overnments routinely play a role in the details of day-to-day parenting," and this Court should not "aggressively constitutionaliz[e] every aspect of" medical treatment for children. *Doe v. Lee*, 2022 WL 17650484, at *23 (M.D. Tenn. Dec. 13). Parental direction does not create a backdoor constitutional right to a treatment that the State can lawfully ban.

### B.    The Act equally protects all minors from the proscribed treatments.

The Act equally protects all Tennessee minors from hormonal and surgical procedures performed "for the purpose of: (A) Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or (B) Treating purported discomfort or distress from a discordance

---

[1] Numerous circuits agree. See, *e.g., Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 711 (D.C. Cir. 2007) (en banc) (no "right to procure and use experimental drugs"); *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007) (no right to "medical marijuana"); *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) (no right for mentally ill patients "to take whatever treatment they wished regardless of" FDA); *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017) (rejecting fundamental right to IVF surrogacy treatment, not in use "until the mid to late 1980s").

between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1). Plaintiffs focus only on subsection (A) and forfeit any argument that (B) discriminates. *See* Mem.12-14. Neither triggers heightened scrutiny. A law that relates in some way to biological sex is not automatically sex discrimination, and the Supreme Court has said so.

### 1. The Act equally protects minors of both sexes.

Sex discrimination under the Equal Protection Clause means "giv[ing] a mandatory preference to members of either sex over members of the other." *Reed v. Reed*, 404 U.S. 71, 76 (1971); *accord United States v. Virginia*, 518 U.S. 515, 547 (1996). Here, the Act proscribes treatments equally for minors of both sexes. The fact that biological sex is implicated proves nothing because "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination.'" *Dobbs*, 142 S. Ct. at 2245-46 (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). Even Plaintiffs allege only that the Act "targets transgender people," Mem.13, not members of one sex or the other.

Plaintiffs repeatedly invoke *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), but fail to cite or address the Sixth Circuit's holding that *Bostock* is "limited only to Title VII itself," *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). *Bostock* held that firing an employee "simply for being homosexual or transgender" is discrimination "'because of . . . sex'" under Title VII. 140 S. Ct. at 1737-38 (quoting 42 U.S.C. § 2000e-2(a)(1)). The firing treats a member of one sex differently than the other even though they express the same gender identity or the same sexual orientation. *Id.* at 1741. The Equal Protection Clause uses different words and "predates Title VII by nearly a century, so there is reason to be skeptical that its protections reach so far." *Brandt v. Rutledge*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16) (Stras, J., joined by Gruender, Erickson, Grasz, Kobes, JJ., dissental). In the decades after the ratification of the Fourteenth Amendment, laws against cross-dressing—one of the very acts Title VII protects from discrimination under *Bostock*—"were a central component of urban

life." Sears, *Arresting Dress* 3-4 (2013); *see id.* ("Between 1848 and 1900 thirty-four cities in twenty-one states passed prohibitions against cross-dressing, as did eleven more cities before World War I."). A die-hard living constitutionalist could ignore this, but a federal court in this jurisprudential era cannot.

Nor would *Bostock* be applicable even if the Supreme Court and Sixth Circuit had not disinvited lower courts from extending it. Discrimination requires treating individuals "worse than others who are similarly situated." *Bostock*, 140 S. Ct. at 1740; *accord City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "An individual's homosexuality or transgender status is not relevant to employment decisions," *Bostock*, 140 S. Ct. at 1741, but anyone who has seen a urologist for a PSA test knows sexual biology is routinely relevant to medicine. [Hruz ¶66.] The "physical differences between men and women are enduring." *Virginia*, 518 U.S. at 533. When it comes to bathrooms, athletics, and medicine, the "distinct differences in physical characteristics and capabilities between the sexes" matter. *Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977). As Justice Marshall put it, a "sign that says 'men only' looks very different on a bathroom door than a courthouse door." *Cleburne*, 473 U.S. 432 at 468-69 (1985) (Marshall, J., concurring in judgment in part). Hospital doors are different still. The Act cannot be distinguished from a law that regulates abortion, which *Dobbs* holds is not sex discrimination at all.

So, Plaintiffs pivot to arguing that the Act is sex discrimination because it punishes "failure to conform to sex stereotypes or expectations." Mem.13. Plaintiffs say it is a stereotype for a girl to "receiv[e] medical treatment to live in accordance with a female gender identity." Mem.14.[2] (As if carrying a baby to term would not also be a "sex stereotype" under this reasoning.) "There is nothing irrational or improper in the recognition," *Nguyen v. INS*, 533 U.S. 53, 68 (2001), that boys' and girls'

---

[2] Plaintiffs cite two district court cases (*Boyden, Kadel*) that are inapplicable because both involved adults who wanted state-health plans to cover their requested treatments. *See Hennessy-Waller v. Snyder*, 529 F.Supp.3d 1031, 1044 (D. Ariz. 2021) (distinguishing those cases and denying preliminary injunction where minors sought funding for double mastectomies), *aff'd sub nom.*, 28 F.4th 103 (9th Cir. 2022).

bodies are naturally distinct and need medical treatment consistent with their sex. Recognizing physical differences between the sexes "is not a stereotype." *Id.* Those differences define sex itself.

The Sixth Circuit has not applied this stereotyping idea to medicine, and for good reason. Sex stereotypes concern whether someone "wear[s] dresses or makeup," not whether someone's body is male or female. *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004).[3] Plaintiffs' logic means it would be sex stereotyping for Tennessee to prohibit implanting fertilized eggs within men based on the "stereotype" that only women have wombs and can become pregnant. Another casualty would be the federal ban on "female genital mutilation" of minors. 18 U.S.C. § 116. Under their living constitution, if parents sign off on castrating a son so that he can sing with an unnaturally high range as an adult, Tennessee would be powerless to stop it—especially if the boy asserted the WPATH-approved gender identity of "eunuch." [WPATH (Ex. 9) 88-92 ("Chapter 9-Eunuchs");] *cf. Whipping & Castration as Punishments for Crime*, 8 Yale L.J. 371, 382 (1899) (citing the existence of *castrati* in the 1800s in Italy to justify eugenic sterilization). Fortunately, Plaintiffs' expansive view does not survive modern constitutional methods and precedents like *Dobbs* and *Geduldig*.

### 2. Transgender individuals are not a quasi-suspect class.

Plaintiffs briskly cite nonbinding cases for the idea that transgender persons are in a quasi-suspect class. Mem.12. Yet they miss the Sixth Circuit precedent holding that gay persons are not in one because, unlike "race or biological gender," sexual orientation is not "definitively ascertainable at the moment of birth." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). So too with transgender

---

[3] Plaintiffs read too much into *Dodds v. U.S. Department of Education*, 845 F.3d 217 (6th Cir. 2016) (per curiam). That divided motions panel merely declined to grant a stay of an already issued preliminary injunction regarding school bathrooms because the school district had only "show[n] a possibility of relief, which is not enough to grant a stay." *Id.* at 221. But the posture of *Dodds* is not what this Court faces in "evaluating the granting of a preliminary injunction." *D.H. v. Williamson Cnty.*, 2022 WL 16639994, at *6 (M.D. Tenn. Nov. 2).

7

status—which cannot be identified by any physical means, cannot be confirmed by any outside observer, and can change over time. *Id.*; [Laidlaw (Ex. 7) ¶17.] Case closed.

Even if transgender minors were in a quasi-suspect class, the Act does not discriminate on that basis. Not all transgender individuals use puberty blockers, hormones, or surgery "to identify with, or live as, a purported identity inconsistent with [their] sex" or to "[t]reat[] purported discomfort or distress from a discordance between" sex and identity. Tenn. Code Ann. § 68-33-103(a)(1).[4] Transgender minors are in "both" the group of individuals not receiving such treatments and the group of individuals receiving such treatments. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc). Accordingly, there is a "lack of identity" between transgender status and the prohibited treatments. *Geduldig*, 417 U.S. at 496 n.20; *see id.* (even though everyone who is pregnant is a woman, "members of both sexes" are in the nonpregnant group); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) ("'Women seeking abortion' is not a qualifying class."). And "uneven effects upon particular groups within a class" do not violate the Fourteenth Amendment. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). *Dobbs* confirms that although the procedure obviously involves sex, "laws regulating or prohibiting abortion are not subject to heightened scrutiny. Rather, they are governed by" rational-basis review, "the same standard of review as other health and safety measures." 142 S. Ct. at 2245-46. The same is true for this health measure.

Plaintiffs try one last end-run around rational-basis review by arguing that legislators intentionally targeted transgender minors. Mem.15. After scouring the legislative record, Plaintiffs agree there was no "malice or hostile animus" but insist that the General Assembly displayed too much "insensitivity." Mem.19 (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001)(Kennedy, J., concurring)). There is no Insensitivity Clause in the Constitution, and a review of the legislative

---

[4] As one VUMC doctor observed, "not every patient wants surgery. Not every patient wants hormonal treatment." [Ex. 1-B, 31:18-31:22 (Dr. Romano).] WPATH agrees. [WPATH 57.]

history shows a tremendous depth of concern for the affected children. In any event, the Supreme Court "has long disfavored arguments based on alleged legislative motives" and requires "invidiously discriminatory animus." *Dobbs*, 142 S. Ct. at 2246, 2255. The General Assembly was trying "to protect the health and welfare of" *all* "minors" from specific treatments where it thought the risks outweighed the benefits. Tenn. Code Ann. § 68-33-101(a).

Demonstrating how far off-base Plaintiffs are, they argue that the General Assembly has "a larger legislative strategy to discriminate," Mem.15, due to a bill that failed to pass either house, H.B. 1215, 113th Gen. Assem. (2023). They also cite a law that guarantees teachers the option not to use biologically inaccurate pronouns but do not note that the Sixth Circuit has recognized this as a constitutional right for public university professors. *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). In short, "whether a law is dignifying or demeaning is a question for legislators, not judges." *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 487 (6th Cir. 2021) (en banc).

### 3. The Act survives any level of review.

The Act, "like other health and welfare laws, is entitled to a strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284. "It must be sustained if there is a rational basis on which the legislature could have thought it would serve legitimate state interests." *Id.* But even under the strictest scrutiny, Tennessee's laws need not be "perfectly tailored." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015).[5]

Again, ignoring the lessons of *Dobbs*, Plaintiffs ask this Court to (1) "conduc[t] the sort of fact-finding that might be undertaken by a legislative committee," and (2) defer to the positions of various medical associations. 142 S. Ct. at 2267 (describing the flaws of *Roe*). Joining the battle of the experts on a field that should be decidedly legislative and not judicial, Defendants provide expert declarations

---

[5] By necessity, then, the Act also survives intermediate scrutiny. It serves "important governmental objectives" and employs means "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533. This inquiry does not "require[e]" that the statute "be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70.

describing the life-altering negative effects of these unproven treatments, including delayed development, permanent sterilization, loss of sexual function, decreased bone density, increased risks of cardiovascular disease and cancer, negative psychological consequences, and a lifetime of dependence on these drugs. [Cantor ¶¶205-225; Levine ¶¶121, 178, 189-95; Hruz ¶¶88-92, Laidlaw ¶¶19, 135-154.] And they explain that many of the long-term effects of administering these drugs during puberty, including their impact on neurocognitive development, remain unknown. [Cantor ¶¶209-13; Levine ¶127.] There also are no reliable studies that demonstrate medical transition lowers suicide rates or suicidality in minors, nor is there reliable evidence that medical transition improves mental health relative, to mental health treatments that lack medical risk. [Cantor ¶¶147-153, 177-200.] It is undisputed that youth who present with gender dysphoria often exhibit other mental-health comorbidities. [Levine ¶130; Román ¶¶30-32.] Defendants' experts further explain that the protocols adopted by WPATH and the Endocrine Society promoting hormonal and surgical transition are based on "very low quality" evidence under established research evaluation standards.[6] [Cantor ¶82, 88-104; Levine ¶¶173-74, 187; Laidlaw ¶¶175-183.]

Just listen to how the founder of the Vanderbilt Clinic for Transgender Health talked before the truth came out: "We have very, very little data to guide our treatment." [Ex. 1-G 37:29-37:32 (Dr. Taylor)]. She agreed with many of Defendants' experts' criticisms of available studies: "Any studies that we do have are generally small cohort studies" that "only follow the patients for 12 to 18 months." [Id. 37:33-40]. "We haven't been doing this particularly long enough to know the long-term effects of hormone replacement therapy, and this is particularly true in our pediatric population." [Id. 38:08-38:20]. "I've had no fellowship training in this. Everything I have learned, I have learned from my

---

[6] The efforts of Plaintiffs' designated experts (several of whom derive income from providing the type of treatment proscribed by the Act) to explain away this "very low quality" evidence is specious, at best. [Cantor, ¶¶259-312].

patients, and I've learned from the Internet." [*Id.* 44:30-44:36]. In a "primer" on transgender medicine, Dr. Taylor explained there is "[n]o real consensus" about estradiol levels for boys who identify as girls. [Ex. 1-F VUMC Dep. 0169]. According to her, Planned Parenthood's approach is "based on symptomatic response without lab monitoring," while her own practice is "still figuring it out!" *Id.* The title of two of Dr. Taylor's presentations perhaps summed it up best: "Caring for the Transgender Patient: With little evidence, but a lot of love." [Ex. 1-H Taylor CV 13.] With more evidence, and equal if not greater love, the State intervened to "preserv[e] . . . the integrity of the medical profession" within its borders. *Dobbs*, 142 S. Ct. at 2284. Tennessee has a "compelling state interest of proscribing complicity by its physicians" in these "misguided practice[s]." *Preterm-Cleveland v. McCloud,* 994 F.3d 512, 560 (6th Cir. 2021) (en banc) (Griffin, J., concurring). In the face of an astonishing rise in cases, which common sense and experts attribute to social contagion, [Nangia (Ex. 8) ¶¶36, 126, Román ¶¶27-28,] Tennessee took appropriate action to protect minors.[7]

Paying no attention to the General Assembly's concerns, Plaintiffs say the Endocrine Society Guidelines and WPATH Standards answer all doubts, as if VUMC's infidelity to even those standards could be ignored. Mem.3. Yet, "[j]udges cannot displace the cost-benefit analyses embodied in democratically adopted legislation guided by nothing more than their own faith in" two organizations with their own agendas. *Nat'l Pork Producers Council v. Ross*, 2023 WL 3356528, at *13 (U.S. May 11) (op. of Gorsuch, J.). And even the true believers acknowledge the serious harms of these treatments.

The Endocrine Society says the "primary risks of pubertal suppression" to treat gender

---

[7] Plaintiffs also appear to argue, Mem.15, that Tennessee has no interest in "encouraging minors to appreciate their sex, particularly as they undergo" the stresses of "puberty" or in protecting them from medical procedures "that might encourage minors to become disdainful of their sex." Tenn. Code Ann. § 68-33-101(m). Tennessee undoubtedly has a compelling interest in helping minors mature through puberty into healthy adults and in stopping doctors from knowingly performing medical procedures "premised on the undesirability of the" child's "sex." *Preterm-Cleveland*, 994 F.3d at 536 (Sutton, J., concurring).

dysphoria are "adverse effects on bone mineralization," "compromised fertility if the person subsequently is treated with sex hormones," and "unknown effects on brain development." [ES Guidelines (Ex. 10) 3882.] WPATH agrees that "long-term data are more limited in" gender dysphoric "adolescents than in adolescents with precocious puberty." [WPATH 114.] No wonder, since the FDA has approved the use of GnRH analogs to treat precocious puberty *but not* gender dysphoria. [Levine ¶175; Laidlaw ¶¶74, 77.] Research shows that the vast majority of children who exhibit gender dysphoria grow up to align their gender identity with their biological sex by the time they reach adulthood, absent hormonal intervention; and, desistence is increasingly observed among teens and young adults who first manifest gender dysphoria during or after adolescence. [Levine ¶¶93, 105-118; Hruz ¶62 (estimates in peer-reviewed literature reported desistence in approximately 85% of children before adoption of "affirming" model).] It is also not yet known how to distinguish between those children whose gender dysphoria will desist and the minority who will persist. [Levine ¶¶88, 108.] Because starting gender dysphoric minors on puberty blockers "will start [them] down the path" to sterilizing cross-sex hormones and often surgery,[8] the General Assembly has an "unquestionably important" interest in prohibiting it. *Glucksberg*, 521 U.S. at 732, 735.

The harms of cross-sex hormone treatment for gender dysphoria also outweigh the benefits. Putting boys on high, supraphysiologic doses of estrogen leads to a "[v]ery high risk of" thromboembolic disease (circulating blood clots) and a moderate risk of macroprolactinoma (a tumor impacting the pituitary gland), breast cancer, coronary artery disease, cerebrovascular disease, cholelithiasis (gallstones), and hypertriglyceridemia. [ES Guidelines 3886.] Putting girls on high doses of testosterone leads to a "[v]ery high risk of" erythrocytosis (too many red blood cells) and a moderate risk of severe

---

[8] [Levine ¶¶128-29 (UK study found 98% of adolescents who used puberty blockers progressed to cross-sex hormones); Laidlaw ¶114 (Dutch study found 100% of adolescents who took puberty blockers progressed to cross-sex hormones, and follow-up study found overwhelming majority of those went on to have sex reassignment surgery).]

liver dysfunction, coronary artery disease, cerebrovascular disease, hypertension, and breast or uterine cancer. *Id.* Both treatments threaten fertility. [Hruz ¶¶52, 89.]

With increasing frequency, detransitioners have come forward lamenting these impacts. [Levine ¶¶110-118; Cole (Ex. 11) ¶¶15, 23; Kerschner (Ex. 12) ¶¶12-14; Mosley (Ex. 13) ¶¶8-10.] Parents also are coming forward to voice their angst over healthcare providers pressuring them to place their children on the conveyor belt of medical transition without first treating psychological comorbidities or explaining the various harms associated with these treatments. [Barbara F. (Ex. 14) ¶¶7-11; Stiles (Ex. 15) ¶13-15; Kellie C. (Ex. 16) ¶¶7-8; Robert Roe (Ex. 17) ¶¶10-11; Yoe (Ex. 18) ¶¶6-10; Noakes (Ex. 19) ¶¶10-12; Reed (Ex. 20) ¶¶13-14; *accord* Román ¶6.] Those who use the language of a hostage taker and tell parents they face a choice between "a live son or a dead daughter," [Kellie C. ¶8; Reed ¶13,] are both factually wrong and unethical. [Levine ¶158.]

Hormonal treatment for gender dysphoria has lifelong repercussions. Even the Endocrine Society selected the age of 16 for cross-sex hormones precisely because that is the age of majority "in certain European countries." [WPATH 43]. The Endocrine Society, of course, gave themselves an out by saying "there may be compelling reasons to initiate hormone treatment prior to the age of 16." [ES Guidelines 3883.] But prescribing hormones to 14-year-olds was *standard* practice at VUMC, not a treatment reserved for a select group of minors. [D.E. 23 S. Williams ¶¶16-18.] In the face of "limited data," [WPATH 65,] WPATH's current approach is to set no minimum age for hormone treatment. That is indefensible, let alone constitutionally required. Due to their lack of full neurologic, psychosocial, and cognitive maturation, most minors are unable to comprehend and appreciate the long-term risks of medical gender transition or the low-quality data on which the WPATH and ES guidelines are based. [Nangia ¶¶154.] The Act's approach is far better tailored. As in many areas of law, the States have constitutional power to regulate the well-being of its children—broader than its power over adults—where it is "rational for the legislature to find that the minors' exposure" to the

13

regulated conduct "might be harmful." *Ginsberg v. New York*, 390 U.S. 629, 639-40 (1968).

For the surgery prohibition, Plaintiffs, none of whom have a present intention to seek or perform surgery, weakly defend "[c]hest masculinization surgery" because it "has no effect on fertility." Mem.18. Plaintiffs ignore that double mastectomies will permanently mar girls' bodies and prevent future mothers from ever nursing their babies. [Cole ¶15.] The Endocrine Society Guidelines do not set *any* minimum age for mastectomies. [ES Guidelines 3872.] And until VUMC stopped performing surgeries on gender dysphoric minors, VUMC was performing double mastectomies on girls as young as 16. [Ex. 1-C 15.] One Tennessee plastic surgeon posted a before-and-after picture of a naked 15-year-old girl as an advertisement. [Ex. 1-I;] *see* Tenn. Code Ann. § 68-33-101(l). Moreover, there is no evidence of long-term benefits from chest surgery for treatment of gender dysphoria. [Laidlaw ¶222; Hruz ¶128.]

Other prohibited surgeries have even more dire effects. The new WPATH standards set no minimum age for any surgery other than phalloplasty. [WPATH 66.] Following them means a doctor can perform orchiectomies (removal of testicles) on boys or hysterectomies (removal of uterus) on girls—even though there is nothing functionally wrong with those body parts—with the only condition being that the minor undergo 12 months of hormone therapy first. [WPATH 64.] Plaintiffs absurdly proclaim that the removal of healthy organs is more defensible than the surgical correction of ambiguous genitalia in minors with congenital defects. Mem.14 & n.12. Even if that were so, the "legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955) (rational basis); *accord Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (intermediate scrutiny tolerates over inclusiveness). The mistreatment of children with gender dysphoria "seem[ed] most acute to the legislative mind," and disorders of sexual development and other congenital defects "may present problems of regulation distinct" from treating mental disorders with surgeries and hormones. *Lee Optical*, 348 U.S. at 489.

WPATH and the Endocrine Society do not make policy in the United Kingdom, Sweden, and Finland, which all have initiated a presumptive ban on these treatments for minors after lengthy study. [Cantor ¶¶167-169; Román ¶37.] The international consensus explicitly regards medical gender transition to be experimental. [Cantor ¶¶167-171.] Trying to distinguish Tennessee, Plaintiffs point to narrow exceptions for research. Mem.22. But Plaintiffs are just quibbling with Tennessee's approach at the margins. None of them are enrolled in a clinical trial or other research program, and Dr. Lacy does not say she wants to start one.

The Fourteenth Amendment grants no right to participate in research studies of procedures the legislature can otherwise prohibit, just as States do not need research exceptions to generally applicable abortion laws. The General Assembly can rationally decide to prohibit certain procedures and, in the meantime, await the results of studies underway in other places. At the very most, "facial attacks are not the proper procedure for challenging the lack of a" research "exception." *Preterm-Cleveland*, 994 F.3d at 529 (majority).

The General Assembly's other legislative findings are also correct. In the past 12 months, WPATH liberalized its standards by removing all minimum age requirements for hormonal and surgical treatments despite the lack of new evidence to justify the changes. [Cantor ¶248-50; Laidlaw ¶184-191.] Sterilizing treatments are most certainly harmful and experimental. [Hruz ¶115.] There is little to no long-term evidence to support the claimed benefits. [Cantor ¶¶147-153, 177-200; Levine ¶¶140-144; Hruz ¶¶113, 140, 142-43; Laidlaw ¶173.] The FDA has not approved puberty blockers for stopping gender dysphoric youth from experiencing normal puberty. [Laidlaw ¶77; Nangia ¶41]. Plaintiffs ignore other legislative findings, such as the accurate statement that "many of the same pharmaceutical companies that contributed to the opioid epidemic have sought to profit from the administration of drugs" to minors "or have paid consulting fees to physicians who then advocate for administration of drugs" for the prohibited purposes. Tenn. Code Ann. § 68-33-101(*i*). Nor do

Plaintiffs contest that "minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures" and that "many individuals have expressed regret for medical procedures that were performed or administered on them for such purposes when they were minors." § 68-33-101(h); *see, e.g.*, [Nangia ¶154.]

The General Assembly acted rationally and met any standard of heightened scrutiny.

### C.    Plaintiffs lack standing for many of their claims.

Most significantly, Dr. Lacy lacks third-party standing to assert the equal-protection rights of her patients or prospective patients.  (She has not moved for a preliminary injunction based on her § 1557 claim.)  "[P]roviders have *no* constitutional rights of their own in this setting." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 914 (6th Cir. 2019) (en banc).  Even if minors had a right to the prohibited treatments, or parents had a right to choose them, Dr. Lacy has no "constitutional right" to provide them.  *Id.*  So, she must prove third-party standing.  Yet there is no "hindrance" to Dr. Lacy's current patients seeking a preliminary injunction to protect their own interests, as her co-plaintiffs are doing here.  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).  She also lacks any "relationship" with minors who are not yet her patients, let alone a "close" one.  *Id.* (concluding attorneys lacked third-party standing for potential future clients).

No Plaintiff has standing to challenge the prohibition of "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being."  Tenn. Code Ann. § 68-33-102(5)(A).  The minors and their parents seek to continue administration of puberty blockers and hormones.  Nowhere do they mention a desire for surgery or complain that this provision blocks any of their treatments.  VUMC stopped providing surgeries for gender dysphoric minors in October 2022, so granting a preliminary injunction would have no effect.  [Ex. 1-L (VUMC letter to the Honorable Rep. Jason Zachary).]  Dr. Lacy similarly says she treats minors "with hormone therapy," not surgery.  [Complaint (D.E. 1), at 31.]  Plaintiffs cannot enjoin enforcement of this severable provision.

16

## II.   Plaintiffs cannot show irreparable harm.

The "absence of irreparable injury is always fatal to a motion for a preliminary injunction." *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 680 (M.D. Tenn. 2020). A district court "abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (cleaned up). Plaintiffs have the burden of clearly establishing the harm. *Dist. Brewing Co., Inc. v. CBC Rest.*, LLC, 2016 WL 1366230, at *2 (S.D. Ohio Apr. 6). To be irreparable, a harm must be "imminent," *D.T.*, 942 F.3d at 327, and it must injure the plaintiffs, not absent third parties. *Dobbs-Weinstein v. Vanderbilt Univ.*, 2022 WL 860450, at *2 (M.D. Tenn. Mar. 22). A preliminary injunction must actually prevent the irreparable injury. *Ohio v. Yellen*, 539 F. Supp. 3d 802, 821 (S.D. Ohio 2021). Plaintiffs fail all these requirements.

### A.   Plaintiffs' alleged harms are not caused by the lack of a preliminary injunction.

A preliminary injunction would not redress Plaintiffs' alleged harms because the challenged portions of the Act are not causing them. Though the Act comes into effect on July 1, it allows minors who are currently receiving treatment to continue that treatment until March 31, 2024. Tenn. Code Ann. § 68-33-103(b)(1)(B). All that a provider must do is certify that ending the current treatment would be "harmful." *Id.* § 68-33-103(b)(3). This Court, Dr. Lacy, Rebecca Roe, and a provider in Memphis agree. [Order (D.E. 88) 3; (D.E. 28) ¶19 (Dr. Lacy); (D.E. 27) ¶31 (Rebecca Roe); Choices Webpage (D.E. 74-1).] If doubts remained, Defendants' clear representations in this case should have ended them. *See* Motion to Reset Briefing Schedule (D.E. 74) 7-8.

The continuing care exception means Plaintiffs face no irreparable harm right now. While *other* minors cannot *begin* treatment after July 1, none of those other minors are plaintiffs. Plaintiffs here say their providers are cutting them off, not titrating them down. [(D.E 23) ¶26 (S. Williams); (D.E 25) ¶23 (Jane Doe); (D.E. 27) ¶31 (Rebecca Roe).] If providers are comfortable abruptly ending existing treatments, nothing in the Act requires them to abruptly end them on July 1 instead of March

31.  Nor does the Act say anything about "titration."  It only requires that a preexisting treatment conclude by March 31.  Tenn. Code Ann. § 68-33-103(b)(1)(B).  Unless the treatment is "different" from what started before July 1, the Act places no limits on it.  *Id.* § 68-33-103(b)(4).  Plaintiffs have provided no medical evaluation whatsoever, an independent problem with their allegations of irreparable harm, *see infra* 22, much less any opinion about how long it would take to "titrate."  Dr. Laidlaw concludes from a review of their records that all three Plaintiffs could stop their treatments within a few weeks. [Laidlaw ¶¶ 260 (L.W.), 289 (Ryan Roe), 300 (John Doe).]

While VUMC decided to stop treating minors altogether on July 1, the *challenged portions* of the Act are not the reason why.  VUMC's declaration is revealing.  It admits that the Act allows it to continue existing treatments "through March 31, 2024," so long as its doctors can certify that discontinuing those treatments would be "harmful." [Pinson (Ex. 1-J) ¶6.]  But then it attests that "no" patient will continue getting treatment under this exception.  *Id.* ¶8.  This can mean only one of two things.  Either VUMC cannot certify that ending these treatments will be "harmful," *dis*proving Plaintiffs' claims of irreparable harm, or Plaintiffs are no longer patients at VUMC.  [Brady (Ex. 1-K) ¶9.]  Defendants cannot be blamed if Plaintiffs are refusing to get treatments that providers are willing to give them.  *Chandrasekaran v. Wolf*, 2021 WL 1137992, at *6 (E.D. Mich. Mar. 25).  Plaintiffs are not suffering irreparable harm at all if they are getting their treatments elsewhere. [Brady ¶9;] *see Adams v. Freedom Forge Corp.*, 204 F.3d 475, 490 (3d Cir. 2000) (changing physicians is "not the kind of irreparable harm contemplated by the preliminary injunction standard"); *Anand v. Indep. Blue Cross*, 2023 WL 1927993, at *2 (E.D. Pa. Feb. 10) ("Nor does denial of medical care from one's chosen doctor … constitute irreparable harm.").

Nor is there any evidence a preliminary injunction would change VUMC's decision.  In a carefully worded paragraph, VUMC says it would continue care for certain patients "[s]hould enforcement of the Act's provisions prohibiting Hormone Therapy be deferred, delayed[,] or enjoined."

[Pinson ¶9.]  But this preliminary injunction would not provide that relief.  A *preliminary* injunction is, by definition, preliminary.  It will disappear if this Court rules for Defendants at trial, and it could be stayed or reversed on interlocutory appeal.  If either occurs, VUMC can be held liable for its violations of the Act while the preliminary injunction was in place, *see Edgar v. MITE Corp.*, 457 U.S. 624, 651-53 (1982) (Stevens, J., concurring in part and concurring in judgment)—especially because VUMC is not a party, *id.* at 656 n.1 (Marshall, J., dissenting).  The prospect that a preliminary injunction would cause VUMC to resume this care is thus entirely "speculative."  *D.T.*, 942 F.3d at 327.

VUMC is perhaps confused that this Court could possibly enjoin *all* "enforcement" of the Act.  [Pinson ¶9.]  But it cannot.  Plaintiffs do not and cannot challenge the Act's private right of action, Tenn. Code Ann. § 68-33-105.  No one can in federal court, as the Supreme Court has said in an analogous case involving the Texas Heartbeat Act, when it addressed the precise circumstances presented here—*i.e.* where state officials have some enforcement authority alongside a parallel private right of action.

> Supposing the attorney general did have some enforcement authority under S. B. 8, the petitioners have identified nothing that might allow a federal court to parlay that authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own S. B. 8 suits.  The equitable powers of federal courts are limited by historical practice.  "A court of equity is as much so limited as a court of law."  Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions.  But under traditional equitable principles, no court may "lawfully enjoin the world at large" or purport to enjoin challenged "laws themselves."

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (cleaned up).  Future private plaintiffs are not parties to this case, and their claims will be brought in state court where nothing this Court or the Sixth Circuit says about federal law is binding.  *Johnson v. Williams*, 568 U.S. 289, 305 (2013); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 n.21 (1997).

This near-permanent threat of civil liability, categorically immune from this Court's equitable powers, makes it even more speculative that a preliminary injunction would give VUMC any comfort. Plaintiffs' own treating physician's declaration says out loud what VUMC must be thinking. She admits that she is not continuing preexisting treatments for any of her patients, even though the Act allows her to do so until March 31. [Brady ¶9.] Some of those patients have left her care. *Id.* As for the rest? Dr. Brady is "concerned" that doing what the Act allows will "expose [her] to punitive consequences" by "non-medical third parties." *Id.* ¶10. Those third parties, suing under § 68-33-105, are future civil litigants beyond this Court's power with cases in front of state judicial officers free, by constitutional design, to disagree with lower federal courts. No preliminary injunction here could remove that "concern." *See Ohio*, 539 F. Supp. 3d at 821.

### B. Plaintiffs' alleged harms are not imminent.

For the same reasons, Plaintiffs' alleged harms lack "imminence." *Mitchell v. Cincinnati*, 2022 WL 4546852, at *4 (6th Cir. Sept. 29). Nothing traceable to the Act will occur to them until at best several weeks prior to March 31, 2024. Something over six months away is not imminent. *E.g.*, *Women's Emergency Network v. Bush*, 191 F. Supp. 2d 1356, 1362 (S.D. Fla. 2002) ("an injury, at least five months from realization, is simply not 'imminent'"); *In re Baker*, 2017 WL 6015380, at *5 (E.D. Mich. Dec. 5) (harm not imminent when months away). It creates "no need to grant relief now as opposed to" next year, after reasonable discovery and motions practice. *D.T.*, 942 F.3d at 327. Plaintiffs cannot get "[a]n [o]rder telling [Defendants] not to do that which [they have] no current ability—or intent—to do, and likely will not be in a position to do at any time soon." *Ohio*, 539 F. Supp. 3d at 821.

### C. Plaintiffs' alleged harms are not proven with nonspeculative evidence.

Finally, Plaintiffs have not substantiated their asserted harms. Though some constitutional violations are irreparable *per se*, not all are. *E.g.*, *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) ("a denial of equal protection rights may be more or less serious depending on the other injuries which accompany such deprivation."); *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir.

2000) (same).  No violation is irreparable where, as here, the plaintiff is unlikely to succeed on the merits.  *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  Because "[t]he simple claim that a rule is unconstitutional is insufficient to demonstrate irreparable harm," Plaintiffs must prove some other "imminent concrete and irreparable injury."  *MetroBanc v. Fed. Home Loan Bank Bd.*, 666 F. Supp. 981, 984 (E.D. Mich. 1987).

The minors fail to substantiate their alleged harms.  Most of them require this Court to predict the medical consequences of ending their treatments.  But Plaintiffs (children and parents) are not medical experts, and they submitted no evidence from their physician, Dr. Brady.  She did provide a declaration but, astonishingly, refused to offer any opinion about Plaintiffs whatsoever.  Though she says "weaning from Hormone Therapy has begun," her use of the passive voice is telling: she does not say that *she* is doing the weaning or that *Plaintiffs* are the ones being weaned.  [Brady ¶9.]  In fact, she confirms that she is not continuing prior treatments for any minor patients, including Plaintiffs—either because they left her care, they are being treated elsewhere, she fears liability, or other "reasons." [*Id.* ¶¶9-10.]  This Court cannot find irreparable harm based on "the plaintiffs' own testimony," with no actual "medical testimony that [they] need the treatments at issue and will suffer irreparable harm if it is not provided before the scheduled trial."  *Dekker v. Marstiller*, 2022 WL 19394894, at *3 (N.D. Fla. Oct. 24); *accord Alvarez v. Corr. Med. Servs., Inc.*, 2011 WL 768880, at *2 (D. Md. Feb. 25).

Plaintiffs' "stress and emotions" are not irreparable either to the extent they are not tied to the Act itself, *Nova Health Sys. v. Edmondson*, 373 F. Supp. 2d 1234, 1240 (N.D. Okla. 2005), and their fears of losing treatment could not be remedied by a mere *preliminary* injunction that could be stayed or reversed on appeal.  That Plaintiffs had to switch providers or travel further is an inherent risk with experimental treatments, is not irreparable, and is not enough to outweigh the countervailing harms to the State.  *See Adams*, 204 F.3d at 490; *Anand*, 2023 WL 1927993, at *2.

21

Dr. Lacy likewise fails to substantiate any harm to her. As explained, she lacks third-party standing to claim the injuries of her patients. Regardless, of her "twenty" current patients who are transgender minors, she admits she can continue treating them until March 31. [(D.E. 28) Lacy ¶¶17, 19.] She does not explain whether she has other patients who have not started treatment but would after July 1, and she says nothing about titration or how long it would take. She does not assert any economic harms, let alone quantify them with nonspeculative evidence. *Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 520 (D. Del. 1984). Even if she had, those costs are not irreparable. *Id.* at 520-21. And, of course, she would not risk her medical license by following state law and not providing treatments that many doctors didn't provide even before the Act.

In its earlier order, this Court reserved judgment on whether Plaintiffs could show the required "imminency or irreparability of harm in support of their *motion for a preliminary injunction*." Order 4 n.3. Now that more evidence is in, the answer is clearly no. This Court would be "'well within its province'" to "le[ave] the merits … for another day" and "den[y] a preliminary injunction based solely on the lack of an irreparable injury." *D.T.*, 942 F.3d at 327.

### III. The balance of equities and public interest favor Defendants.

Because Defendants are government officials, the balance-of-equities and public-interest factors "'merge.'" *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). It is "in the public interest" to enforce the State's democratically enacted laws, *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020), and "[a]ny time" such a law is enjoined the State "suffers a form of irreparable injury," *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 787 (M.D. Tenn. 2020) (cleaned up).

These principles apply with unique force here. As explained, the Act protects Tennessee's children from controversial treatments that risk long-term consequences to their health. If Plaintiffs are right that a preliminary injunction will cause providers to resume these dangerous treatments, then the harm to Tennessee's children will be widespread. Far from "temporar[y]," Mem.24, the harms

that occur while a preliminary injunction is in place cannot be undone later. That harm to families throughout the State outweighs any harm to these individual plaintiffs. "It is not the Court's role to second-guess" Tennessee's "reasoned public health decisions," especially on a truncated record in an emergency posture. *Loc. Spot, Inc. v. Cooper*, 2020 WL 7554247, at *3 (M.D. Tenn. Dec. 21).

## IV.   Plaintiffs' requested relief is overbroad.

Relying on a case that involved a "nationwide" class action certified under Rule 23(b)(2), *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), Plaintiffs say a preliminary injunction in their favor should be "facial" and "statewide," Mem.25. But this Court cannot conjure class relief in a classless action.

Such relief would be wildly overbroad. Plaintiffs are individuals, and they cannot "sidestep Rule 23's requirements." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring); *accord Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) (en banc). A valid remedy "'operate[s] with respect to specific parties,'" not on "a law 'in the abstract.'" *Id.* (quoting *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). It "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). As Defendants have now mentioned a few times, courts do not "'erase' … unconstitutional provisions." *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring) (quoting Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1016-17 (2018)). So even assuming Plaintiffs were entitled to a preliminary injunction here, that relief could not apply beyond them or the parts of the Act they can challenge.

A preliminary injunction could not be statewide. Injunctions can be "no more burdensome … than necessary to provide complete relief to the plaintiffs." *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023). A district court thus "abuse[s] its discretion" if it "extend[s] the preliminary injunction's protection to non-part[ies]" when "an injunction limited to the parties" would do. *Id.* Here, the parties seeking protection are three minors, plus parents, and one physician. An injunction ordering Defendants not to enforce the Act as to them would completely redress their injuries. *CASA*

*de Md., Inc. v. Trump*, 971 F.3d 220, 262 (4th Cir. 2020). Plaintiffs' suggestion that they need statewide relief from Defendants, or else no one could treat them, is absurd; Defendants obviously would read an injunction as to these three minors as an instruction not to enforce the Act for treatment of them as long as that injunction remained in place. That would fully protect Dr. Lacy—though, given the issues identified above, an injunction should cover only her existing patients.

Nor could a preliminary injunction for Plaintiffs be "facial." If by "facial" Plaintiffs mean this Court should enjoin Defendants from enforcing the Act against anyone, that argument fails for the reasons given above. If by "facial" Plaintiffs are asking this Court to enjoin the Act itself, this Court knows the answer: it cannot. *California*, 141 S. Ct. at 2115; *Whole Woman's Health*, 142 S. Ct. at 535.

Plaintiffs do not meet the standard for a facial challenge no matter what they mean. Plaintiffs have not attempted to show that the Act is facially unconstitutional under *Salerno*, meaning "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *e.g., Brakebill v. Jaeger*, 932 F.3d 671, 678 (8th Cir. 2019) (vacating statewide preliminary injunction where plaintiff could not satisfy *Salerno*); *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 870 (11th Cir. 2013) (similar). Even if the Act failed intermediate scrutiny as applied to Plaintiffs, it could survive when applied to: healthcare providers who treat minors who do not meet the medical guidelines that Plaintiffs cite, minors under the age of 12, minors whose parents do not consent, minors with unfit parents, minors with severe mental disabilities, minors in state custody, and more. Because these applications raise questions that are different, complex, hypothetical, and un-briefed, it would not be "appropriate . . . to grant a preliminary injunction in favor of persons other than [Plaintiffs]." *Warshak*, 532 F.3d at 531; *e.g., Picard v. Magliano*, 42 F.4th 89, 107 (2d Cir. 2022) (vacating facial injunction and remanding "to craft a narrower injunction prohibiting the application of [the law] only in the circumstances presented by [Plaintiff]").

Nor could Plaintiffs invalidate parts of the Act that they don't have standing to challenge. *Gill*, 138 S. Ct. at 1934; *California*, 141 S. Ct. at 2115. As explained, Dr. Lacy lacks standing altogether. The individual plaintiffs do not represent other minors in the State and cannot assert their rights. Dr. Lacy does not purport to perform, and no plaintiff purports to want, a surgery covered by the Act. No plaintiff has standing to challenge the Act's private right of action, which is also severable, *see* S.B. 1 § 3, and would retain independent force even if this Court deemed the substantive prohibitions it incorporates likely unconstitutional, *see Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1207 (11th Cir. 2003); *Roddy Mfg. Co. v. Olsen*, 661 S.W.2d 868, 871 (Tenn. 1983). Any injunction that fails to account for these principles would be overbroad. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-32 (2006).

## V.    The Court cannot grant Plaintiffs' motion without holding an evidentiary hearing.

The Court can dispose of Plaintiffs' motion by denying it without a hearing as it would in a Rule 12 posture. Plaintiffs' claims are meritless under *Dobbs*, and the Act is subject to only rational-basis review, which it easily survives. Should the Court entertain Plaintiffs' motion beyond that threshold, then it must hold an evidentiary hearing because material facts are in dispute. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007). The parties disagree on whether sufficient evidence supports the efficacy of these treatments. The parties dispute material facts surrounding Plaintiffs' claims for irreparable harm and their eligibility for continued care beyond July 1. In those circumstances, an evidentiary hearing is required.

## CONCLUSION

For all these reasons, the Court should deny Plaintiffs' motion.

Dated: May 19, 2023

Respectfully submitted,

/s/ Steven J. Griffin

ADAM K. MORTARA (BPR# 40089)
Lawfair LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

CAMERON T. NORRIS (BPR# 33467)
TIFFANY H. BATES (pro hac vice)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com

*Counsel for Defendants*

STEVEN J. GRIFFIN (BPR# 40708)
Assistant Attorney General
RYAN N. HENRY (BPR# 40028)
Assistant Attorney General
CLARK L. HILDABRAND (BPR# 38199)
Deputy Chief of Staff & Senior Counsel
TRENTON MERIWETHER (BPR# 38577)
Assistant Attorney General
BROOKE A. HUPPENTHAL (BPR# 40276)
Assistant Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-959
steven.griffin@ag.tn.gov
clark.hildabrand@ag.tn.gov
trenton.meriwether@ag.tn.gov
ryan.henry@ag.tn.gov
brooke.huppenthal@ag.tn.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 19, 2023, the undersigned filed this document via this Court's electronic filing system, which sent notice of such filing to the following counsel of record:

| COUNSEL OF RECORD | PARTY REPRESENTED |
|---|---|
| Stella Yarbrough<br>Lucas Cameron-Vaughn<br>Jeff Preptit<br>ACLU Foundation of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>Tel.: 615-320-7142<br>syarbrough@aclu-tn.org<br>lucas@aclu-tn.org<br>jpreptit@aclu-tn.org<br><br>Joshua A. Block<br>Chase Strangio<br>American Civil Liberties Union Foundation<br>125 Broad Street, Floor 18<br>New York, NY 10004<br>Tel.: 212-549-2593<br>jblock@aclu.org<br>cstrangio@aclu.org<br><br>Sruti J. Swaminathan<br>Lambda Legal Defense and Education Fund, Inc.<br>120 Wall Street, 19th Floor<br>New York, NY 10005<br>Tel.: 212-809-8585<br>sswaminathan@lambdalegal.org<br><br>Avatara A. Smith-Carrington<br>Lambda Legal Defense and Education Fund, Inc.<br>1776 K Street N.W., 8th Floor<br>Washington DC 20006<br>Tel.: 202-804-6245<br>asmithcarrington@lambdalegal.org | Plaintiffs L.W., Samantha Williams, Brian Williams, John Doe, Jane Doe, James Doe, Ryan Doe, Rebecca Doe, and Susan N. Lacy |

| | |
|---|---|
| Tara Borelli<br>Lambda Legal Defense and Education Fund, Inc.<br>1 West Court Square, Ste. 105<br>Decatur, GA 30030<br>Tel.: 404-897-1880<br>tborelli@lambdalegal.org<br><br>Joseph L. Sorkin<br>Dean L. Chapman, Jr.<br>Kristen W. Chin<br>Richard J. D'Amato<br>Theodore James Salwen<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Tel.: 212-872-1000<br>jsorkin@akingump.com<br>dchapman@akingump.com<br>kristen.chin@akingump.com<br>rdamato@akingump.com<br>jsalwen@akingump.com<br><br>Elizabeth D. Scott<br>Akin Gump Strauss Hauer & Feld LLP<br>2300 N. Field Street, Suite 1800<br>Dallas, TX 75201<br>Tel.: 214-969-2800<br>edscott@akingump.com<br><br>Christopher J. Gessner<br>David Bethea<br>Akin Gump Strauss Hauer & Feld LLP<br>Robert S. Strauss Tower<br>2001 K Street N.W.<br>Washington, DC 20006<br>Tel.: 202-887-4000<br>cgessner@akingump.com<br>dbethea@akingump.com | |
| Ellen B. McIntyre<br>U.S. Attorney's Office for the Middle District of Tennessee<br>719 Church Street, Suite 300<br>Nashville, TN 37203<br>ellen.bowden2@usdoj.gov<br><br>Rascoe S. Dean | Proposed Intervenor-Plaintiff United States of America |

Assistant United States Attorney
719 Church Street, Suite 33
Nashville, TN 37203
(615) 736-5151
rascoe.dean@usdoj.gov

Alyssa C. Lareau
United States Department of Justice
Federal Coordination and Compliance Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 305-2994
Alyssa.Lareau@usdoj.gov

Coty Montag
United States Department of Justice
Federal Coordination and Compliance Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 305-2222
Coty.Montag@usdoj.gov

Gloria Yi
United States Department of Justice
Federal Coordination and Compliance Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 616-3975
Gloria.Yi@usdoj.gov

Tamica Daniel
United States Department of Justice
Housing and Civil Enforcement Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 598-9636
Tamica.Daniel@usdoj.gov

*/s/ Steven J. Griffin*
STEVEN J. GRIFFIN (BPR# 40708)
Assistant Attorney General
*Counsel for Defendants*

29