# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| L.W. et al., | ) |
| *by and through her parents and next friends,* | ) |
| *Samantha Williams and Brian Williams*, | ) |
| | ) No. 3:23-cv-00376 |
| Plaintiffs, | ) JUDGE RICHARDSON |
| | ) |
| v. | ) |
| | ) |
| JONATHAN SKRMETTI et al., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF JOHN NOAKES

1

I, John Noakes,[1] declare as follows:

1. I am over the age of 18 years and am not a party to this action. I have actual knowledge of the following facts and, if called upon to testify to them, could and would do so competently. I am submitting this Declaration in support of Defendants' opposition to Plaintiffs' Motion for a Preliminary Injunction.

2. Tennessee recently passed a law prohibiting hormonal and surgical procedures "for the purpose of: (A) Enabling a minor to identify with, or live as a purported identity inconsistent with the minor's sex, or (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity," Tenn. Code Ann. § 68-33-101, *et seq*. This Act will protect parents against confused children, ex-spouses, and providers, whose coercive tactics to obtain consent to medical interventions "affirming" a child's professed discordant gender identity include threatening alienation or loss of a child through suicide.

3. I am a resident of the State of Tennessee, along with my 20-year-old daughter, B, who recently identified as transgender. However, B had never suggested that she had issues with her gender before. She was a "girly girl." She did gymnastics and ballet, and happily wore a pink tutu.

4. Growing up, my daughter, B, and I had a good relationship. However, my relationship with B changed after her mother and I divorced. B was about 13 years old at this time. Initially, visitation was regular and normal. However, as time went on, I did not see her as much due to the distance created by the divorce.

---

[1] Declarant is submitting this Declaration using a pseudonym to protect the privacy of his children and other family members.

5. After B turned 16, I saw her only a handful of times the following year. It became increasingly difficult for B to deal with her mother whenever she visited me.

6. I invited B over right before she was about to turn 17 years old to celebrate her birthday. It was the first time I had seen her in months. When B arrived, I was completely shocked. She had given herself a buzz cut and was dressed like a boy.

7. B announced that she was transgender. She told me that she identified as a boy and wanted me to call her by a new name she had chosen. This was the first time I learned that B was experiencing issues with her gender identity.

8. B handed me papers from the Vanderbilt University Medical Clinic ("VUMC"). She had been to VUMC's gender clinic and saw Dr. Cassandra Brady. My ex-wife had taken her and had not informed me about the appointment. B's mother supported her new male gender identity.

9. B told me she wanted me to sign these papers, giving my consent and approval for her to receive testosterone shots from Vanderbilt. Her request overwhelmed me, and I wanted to speak with her doctor.

10. B and my ex-wife pressured me to sign immediately. Dr. Brady had told them about the risk of suicide if they chose not to administer medical treatments. They both told me that if B committed suicide, it would be all my fault. However, I needed more information before signing. My gut told me that something was not right. B and her mother said everything would make sense once I talked to Dr. Brady.

3

11. So, I called Dr. Brady at VUMC. Dr. Brady told me she was "so sure" that B was a good candidate. Dr. Brady said that kids as young as 5 to 7 years old come to the clinic and that the physicians know right away if the kids are good candidates for medical treatments.

12. Dr. Brady said that kids question their gender as early as 5 to 7 years old, and when these kids come into the clinic, the physicians know right away if the kids are good candidates for medical treatments. The concept that a child would know they are transgender that young was completely absurd. Still, I challenged Dr. Brady's suggestion and told her that when B was younger, she never acted like a boy, did girly things, and never suggested she was uncomfortable in her body. I ended the call when it became clear that Dr. Brady did not care about my experiences with and observations of B as a child that clearly identified as female.

13. Ultimately, I could not agree to the medical treatments. I was concerned about the permanent harm it might have on her body. I wanted to wait for her at least to turn 18 so she could have more time to develop. The possibility that she might change her mind was very real. This change happened so quickly that she could easily change her mind.

14. Dr. Brady's promotion of "gender-affirming" medical intervention for minors was used to drive a wedge between me and my daughter. For the next year, until B turned 18, B and her mother harassed me for not affirming her gender or consenting to the treatments. B has since completely alienated me from her life. I have no idea if she has received medical treatments or continues to visit VUMC.

15. Tennessee's law will prevent its parents from suffering harm like mine. It will also help prevent coercive manipulation and potential harm against its vulnerable children and should be upheld to protect children and their families.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 19, 2023.

                                                    */s/ John Noakes*
                                                    John Noakes (pseudonym)