IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
TENNESSEE NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| L.W. et al., | ) | |
| *by and through her parents and next friends,* | ) | |
| *Samantha Williams and Brian Williams*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 3:23-cv-00376 |
| | ) | JUDGE RICHARDSON |
| v. | ) | |
| | ) | |
| JONATHAN SKRMETTI et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | **)** | |

**MOTION OF 26 STATE FAMILY POLICY COUNCILS AND FAMILY POLICY
ALLIANCE FOR LEAVE TO FILE MEMORANDUM OF LAW AS AMICUS
CURIAE IN SUPPORT OF DEFENDANTS' OPPOSITION TO INTERVENOR'S
MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 7(b) and Local Rules 15.01, twenty-six

family policy councils representing twenty-seven states and their national allied organization,

Family Policy Alliance, by and through their counsel, The Constitutional Government Defense

Fund, a Tennessee not-for-profit legal advocacy organization, move this Court for leave to file a

Memorandum of Law as Amici in support of Defendant's opposition to Plaintiff-Intervenor

United States' Motion for a Preliminary Injunction.[1]

---

[1] The undersigned certifies that no counsel for a party authored any part of this brief, and no person
other than *amicus*, or its counsel made a monetary contribution intended to fund its preparation or
submission.

## I.    Interest of Amici.

*Amici* are state-based non-profit organizations that address most closely who we are as human beings and the national allied organization through which they cooperate in those efforts. Grounding *Amici*'s policy advocacy is the pre-positive anthropology resident in customary and natural law. *Amici* organizations are identified in Part III.

The positivistic reduction of persons that is inherent in the Department's attempt to redefine the person according to the modernist conception of gender theory through judicial decree will leaven the law in a way that curtails historic State policies grounded in deference to a given human nature and the common law rights that correspond to that nature. The meaning of persons in the Fourteenth Amendment *in the context of the Department's gender theory interpretation of health care* cannot be left unanswered; a national transgender-enablement policy for minors will not keep to itself. The Department's conception of persons (including sex) based on gender theory, if adopted, will prohibit Amici from ascribing objective meaning, dignity, and value to persons under their respective state's law. The distortion of the human person in constitutional caselaw from that which is found in our nation's common law invites systemic effects in other areas of state law on which Amici work.

## I.    Law

This Court has "inherent authority" to grant Amici leave to file a memorandum of law. *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008). In exercising that authority, "[a]n amicus brief should normally be allowed when a party . . . is not represented at all, when the amicus has an interest in some other case that may be affected by the decision in the present case (though not enough affected to entitle the amicus to intervene and become a party in the present case), or when the amicus has unique information or perspective that can help the court beyond

the help that the lawyers for the parties are able to provide." *Ryan v. Commodity Futures Trading Commission*, 125 F.3d 1062, 1063(1997). Amici meets the first and third of these three criteria.

First, Amici have an interest that goes far beyond the various Defendants' interest in having the enacted law held constitutional and extends to all the areas of state law on which they work to develop policies, especially in the area of family-related law. For Defendants to claim victory, they need not pursue a definition of persons in relation to transgender medical practices. Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction does not contest Plaintiffs' thesis that sex discrimination is at issue but argues that all sexes are treated the same, and, therefore, the law does not discriminate on the basis of sex, (Document 112, p. 10-12), when what sex is, is at issue—assigned at birth and malleable or a given at birth and enduring. Amici can only presume Defendants will answer in the same way since Intervenor's Complaint makes the same claim. Defendants' also do not directly contest Plaintiffs' assertion that persons are to be understood in terms of gender identity and transgendered persons are a suspect class but argue that a transgendered identity is not a suspect class. (Document 112, p. 12-14). Amici can only presume Defendants will answer in the same way since Intervenor's Complaint makes the same claim.

However, Amici's arguments supplement Defendant's arguments in response to Intervenor's novel categorizations of persons by focusing on the meaning of the word "person" in the Fourteenth Amendment and by arguing that Intervenor's argument for application of heightened scrutiny to its sex discrimination claims rests upon a repudiation of the objective categories in the law on a claim for such scrutiny depends.

Second, framing *Amici*'s educational and advocacy work is the anthropology acknowledged and resident in customary and natural law, respectively. Amici seeks to urge citizens, policy makers, and judicial bodies in Tennessee to give proper regard to the fundamental

and absolute rights of persons at common law. Consequently, when court decisions foreclose or defeat common law principles and standards through constitutional rights interpretations divorced from the common law, *Amici*'s mission is compromised.  However, Plaintiffs, Intervenor, and Defendants do not represent or speak on behalf of persons who would predicate rights claims under the Fourteenth Amendment on the customary (common law) and natural law duties persons owe to each other. Thus, Amici provide a unique perspective on this law as their interests go beyond the more limited interest of the parties in seeking a judgment in their favor.

## II.  List of Amici.

| *State* | *Family Policy Council Name* |
|---------|------------------------------|
| Alabama | Alabama Policy Institute |
| Alaska | Alaska Family Council |
| Arizona | Center for Arizona Policy |
| Delaware | Delaware Family Policy Council |
| Florida | Florida Family Policy Council |
| Hawaii | Hawaii Family Forum |
| Indiana | Indiana Family Institute |
| Iowa | The Iowa Leader |
| Kansas | Kansas Family Voice |
| Kentucky | The Family Foundation |
| Louisiana | Louisiana Family Forum |
| Maine | Christian Civil League of Maine |
| Massachusetts | Massachusetts Family Institute |
| Michigan | Michigan Family Forum |

| | |
|---|---|
| Minnesota | Minnesota Family Council |
| Montana | Montana Family Foundation |
| Nebraska | Nebraska Family Alliance |
| New Jersey | New Jersey Family Policy Center |
| North Dakota | North Dakota Family Alliance |
| Pennsylvania | Pennsylvania Family Council |
| South Carolina | Palmetto Family Council |
| South Dakota | Family Heritage Alliance |
| Tennessee | The Family Action Council of Tennessee |
| Virginia | The Family Foundation |
| Wisconsin | Wisconsin Family Action |
| Wyoming | Wyoming Family Alliance |
| Nationally | Family Policy Alliance |

### III.  Conclusion.

For the foregoing reasons, counsel for Amici-Movants respectfully request that their motion be granted and that an order be entered admitting the attached Memorandum of Law as part of the record.

Dated: May 31, 2023

Respectfully submitted,

Constitutional Government Defense Fund

*/s/ David E. Fowler*
By: David E. Fowler, Esq. (TNBPR #014063)

Counsel for Amici
1113 Murfreesboro Road, No. 106-167
Franklin, TN. 37064-167
615-591-2090
jthomsmith@cgdfund.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2023, the undersigned filed the foregoing document via this Court's electronic filing system, which sent notice of such filing to the following counsel of record:

| COUNSEL OF RECORD | PARTY REPRESENTED |
|---|---|
| Stella Yarbrough<br>Lucas Cameron-Vaughn<br>Jeff Preptit<br>ACLU Foundation of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>Tel.: 615-320-7142<br>syarbrough@aclu-tn.org<br>lucas@aclu-tn.org<br>jpreptit@aclu-tn.org<br><br>Joshua A. Block<br>Chase Strangio<br>American Civil Liberties Union Foundation<br>125 Broad Street, Floor 18<br>New York, NY 10004<br>Tel.: 212-549-2593<br>jblock@aclu.org<br>cstrangio@aclu.org<br><br>Sruti J. Swaminathan<br>Lambda Legal Defense and Education Fund, Inc.<br>120 Wall Street, 19th Floor<br>New York, NY 10005<br>Tel.: 212-809-8585<br>sswaminathan@lambdalegal.org<br><br>Avatara A. Smith-Carrington<br>Lambda Legal Defense and Education Fund, Inc.<br>1776 K Street N.W., 8th Floor<br>Washington DC 20006<br>Tel.: 202-804-6245<br>asmithcarrington@lambdalegal.org<br><br>Tara Borelli<br>Lambda Legal Defense and Education Fund, Inc. | Plaintiffs L.W., Samantha Williams, Brian Williams, John Doe, Jane Doe, James Doe, Ryan Doe, Rebecca Doe, and Susan N. Lacy |

1 West Court Square, Ste. 105
Decatur, GA 30030
Tel.: 404-897-1880
tborelli@lambdalegal.org

Joseph L. Sorkin
Dean L. Chapman, Jr.
Kristen W. Chin
Richard J. D'Amato
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Tel.: 212-872-1000
jsorkin@akingump.com
dchapman@akingump.com
kristen.chin@akingump.com
rdamato@akingump.com

Elizabeth D. Scott
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Tel.: 214-969-2800
edscott@akingump.com

Christopher J. Gessner
David Bethea
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street N.W.
Washington, DC 20006
Tel.: 202-887-4000
cgessner@akingump.com
dbethea@akingump.com

Ellen B. McIntyre
U.S. Attorney's Office for the Middle District of Tennessee
719 Church Street, Suite 300
Nashville, TN 37203
ellen.bowden2@usdoj.gov

Proposed Intervenor-Plaintiff
United States of America

Steven J. Griffin (BPR# 40708)
Assistant Attorney General
steven.griffin@ag.tn.gov

Clark L. Hidabrand (BPR# 38199)
Deputy Chief of Staff & Senior Counsel
clark.hildabrand@ag.tn.gov

Trenton Meriwether (BPR# 38577)
Assistant Attorney General
trenton.meriwether@ag.tn.gov

Ryan N. Henry (BPR# 40028)
Assistant Attorney General
ryan.henry@ag.tn.gov

Brooke A. Huppenthal (BPR# 40276)
Assistant Attorney General
brooke.huppenthal@ag.tn.gov

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 3720
(615) 741-959

Adam K. Mortara* (BPR# 40089)
Lawfair LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Cameron T. Norris (BPR# 33467)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

Defendants: Jonathan Skrmetti, in his official capacity as Tennessee Attorney General and Reporter,

Tennessee Department of Health ("TDH"),

Ralph Alvarado, in his official capacity as Commissioner of TDH,

Tennessee Board of Medical Examiners ("BME"),

Melanie Blake, in her official capacity as President of BME,

Stephen Lloyd, in his official capacity as Vice President of BME,

Randall E. Pearson, Phyllis E. Miller, Samantha McLerran, Keith G. Anderson, Deborah Christiansen, John W. Hale, John J. McGraw, Robert Ellis, James Diaz-Barriga, and Jennifer Claxton, all in their official capacities as members of BME, and

Logan Grant, in his official capacity as Executive Director of the Tennessee Health Facilities Commission.

/s/ David E. Fowler
DAVID E. FOWLER (TNBPR #014063)

*Counsel for Amici*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

L.W. et al.,

          *Plaintiffs*,

and

UNITED STATES OF AMERICA,

          *Intervenor-Plaintiff*,

    v.

JONATHAN SKRMETTI et al.,

          *Defendants*.

No. 3:23-cv-00376
Judge Richardson
Judge Newbern

**AMICI'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
OPPOSITION TO INTERVENOR'S MOTION
FOR PRELIMINARY INJUNCTION**

**I.    Introduction**.

The essence of the dispute raised in this case is as plain as it is radical: the question of what a human person is, and whether a State can protect vulnerable children within its borders from medical exploitation and harm. In the motion now before the Court, Intervenor-Plaintiff United States urges that the Fourteenth Amendment's prohibition on States denying "persons… the equal protection of the laws" is a constitutional standard that disqualifies the historically and legally universal recognition across the earth through time that the human person is objectively and profoundly male or female, along with State common law authority to protect persons from injury.

In 2022, the State of Tennessee enacted Senate Bill 1/ House Bill 1, codified in Tennessee Code Annotated § 68-33-101 *et seq*. (hereinafter "Minor Persons Protection Act" or "MPPA") to

protect the uncomprehending children within its borders from the historically novel eruption of medical onslaughts foisting irreversible alterations upon their otherwise healthy bodies. In response, Intervenor argues that the Fourteenth Amendment that was ratified over a century and a half ago stripped the State of Tennessee of its then-indubitable common law authority to forbid the infliction of permanent harms upon the bodies of children, whether male or female.

Intervenor correctly notes that the text of the Equal Protection Clause entitles persons to "the equal protection of the laws." But this provision, like all constitutional provisions, must be "centered on constitutional text *and history*." *N.Y. State Rifle & Pistol Assn. v. Bruen*, 142 S.Ct. 2111, 2128-29 (2022) (emphasis added). Even as "[h]istorical inquiries of this nature are essential whenever [courts] are asked to recognize a new component of the 'liberty' protected by the Due Process Clause," *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228, 2235 (2022), the same must be true when Intervenor asks this Court to reconfigure the nature of the "person" to whom equal protection of the laws applies.

Interestingly, Intervenor's argument does not actually contest the MPPA as discriminatory treatment of a child *because* that child is male or female. Intervenor's argument rather, and more radically, disputes the legal categories of male and female to begin with—and thus (ironically) denies the premise of equal protection sex-equality jurisprudence on which it purports to rely. Without discrete categories of male and female to compare, equal protection sex-based intermediate scrutiny jurisprudence is rendered inoperable. Intervenor's ambitious argument is at odds not just with history but with the very legal standard it invokes.

## II.    Tennessee has a duty to extend "protection of the laws" to all persons regarding bodily injuries and remedial relief for such injuries.

### A.   History clarifies the meaning of "equal protection of the laws."

The United States Supreme Court has spoken unequivocally regarding protection of the laws and injuries to a person: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

*Marbury*'s fundamental conception of civil liberty (which is not personal autonomy)[2] and government's duties are in accord with that of the common law. The analysis in *Bruen* and *Dobbs* makes the common law of utmost relevance, not just because the Court analyzed the common law in rendering its judgments,[3] but for reasons beyond that:  it is our "birthright and inheritance" as Americans. Joseph Story, *Commentaries on the Constitution of the United States* § 157. In fact, common law is the conception of law upon which "[t]he whole Structure of our present jurisprudence stands," *id*., and it is the legal "nomenclature of which the framers of the Constitution

---

[2] Civil liberty, not personal autonomy, is the *telos* for governments like ours that are grounded in a common law system.  1 William Blackstone, *Commentaries on the Laws of England*, *6 (1765) (hereinafter "Blackstone's *Commentaries*") (stating "the singular frame and polity of that land which is governed by this system of laws" is one "in which political or civil liberty is the very end and scope of the constitution"). Thus, "every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and . . . obliges himself to conform to those laws, which the community has thought proper to establish. . . . Political, therefore, or civil liberty . . . is no other than natural liberty so far restrained by human laws (and no farther) as is necessary and expedient for the general advantage of the public." *Id.* at *125; see also Joseph Story, *Commentaries on the Constitution of the United States*, § 356, quoting Journal of Convention, p. 367, 368 ("The convention also, which framed the constitution, declared this in the letter accompanying it. 'It is obviously impracticable in the federal government of these states,' says that letter, 'to secure all rights of independent sovereignty to each, and yet provide for the interest and safety of all. Individuals entering into society must give up a share of liberty to preserve the rest.'")
[3] In the majority opinion in *Bruen*, the term "common law" is found 10 times, and Blackstone's *Commentaries* is cited twice. In the majority opinion in *Dobbs*, the term "common law" is found 26 times, and Blackstone or his *Commentaries* is referenced as an authority ten times.

were familiar." *Minor v. Happersett*, 88 U.S. 162, 167 (1875). "The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." *Smith v. Alabama*, 124 U.S. 465, 478 (1888). As evidenced by *Bruen* and *Dobbs*, the Supreme Court continues to analyze common law in reaching decisions interpreting the Constitution's words and phrases. Blackstone has retained his influence through the adoption of the Civil War Amendments and beyond. James M. Ogden, *Lincoln's Early Impressions of the Law in Indiana*, 7 Notre Dame L. Rev. 325, 328 (1932).[4]

Looking then to Sir William Blackstone, "whose works constituted the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), we find "[t]he remedial part of a law is so necessary a consequence of" of the declaratory and directory elements of law "that laws must be very vague and imperfect without it. For in vain would rights be declared, in vain to be observed, if there were no method of recovering and asserting these rights, when wrongfully withheld or invaded. *This is what we mean properly, when we speak of the protection of the law*." 1 Blackstone's *Commentaries*, *55-56 (emphasis added).

This right to protection of the laws extends back to Magna Carta: "We will sell to no man, we will not deny or delay to any man right or justice." MAGNA CARTA, chap. 40. *See also*

---

[4] *See also, e.g., Gamble v. United* States, __ U.S. __, 139 S. Ct. 1960 (2019) (the Court's opinion, the concurrence, and one dissent citing Blackstone multiple times to determine the meaning of the phrase "the same offense" in the Fifth Amendment's double jeopardy clause); *Department of Homeland Security v. Thuraissigiam*, __ U.S. __, 140 S. Ct. 1959, 1969 (2020) (calling Blackstone's *Commentaries* a "satisfactory exposition of the common law of England"); *Ramos v. Louisiana*, __ U.S. __, 140 S. Ct. 1390, 1395 (2020) (citing Blackstone in explanation of the holding that the requirement of juror unanimity is "a vital right protected by the common law" and therefore the Constitution's jury trial guarantee); *Torres v. Madrid*, __ U.S. __, 141 S. Ct. 989, 996, 997, 998, 1000 (2021) (citing Blackstone multiple times to determine meaning of Fourth Amendment "seizure").

Blackstone's *Commentaries*, \*141 (discussing this chapter of Magna Carta in explaining the "right of every Englishman . . . of applying to the courts of justice for redress of injuries . . . [which] must at all times be open to the subject, and the law be duly administered therein."). During the ratification debates over the Fourteenth Amendment and its Equal Protection Clause, several members of Congress affirmatively spoke of this provision in the Great Charter. Christopher R. Green, *The Original Sense of the (Equal) Protection Clause: Subsequent Interpretation and Application*, *19 Geo. Mason U. C.R.L.J. 219, 245-247 (2009)*.

In sum, the right to be protected from injury is a private right belonging to all persons as against all others. No state can constitutionally exclude or deny any person access to its court from the "protection of [its] laws" for injuries sustained. Thus does the Tennessee Constitution require "[t]hat all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay." TENNESSEE CONST.; Art. 1, sec. 17. Suitably, the final words of that passage echo Magna Carta.

  B. Tennessee fulfilled its duty to extend "protection of the law" to all persons who suffer bodily injuries.

Tennessee has done that which is required by *Marbury*, the text and history of "equal protection of the laws," and the Tennessee Constitution. The legislature has determined in the declaratory part of the law at issue "the boundaries of right and wrong," 1 Blackstone's *Commentaries,* \*53, in accord with one of absolute rights at common law, namely, the right to "personal security" which is the "legal and uninterrupted enjoyment of" one's "life," "limbs," "body," "health," and "reputation." *Id*. at \*129.

This right includes "[t]he preservation of a man's health from such practices as may prejudice or annoy it." *Id*. Thus, "[t]he least touching of another's person wilfully [sic], or in anger, is a

battery; for the law cannot draw the line between different degrees of violence, and therefore totally prohibits the first and lowest stage of it; every man's person being sacred, and no other having a right to meddle with it in any the slightest manner." 3 Blackstone's *Commentaries*, *120.[5]

In this juridical context, the Supreme Court has commented that the States' historic police power authority to punish self-maiming and suicide "cannot be doubted." *New York Central R.R. Co. v. White*, 243 US 188, 207 (1917). Justice Field, in dissent in *Munn v. Illinois*, 94 U.S. 113 (1877), had considered the word "life" in the Fourteenth Amendment, expounding that

> something more is meant than mere animal existence. The inhibition against its deprivation extends to all those limbs and faculties by which life is enjoyed. The provision equally prohibits the mutilation of the body by the amputation of an arm or leg, or the putting out of an eye, or the destruction of any other organ of the body through which the soul communicates with the outer world. The deprivation not only of life, but of whatever God has given to everyone with life, for its growth and enjoyment, is prohibited by the provision in question, if its efficacy be not frittered away by judicial decision.

*Id*. at 142. *See also People v. Clough*, 17 Wend. 351, 352 (N.Y. Sup. Ct. 1837) (citing common law sources as to the crime of maiming and mayhem, as implicated in amputating appendages).

Accordingly, the common law protection for life and limb has been carried over to our nation's jurisprudence. Justice Story, in explaining the extent to "colonies in distant countries . . . carry with them English common law, he wrote that "protection from personal injuries, the rights secured by Magna Charta, and the remedial course in the administration of justice, are examples as clear perhaps as any, which can be stated, as presumptively adopted, or applicable" to the American colonies. J. Story, *Commentaries*, §147-149.

---

[5] The solicitude for the body is seen also in the common law rule protecting a person's limbs from injury. Blackstone's *Commentaries*, *130 ("A man's limbs (by which for the present we only understand those members which may be useful to him in fight, and the loss of which alone amounts to mayhem by the common law) are also the gift of the wise Creator, to enable him to protect himself from external injuries in a state of nature. . . . [T]hey cannot be wantonly destroyed or disabled without a manifest breach of civil liberty.").

Therefore, all persons have a right to protection from bodily injury. And it being a private right, physicians like any other person have a duty in their practice not to injure the bodies of other persons. Tennessee statutes now make more secure this common law duty of physicians.[6] *See* Tenn. Code Ann. § 29-26- 101 (defining a "Health care liability action" as "any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based"); § 29-26-118 ("In a health care liability action, the plaintiff shall prove by evidence as required by § 29-26-115(b) that the defendant did not supply appropriate information to the patient in obtaining informed consent (to the procedure out of which plaintiff's claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which the defendant practices and in similar communities").

Moreover, state jurisdiction to regulate the practice of medicine to protect the health of its citizens has been recognized since adoption of the Fourteenth Amendment. *See*, *e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) (acknowledging the state's authority over public health, quoting *Ogden v. Utah*, 22 U.S. 1, 203 (1824), that "health laws of every description" were left to the powers of the state and "[n]o direct general power over these objects is granted to Congress; and, consequently, they remain subject to state legislation.").

---

[6] In *Munn v. Illinois*, 94 U.S. at 134, the Supreme Court addressed the relationship between common law and State statutes in a Fourteenth Amendment dispute, explaining that "the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances."

In sum, the state has a duty to protect persons against intentional bodily injury, and provide process for restitution upon violation. To exclude any person from that protection is to deny persons the equal protection of the laws. Tennessee's statutory protection of children from medical harms and exploitation is not a denial of the Fourteenth Amendment's requirement to provide equal protection of the laws, but in furtherance of it.

### III. Tennessee's codification of its common law duty to protect persons against intentional bodily injury conforms to equal protection standards.

A. Tennessee's justly protects persons from intentional injury to their bodies.

Because the word "person" is found in the Fifth Amendment's Due Process Clause, "[t]he conclusion is . . . irresistible, that when the same phrase was employed in the Fourteenth Amendment to restrain the action of the States, it was used in the same sense and with no greater extent" than was true of the Fifth Amendment's restraint on the federal government. *Hurtado v. California*, 110 U.S. 516, 535 (1884). Thus, even as "[d]ue process of law" under the Fifth Amendment is to be "interpreted according to the principles of the common law," *Id.* at 535, the word "person" to whom that process applies must mean the same thing in the Fourteenth Amendment to whom both due process and equal protection of the laws apply.

At common law, persons were "divided by the law into either natural persons, or artificial. Natural persons are such as the God of nature formed us; artificial are such as are created and devised by human laws for the purposes of society and government, which are called corporations or bodies politic." 1 Blackstone's *Commentaries*, *123. Nothing in the text or history of the Fourteenth Amendment remotely implies that this understanding of persons was thereby abrogated, especially as relates to protection of a person's limbs and body from physical injury.

But Intervenor United States would have this court do just that by redefining persons according to the nouveau concept of gender identity.[7] While Anglo-American law (to say nothing of human law always and everywhere) has deferred to the patent and physiologically distinct sexes of male and female, Intervenor argues that the Constitution divides persons instead according to the non-physical terms of an individual's announced psychological interiority. This is both an irrational and unworkable proposal for State jurisdiction over health, and one that implies a fundamental redefinition of personal identity, social institutions, and venerable legal categories. The Equal Protection Clause of the Fourteenth Amendment requires no such refutation of its own standards (as discussed below) or disruption to state law.

Yet in order to eliminate the objective, embodied realities of male and female, Intervenor would have this Court nullify Tennessee's recognition of such embodiment by replacing sex with mental states: transgendered, transgendered with gender dysphoria, and non-transgendered. *See* Intervenor's Complaint, ¶ 19 ("Gender identity refers to a person's core sense of belonging to a particular gender, such as male or female. Every person has a gender identity."); ¶ 20 ("Transgender people are people whose gender identity does not align with the sex they were assigned at birth."); ¶ 6 (differentiating between transgender people from "transgender minors" with "a diagnosis of gender dysphoria"); ¶ 24 ("The American Psychiatric Association recognizes

---

[7] UCLA psychoanalyst Robert Stoller was one of the first to use the term "gender identity." In 1968, exactly 100 years after the Fourteenth Amendment was ratified, he wrote that gender had "psychological or cultural rather than biological connotations." Robert J. Stoller, *Sex and Gender: On the Development of Masculinity and Femininity* 9 (1968). To him, "sex was biological but gender was social." David Haig, The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945–2001, Archives of Sexual Behavior, Apr. 2004, at 93. "Biological sex" is not the same as "socially assigned gender." *Id.* (quoting Ethel Tobach, 41 Some Evolutionary Aspects of Human Gender, Am. J. of Orthopsychiatry 710 (1971)).

that not all transgender persons have gender dysphoria."); ¶¶ 5, 49, 50, 51, 64, 65 (distinguishing between "non-transgender" persons and transgender persons).

Intervenor argues in terms of the "dignity" of persons (Complaint, ¶ 2), yet it does so in terms denying "the meaning of [person] that has persisted in every culture throughout human history." *Obergefell v. Hodges*, 135 S.Ct. 2584, 2611 (2015) (Roberts, CJ., dissenting). In fact, just as the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors," *Bruen*, 142 S.Ct. at 2127, the Constitution did not lay down a novel replacement understanding of persons; it codified the inherited common law understanding.

B. Intervenor's argument inverts the Supreme Court's equal protection caselaw which it invokes.

The Equal Protection Clause does not forbid State legal acknowledgment of vital differences between male and female persons, nor does it foreclose States to protect children's bodies from harm by regulating the medical profession accordingly. And it is precisely because of the physical, embodied differences among the two sexes that equal protection analysis on sex classifications deviates from the "sameness norm" typical of civil rights law on (for instance) race. The Supreme Court recognizes that there is much that is *not* the same between the sexes, and that there is deep significance of these features of embodied difference.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1982). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). The Court's "traditional view of the core concern of the Equal Protection Clause" is "as a shield against *arbitrary* classifications." *Engquist v. Oregon Dept. of*

*Agric.*, 553 U.S. 591, 598 (2008) (emphasis added)—not against State recognition of patent, momentous, and universally acknowledged distinctions of human existence and identity.

Sex-based classifications (unlike those of race) are not presumptively unlawful. "Gender has never been rejected as an impermissible classification in all instances." *Kahn v. Shevin*, 416 U.S. 351, 356 n.10 (1974); *accord Michael M. v. Sonoma County Superior Court*, 450 U.S. 464, 469 (1981) ("the sexes are not similarly situated in certain circumstances"). The Supreme Court recognizes that sex is both a "high visibility ... characteristic" and an "immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 US. 677, 686 (1973) (plurality). The Supreme Court also emphasizes that the differences manifest in the sex binary are not a matter of choice or triviality:

> Physical differences between men and women … are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one is different from a community composed of both.

*United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*) (citation omitted); *see also Nguyen v. INS*, 533 U.S. 53, 73 (2001) (condemning the failure "to acknowledge even [the] most basic biological differences" between the sexes, as if those real differences were but stereotypes).

In *VMI*, the court majority, while denouncing "overbroad generalizations" about the sexes, *VMI,* 518 at 516, 533, volunteered that the admission of women to VMI "would undoubtedly require" adjustments to VMI's physical training program previously designed only for men. *Id*. at 550 n.19. The Court cited congressional notes addressed to service academies' regulations, referencing the "essential adjustments" proper to those academies' admission standards in order to accede to the "physiological differences between male and female individuals." *Id*.; *see also id.*

at 540 (same).[8] In similar fashion the Ninth Circuit ratified a state policy that forbade male student participation on female high school sports teams. The court resolved that there is "no question that the Supreme Court allows for these average real differences between the sexes to be recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy." *Clark ex rel. Clark v. Arizona Interscholastic Ass'n*, 695 F.2s 1126, 1131 (9th Cir. 1982).

While Intervenor United States argues that the MPPA is subject to heightened equal protection scrutiny as a sex-based classification (Court Document 41, 10-12), Intervenor's argument does not match the jurisprudence it relies on. Intervenor does not argue on behalf of a sex-based class. Instead, it argues by implication that the very category of sex should be replaced by gender identities, which is how it grounds all its descriptions of persons.

It is not just that this novel argument is unknown to the Supreme Court's sex-classification equal protection caselaw. Rather, the argument repudiates the categories on which it feigns to depend. Intervenor nominally wields the intermediate scrutiny equal protection principle based on the real category of the physical sex binary. Court Document 41, 10. But it does so hoping to achieve a ruling that the MPPA is unconstitutional for acknowledging the reality of male and female sex (and attending medical vulnerability of children) instead of the psychological alternative it proffers (gender identity). If sex-specified categories in law are unconstitutional, then so also is the Supreme Court's sex-based intermediate scrutiny analysis that Intervenor purports to employ to attain such a ruling. Intervenor's goal defeats its method, and vice versa.

Intervenor also errs in requesting elevated equal protection consideration for the class of transgender-identifying persons. Unlike suspect or quasi-suspect classes that the Supreme Court

---

[8] The Supreme Court's additional statement that "housing assignments" on campus would likewise require adjustment for women implied the court's acknowledgment of yet additional significance to female presence, of a sort calling for appropriate residence separation. *VMI*, 518 U.S. at 540.

has acknowledged (*e.g.*, race, alienage, illegitimacy) which have an objective and independent character, transgender status only exists in a negative and inverted relation to the existing equal protection category of sex. Transgender identity's attainment to the requested quasi-suspect class of equal protection would mean and require the elimination of its antithesis (sex) as an operative category from the same field of jurisprudence. Intervenor proposes the putative suspect class of transgender identity to eliminate Tennessee's authority to countenance the central identity-significance of embodied sex. All to say, a legally privileged "suspect" status for gender identity requires nullification of legal status for sex.

Equal protection suspect-class analysis simply cannot map onto Intervenor's claim for a new protected class, as it would erase the operation of another class that State law presently (and constitutionally) recognizes favorably.

C.      The place of history and separation of powers.

Neither this court nor the state of Tennessee is free to "sweep away what has so long been settled" nor could such a radical change be made by this Court without rendering the Supremacy Clause and the separation of powers meaningless. *See Obergefell*, 135 S. Ct. at 2612 (Roberts, CJ., dissenting) quoting *Town of Greece v. Galloway,* 572 U. S. 565, ___, 134 S.Ct. 1811, 1819 (2014) (stating with respect to certain religious invocations the Court should not "sweep away what has so long been settled" without showing greater respect for all that preceded us"). Years ago, Justice Sutherlin succinctly described the constitutional dynamic Intervenor seeks to upend:

> The judicial function is that of interpretation; it does not include the power of amendment under the guise of interpretation. To miss the point of difference between the two is to miss all that the phrase 'supreme law of the land' stands for and to convert what was intended as inescapable and enduring mandates into mere moral reflections.

*West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 404 (1937) (Sutherland, J., dissenting).

## IV.    Conclusion

For the reasons stated above, Amici respectfully request that Intervenor's Motion for a Preliminary Injunction be denied.


Dated: May 31, 2023                          Respectfully submitted,

                                             Constitutional Government Defense Fund

                                             */s/ David E. Fowler*
                                             By: David E. Fowler, Esq. (TNBPR #014063)

                                             Counsel for Amici
                                             1113 Murfreesboro Road, No. 106-167
                                             Franklin, TN. 37064-167
                                             615-591-2090
                                             jthomsmith@cgdfund.com