IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

L.W., *by and through parents and next friends,*            )
*Samantha Williams and Brian Williams*, et al.            )
                                                          )
     *Plaintiffs,*                                        )
                                                          )
                                                          )    No. 3:23-cv-00376
and                                                       )    JUDGE RICHARDSON
                                                          )    JUDGE NEWBERN
UNITED STATES OF AMERICA                                  )
                                                          )
     *Plaintiff-Intervenor*,                              )
                                                          )
v.                                                        )
                                                          )
JONATHAN SKRMETTI, *in his official capacity*             )
*as the Tennessee Attorney General and Reporter*, et      )
al.,                                                      )
                                                          )
     *Defendants.*                                        )


<u>**DEFENDANTS' RESPONSE IN OPPOSITION TO**</u>
<u>**PLAINTIFF-INTERVENOR'S MOTION FOR A PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................ii

Introduction.........................................................................................................................1

Legal Standard....................................................................................................................2

Argument ............................................................................................................................3

    I.    The United States has not demonstrated a clear likelihood of success on the merits.......3

      A.  The Act equally protects all minors from the proscribed treatments....................................3

          1.    The Act equally protects minors of both sexes.........................................................3

          2.    Transgender individuals are not a quasi-suspect class.............................................7

          3.    The Act's stated interests are compelling and are not pretexts.............................9

          4.    The Act is well tailored to achieving its interests.....................................................13

      B.  The United States lacks standing and its own cause of action...........................................21

    II.    Intervenor cannot show irreparable harm. ...........................................................21

    III.    The balance of equities and public interest favor Defendants..........................................23

    IV.    Intervenor's requested relief is overbroad. ..........................................................23

    V.    The Court cannot grant Intervenor's motion without holding an evidentiary hearing...25

Conclusion ...........................................................................................................................25

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*A.M.C. v. Smith,*
620 F. Supp. 3d 713 (M.D. Tenn. 2022) ....................................................................22

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
57 F.4th 791 (11th Cir. 2022) (en banc) .............................................................. 8, 25

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022).............................................................................. 21, 24

*Barnes v. City of Cincinnati,*
401 F.3d 729 (6th Cir. 2005) ..................................................................................6

*Bd. of Trustees of State Univ. of N.Y. v. Fox,*
492 U.S. 469 (1989) ...............................................................................................12

*Boe v. Marshall,*
2023 WL 2646437, (M.D. Ala. Mar. 27) ........................................................... 16, 17

*Bostock v. Clayton County,*
140 S.Ct. 1731 (2020) ......................................................................................... 4, 5

*Braidwood Mgmt. v. Becerra,*
No. 23-10326 (5th Cir. May 31, 2023).....................................................................24

*Brandt v. Rutledge,*
2022 WL 16957734 n.1 (8th Cir. Nov. 16) ...............................................................4

*Breeze Smoke, LLC v. U.S. FDA,*
18 F.4th 499 (6th Cir. 2021)...................................................................................20

*Bristol Reg'l Women's Ctr., P.C. v. Slatery,*
7 F.4th 478 (6th Cir. 2021) (en banc) ............................................................... 10, 13

*Cape v. TSSAA,*
563 F.2d 793 (6th Cir. 1977)....................................................................................5

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
511 F.3d 535 (6th Cir. 2007) ..................................................................................25

*City of Cleburne v. Cleburne Living Center,*
473 U.S. 432 (1985) ............................................................................................ 5, 8

*Comm. on Judiciary of U.S. House of Representatives v. McGahn,*
973 F.3d 121 (D.C. Cir. 2020) .......................................................................... 24, 25

*D.H. v. Williamson Cnty.,*
2022 WL 16639994 (M.D. Tenn. Nov. 2) ............................................................ 6, 7

*D.T. v. Sumner Cnty. Schs.,*
942 F.3d 324 (6th Cir. 2019) ..................................................................................22

*Dist. Brewing Co., Inc. v. CBC Rest., LLC,*
2016 WL 1366230 (S.D. Ohio Apr. 6) .....................................................................21

*Dobbs v. Jackson Women's Health Organization,*
142 S.Ct. 2228 (2022)......................................................................................passim

*Dobbs-Weinstein v. Vanderbilt Univ.,*
2022 WL 860450 (M.D. Tenn. Mar. 22) .................................................................22

*Edgar v. MITE Corp.,*
  457 U.S. 624 (1982) ......................................................................................22

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC,*
  958 F.3d 532 (6th Cir. 2020) .....................................................................2, 3

*FCC v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993) ......................................................................................12

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) ........................................................................................8

*Geduldig v. Aiello,*
  417 U.S. 484 (1974) ........................................................................................8

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) ......................................................................................25

*Horner v. Ky. High Sch. Athletic Ass'n,*
  43 F.3d 265 (6th Cir. 1994) ...........................................................................3

*Kentucky v. Biden,*
  57 F.4th 545 (6th Cir. 2023) ...........................................................2, 12, 24

*Kentucky v. Biden,*
  571 F. Supp. 3d 715 (E.D. Ky. 2021) .........................................................24

*Kosilek v. Spencer,*
  774 F.3d 63 (1st Cir. 2014) ..........................................................................17

*Lichtenstein v. Hargett,*
  489 F. Supp. 3d 742 (M.D. Tenn. 2020) ....................................................23

*Loc. Spot, Inc. v. Cooper,*
  2020 WL 7554247 (M.D. Tenn. Dec. 21) ..................................................23

*McMain v. Peters,*
  2018 WL 3732660 (D. Ore. Aug. 2, 2018) ...................................................5

*Memphis A. Phillip Randolph Inst. v. Hargett,*
  482 F. Supp. 3d 673 (M.D. Tenn. 2020) ....................................................21

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) .....................................................................4, 6

*Nat'l Pork Producers Council v. Ross,*
  143 S.Ct. 1142 (2023) .....................................................................................2

*NFIB v. Dep't of Labor,*
  142 S.Ct. 661 (2022) ..................................................................................1, 13

*Nguyen v. INS,*
  533 U.S. 53 (2001) ....................................................................................5, 10

*Obama for Am. v. Husted,*
  697 F.3d 423 (6th Cir. 2012) .......................................................................22

*Ohio v. Yellen,*
  539 F. Supp. 3d 802 (S.D. Ohio 2021) .......................................................22

*Ondo v. City of Cleveland,*
  795 F.3d 597 (6th Cir. 2015) .....................................................................3, 7

*Pelcha v. MW Bancorp, Inc.,*
  988 F.3d 318 (6th Cir. 2021) .........................................................................4

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) ........................................................................................8

*Preterm-Cleveland v. McCloud,*
  994 F.3d 512 (6th Cir. 2021) (en banc) .................................................11, 13

*Reed v. Reed,*
    404 U.S. 71 (1971) .......................................................................................3

*Ricci v. DeStefano,*
    557 U.S. 557 (2009) .....................................................................................4

*Sayman v. Nat'l Evaluation Sys., Inc.,*
    No. 02 C 2413, 2002 WL 598519 (N.D. Ill. Apr. 17, 2002) ......................24

*Smith v. City of Salem,*
    378 F.3d 566 (6th Cir. 2004) .......................................................................6

*Spangler v. United States,*
    415 F.2d 1242 (9th Cir. 1969) ...................................................................21

*Tennessee v. Dep't of Educ.,*
    615 F. Supp. 3d 807 (E.D. Tenn. 2022) .................................................4, 9

*Thompson v. DeWine,*
    976 F.3d 610 (6th Cir. 2020) .....................................................................23

*Titus v. Aranas,*
    2020 WL 4248678 (D. Nev. June 29, 2020) ...............................................5

*Trump v. Sierra Club,*
    140 S.Ct. 1 (2019) ......................................................................................24

*USDA v. Moreno,*
    413 U.S. 528 (1973) ..............................................................................12, 13

*U.S. v. Virginia,*
    518 U.S. 515 (1996) ..............................................................................5, 10

*Williamson v. Lee Optical of Okla. Inc.,*
    348 U.S. 483 (1955) ..............................................................................11, 12

*Wilson v. Williams,*
    961 F.3d 829 (6th Cir. 2020) .....................................................................23

**Statutes**

18 U.S.C. §116 ....................................................................................................6
2022 Cal. Legis. Serv. Ch. 810 (S.B. 107) ........................................................9
2023 Minn. Sess. Law Serv. Ch. 29 (H.F. 146) ................................................9
Tenn. Code Ann. § 68-33-101(a) .....................................................................11
Tenn. Code Ann. § 68-33-101(h) .....................................................................10
Tenn. Code Ann. § 68-33-101(*i*)-(j) ................................................................10
Tenn. Code Ann. § 68-33-101(k) .....................................................................10
Tenn. Code Ann. § 68-33-103(a)(1) ..............................................................3, 7
Tenn. Code Ann. § 68-33-105 ..........................................................................22
U.S. Const. amend. XIV, § 5 .............................................................................24

**Other Authorities**

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021) ............................8
*Whipping & Castration as Punishments for Crime,* 8 Yale L.J. 371 (1899) ......6

iv

# INTRODUCTION

By intervening in this case, the President, acting through the Department of Justice, asserts that he can decide what is and is not "necessary medical care" for Tennessee minors—without a Constitutional or statutory grant of any such authority. Mem.1. According to the US, the Fourteenth Amendment, ratified in 1868, permanently transferred the States' authority to protect vulnerable children from harmful and sterilizing procedures to medical organizations of the President's choosing. After three years of federal overreach cloaked in the gown of science, the US should have recognized that "[t]his Court is not a public health authority" entitled to substitute the Federal Executive's opinions about medicine for the State's "considerable power to regulate public health." *NFIB v. Dep't of Labor*, 142 S.Ct. 661, 667 (2022) (Gorsuch, J., concurring).

The US lectures that "Tennessee's primary stated interest of protecting youth is pretextual," Mem.16, without even mentioning the local events at VUMC that led to this legislation. The refusal to acknowledge that Americans can have good-faith policy disagreements is no surprise. The same month Governor Lee signed this bipartisan legislation into law, President Biden declared that "MAGA extremists are advancing hundreds of hateful and extreme state laws that target transgender kids and their families."[1] Anyone who disagrees is simply "un-American." *Id.* It is the invocation of the Fourteenth Amendment by the US that is the pretext here—a pretext for virtue-signaling bigotry against those who do not share the President's zeal for children being permanently disfigured in an ongoing experiment.

Like the Private Plaintiffs, the US does not even attempt to explain how its living Constitutionalist approach to the Equal Protection Clause can coexist with *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022). Oppositional defiance is not a legal argument. *Dobbs* held that the

---

[1] White House, Statement from President Joe Biden on Transgender Day of Visibility (Mar. 31, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/31/statement-from-president-joe-biden-on-transgender-day-of-visibility.

States retain broad authority to regulate medical treatments, including the prohibition of treatments that apply only to patients of one sex. "[U]nder the Constitution, courts cannot substitute their social and economic beliefs for the judgment of legislative bodies." *Id.* at 2284 (quotation omitted). "That respect for a legislature's judgment applies even when the laws at issue concern matters of great social significance and moral substance." *Id.* If we are to remain "a functioning democracy, policy choices like these" must remain where they belong: with "the people and their elected representatives." *Nat'l Pork Producers Council v. Ross*, 143 S.Ct. 1142, 1160 (2023) (op. of Gorsuch, J.). This Court should reject the invitation to repeat the errors of *Roe*.

Beyond Intervenor's inability to demonstrate a clear likelihood of success on the merits, its motion defies Article III's limits on standing and the requirement to demonstrate irreparable harm. The United States is merely an Intervenor. It has no cause of action of its own and has disclaimed all bases for standing other than the purported harm to the Private Plaintiffs. Worse, the US' request for a preliminary injunction providing statewide relief for nonparties flatly contradicts arguments it has successfully made at the Sixth Circuit and elsewhere. *E.g.*, *Kentucky v. Biden*, 57 F.4th 545, 556-57 (6th Cir. 2023). This Court should deny Intervenor's motion.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). To do so, a plaintiff "must establish" four things: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 535-36. The United States fails all four.

## ARGUMENT

### I. The United States has not demonstrated a clear likelihood of success on the merits.

The United States' failure to establish a "likelihood of success on the merits" is "fatal." *Enchant Christmas Light Maze*, 958 F.3d at 539 (cleaned up). The Act does not deny equal protection of the laws. Intervenor, relying on Private Plaintiffs' cause of action and purported harm, also lacks standing.

#### A. The Act equally protects all minors from the proscribed treatments.

The Act equally protects all Tennessee minors from hormonal and surgical procedures performed "for the purpose of: (A) Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1). Neither subsection triggers heightened scrutiny. Touching on biological sex is not sex discrimination. And, following Private Plaintiffs' lead, the US ignores Sixth Circuit precedent that forecloses treating transgender status as a quasi-suspect class. *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015).

##### 1. The Act equally protects minors of both sexes.

Sex discrimination under the Equal Protection Clause means "giv[ing] a mandatory preference to members of either sex over members of the other." *Reed v. Reed*, 404 U.S. 71, 76 (1971). Here, the Act proscribes treatments equally for minors of both sexes. The fact that biological sex is implicated proves nothing because "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination.'" *Dobbs*, 142 S.Ct. at 2245-46 (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). Intervenor argues that the Act "demonstrates an intent to target only transgender minors," Mem.12, not an intent to target either sex. Because the "Equal Protection Clause forbids only intentional discrimination" against one sex or the other, Intervenor's claim fails. *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) (citing *Washington v. Davis*, 426 U.S. 229 (1976)).

The United States leans heavily on what it argues is the "clear import," Mem.11, of *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), but fails to cite or address the Sixth Circuit's holding that *Bostock*'s reasoning is "limited only to Title VII itself," *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). *Bostock* held that firing an employee "simply for being homosexual or transgender" is discrimination "'because of . . . sex'" under Title VII. 140 S.Ct. at 1737-38, 1754 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court was careful to limit its decision in *Bostock* and expressly did "not prejudge" any other federal law or even whether Title VII itself prohibits "sex-segregated bathrooms, locker rooms, and dress codes." *Id.* at 1754; *see also Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 838-39 (E.D. Tenn. 2022) (rejecting EEOC and the Department of Education's attempts to "go[] beyond the holding of *Bostock*"), *appeal argued* No. 22-5807 (6th Cir. Apr. 26, 2023). For example, "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

If the principles of *Bostock* do not apply to Title IX—a law enacted within ten years of Title VII—"there is reason to be skeptical that" *Bostock*'s reasoning applies to the Equal Protection Clause, which "predates Title VII by nearly a century." *Brandt v. Rutledge*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16) (Stras, J., joined by Gruender, Erickson, Grasz, Kobes, JJ., dissental). In the decades after the ratification of the Fourteenth Amendment, laws against cross-dressing were also "a central component of urban life," even though the United States would no doubt argue such laws violate *Bostock*'s Title VII reasoning. C. Sears, *Arresting Dress* 3-4 (2013). And "the war between disparate impact" liability under Title VII "and equal protection" under the Fourteenth Amendment, which does not encompass disparate impact, is further reason to shy away from ignoring Sixth Circuit precedent and applying *Bostock*'s Title VII reasoning across the board to the Equal Protection Clause. *Ricci v. DeStefano*, 557 U.S. 557, 595 (2009) (Scalia, J., concurring).

Nor would *Bostock* be applicable even if the Supreme Court and Sixth Circuit had not disinvited lower courts from extending it. Discrimination requires treating individuals "worse than others who are similarly situated." *Bostock*, 140 S.Ct. at 1740; *accord City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "An individual's homosexuality or transgender status is not relevant to employment decisions," *Bostock*, 140 S.Ct. at 1741, but sexual biology is routinely relevant to medicine, *see, e.g.*, *Titus v. Aranas*, 2020 WL 4248678, at *6 (D. Nev. June 29, 2020) (prisoner seeking testosterone to treat abnormally low testosterone levels not similarly situated to biologically female prisoner taking testosterone to transition); *McMain v. Peters*, 2018 WL 3732660, at *4 (D. Ore. Aug. 2, 2018) (prisoner seeking testosterone for PTSD not similarly situated to prisoner with Klinefelter Syndrome).

The "physical differences between men and women are enduring." *U.S. v. Virginia*, 518 U.S. 515, 533 (1996). When it comes to bathrooms, athletics, and medicine, the "distinct differences in physical characteristics and capabilities between the sexes" matter. *Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977). As Justice Marshall put it, a "sign that says 'men only' looks very different on a bathroom door than a courthouse door." *Cleburne*, 473 U.S. 432 at 468-69 (1985) (Marshall, J., concurring in judgment in part); *see also Virginia*, 518 U.S. at 550 n.19 ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs."). A law that prohibits a girl from being injected with permanently sterilizing testosterone cannot be distinguished from a law that prohibits a woman from having an abortion, which *Dobbs* holds is not sex discrimination at all.

So, aping Private Plaintiffs, the US pivots to arguing that the Act is sex discrimination "because it conditions the availability of particular medical procedures on a sex stereotype: that an individual's gender identity should match the sex that individual was assigned at birth." Mem.11. At most, that is a stereotype about gender identity, not a stereotype about sex. Further, "[t]here is nothing irrational or improper in the recognition," *Nguyen v. INS*, 533 U.S. 53, 68 (2001), that boys' and girls' bodies are

5

naturally distinct and need medical treatment consistent with their sex.[2]  Recognizing physical differences between the sexes "is not a stereotype."  *Id.*  Those differences define sex itself.

The Sixth Circuit has not applied this stereotyping idea to medicine.  Sex stereotypes concern whether someone "wear[s] dresses or makeup," not whether someone's body is male or female.  *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004).[3]  The Sixth Circuit has declined to apply cases like *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, outside the Title VII context.  *Meriwether*, 992 F.3d 510 ("*Harris* does not decide this case.").[4]  Intervenor's logic means it would be sex stereotyping for Tennessee to prohibit implanting fertilized eggs within men based on the "stereotype" that only women have wombs and can become pregnant.  The United States is presumably unconcerned about the constitutionality of its own ban on "female genital mutilation" of minors.  18 U.S.C. §116.  Yet under its living Constitution, if parents sign off on castrating a son so he can sing with an unnaturally high range as an adult, Tennessee would be powerless to stop it—especially if the boy asserted the WPATH-approved gender identity of "eunuch."  [WPATH (Doc. 113-9) at 88-92 ("Chapter 9-Eunuchs");] *cf. Whipping & Castration as Punishments for Crime*, 8 Yale L.J. 371, 382 (1899) (citing the existence of *castrati* in the 1800s in Italy to justify eugenic sterilization).  Fortunately, Intervenor's expansive view does not survive modern constitutional methods and precedents like *Dobbs* and *Geduldig*.

---

[2] Surgically correcting the ambiguous genitalia of an individual with a congenital defect is not "the same medical care," Mem.10 n.25, as removing healthy bodily organs.  Disorders of sexual development ("DSDs") are "diagnosed with very high accuracy on the basis of objective features, unlike the subjective basis of diagnosing gender dysphoria."  [Cantor ¶288; Hruz ¶¶18-19.]  Treatment is primarily directed toward identifying the etiology of the defect and addressing complications.  [Hruz ¶19.]

[3] Intervenor reads too much into *Dodds v. U.S. Department of Education*, 845 F.3d 217 (6th Cir. 2016) (per curiam).  That divided motions panel merely declined to grant a stay of an already issued preliminary injunction regarding school bathrooms because the school district had only "show[n] a possibility of relief, which is not enough to grant a stay."  *Id.* at 221; *see D.H. v. Williamson Cnty.*, 2022 WL 16639994, at *6 (M.D. Tenn. Nov. 2).  And *Barnes v. City of Cincinnati* expressly declined to address the merits of the Equal Protection Clause dispute.  401 F.3d 729, 741 (6th Cir. 2005).

[4] *Bostock* affirmed the judgment of *Harris* but disagreed with its reasoning.  *Bostock*, 140 S.Ct. at 1754.

6

## 2. Transgender individuals are not a quasi-suspect class.

Intervenor admits this Court would be breaking new ground were it to rule transgender individuals are a quasi-suspect class, which the Sixth Circuit has never done. Mem.13. Despite this bold ask, the US brazenly refuses to cite Sixth Circuit precedent holding that gay persons are not in a quasi-suspect class because, unlike "race or biological gender," sexual orientation is not "definitively ascertainable at the moment of birth." *Ondo*, 795 F.3d at 609. So too with transgender status—which cannot be identified by physical means, cannot be confirmed by outside observers, and can change over time. *Id.*; [Laidlaw (Doc. 113-7) ¶17.] Case closed.

Better than what Plaintiffs managed, Intervenor at least acknowledges the four *City of Cleburne* requirements for a quasi-suspect class. Mem.12-13. Intervenor cursorily asserts the first factor— historical discrimination—due to nonprecedential cases about sex-separating bathrooms and restricting the ability to rewrite a birth certificate that accurately identified the baby's sex. Mem.13. That hardly suffices, and Intervenor has not bothered to submit further evidence on this factor in this case. *Cf. D.H.*, 2022 WL 16639994, at *12 (denying preliminary injunction where plaintiff claimed sex-separating bathrooms was discrimination against a transgender student).

Next, Intervenor cites the American Psychiatric Association for the idea that transgender individuals can equally contribute to society. But the class the United States is really seeking protection for is not simply transgender individuals; it is individuals diagnosed "with gender dysphoria." Mem.1,3,4,19,20,22,24. Otherwise, the proposed class makes no sense for this case. Not all transgender individuals use puberty blockers, hormones, or surgery "to identify with, or live as, a purported identity inconsistent with [their] sex" or to "[t]reat[] purported discomfort or distress from a discordance between" sex and identity. Tenn. Code Ann. § 68-33-103(a)(1); *see* Mem.2 (explaining how gender dysphoria is a "condition experienced by *some* transgender people" (emphasis added)). Transgender minors are in "both" the group of individuals not receiving treatment for gender

dysphoria and the group of individuals not receiving treatment. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc). Additionally, the Act prohibits even non-transgender individuals experiencing gender dysphoria from receiving such treatments. For example, a girl who has a strong desire to have the chest of a boy and thinks she has the typical feelings and reactions of boys could be diagnosed with gender dysphoria under the DSM-5-TR and then be administered puberty blockers to "giv[e] the subject more time to explore options." [ES Guidelines 3880.] Either there is a "lack of identity" between transgender status and the prohibited treatments, *Geduldig*, 417 U.S. at 496 n.20 (even though everyone who is pregnant is a woman, "members of both sexes" are in the nonpregnant group),[5] or the US is really complaining about harm to a purported class that is defined by its "clinically significant distress or impairment in occupational, social, or other important areas of functioning," Mem.2; DSM-5-TR. Neither works.

The third requirement is the one that *Ondo* found key: transgender status is not, like sex, "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.). At least some minors who claim transgender status will desist from that identity. [Levine (Doc. 113-5), ¶¶93, 105-118; Hruz (Doc. 113-4), ¶62.] Many purported gender identities, such as "genderfluid," are defined by how an individual claims to "have a gender that changes over time." [WPATH 80.] WPATH itself acknowledges research that "children may experience gender fluidity" "or even detransition after an initial social transition." [WPATH 77.]

Finally, the presence of the US Government on the side of Private Plaintiffs in this very action undermines the contention that transgender individuals "are politically powerless." *City of Cleburne*, 473 U.S. at 445. From his first day in office, President Biden has prioritized "Preventing and Combating Discrimination on the Basis of Gender Identity." Exec. Order No. 13,988, 86 Fed. Reg. 7,023

---

[5] And "uneven effects upon particular groups within a class" do not violate the Fourteenth Amendment. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).

(Jan. 20, 2021).  His agencies have attempted to impose new gender-identity obligations on the States.  *See, e.g.*, *Tennessee*, 615 F. Supp. 3d 807.  President Biden has "appointed a record number of openly LGBTQI+ leaders," including a Senate-confirmed transgender admiral[6] and a nonbinary Deputy Assistant Secretary for the Office of Nuclear Energy.[7]  White House, A Proclamation on Transgender Day of Visibility (Mar. 30, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/03/30/a-proclamation-on-transgender-day-of-visibility.  Just three days after a transgender individual murdered six Tennesseans at The Covenant School, President Biden lamented an "epidemic of violence against transgender" individuals.  *Id.*[8]  The mere fact that a group is "a fraction of office holders" or of our nation's total population, Mem.14, does not mean that it is politically powerless.  In many States, transgender and gender dysphoric individuals have flexed their political muscle and convinced legislatures to take the unprecedented step of prohibiting recognition of child custody orders when a custodial parent does not want these treatments performed on a gender dysphoric child.  *E.g.*, 2023 Minn. Sess. Law Serv. Ch. 29 (H.F. 146); 2022 Cal. Legis. Serv. Ch. 810 (S.B. 107).  President Biden has expressed no concern about those laws.

### 3.    The Act's stated interests are compelling and are not pretexts.

The Act, "like other health and welfare laws, is entitled to a strong presumption of validity." *Dobbs*, 142 S.Ct. at 2284 (quotation omitted).  "It must be sustained if there is a rational basis on which the legislature could have thought it would serve legitimate state interests."  *Id.*  This Court "must

---

[6]  U.S. Dep't of Health & Hum. Servs., Admiral Rachel Levine (Oct. 31, 2022), https://www.hhs.gov/about/leadership/rachel-levine.html.

[7]  Geneva Sands et al., *Top Energy Department official no longer employed after luggage theft accusations*, CNN (Dec. 13, 2022), https://www.cnn.com/2022/12/13/politics/sam-brinton-department-of-energy/index.html.

[8]  The Club Q shooting in Colorado referenced in President Biden's Proclamation was carried out by an individual who identifies as nonbinary, but that did not stop President Biden or Plaintiffs' expert Dr. Janssen from blaming it on "politicians and pundits that make political pawns of queer and trans youth and adults."  Dr. Aron Janssen (@LGBTDoc), Twitter (Nov. 21, 2022, 5:54 a.m.) [Ex. A].

defer to a state's judgment that there is a problem that merits correction." *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 483 (6th Cir. 2021) (en banc). But even under intermediate scrutiny, the Act need not "be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. That standard only requires laws to serve "important governmental objectives" and employ means "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533.

The Act serves governmental interests that are not just important but also compelling. The United States, however, ignores the entire history of medical malfeasance that led to the Act. As a reminder, the Tennessee public learned in September 2022 that VUMC was engaged in a widespread and profit-motivated practice of prescribing hormones to and conducting surgeries on the State's children. [Doc. 113, Ex. 1-A.] The creator and lead clinician of the Vanderbilt Clinic for Transgender Health boasted that, despite VUMC's nonprofit status, "top surgeries" (double mastectomies) and "routine hormone treatment" would "make a lot of money" for VUMC. [Doc. 113, Ex. 1-D 0:11-0:47 (quoting Dr. Taylor).] As Defendants have already established, the General Assembly was justified in its concerns about financial incentives motivating these treatments, Tenn. Code Ann. § 68-33-101(*i*)-(j); and hospital administrators threatening employees for conscientiously objecting, *id.* § 68-33-101(k). The United States addresses none of these interests and does not dispute that minors "lack the maturity to fully understand and appreciate the life-altering consequences" of the prohibited treatments. *Id.* § 68-33-101(h).

That concern is particularly important because VUMC doctors themselves admitted that they "have very, very little data to guide our treatment." [Doc. 113, Ex. 1-G 37:29-37:32 (quoting Dr. Taylor)]. "We haven't been doing this particularly long enough to know the long-term effects of hormone replacement therapy, and this is particularly true in our pediatric population." [*Id.* at 38:08-38:20]. In a "primer" on transgender medicine, Dr. Taylor explained there is "[n]o real consensus" about estradiol levels for boys who identify as girls. [Doc. 113, Ex. 1-F, at VUMC Dep. 0169]. Her

own practice is "still figuring it out!" *Id.* And if insurance would not cover "a big bill" for treatment Dr. Taylor wanted to provide, she claimed to deceptively edit patient records by changing the diagnosis to "endocrine disorder not otherwise specified," which is potentially insurance fraud. [Doc. 113, Ex. 1-G 36:39-37:05.] The title of two of her presentations perhaps summed it up best: "Caring for the Transgender Patient: With little evidence, but a lot of love." [Doc. 113, Ex. 1-H, Dr. Taylor Curriculum Vitae (filed in another case) at 3.]

With more evidence, and equal if not greater love, the State intervened to "preserv[e] . . . the integrity of the medical profession" within its borders. *Dobbs*, 142 S.Ct. at 2284. Tennessee has a "compelling state interest of proscribing complicity by its physicians" in these "misguided practice[s]." *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 540 (6th Cir. 2021) (en banc) (Griffin, J., concurring). In the face of an astonishing rise in cases, which common sense and experts attribute to social contagion [Nangia ¶¶36, 126; Román (Doc. 113-6) ¶¶27-28], Tennessee appropriately acted to protect minors.

Knowing that "protect[ing] the health and welfare of minors" is a compelling state interest, Tenn. Code Ann. § 68-33-101(a), Intervenor cries pretext. The Supreme Court "has long disfavored arguments based on alleged legislative motives" and requires "invidiously discriminatory animus." *Dobbs*, 142 S.Ct. at 2246, 2255. Intervenor cannot find that in the legislative history, so it asks this Court to give a heckler's veto to all "legislators opposing the bill" with allegations of "targeting a group." Mem.16. This bipartisan legislation was not driven by invidiously discriminatory animus.

The US places great emphasis on the General Assembly declining to add a sweeping amendment addressing all cosmetic procedures. Mem.17. The cosmetic procedures amendment was not a genuine proposal to address the problem at hand. What "seem[ed] most acute to the legislative mind" was the mistreatment of children with gender dysphoria, not doctors removing warts. *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955). The representative who introduced the amendment did not like the bill and wanted either to slow it down or kill it "when this goes to court." [H.B.

Transcript, Ex. B, 179:12 (Rep. Bo Mitchell).]  He did not care that VUMC was performing mastectomies on young girls when they had no physical malady because he thought the number of times VUMC did so was "very small."  *Id.* at 24:11.

The General Assembly had no obligation to indulge Representative Mitchell and comprehensively address all cosmetic procedures, which "may present problems of regulation distinct" from treating gender dysphoria.  *Lee Optical*, 348 U.S. at 489.  The removal of healthy organs essential to fertility or nursing infants simply is not equivalent to every cosmetic procedure imaginable.  Under the Equal Protection Clause, the "legislature may select one phase of one field and apply a remedy there, neglecting the others."  *Id.* (rational basis); *accord Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (intermediate scrutiny tolerates over-inclusiveness).[9]  The Act was not the first Tennessee law to restrict parents' authority over their child's body.  Among many other laws, Tennessee prohibits elective abortions of unborn children, Tenn. Code Ann. § 39-15-213, and bans tattooing a minor even when parents consent, *id.* § 62-38-211(a).  Ending the mistreatment of Tennessee children with gender dysphoria was *this* Act's objective.

Left with little more than misconstruing scattered statements in the legislative record, Intervenor quibbles with the Act's use of the words "purported" and "asserted" to modify "identity." Mem.17 (quoting Tenn. Code Ann. § 68-33-103(a)(1)).  Those words do not express "a bare" legislative "desire to harm a politically unpopular group."  *USDA v. Moreno*, 413 U.S. 528, 534 (1973).  As every lawyer knows, "purported" and "asserted" express no commitment one way or the other about the truth of the modified term.  *See, e.g.*, *Kentucky*, 57 F.4th at 557 (using "purports" while agreeing with Kentucky, Ohio, and Tennessee that a federal "mandate purports to preempt" their laws).  Not every minor will persist in their asserted gender identity, so the language of the Act is more accurate

---

[9] The US misconstrues *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, which was a First Amendment case applying strict scrutiny, not an Equal Protection Clause case.  508 U.S. 520, 546-47 (1993).

than what the United States proposes anyway.

Plus, the Equal Protection Clause does not require legislators to jettison their moral judgment while evaluating medical regulations. *Dobbs*, 142 S.Ct. at 2283-84. State legislatures possess authority to answer "profound moral issues" about the appropriate medical treatment for gender dysphoric minors, even if President Biden or this Court in its personal capacity may believe that the General Assembly's answer "prevents" those youth "from achieving full equality." *Id.* at 2240. In accord with "the stated purposes of the Act," the law sensibly postpones the treatments until the minor turns eighteen. *Moreno*, 413 U.S. at 534. Granting the preliminary injunction would be nothing but the exercise of "raw judicial power," substituting Intervenor's moral judgment for that of the State. *Id.* at 2265 (quotation omitted). Deciding "whether a law is dignifying or demeaning is a question for legislators, not judges." *Bristol Reg'l Women's Ctr.*, 7 F.4th at 487.

### 4. The Act is well tailored to achieving its interests.

*Dobbs* confirms that, although the procedure obviously involves sex, "laws regulating or prohibiting abortion are not subject to heightened scrutiny. Rather, they are governed by" rational-basis review, "the same standard of review as other health and safety measures." 142 S.Ct. at 2245-46. Even before *Dobbs*, when *Casey* required an undue burden standard on top of rational-basis review, the en banc Sixth Circuit explained how rational-basis review is a "highly deferential" standard "designed to respect the constitutional prerogatives of democratically accountable legislatures." *Bristol Reg'l Women's Ctr.*, 7 F.4th at 483. The same rational-basis review applies here. The State's rationales need not be supported with evidence and are not "subject to courtroom fact-finding." *Id.* at 484 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). "Courts may not second-guess a state's medical and scientific judgments," as Plaintiffs ask the Court to do for this medical regulation. *Id.* at 483 (quoting *Preterm-Cleveland*, 994 F.3d at 525 (majority)). Even if the Court ignores *Dobbs* and second-guesses the State's judgments, it will still see that the Act is more than substantially related to

13

stopping the mistreatment of minors and thus survives any level of review. The science is not as settled as claimed by Private Plaintiffs' experts, whose declarations Intervenor free rides on.

The United States is of many minds about how long healthcare professionals have been performing these treatments on gender dysphoric minors. Most aggressively, Intervenor asserts that at least some of these treatments "became commercially available in the 1930s" in Germany at the *Institut für Sexualwissenschaft* (Institute for Sexual Research). Mem.21 & n.58 (citing Brandy Schillace, *The Forgotten History of the World's First Trans Clinic*, Scientific American (May 10, 2021), *available at* https://www.scientificamerican.com/article/the-forgotten-history-of-the-worlds-first-trans-clinic/). Defendants have no obligation to travel on the axis of Weimar-era German science and endorse the "forgotten" practices of the Institute, none of which involved treatment of minors anyway. Tennessee prefers to follow the current medical practice of our allies in the United Kingdom, Sweden, and Finland, all of which have initiated a presumptive ban on these treatments for minors after lengthy study. [Cantor (Doc. 113-3) ¶¶167-169; Román ¶37.]

Other countries rightfully rejected German practices of the 1930s. The founder of the Institute for Sexual Research also co-founded the Medical Society for Sexual Science and Eugenics. Aleksandra Djajic-Horváth, *Magnus Hirschfeld*, Encyclopedia Britannica (May 10, 2023), https://www.britannica.com/biography/Magnus-Hirschfeld. He "[a]greed" with the Nazis "that the widespread practice of sterilisation by a great realm is an interesting experiment," as long as such "large-scale sterilisation" was limited to "the feeble-minded, epileptics, persons suffering from various forms of mental disorder, and so on." Magnus Hirschfeld, *Racism* 306, 308 (1938 transl. by Eden & Cedar Paul). Further, the article the US relies on features a large picture of the Institute for Sexual Research's most famous patient, Lili Elbe. What the US neglects to mention is that Elbe died after the Institute's doctors attempted to transplant a uterus into Elbe. *See* Lili Elbe, *Man into woman: an authentic record of a change of sex* 282 (1933) (edited by Niels Hoyer & translated by H.J. Stenning) (recording Elbe's

mistaken belief the day before the fatal surgery that "[o]f course I shan't die").

Intervenor then leaves behind the heyday of eugenics and jumps ahead half a century to argue that "[c]linicians have used these standards of care, which are peer-reviewed and based on reviews of scientific literature, for over forty years." Mem.20. These supposed "standards of care" are not remotely consistent with treatment of gender dysphoric minors forty years ago. Consider the Fifth Version of the WPATH Standards of Care published in 1998.[10] Defendants' expert Dr. Levine chaired the committee that wrote the 1998 version of the Standards of Care. Under the 1998 WPATH Standards of Care, the "administration of hormones to adolescents younger than 18 should *rarely* be done," and cross-sex hormones "should not be given prior to age 16 years" in any circumstance. WPATH Version 5, Part II, § VIII (emphasis added). Both L.W. and Ryan Roe are younger than 16, so their treatment with cross-sex hormones today would flagrantly violate the 1998 WPATH Standards of Care. Those standards also prohibited the use of puberty blockers, which were FDA-approved for treating precocious puberty in 1993, until "only after puberty is well established." *Id.*[11] Yet Dr. Brady began administering puberty blockers to John Doe at the age of 10, the same month Dr. Brady determined John Doe "was beginning puberty." [Jane Doe (Doc. 25) ¶17.]

The three documents the US points to as "standards of care" did not exist six years ago. Mem.3. These documents neither "shed light on the meaning of the Constitution," *Dobbs*, 142 S.Ct. at 2267, nor do they end scientific debate about the benefits and risks of the prohibited treatments.

_____

[10] Back then, WPATH was named the Harry Benjamin International Gender Dysphoria Association.

[11] Precocious puberty is an objectively-verifiable hormonal disorder that causes children to undergo puberty too early and can interfere with bone growth, while gender dysphoria is a mental condition based entirely on subjective self-reporting. [Hruz (D.E. 113-4), ¶ 37, 40-41; Cantor ¶283.] The FDA-approved use of puberty blockers to treat a child with precocious puberty suppresses the release of sex hormones only until the child reaches normal puberty age, helping slow the rate of bone age advancement and preserve adult height. [Hruz ¶45; Laidlaw ¶77; Cantor ¶283.] On the other hand, the non-FDA approved use of puberty blockers for gender dysphoria is a different treatment that almost always leads to the long-term use of sterilizing cross-sex hormones (and often surgery). [Levine ¶¶128-29; Laidlaw ¶94; Cantor ¶¶283-84.]

The two documents published before 2022 expressly deny that they are standards of care. The 2017 Endocrine Society Guidelines "cannot guarantee any specific outcome, nor do they establish a standard of care." [ES Guidelines (Doc. 113-10) 3895.] "The Endocrine Society makes no warranty, express or implied, regarding the guidelines and specifically excludes any warranties of merchantability and fitness for a particular use or purpose." *Id.* The 2018 AAP Policy Statement—in reality, the work of a single doctor—also clarifies that it "does not indicate an exclusive course of treatment or serve as a standard of medical care." [AAP Policy Statement 1.] The AAP Policy Statement is shoddy work that "fail[ed] to include any of the actual outcomes" research on gender dysphoric children and "also misrepresented the contents of its citations, which repeatedly said the very opposite of what AAP attributed to them." James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. of Sex & Marital Therapy 1 (2019) (Doc. 113-3, pg. 185). For example, the references cited by the AAP Policy Statement as the basis of its policy repeatedly endorse a "watchful waiting" approach, contradicting AAP's affirmation-on-demand policy. [Cantor ¶256.] The AAP Policy statement also repeatedly labels everyday psychological counseling for gender dysphoric minors as conversion therapy, Mem.19, but the studies it cites on that issue had to do with therapy for sexual orientation (in adults) and not gender identity (in any context), Cantor, J. of Sex & Marital Therapy 2. There are multiple psychological modalities used to help patients with gender dysphoria, none of which are conversion therapy. [Nangia (¶¶58-60).] Private Plaintiffs do not rely on the AAP Policy Statement anywhere in their own preliminary injunction briefing.[12]

All that is left is the newest WPATH Standards of Care, published the same month the VUMC scandal broke. But the WPATH of today describes itself as an "advocacy organization[]." *Boe v.*

---

[12] The AAP confesses that "age range and reversibility is based on the little data that are currently available" and that the "effect of sustained puberty suppression on fertility is unknown." [AAP Policy Statement 6.] Like the WPATH Standards and ES Guidelines, the AAP did not conduct systematic reviews of safety and efficacy in promulgating its treatment recommendations. [Cantor ¶¶88-104.]

*Marshall*, No. 2:22-cv-184-LCB (M.D. Ala. Dec. 27, 2022), ECF 208, at 3. "[C]onflict" between WPATH's "aspirations" to serve as "both a scientific organization and an advocacy group for the transgendered" is routinely resolved in favor of its advocacy role. *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014) (relying on expert report of Dr. Levine). WPATH has aggressively tried to quash attempts to analyze the methods by which it created its 2022 Standards of Care. *Boe v. Marshall*, 2023 WL 2646437, (M.D. Ala. Mar. 27) (denying WPATH's motion to quash). Despite the Standards of Care claiming there was a public comment period from November 2021 to January 2022 [Standards 247], Plaintiffs' putative expert Dr. Janssen testified in deposition for another case in this Court that the draft chapters "weren't publicly made available" and refused to acknowledge the draft Child Chapter he had worked on. [Ex. C, Janssen Dep. 218:17-220:12.] In that August 2022 deposition, he also denied seeing "a draft of an alleged chapter on eunuchs" and did not know if there would be a chapter on eunuchs. *Id.* at 223:9-223:24. Thus, even WPATH members involved in drafting the Standards were unaware of major aspects of the Standards' contents as late as *one month* before their publication.

In the face of "limited data" [WPATH 65], WPATH's current approach is to set no minimum age for hormone treatment and all surgeries other than phalloplasty. That is indefensible, let alone constitutionally required. Most minors cannot comprehend and appreciate the long-term risks of the prohibited treatments or the low-quality data on which they are based. [Nangia ¶154.] In setting such a permissive standard, WPATH follows the same principle Plaintiffs' expert Dr. Janssen has said is an "important ideal: F--- that. Nobody gets to tell you no." [Dr. Aron Janssen, Twitter (June 24, 2022, 12:39 p.m.), Ex. D (uncensored in original) (responding to *Dobbs*); *see also* Janssen Dep. 239:8-240:12 (testifying "F-that" is "a value for" him and "an ideal that [he] stand[s] for").] The Act's approach is far better tailored than the unbounded approach Dr. Janssen and other WPATH doctors chose.

If this Court feels compelled to engage in the quintessentially legislative task of deciding whether the General Assembly was right to reject these organizations' healthcare policy advice,

Defendants' experts have accurately described the life-altering negative effects of these unproven treatments; the fact that many of the long-term effects of administering these drugs during puberty remain unknown; the lack of reliable studies demonstrating that medical transition improves mental health compared to mental health treatments without medical risk; that youth who present with gender dysphoria often exhibit other mental health comorbidities; that the protocols adopted by WPATH and the Endocrine Society promoting hormonal and surgical transition are based on "very low quality" evidence under established research evaluation standards; and that the vast majority of children who exhibit gender dysphoria grow up to align their gender identity with their biological sex by the time they reach adulthood absent hormonal intervention, with desistence being increasingly observed among teens and young-adults with adolescent-onset gender dysphoria. [Defendants' Resp. to Private Plaintiffs' Mot. (Doc. 112) at 10-13.] Defendants have also produced testimony from "detransition-ers," who have with increasing frequency come forward lamenting the impacts of these treatments, as well as from parents pressured by healthcare providers to consent to the same. *Id.* at 13. The General Assembly was right to prohibit such treatments for minors.

Disagreeing with the General Assembly's legislative judgments, Plaintiffs' experts make broad, misleading assertions regarding the mental health benefits of medical transition. Dr. Adkins states that "if left untreated," gender dysphoria can result in "severe anxiety and depression, self-harm, and suicidality," [Adkins ¶22]. But the two sources she cites do not support her conclusion in that regard. [Cantor ¶265-68.] And Dr. Adkins' anecdotal testimony regarding patient outcomes [Adkins ¶24] is unreliable, particularly in contrast to the systematic reviews that undermine her opinion (which her declaration ignores) and given that she is not qualified to assess a patient's mental health. [Cantor ¶¶269-271.] Also, Dr. Antommaria cherry-picks certain studies to support his assertion that medical-ized transition is beneficial, but the systematic reviews comprising the full set of all such studies found the opposite, recognizing insufficient evidence exists to reach such a conclusion. [Cantor ¶¶177-200.]

Dr. Janssen cites a 2014 study for the proposition that puberty blockers "forestall[] increased distress and dysphoria" and that the benefits "increase over the long term" [Janssen ¶48], but he fails to mention that the study's own authors admit the results could be attributable to the social, financial, and psychological support also received by study participants—making it scientifically impossible to know whether positive outcomes were due to medical interventions or other factors. [Cantor ¶293.]

For his part, Dr. Turban makes broad assertions regarding improvements in mental health outcomes [Turban ¶¶11-22], with citations that, at best, establish correlation and not causation. [Cantor ¶¶298-99, 303-05]. As for desistence, Dr. Turban suggests that "once a transgender youth begins puberty, it is rare for them to later identify as cisgender." [Turban ¶24]. But this assertion is contradicted by multiple studies. [Laidlaw ¶¶218-19.] And although Dr. Turban and Dr. Antommaria touch on the topic of regret, they ignore the fact that regret often appears 10 to 15 years after starting medical transition, when sexual dysfunction, social difficulties, the need for ongoing medical care, and the use of medication to quell anxiety and depression often become a recurrent experience. [Levine ¶223]. Dr. Turban's insistence that medicalized transition for gender-dysphoric youth is not "experimental" [Turban ¶14] contradicts the conclusion of every systematic review of the safety and effectiveness of the same [Cantor ¶302].

Dr. Adkins and Dr. Antommaria also suggest that hormonal treatment does not necessarily impair fertility. [Adkins ¶59; Antommaria ¶45]. While that may be true for some who have not had normal puberty blocked, that is not the case for patients whose normal pubertal development has been altered by puberty blockers and cross-sex hormones taken while an adolescent. [Laidlaw ¶155].[13]

---

[13] Likewise, the purpose and effects of FDA-approved use of hormones to treat medically-verifiable hormone deficiencies are much different from the experimental use of hormones to treat gender dysphoria. [Laidlaw ¶119; Hruz ¶¶47-48.] For instance, when testosterone is administered to males to treat hypogonadism (an endocrine disorder that can cause problems with mood, sexual function, libido, and bone density) the purpose is to restore hormone levels to a normal balance. [Laidlaw ¶¶118-19; Hruz ¶49-50.] In contrast, administering the same amount of testosterone to females is not

Dr. Antommaria tries to explain away the conclusion of the European medical community that the evidence for hormonal and surgical treatment for gender-dysphoric youth is of "very low quality" by stating that "'low' does not necessarily mean poor or inadequate." [Antommaria ¶18.] But Dr. Antommaria provides no evidence that the use of the term "low" is somehow misleading in this context. [Cantor ¶276.] The comprehensive literature reviews conducted by the national health authorities in Europe make clear that the research regarding the safety and efficacy of hormonal and surgical treatments for gender dysphoria in minors is, indeed, of poor quality. [Cantor ¶¶70-87.]

As one last effort to explain why American medical associations have dramatically liberalized their approach to gender dysphoria in the past few years despite the lack of high-quality evidence, the US argues that randomized controlled trials—which help distinguish causation from correlation in the treatment studied [Cantor ¶277]—"are not, and cannot be, the gold standard for medical research on gender dysphoria." Mem.21 (quotation omitted). The DOJ likely did not run that statement by the FDA, which has time-and-again taken the position that "randomized control trials would present the strongest evidence of appropriateness for the public health." *Breeze Smoke, LLC v. U.S. FDA*, 18 F.4th 499, 506 (6th Cir. 2021). The US puts the cart before the horse in arguing that, "given medical consensus in support of" the prohibited treatments, "it would be unethical to deny a patient enrolled in a" randomized controlled trial access to those treatments. Mem.21. This ignores the "utter lack of knowledge about the long-term outcomes" of such treatments [Levine ¶221], and the fact that the growing medical consensus in Europe conflicts with the views of American medical associations. [Román ¶¶14-21, 35-38.] Doctors in Europe have "call[ed] for such studies, which may be the only way to address biases that [they] have noted in the field." [Doc. 113-2, Landén et al. Systematic Review

FDA-approved because females normally have lower levels of testosterone, and administering high doses of testosterone to females *creates* severe hyperandrogenism (an endocrine disorder that presents multiple risks to the patient's physical and mental health). [Laidlaw ¶¶115-16, 119-44.]

1084 (providing suggestions on how to conduct "ethically feasible" randomized controlled trials).]

The General Assembly acted rationally and met any standard of heightened scrutiny.

### B.     The United States lacks standing and its own cause of action.

Throughout this case, the United States has identified no harm to itself and thus—after filing its Complaint in Intervention, briefing on its Intervention Motion, and Motion for Preliminary Injunction—has disclaimed all sources of standing other than the harms alleged by the Private Plaintiffs. Intervenor of course complains that the Act will cause "harm to many transgender minors diagnosed with gender dysphoria" and "impose harm on their parents and medical providers."  Mem.24.  But those are allegations of harm to individual Tennesseans, not to the United States as a sovereign.  The United States' status as a sovereign "does not allow [it] to bypass proof of injury in particular or Article III in general."  *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (adopting argument of Federal Executive defendants to reverse grant of preliminary injunction to States).  As Defendants have explained, [Defendants' Resp. to Private Plaintiffs' Mot. (Doc. 112) at 16], Plaintiffs lack standing for many of their claims.  Although this Court has allowed the US to intervene, its Equal Protection Clause claim at least fails to the extent Plaintiffs lack standing to advance their own such claim.

Further, the US' claim will fail because it lacks its own cause of action.  Unlike the 1969 Ninth Circuit case this Court found persuasive, [Intervention Order (Doc. 108) at 2-3], the United States has no statutory cause of action against Defendants which it could add "to claim relief as to the entire" State, *Spangler v. United States*, 415 F.2d 1242, 1244 (9th Cir. 1969) (citing 42 U.S.C.A. § 2000c-6 as providing cause of action).  The US has not even argued that 42 U.S.C. § 2000h-2 is itself a cause of action.  Finally, as explained more fully below, the US has no implied cause of action either.

## II.     Intervenor cannot show irreparable harm.

The "absence of irreparable injury is always fatal to a motion for a preliminary injunction." *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 680 (M.D. Tenn. 2020).  Plaintiffs have "'the burden of establishing'" the harm "'clear[ly].'"  *Dist. Brewing Co., Inc. v. CBC Rest., LLC*, 2016 WL

1366230, at *2 (S.D. Ohio Apr. 6). To be irreparable, a harm must be "imminent," *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019), and it must injure the plaintiffs, not absent third parties. *Dobbs-Weinstein v. Vanderbilt Univ.*, 2022 WL 860450, at *2 (M.D. Tenn. Mar. 22). And a preliminary injunction must actually prevent the irreparable injury. *Ohio v. Yellen*, 539 F. Supp. 3d 802, 821 (S.D. Ohio 2021). Intervenor identifies no irreparable harm to the US itself. All of its asserted irreparable harms are nebulous ones to unspecified "transgender youths," parents who want this treatment for their children, and physicians who want to provide the prohibited treatments. Mem.24. For reasons Defendants have already explained, [Defendants' Resp. to Private Plaintiffs' Mot. (Doc. 112) at 17-22], Private Plaintiffs and others similarly situated have not and cannot establish irreparable harm.

The US also fails to demonstrate irreparable harm because its Complaint in Intervention does not challenge or request an injunction against enforcement of the private cause of action in Tenn. Code Ann. § 68-33-105. [Doc. 38-2 at 18.] Providers face the prospect of civil liability even if Defendants are permanently enjoined from enforcing the Act. And they face liability from enforcement by the Defendants for acts undertaken while a preliminary injunction is in effect if that injunction is later vacated. *Edgar v. MITE Corp.*, 457 U.S. 624, 651-53 (1982) (Stevens, J., concurring in part and concurring in judgment). Intervenor must present "forward-looking" harms for its Equal Protection claim that preliminary relief will *prevent*. *A.M.C. v. Smith*, 620 F. Supp. 3d 713, 731 (M.D. Tenn. 2022) (quoting *Gale v. O'Donohue*, 751 F. App'x 876, 884 (6th Cir. 2018)).[14] Intervenor has not proven that any irreparable harm will be prevented by the preliminary injunction it requests.

---

[14] The US proves too much arguing that "irreparable injury is presumed" whenever "constitutional rights or civil rights are threatened or impaired." Mem.24. The cases it cites find their roots in *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of *First Amendment freedoms*, for even minimal periods of time, unquestionably constitutes irreparable injury." (emphasis added)). The same goes when the "fundamental right to vote" is restricted. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). But that principle does not mean that *every* Fourteenth Amendment claim automatically entails irreparable harm. Minors do not have a fundamental right to access the prohibited treatments. Nor does Intervenor argue that parents and physicians are denied equal protection of the laws.

## III. The balance of equities and public interest favor Defendants.

All agree that the balance-of-equities and public-interest factors "merge." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). It is "in the public interest" to enforce the State's democratically enacted laws. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020). Any time such a law is enjoined, the State suffers irreparable injury. *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 787 (M.D. Tenn. 2020).

These principles apply with unique force here. As explained, the Act protects Tennessee's children from controversial treatments that risk long-term consequences to their health. If Plaintiffs are right that a preliminary injunction will cause providers to resume these dangerous treatments, then the harm to Tennessee's children will be widespread and cannot be undone later. A bit on the nose, the US tries to justify preliminarily enjoining this Act by citing a federal court's preliminary injunction of an Alabama abortion law. Mem.25 (citing *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280 (M.D. Ala. 2013)). The federal courts' complicity in enjoining abortion law after abortion law for nearly half a century before reversing course in *Dobbs* should give this Court pause before once again enjoining a State's medical regulation. "It is not the Court's role to second-guess" Tennessee's "reasoned public health decisions," especially on a truncated record in an emergency posture. *Loc. Spot, Inc. v. Cooper*, 2020 WL 7554247, at *3 (M.D. Tenn. Dec. 21).

## IV. Intervenor's requested relief is overbroad.

The US makes no attempt to justify a preliminary injunction that would "enjoin Defendants' enforcement of" the Act in its entirety statewide, purporting to apply to both the Plaintiffs in this case and nonparties alike. [Intervenor's Preliminary Injunction Mot. (Doc. 40).] This Court cannot grant such an injunction, as Defendants have explained. [Defendants' Resp. to Private Plaintiffs' Mot. (Doc. 112) at 23-25.] Intervenor knows its requested injunction is unjustifiably broad because the US has made the same overbreadth arguments many times before.

For example, a federal district court granted the request of Kentucky, Ohio, and Tennessee to preliminarily enjoin the federal government "from enforcing the vaccine mandate for federal

contractors and subcontractors in all covered contracts in Kentucky, Ohio, and Tennessee," an in-junction geographically limited to those three States. *Kentucky v. Biden*, 571 F. Supp. 3d 715, 735 (E.D. Ky. 2021). The Sixth Circuit agreed with the States on the merits but, at the Federal Executive's request, held that "the district court abused its discretion by prohibiting enforcement of the mandate against non-parties in the plaintiff States." *Kentucky*, 57 F.4th at 556-57. Ordering "the government to act or refrain from acting toward nonparties in the case" takes "the judicial power beyond its tradi-tionally understood uses." *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring).[15] At most, this Court could only preliminarily enjoin Defendants' enforcement of the Act as to the three minors, their par-ents, and the one physician in this case.

For additional statutory reasons, the US' authority to seek a preliminary injunction is limited to, at most, the relief to which the Private Plaintiffs are entitled. Section 2000h-2 limits the United States to "the same relief as if it had instituted the action." But § 2000h-2 "does not create an inde-pendent federal claim; it merely allows the United States Attorney General to intervene." *Sayman v. Nat'l Evaluation Sys., Inc.*, No. 02 C 2413, 2002 WL 598519, at *1 (N.D. Ill. Apr. 17, 2002). Thus, if the United States "had initiated" this action, it would be entitled to no relief because it has no cause of action. There is no implied cause of action in the U.S. Constitution for the United States to sue States. Rather, the Fourteenth Amendment empowers Congress to "enforce" its requirements "by appropriate legislation." U.S. Const. amend. XIV, § 5. As the Federal Executive has itself reminded courts, "the Supreme Court has warned federal courts to hesitate before finding implied causes of action—whether in a congressional statute or in the Constitution." *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 973 F.3d 121, 123 (D.C. Cir. 2020), *judgment vacated upon grant of rehearing en banc* (Oct. 15, 2020); *see also Trump v. Sierra Club*, 140 S.Ct. 1, 1 (2019) (granting stay where United States

---

[15] The US has repeatedly relied on this concurrence in asking courts to limit relief to the parties in the case. *See, e.g.*, *Braidwood Mgmt. v. Becerra*, No. 23-10326 (5th Cir. May 31, 2023), ECF 138, at 1-4.

"made a sufficient showing at this stage that the plaintiffs," proceeding on an implied cause of action, "have no cause of action"). What the United States today requests is a remedy "previously unknown to equity jurisprudence" in 1789. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999). Without an express cause of action, this Court cannot grant the US an injunction that goes beyond what Private Plaintiffs are entitled to under their causes of action.

Even if the US could seek a broader injunction, this Court "should not ignore Congress's carefully drafted limitations on" the US' authority to intervene. *McGahn*, 973 F.3d at 123. Congress gave the United States authority to intervene as of right only in actions "seeking relief from the denial of equal protection of the laws . . . on account of race, color, religion, sex or national origin." 42 U.S.C. § 2000h-2. When Congress enacted Title IX in 1972 and added "sex" to the intervention statute, "it meant biological sex," not sex stereotypes or transgender status. *Adams*, 57 F.4th at 812. To the extent this Court desires to issue a preliminary injunction on those grounds, the United States cannot obtain a broader injunction using those nonbiological understandings of sex.

## V. The Court cannot grant Intervenor's motion without holding an evidentiary hearing.

The Court can easily dispose of Intervenor's motion by denying it. The US' claim is meritless under *Dobbs*, and the Act is subject only to rational-basis review, which it easily survives. Should the Court entertain Intervenor's motion beyond that threshold, then it must hold an evidentiary hearing because material facts are in dispute. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007). For instance, the parties dispute material facts surrounding Private Plaintiffs' claims for irreparable harm and their eligibility for continued care beyond July 1. As the United States has offered no particularized evidence of any harm to itself, its motion fails if a preliminary injunction would not prevent irreparable harm to Private Plaintiffs. An evidentiary hearing is therefore required.

## CONCLUSION

For all these reasons, the Court should deny Intervenor's motion.

Dated: June 1, 2023

Respectfully submitted,

/s/ Clark L. Hildabrand

ADAM K. MORTARA (BPR# 40089)
Lawfair LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

STEVEN J. GRIFFIN (BPR# 40708)
Assistant Attorney General
CLARK L. HILDABRAND (BPR# 38199)
Senior Counsel
RYAN N. HENRY (BPR# 40028)
Assistant Attorney General
TRENTON MERIWETHER (BPR# 38577)
Assistant Attorney General

CAMERON T. NORRIS (BPR# 33467)
TIFFANY H. BATES (pro hac vice)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com

BROOKE A. HUPPENTHAL (BPR# 40276)
Assistant Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-959
steven.griffin@ag.tn.gov
clark.hildabrand@ag.tn.gov
trenton.meriwether@ag.tn.gov
ryan.henry@ag.tn.gov
brooke.huppenthal@ag.tn.gov

*Counsel for Defendants*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2023, the undersigned filed this document via this Court's electronic filing system, which sent notice of such filing to the following counsel of record:

| COUNSEL OF RECORD | PARTY REPRESENTED |
|---|---|
| Stella Yarbrough<br>Lucas Cameron-Vaughn<br>Jeff Preptit<br>ACLU Foundation of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>Tel.: 615-320-7142<br>syarbrough@aclu-tn.org<br>lucas@aclu-tn.org<br>jpreptit@aclu-tn.org<br><br>Joshua A. Block<br>Chase Strangio<br>American Civil Liberties Union Foundation<br>125 Broad Street, Floor 18<br>New York, NY 10004<br>Tel.: 212-549-2593<br>jblock@aclu.org<br>cstrangio@aclu.org<br><br>Sruti J. Swaminathan<br>Lambda Legal Defense and Education Fund, Inc.<br>120 Wall Street, 19th Floor<br>New York, NY 10005<br>Tel.: 212-809-8585<br>sswaminathan@lambdalegal.org<br><br>Avatara A. Smith-Carrington<br>Lambda Legal Defense and Education Fund, Inc.<br>1776 K Street N.W., 8th Floor<br>Washington DC 20006<br>Tel.: 202-804-6245<br>asmithcarrington@lambdalegal.org | Plaintiffs L.W., Samantha Williams, Brian Williams, John Doe, Jane Doe, James Doe, Ryan Doe, Rebecca Doe, and Susan N. Lacy |

| | |
|---|---|
| Tara Borelli<br>Lambda Legal Defense and Education Fund, Inc.<br>1 West Court Square, Ste. 105<br>Decatur, GA 30030<br>Tel.: 404-897-1880<br>tborelli@lambdalegal.org<br><br>Joseph L. Sorkin<br>Dean L. Chapman, Jr.<br>Kristen W. Chin<br>Richard J. D'Amato<br>Theodore James Salwen<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Tel.: 212-872-1000<br>jsorkin@akingump.com<br>dchapman@akingump.com<br>kristen.chin@akingump.com<br>rdamato@akingump.com<br>jsalwen@akingump.com<br><br>Elizabeth D. Scott<br>Akin Gump Strauss Hauer & Feld LLP<br>2300 N. Field Street, Suite 1800<br>Dallas, TX 75201<br>Tel.: 214-969-2800<br>edscott@akingump.com<br><br>Christopher J. Gessner<br>David Bethea<br>Akin Gump Strauss Hauer & Feld LLP<br>Robert S. Strauss Tower<br>2001 K Street N.W.<br>Washington, DC 20006<br>Tel.: 202-887-4000<br>cgessner@akingump.com<br>dbethea@akingump.com | |
| Ellen B. McIntyre<br>U.S. Attorney's Office for the Middle District of Tennessee<br>719 Church Street, Suite 300<br>Nashville, TN 37203<br>ellen.bowden2@usdoj.gov | Plaintiff-Intervenor United States of America |

Rascoe S. Dean
Assistant United States Attorney
719 Church Street, Suite 33
Nashville, TN 37203
(615) 736-5151
rascoe.dean@usdoj.gov

Alyssa C. Lareau
United States Department of Justice
Federal Coordination and Compliance Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 305-2994
Alyssa.Lareau@usdoj.gov

Coty Montag
United States Department of Justice
Federal Coordination and Compliance Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 305-2222
Coty.Montag@usdoj.gov

Gloria Yi
United States Department of Justice
Federal Coordination and Compliance Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 616-3975
Gloria.Yi@usdoj.gov

Tamica Daniel
United States Department of Justice
Housing and Civil Enforcement Section
950 Pennsylvania Avenue NW
4CON
Washington, DC 20530
(202) 598-9636
Tamica.Daniel@usdoj.gov

*/s/ Clark L. Hildabrand*
CLARK L. HILDABRAND (BPR #38199)
Senior Counsel
*Counsel for Defendants*

29