**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**Nashville Division**

| | |
|---|---|
| L.W., by and through her parents and next friends, Samantha Williams and Brian Williams, *et al.*, | |
| *Plaintiffs,* | **Civil No. 3:23-cv-00376** |
| and | **Judge Richardson** |
| UNITED STATES OF AMERICA, | **Judge Newbern** |
| *Plaintiff-Intervenor*, | |
| *v.* | |
| JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, *et al.*, | |
| *Defendants.* | |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

[To Come]

i

# TABLE OF AUTHORITIES

[To come]

ii

## I. The Minor and Parent Plaintiffs Have Standing to Assert Their Claims

The Health Care Ban threatens the Minor and Parent Plaintiffs with imminent and irreparable injury that would be redressed by a preliminary injunction. In their Opposition to Plaintiffs' Motion for a Preliminary Injunction, Defendants repeat their previous assertions that Plaintiffs cannot show imminent harm because the Ban includes a "wind down" provision allowing them to continue gender-affirming care for eight months after the law's effective date. (Opp. 20.) But, as this Court recognized, "the plain text of the statute and the natural consequences of the prohibitions contained in the statute indicate that the effects of the statute . . . will be felt starting on July 1, 2023.[1] VUMC, the clinic where each of the Minor Patients currently receives care, has definitively stated that it will stop providing services as of July 1, 2023, and will not resume care unless and until the law is enjoined.[2] None of the Minor Plaintiffs have been able to find alternative care in state, and even if they could, such care would be limited to lowering their dosages in preparation for treatment being prohibited altogether.[3] Indeed, that is exactly what Dr. Lacy will have to do to her patients if the law is not enjoined, thereby causing irreparable harm to those adolescents on whose behalf she seeks injunctive relief.[4]

Even if VUMC were not poised to cease care, the Minor and Parent Plaintiffs would still have to act immediately to arrange care out of state. Because an increasing number of transgender minors with gender dysphoria throughout the South have been forced to search for out-of-state

---

[1] Order Denying Defendants' Motion to Reset the Briefing Schedule and Consolidate a Preliminary Injunction Hearing With Trial on the Merits [ECF No. 88] at 4.

[2] Pinson Decl. ¶¶ 7, 9; Brady Decl. ¶¶ 8-9; Williams Reply Decl. ¶ 4; Doe Reply Decl. ¶ 3; Roe Reply Decl. ¶ 3. The only exception is for patients who (i) will not receive care out of state and (ii) cannot complete titration down prior to July 1, 2023. Brady Decl. ¶¶ 8-9.

[3] Williams Reply Decl. ¶¶ 5-10; Doe Reply Decl. ¶¶ 4-8; Roe Reply Decl. ¶¶ 6-7. Defendants assert that the Minor Plaintiffs could obtain care at CHOICES, but that clinic does not provide care to patients under 16. Roe Reply Decl. ¶ 4.

[4] Lacy Reply Decl. ¶¶ 3-5.

care from a shrinking number of clinics, out-of-state care will take months to secure and is far from guaranteed.[5] And even if one or more Minor Plaintiffs were ultimately successful in finding care out of state, they would still suffer irreparable harm in the form of (i) disruption to their existing medical care and doctor-patient relationship, (ii) missing school, work, and family engagements, and (iii) travel and medical expenses (including the cost of out-of-network providers) that would impose an immediate and severe financial burden on the families.[6] *See Kentucky v. Biden*, 57 F.4th 545, 550 (6th Cir. 2023) (explaining that plaintiffs' "unrecoverable compliance costs" supported injunctive relief because of Defendant's sovereign immunity); *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 861 F. Supp. 2d 1170, 1188 (D. Haw. 2012), *aff'd*, 555 F. App'x 730 (9th Cir. 2014) (having new doctor "with whom the patients have not established relationships of professional confidence and trust, perform the procedures is likely to cause the patients significant anxiety during an already stressful and vulnerable period in their lives").

These harms are all traceable to the Ban. Defendants argue that any harm to Minor Plaintiffs and their parents is attributable to the "independent" decision of VUMC to forego providing care during the Ban's "wind down" period. (Opp. 17-18.) That is neither practically correct—as noted above, medical providers would, at best, only be able to titrate down care during this phase-out period—nor literally correct: VUMC has submitted declarations stating that it will stop providing care because of the Ban, and that Dr. Brady is afraid to provide care during the "wind down" period because VUMC's certification that withdrawing care would be harmful could

---

[5] Williams Reply Decl. ¶ 5(describing unsuccessful search for care in Illinois and Virginia); Doe Reply Decl. ¶ 4 (describing inability to make appointment in Georgia because of new Georgia law and long wait list at clinic in Ohio); Roe Reply Decl. ¶ 7 (describing fear that appointments in Ohio and North Carolina will be cancelled if pending bills to ban care are passed in those states).
[6] Williams Reply Decl. ¶¶ 5-10; Doe Reply Decl. ¶ 4-8; Roe Reply Decl. ¶ 6-7.

be second-guessed by state officials enforcing the Ban.[7]  In light of how the Attorney General's office has targeted VUMC for legal investigation, these fears are well founded.[8]  But even if VUMC's actions were not unambiguously compelled by the Ban, it cannot seriously be disputed that the Ban was "a motivating factor" in VUMC's decision; which is all that is required to show an injury traceable to an unconstitutional law.  *Parsons v. DOJ*, 801 F.3d 701, 714 (6th Cir. 2015); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (standing established by third-party actions due "at least in part" to government action because only "de facto causality" is required).

Defendants also argue Plaintiffs' harm will not be redressed by a preliminary injunction because VUMC will not actually resume care.  But VUMC's testimony says the opposite: "Should enforcement of the Act's provision prohibiting Hormone Therapy be deferred, delayed or enjoined, VUMC would continue to provide Hormone Therapy consistent with prevailing standards of care for persons with gender dysphoria to those minor patients of VUMC for whom such care is clinically appropriate."[9]  Defendants dismiss that clear statement based on Dr. Brady's expressed concern that, if she provided care during the "wind down" period, she "could subsequently be deemed by non-medical third parties to violate the Act, which could expose [her] to punitive consequences."[10]  Defendants contend that Dr. Brady's testimony refers to the potential for liability for private lawsuits under TCA § 68-33-105 (Opp. 20), which Plaintiffs' requested relief would not block.  But those lawsuits can be brought only by the minor patient or their parents and next of kin—not by "third parties."  TCA § 68-33-105(a).  Thus, Dr. Brady's statement plainly refers to

---

[7] Pinson Decl. ¶ 7; Brady Decl. ¶¶ 8-10.

[8] Indeed, the Attorney General's office has served multiple civil investigative demands ("CIDs") on VUMC, including two shortly after the Ban's passage.  The CIDs are attached as exhibits to the *Declaration of David Bethea, Esq. In Support of Plaintiffs' Reply in Support of Motion for Preliminary Injunction* (the "Bethea Decl."), filed contemporaneously herewith.

[9] Pinson Decl. ¶ 9.

[10] Brady Decl. ¶ 10.

3

governmental officials like Defendants and her (reasonable) fear that they would take action against her if she provided gender-affirming care after July 1 absent an injunction.  Moreover, there is no dispute that a preliminary injunction would redress Dr. Lacy's patients' harm, as Dr. Lacy has testified unequivocally that, if the law is enjoined, she will provide continued hormone therapy to her existing patients without having to titrate down and be able to accept new patients.[11]

In any event, an injunction need not completely redress a plaintiff's injury to confer standing.  *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).  Even if an injunction did not reopen VUMC's doors, it would still make it possible for other medical providers in Tennessee to begin or resume providing care.  As such, an injunction "significant[ly] increase[s] . . . the likelihood that the plaintiff[s] would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002).  No more is required.

## II.     Dr. Lacy Has Third-Party Standing to Assert the Rights of Her Patients

Without an injunction, Dr. Lacy's current patients will suffer imminent irreparable injury as Dr. Lacy is forced to titrate down hormone doses to comply with the Ban.  Dr. Lacy therefore has standing to seek relief on their behalf because (i) she will suffer an injury from the Ban as it forces her to alter care for existing patients and/or threatens her ability to treat those patients in accordance with proper medical guidelines and her ethical obligations; (ii) as a medical provider, she has a close relationship to those patients subject to discrimination under the Ban; and (iii) those patients face meaningful obstacles in enforcing their rights given the extraordinary privacy issues at stake.  *See Ass'n of Am. Physicians & Surgeons v. FDA*, 479 F. Supp. 3d 570, 584 (W.D. Mich. 2020), *aff'd*, 13 F.4th 531 (6th Cir. 2021); *Little Rock Fam. Plan. Servs.*, 397 F. Supp. 3d 1213, 1261 (E.D. Ark. 2019); Opening Lacy Decl. ¶¶ 19-20, 23.

---

[11] Lacy Reply Decl. ¶¶ 7.

Dr. Lacy also has third-party standing to protect the constitutional rights of future patients for whom she cannot provide care. Defendants cite *Kowalski v. Tesmer*, 543 U.S. 125 (2004), in which the Supreme Court rejected attorneys' third-party standing to invoke the constitutional interests of their future clients. But *Kowalski* expressly distinguished cases where "enforcement of the challenged restriction against the litigant would result *indirectly* in the violation of third parties' rights." *Id.* at 130 (emphasis in original) (citing, *e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976)). Because the Ban will be enforced directly against Dr. Lacy, *Kowalski* is inapposite.

## III. Plaintiffs Are Likely to Prevail on Their Equal Protection Claims.

### A. The Health Care Ban Is Subject to Heightened Scrutiny Because It Discriminates Based on Sex and Transgender Status.

Other courts in this Circuit have recognized transgender status as a quasi-suspect classification, *see Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020) (collecting cases), and explicitly rejected Defendants' argument that *Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015), forecloses such recognition (Opp. 8), *see D.H. by A.H. v. Williamson Cty. Bd. of Educ.*, No. 3:22-CV-00570, 2022 WL 16639994, at *8 (M.D. Tenn. Nov. 2, 2022). *Ondo* was a case about sexual orientation—not transgender status—and pre-existing circuit precedent had "always applied rational-basis review to state actions involving sexual orientation." 795 F.3d at 609. Given those critical distinctions, *Ondo* does not "close[]" the matter, as Defendants claim. (Opp. 8). *Cf. EEOC v. R.G. & G.R. Harris Funeral Homes, Inc*, 884 F.3d 560, 580 (6th Cir. 2018) (whether Title VII prohibits sexual-orientation discrimination is a "substantially different legal issue[]" from whether it prohibits discrimination based on transgender status).

The Ban is also subject to heightened scrutiny because it draws a facial classification based on sex assigned at birth, thereby discriminating based on sex. TCA § 68-33-102(9). Moreover, by discriminating against transgender persons, the Ban "unavoidably discriminates against persons

5

with one sex identified at birth and another today," *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1746 (2020), and punishes transgender people for "fail[ure] to act and/or identify with" their sex designated at birth, *Smith v. Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004).

Defendants' attempts to escape heightened scrutiny are unavailing. Defendants contend that *Bostock*'s reasoning does not apply to the Equal Protection Clause because, in Defendants' telling, the Equal Protection Clause (unlike Title VII) tolerates sex discrimination so long as men as a group are treated the same as women as a group. (Opp. 5). Not so. "The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy J., concurring) (discriminatory use of peremptory challenges against individual women jurors is not cured by discriminatory use of peremptory challenges against men). Thus, as this Court previously determined, *Bostock*'s reasoning "is equally applicable to the Equal Protection context."[12]

Even without *Bostock*, Sixth Circuit law holds that discrimination based on transgender status is discrimination based on sex under *both* Title VII *and* the Equal Protection Clause because it amounts to discrimination based on stereotypes related to sex. *Smith*, 378 F.3d at 575; *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005). Defendants cannot evade the force of that precedent by limiting it to stereotypes about whether someone "wear[s] dresses or makeup" (Opp. 7) while ignoring *Smith*'s explicit reference to transgender individuals' "fail[ure] to act and/or identify with" their sex designated at birth, 378 F.3d at 575. This Circuit has rejected Defendants' argument, making clear that, under *Smith* and *Barnes*, "transgender or transitioning status" by itself "constitutes an inherently gender nonconforming trait." *Harris Funeral Homes*, 884 F.3d at 577.[13]

---

[12] Opinion and Order Granting United States' Motion to Intervene [ECF No. 108] at 3.

[13] *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021), held that *Bostock* did not change the causation standard that applies to claims under the AEDA. That decision does not instruct

Ignoring these decisions, Defendants urge that cases about abortion and pregnancy are the more apt precedents. (Opp. 5 (citing *Dobbs* and *Geduldig*)). But the laws upheld in those cases were facially neutral. The Health Care Ban is not: It *explicitly* classifies based on sex and transgender status, drawing lines based on sex designated at birth, TCA § 68-33-102(9), and prohibiting care that "[e]nabl[es] a minor to identify with, or live as, a purported [gender] identity inconsistent with the minor's sex [designated at birth]," TCA § 68-33-103(a)(1)(A). Facially neutral laws concerning pregnancy and abortion are irrelevant here.[14]

In any event, even if the law were considered facially neutral, Defendants do not dispute that the Health Care Ban was passed for the *specific* purpose of enforcing state-mandated gender conformity. That openly admitted and discriminatory purpose is sufficient on its own to trigger heightened scrutiny. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

**B. The Health Care Ban Fails Heightened Scrutiny, And Any Level of Review.**

Defendants fail to satisfy their demanding burden under heightened scrutiny. Most of Defendants' purported experts have no experience treating gender dysphoria in adolescents.[15] The

---

courts on how to apply the Equal Protection Clause, much less abrogate the Sixth Circuit's prior equal protection precedent. Nor is a district court free to ignore that precedent because "laws against cross-dressing" proliferated in the 19th Century. (Opp. 5-6.) Just because 19th century "statute books" were "laden with gross, stereotyped distinctions between the sexes" does not mean those laws are constitutional. *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973) (plurality). The Supreme Court's sex discrimination precedents squarely reject Defendants' historical approach and, while Defendants may reject those holdings as examples of "die hard living constitutionalism," (Opp. 6) they remain binding on this Court.

[14] For the same reason, Defendants' assertion that "there is a lack of identity between transgender status and the prohibited treatments" misses the mark. (Opp. 8.) That reasoning applies (if at all) to laws that are facially neutral with respect to sex and transgender status.

[15] *Kadel v. Folwell*, 620 F. Supp. 3d 339, 364–65 (M.D.N.C. 2022) (finding that "[Dr.] Hruz is not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will 'desist,' or the efficacy of mental health treatments" and that "his conspiratorial intimations and outright accusations sound in political hyperbole"); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1142-43 (M.D. Ala. 2022) (giving "very little weight" to testimony of Dr. Cantor because, inter alia, "he had never provided

7

one expert who has some limited clinical experience has facilitated treatment for some transgender adolescents with informed consent.[16]  Plaintiffs' treating physician has also testified that the Ban "is harming" her transgender patients "by interfering with their ability to receive necessary medical care."[17]

But even assuming for the sake of argument that Defendants offered valid criticism of the science supporting gender-affirming care, they present no evidence to distinguish that care from other treatments with comparable scientific support and risks.  Plaintiffs' undisputed evidence

---

care to a transgender minor under the age of sixteen," "he had never treated a child or adolescent for gender dysphoria," and "he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic"); *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2022 WL 17092846, at \*4 (W.D. Wash. Nov. 21, 2022) (finding that Dr. Laidlaw's qualifications as an expert present "a close question" because "[l]ess than five percent of his patients are under the age of 18 and he has treated two patients with gender dysphoria," "[h]e has done no original research on gender identity," and he "bases his opinions on his general experience as an endocrinologist and a review of literature"); Janssen Rebuttal Decl. ¶¶ 6-26 (discussing Dr. Nangia).

[16] Dr. Levine's testimony to this effect in *Brandt v. Arkansas* is attached as an exhibit to the Bethea Declaration.  Moreover, Dr. Levine (who specializes in adult psychiatric care, not pediatric care) has been found to be "an outlier in the field of gender dysphoria" who does not "reflect opinions that are generally accepted."  *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125-26 (giving "virtually no weight" to his opinion), *aff'd in part, vacated in part on other grounds*, 935 F.3d 757 (9th Cir. 2019); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (giving Dr. Levine's testimony "very little weight" due to its "illogical inferences, inconsistencies, [] inaccuracies," reliance on "generalizations about gender dysphoric [individuals]," and admitted fabrication of anecdotal evidence).  Plaintiffs' rebuttal declarations respond to Defendants' experts at length.  *See generally* Janssen Rebuttal Decl.; Antommaria Rebuttal Decl.; Turban Rebuttal Decl.; Adkins Rebuttal Decl.

[17] Brady Decl. ¶ 7.  Defendants criticize the care Minor Plaintiffs received from Dr. Brady, but Dr. Laidlaw lacks the necessary qualifications to make those criticisms, and his analysis is undercut by his stated position that gender-affirming care is **never** appropriate.  Laidlaw Decl. ¶ 57 ("[I]n my professional opinion as an endocrinologist, no child should be given these treatments.").  In the disability benefits context, the Sixth Circuit has given "controlling weight" to the opinions of a plaintiff's treating physician "absent justifiable reason . . . for discounting those opinions," *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009. "The opinion of a doctor who is not a treating physician and who testified to his opinion after a review of the record, rather than after a course of treating the claimant, is entitled to less weight." *Edwards v. Sec'y of Health & Hum. Servs.*, 1994 WL 560891, at \*1 (6th Cir. 1994).

8

establishes several critical points: *First*, many clinical practice guidelines, particularly in pediatrics, are based on evidence comparable to that supporting the WPATH and Endocrine Society Guideline recommendations for treatment of gender dysphoria in adolescents; *Second*, patient regret is not unique to the provision of gender-affirming care and in fact rates of regret are low when compared to other treatments; and *Third*, demographic changes in the patient population also are not unique to gender medicine and the treatment of adolescents with gender dysphoria.[18] In short, many of the critiques of gender-affirming medical care that Defendants and their experts offer in defense of the Ban are true of many forms of medical care that remain legal in Tennessee.

Defendants' only response to that glaring discrepancy is to claim that the State regulates one step at a time. (Opp. 14 (citing *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483 (1955) (applying rational basis review))). But under heightened scrutiny, the government must provide an "exceedingly persuasive" justification for "differential treatment." *United States v. Virginia*, 518 U.S. 515, 532–33 (1996). And even under rational-basis review, a regulation cannot be so underinclusive that it "ma[kes] no sense in light of how [it] treat[s] other groups similarly situated in relevant respects." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001). A categorical ban on gender-affirming care, based on rationalizations that apply to countless other medical procedures that remain permitted, fails any level of review.

**IV.     Parent Plaintiffs Are Likely to Prevail on Their Parental Autonomy Claim.**

---

[18] Antommaria Rebuttal Decl. ¶¶ 7-13, 20-21, 23, 26; Turban Rebuttal Decl. ¶¶ 16, 21-23, 25. Defendants also submit declarations from people who regret having received gender-affirming care. The declarations come from a group of people—none of whom received care in Tennessee— who have testified in support of similar bans across the country. *See* Maggie Astor, *How a Few Stories of Regret Fuel the Push to Restrict Gender Transition Care*, N.Y. Times (May 16, 2023). Defendants offer no evidence that the rates of regret are greater or more serious than for other medical care, including non-consensual surgery on infants with intersex conditions. To the contrary, all evidence indicates that rates of regret are low. Turban Decl. ¶¶ 27-31. Accordingly, even under the most capacious standard, these declarations should be deemed inadmissible.

Defendants mistakenly contend that Plaintiffs' Due Process claim fails because gender-affirming care was not available when the Fourteenth Amendment was adopted. Defendants' historical analysis conflates the ***right*** being exercised with the ***means*** by which Plaintiffs exercise it—Fourteenth Amendment incorporation does not protect rights only based on technology that existed in the 1860s. *See, e.g., NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1203 (11th Cir. 2022); *D.C. v. Heller*, 554 U.S. 570, 582 (2008); *Kyllo v. United States*, 533 U.S. 27, 33–34 (2001).

Defendants also proceed from the false assumption that the parents' claims are derivative of their children's claims. (Opp. 3.) That is incorrect: the parent's right to direct appropriate medical care for their children has been recognized even under circumstances when a comparable child's right has not. *See Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 415 (6th Cir. 2019) ("[A]ny substantive due process rights related to directing the medical care of children devolve upon the parents . . . , rather than the children themselves.").

Here, the Health Care Ban deprives Parent Plaintiffs of a fundamental right available to all other parents in Tennessee. For other medical procedures—including even sterilizing procedures on infants that lack any scientific support—Tennessee allows parents to weigh comparable risks and benefits in accordance with their child's best interest. And Tennessee purports to champion the parental autonomy rights of parents who have decided *not* to provide consent for their children to receive care.[19] But for the Parent Plaintiffs and others like them, the Health Care Ban denies them the presumption that they are capable of weighing risks and benefits. When the government seeks to substitute the judgment of a parent, their child, and their treating physician with its own views of a child's best interest, the government must satisfy strict scrutiny.

Defendants omit from their Opposition anything resembling a strict-scrutiny analysis.

_____

[19] *See* Stiles Decl. ¶¶ 16-18; Kellie C. Decl. ¶ 10; Yoe Decl. ¶ 16; Robert Roe Decl. ¶ 15.

They make only one half-hearted effort, citing a concurring opinion for the proposition that the State may act to prohibit eugenics. *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 560 (6th Cir. 2012) (en banc) (Griffin, J., concurring). But while the government certainly has a compelling interest in preventing harmful medical practices, strict scrutiny imposes on Tennessee the burden of establishing that the targeted medical practices are actually harmful and that its solution to the problem is narrowly tailored. Defendants fall woefully short of meeting that standard.

## V. Plaintiffs Have Satisfied the Remaining Preliminary Injunction Factors

Plaintiffs have already explained how they will suffer imminent harm unless the Ban is preliminarily enjoined. Even if the Minor Plaintiffs are eventually able to continue care out of state, they will still suffer irreparable harm. *Bowen v. NYC*, 476 U.S. 467, 483-84 (1986) (courts should be "especially sensitive" to the harm of going through a cumbersome process "to receive the procedure they should have been afforded in the first place."); *Planned Parenthood Great Nw. Haw., Alaska, Ind., & Ky., Inc. v. Cameron*, 2022 WL 3973263, at *8 (W.D. Ky. Aug. 30, 2022) ("disruption to medical services or a patient's continuity of care" is irreparable), *vacated on other grounds*, 2023 WL 3620977 (6th Cir. May 24, 2023); *Blaine v. N. Brevard Cty. Hosp. Dist.*, 312 F. Supp. 3d 1295, 1307 (M.D. Fla. 2018) ("Maintaining the relationship between a patient and treating physician is of paramount concern and cannot be taken lightly."); *see also Kentucky*, 57 F.4th at 550 ("unrecoverable compliance costs" are irreparable because of sovereign immunity). If Minor Plaintiffs are unable to obtain care out of state, they, like Dr. Lacy's patients, will be irreparably harmed by having to titrate down care in state.

Moreover, as Defendants grudgingly acknowledge, the likelihood of success on the merits of a constitutional claim all but "mandates" a preliminary injunction. *ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd*, 545 U.S. 844 (2005). Defendants' only response is to revert to their arguments that Plaintiffs have not shown a likelihood of success on the merits.

11

For the reasons already explained, Defendants are wrong.

The balance of harms and public interest also weigh heavily in Plaintiffs' favor. The State will not incur any harm if the status quo is maintained while this case proceeds, while Plaintiffs will face severe, irreparable harm if the Ban is allowed to take effect. Likewise, "it is always in the public interest to prevent violation of a party's constitutional rights." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).

## VI. A Facial Injunction Is Necessary and Appropriate to Protect Plaintiffs' Interests.

The Court should grant a facial injunction prohibiting Defendants from enforcing the Ban. Although a preliminary injunction should be "tailored to redress the [P]laintiff[s'] particular injur[ies]," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), it should still "provide complete relief." *Kentucky*, 57 F.4th at 557.[20] Here, the Ban will result in the complete shutdown of the medical services that Plaintiffs use to obtain care—and a facial injunction is necessary to abate that harm. Permitting a provider such as VUMC to treat three patients out of hundreds to whom it previously offered care is hardly a guarantee such treatment will resume. This is why facial injunctions have been issued in cases substantially identical to this one. *See, e.g.*, *Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022) (narrower injunction would not provide complete relief); *cf. Bassett v. Snyder*, 951 F. Supp. 2d 939, 972 (E.D. Mich. 2013) (an injunction regarding an act that was "not enforced against individual plaintiffs . . . will necessarily bar the defendant from enforcing the [a]ct against" all those who might be the target of enforcement); *Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) (injunctions that permit enforcement against other targets provide "illusory" relief).

### CONCLUSION

For all these reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

---

[20] As noted above, while a facial injunction is necessary to provide *complete* relief, even partial relief would be sufficient for purposes of Article III standing. *See Larson*, 456 U.S. at 243 n.15.

Dated: June 1, 2023

s/ *DRAFT*
Stella Yarbrough, BPR No. 033637
Lucas Cameron-Vaughn, BPR No. 036284
Jeff Preptit, BPR No. 038451
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org
*Attorneys for the Plaintiffs*

Joshua A. Block*
Chase Strangio*
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel.: 212-549-2593
jblock@aclu.org
cstrangio@aclu.org
*Attorneys for the Plaintiffs*

Sruti J. Swaminathan*
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Tel.: 212-809-8585
sswaminathan@lambdalegal.org
*Attorney for the Plaintiffs*

Tara Borelli*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Ste. 105
Decatur, GA 30030
Tel.: 404-897-1880
tborelli@lambdalegal.org
*Attorney for the Plaintiffs*

*admitted pro hac vice

Respectfully submitted,

Joseph L. Sorkin*
Dean L. Chapman, Jr.*
Kristen W. Chin*
Theodore J. Salwen*
Richard J. D'Amato*
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Tel.: 212-872-1000
jsorkin@akingump.com
dchapman@akingump.com
kristen.chin@akingump.com
jsalwen@akingump.com
rdamato@akingump.com
*Attorneys for the Plaintiffs*

Elizabeth D. Scott*
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Tel.: 214-969-2800
edscott@akingump.com
*Attorney for the Plaintiffs*

Christopher J. Gessner*
David Bethea*
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street N.W.
Washington, DC 20006
Tel.: 202-887-4000
cgessner@akingump.com
dbethea@akingump.com
*Attorneys for the Plaintiffs*

13

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2023, the undersigned filed the foregoing Reply in Support of Motion For Preliminary Injunction via this Court's electronic filing system, which sent notice of such filing to the following counsel of record:

| | |
|---|---|
| Steven J. Griffin<br>Clark L. Hildabrand<br>Trenton Meriwether<br>Ryan N. Henry<br>Brooke A. Huppenthal<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, Tennessee 3720<br>(615) 741-959<br>steven.griffin@ag.tn.gov<br>clark.hildabrand@ag.tn.gov<br>trenton.meriwether@ag.tn.gov<br>ryan.henry@ag.tn.gov<br>brooke.huppenthal@ag.tn.gov | Adam K. Mortara<br>Lawfair LLC<br>40 Burton Hills Blvd., Suite 200<br>Nashville, TN 37215<br>(773) 750-7154<br>mortara@lawfairllc.com |
| | Cameron T. Norris (BPR# 33467)<br>Consovoy McCarthy PLLC<br>1600 Wilson Blvd., Suite 700<br>Arlington, VA 22209<br>(703) 243-9423<br>cam@consovoymccarthy.com |
| Coty Montag<br>Tamica Daniel<br>Gloria Yi<br>Alyssa C. Lareau<br>United States Department of Justice<br>Federal Coordination and Compliance Section<br>950 Pennsylvania Avenue NW – 4CON<br>Washington, DC 20530<br>(202) 305-2994<br>Coty.Montag@usdoj.gov<br>Tamica.Daniel@usdoj.gov<br>Gloria.Yi@usdoj.gov<br>Alyssa.Lareau@usdoj.gov | Ellen Bowden McIntyre<br>Rascoe S. Dean<br>U.S. Attorney's Office (Nashville)<br>719 Church Street<br>Suite 3300<br>Nashville, TN 37203<br>(615) 736-2125<br>(615) 401-6626 (fax)<br>ellen.bowden2@usdoj.gov<br>rascoe.dean@usdoj.gov |

s/ *Stella Yarbrough*

Stella Yarbrough, BPR No. 033637
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142
syarbrough@aclu-tn.org

14