**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**Nashville Division**

| | |
|---|---|
| L.W., by and through her parents and next friends, Samantha Williams and Brian Williams, et al.,<br><br>*Plaintiffs*,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>*Plaintiff-Intervenor*,<br><br>*v.*<br><br>JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, et al.,<br><br>*Defendants*. | **Civil No. 3:23-cv-00376**<br><br>**Judge Richardson**<br><br>**Judge Newbern** |

**EXPERT REBUTTAL DECLARATION OF ARON JANSSEN, M.D.**

I, Aron Janssen, M.D., hereby declare and state as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. The opinions expressed in this declaration are my own and do not express the views or opinions of my employer.

3. I have actual knowledge of the matters stated in this declaration. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4. I incorporate as part of this rebuttal declaration my opinions and qualifications set forth in the expert declaration I filed in this matter dated April 17, 2023. Since that date, I have


Case 3:23-cv-00376 Document 143 Filed 06/01/23 Page 1 of 10 PageID #: 2420

testified as an expert at trial or by deposition in: *Dekker v. Weida*, No. 4:22cv325 (M.D. Fla.) (trial).

5. I submit this rebuttal declaration to respond to the expert declaration by Geeta Nangia, M.D., dated May 19, 2023, which Defendants have submitted in this case.

**SUMMARY OF OPINIONS**

6. Based on her declaration and curriculum vitae, Dr. Nangia does not appear to have a sufficient clinical basis for offering expert opinions regarding the diagnosis and treatment of gender dysphoria in children and adolescents, or the assessment and informed consent process involved when treating adolescents with gender dysphoria with gender affirming care. Her declaration appears to be based on a series of hypothetical assumptions about how other mental health practitioners are diagnosing minors with gender dysphoria and recommending treatment—without any direct experience doing so herself, and without any apparent knowledge of how care is actually provided by others.

7. Dr. Nangia's wildly implausible claim to have treated "550 children and adolescents (and hundreds of adults) who have met criteria at some point in their lives for a 'gender dysphoria' diagnosis," Nangia Decl. ¶ 48, reflects a profound misunderstanding of how gender dysphoria is diagnosed and an inability to distinguish between people with gender dysphoria—a medical condition requiring clinically significant distress or impairment in social, occupational, or other important areas of functioning—and people who are simply gender nonconforming.

8. While Dr. Nangia speculates that people are being misdiagnosed with gender dysphoria because they are tomboys, or have co-occurring medical conditions, or have experienced trauma, those speculations appear to be based on her own misunderstanding of how gender dysphoria is properly diagnosed.

9. Dr. Nangia also appears to assume that mental health providers working with transgender youth are not explaining risks and benefits and are unfamiliar with principles of informed consent and assent. Once again, that speculation appears to be based on her own misunderstanding of how care is actually provided by specialists in the field.

10. Dr. Nangia also does not appear to have an expert basis for her speculation that an increasing number of youth are being diagnosed with gender dysphoria as a result of factors such as "social media" or "social contagion." None of Dr. Nangia's speculation is supported by actual evidence, and her personal opinions do not reflect the common views of experts in the field.

## EXPERT OPINIONS

### A. Dr. Nangia Lacks Experience or Familiarity with Properly Diagnosing Gender Dysphoria.

11. I have significant questions about Dr. Nangia's actual experience working with transgender youth. Dr. Nangia implausibly claims to have evaluated and treated "550 children and adolescents (and hundreds of adults) who have met criteria at some point in their lives for a 'gender dysphoria' diagnosis," including 350 patients who "had a history of gender dysphoria, as discovered on evaluation or over the course of patient care," and "close to 100 additional child patients who meet criteria for gender dysphoria on clinical interview during or over the course of treatment with [her]" and "just over 100 adolescents who have presented with gender dysphoria that has been more abrupt in onset." Nangia Decl. ¶¶ 48-49, 52. While claiming that these 550 children and adolescents met criteria for gender dysphoria, Dr. Nangia does not claim to have provided any actual treatment for that condition.

12. Dr. Nangia appears to derive her claim to have worked with "550 children and adolescents who have met criteria at some point in their lives for a 'gender dysphoria' diagnosis," based on patient case histories that she thinks could have hypothetically supported a gender dysphoria diagnosis. But a proper diagnostic evaluation requires more than reviewing a simple

case history. As Dr. Nangia herself notes "in mental health, if a five-year-old patient presented with difficulty with affect regulation, as well as trouble focusing and being still in the classroom, most physicians would not diagnose ADHD on initial assessment," and would instead evaluate those symptoms within the context of other psychosocial developments in the child's life, while keeping in perspective what we know about the typical emotional and neurological development of children that age. Nangia Decl. ¶ 125. Just as most physicians would not immediately diagnosis a 5-year-old child with difficulty in affect regulation as having ADHD, most physicians would not claim to have worked with 550 patients who had ADHD based on the fact that those patients reported having trouble sitting still when they were 5 years old. Nor would most physicians claim to be experts in treating ADHD based on those case histories.

13. Dr. Nangia's assumption that 550 of her patients *could* have been diagnosed with gender dysphoria also reflects a failure to distinguish between people who have gender dysphoria and people who are simply gender nonconforming. Most critically, Dr. Nangia fails to appreciate that a diagnosis of gender dysphoria in children or adolescents requires "clinically significant distress or impairment in social, occupational, and other important areas of functioning." DSM-5-TR

14. Dr. Nangia concedes she has "difficulty appreciating th[e] distinction" between gender nonconformity and gender discordance. Nangia Decl. ¶ 24. But to be qualified to make a diagnosis, one must understand what that diagnosis is. That is why mental health providers making a gender dysphoria diagnosis should have the training and experience to provide a thorough and comprehensive evaluation that can distinguish gender non-conforming behaviors from a core incongruence of identity with associated distress. Treating patients with gender dysphoria also involves educating patients and their parents and caregivers about the difference between preferred play, dress, and playmates and core identity concerns.

15. Here and elsewhere, Dr. Nangia inexplicably assumes that mental health providers somehow disregard everything else they know about adolescent development and identity formation when they make a gender dysphoria diagnosis. In reality, when assessing adolescents for gender-affirming medical care, providers engage in a comprehensive assessment that takes precisely these considerations into account. Understanding potential reinforcers of identity and challenging patients' assumptions with an aim of developing a nuanced sense of self is a core component of the diagnostic assessment.

16. Dr. Nangia speculates that people with symptoms of gender dysphoria are not being assessed to see if they have suffered other trauma. Like other mental health providers, mental health providers who specialize in gender dysphoria are familiar with treating traumatized youth. We assess patients for trauma, and we assess for how trauma informs identity or complicates a gender dysphoria diagnosis. If an adolescent's identity questions are secondary to trauma, that patient would not meet criteria for the diagnosis of gender dysphoria. But transgender adolescents may experience trauma and still have gender dysphoria that independently requires gender-affirming care to be treated properly.

17. Dr. Nangia also speculates that transgender youth are being misdiagnosed when they have other co-occurring mental health conditions. I have extensive clinical and research experience working with transgender youth who have co-occurring mental health diagnoses. The WPATH Standards of Care specifically recommend that providers who assess adolescents for gender-affirming care should have experience and training to distinguish between gender dysphoria and other mental health conditions or developmental anxieties. But the existence of a co-occurring mental health diagnosis is not—by itself—a reason to withhold care for gender dysphoria. It is important that co-occurring conditions are treated. And if co-occurring conditions impair the individual's capacity to understand the interventions in question, we have to treat those

conditions before any medical care for gender dysphoria would be initiated. But there is no evidence that treating co-occurring mental health conditions resolves gender dysphoria. In the same way that we would not expect that treating anxiety is going to get rid of ADHD, treating anxiety, for example, is not going to get rid of gender dysphoria.

**B. Dr. Nangia Lacks Familiarity With Procedures for Informed Consent to Gender-Affirming Care.**

18. As with her other speculations, Dr. Nangia wrongly assumes that other mental health providers are not explaining risks and benefits of medical interventions for gender dysphoria or are unfamiliar with principles of informed consent and assent. But a fundamental part of assessment for gender-affirming care is determining whether the minor can understand and articulate to the best of their ability the risks, benefits, and alternatives of that intervention, and determining whether parents can provide consent for that intervention. The risks and benefits associated with gender-affirming care are not more difficult to understand than those associated with other mental health conditions.

19. Dr. Nangia asserts that adolescents have developing brains that cannot think about long-term consequences. But a decision to receive pubertal suppression or hormone therapy for gender dysphoria is not a spur-of-the-moment decision. For gender dysphoria care, it is inherent to our assessment that we are evaluating an individual's cognitive capacity, capacity to understand, and ability to think through potential consequences. These are discussions and assessments that occur longitudinally over time, and these are decisions that adolescents and family are making over a long period and not in a moment.

20. In my psychiatric practice, I have seen a tremendous benefit from these interventions. I have seen individuals who blossom when they are able to express and live their lives according to their experienced gender after receiving medical intervention to treat gender

dysphoria. And I have seen so much joy and improvement in functioning when adolescents receive the care that is clinically indicated.

**C. Dr. Nangia's Speculations About Social Causes of Gender Dysphoria Are Not Based on Any Apparent Expert Knowledge and Lack Scientific Support.**

21. Access to medical care for transgender youth with gender dysphoria has dramatically improved over the past 20 years. Instead of attributing an increase in the number of gender dysphoria diagnoses to increased access to care, Dr. Nangia speculates about other phenomena that she views as causes. But none of Dr. Nangia's speculation is supported by actual evidence, and her personal opinions do not reflect the common views of others in the field.

22. Dr. Nangia speculates that children and adolescents are being diagnosed with gender dysphoria because of an "[i]ncrease in pathologization of a normal part of childhood development." Nangia Decl. ¶ 21. Dr. Nangia acknowledges that "[g]ender-medicine experts today distinguish between tomboys or tomgirls and children with gender dysphoria," but she speculates without any evidence that "[m]any parents, who in the past simply would not have worried about their children" who are tomboys or tomgirls "are now compelled to consider a diagnosis of gender dysphoria" and that "[p]hysicians likewise, are acting quickly to usher these children into gender-affirming care." Nangia Decl. ¶¶ 22, 25. There is no evidence that these sorts of misdiagnoses are occurring in significant numbers by practitioners experienced in providing gender-affirming care. In fact, what we see is the opposite. In clinical care, parents are less likely to be concerned by stereotypical non-conforming behaviors than in the past.

23. Dr. Nangia also attributes gender dysphoria diagnoses to social media. But there is no evidence to suggest that social media has led to an increase in youth identifying as transgender. Nor is this a widely-held belief of most child psychiatrists in my experience.

24. Expertise in a field means drawing from the relevant literature. While not commenting on the quality of the New York Times as a news source, it is not a reference from which psychiatrists should make assertions about their clinical practice. And yet, in quoting from the Wortham 2018 article in the New York Times (Nangia Decl. ¶ 30), Dr. Nangia seems to misunderstand the underlying scientific literature being discussed. The study by Helana Darwin discussed in the New York Times article actually contradicts Dr. Nangia's assertions that social media leads to an increase in gender dysphoria. Darwin, H. (2017), Doing Gender Beyond the Binary: A Virtual Ethnography. Symbolic Interaction, 40: 317-334. In that article, individuals who already had a non-binary identity sought out online spaces of support. It was not the online space that created the identity.

25. Although Dr. Nangia divides her speculation into different headings of "social media," "heightened vulnerability" and "social contagion," all of these sections reflect the same speculation that more people are identifying as transgender because of social influences. The only evidence Dr. Nangia cites in support of this speculation is a highly controversial article that purported to survey parents who believe their children experienced what the parents view as "rapid onset gender dysphoria," which is not an actual diagnostic term or concept. See Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a raid onset of gender dysphoria. PLoS ONE, 13(8), e0202330. Although purporting to provide a basis for Dr. Nangia's speculations, the study was based on an anonymous survey, allegedly of parents, about the etiology of their child's gender dysphoria. Participants were recruited from websites promoting this social-contagion theory, and the children were not surveyed or assessed by a clinician. Those serious methodological flaws render the study unreliable. The only conclusion that can be drawn from that study is that a self-selected sample of anonymous people recruited through websites that

predisposed participants to believe that transgender identity can be influenced by social factors believe those social factors influence children to identify as transgender.

26. It is a normal developmental process for adolescents to seek out peers with shared experiences. This is not unique to transgender and gender-diverse young people. All types of minoritized youth tend to seek out affinity groups with those that share their experiences. In my experience, transgender youth also seek out those social connections. It is not the social connections that leads to the identity, but it is the identity that leads to seeking out these social connections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of May 2023.

Aron Janssen, M.D.

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2023, the undersigned filed the foregoing document via this Court's electronic filing system, which sent notice of such filing to the following counsel of record:

| | |
|---|---|
| Steven J. Griffin<br>Clark L. Hildabrand<br>Trenton Meriwether<br>Ryan N. Henry<br>Brooke A. Huppenthal<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, Tennessee 3720<br>(615) 741-959<br>steven.griffin@ag.tn.gov<br>clark.hildabrand@ag.tn.gov<br>trenton.meriwether@ag.tn.gov<br>ryan.henry@ag.tn.gov<br>brooke.huppenthal@ag.tn.gov | Adam K. Mortara<br>Lawfair LLC<br>40 Burton Hills Blvd., Suite 200<br>Nashville, TN 37215<br>(773) 750-7154<br>mortara@lawfairllc.com<br><br>Cameron T. Norris (BPR# 33467)<br>Consovoy McCarthy PLLC<br>1600 Wilson Blvd., Suite 700<br>Arlington, VA 22209<br>(703) 243-9423<br>cam@consovoymccarthy.com |
| Coty Montag<br>Tamica Daniel<br>Gloria Yi<br>Alyssa C. Lareau<br>United States Department of Justice<br>Federal Coordination and Compliance Section<br>950 Pennsylvania Avenue NW – 4CON<br>Washington, DC 20530<br>(202) 305-2994<br>Coty.Montag@usdoj.gov<br>Tamica.Daniel@usdoj.gov<br>Gloria.Yi@usdoj.gov<br>Alyssa.Lareau@usdoj.gov | Ellen Bowden McIntyre<br>Rascoe S. Dean<br>U.S. Attorney's Office (Nashville)<br>719 Church Street<br>Suite 3300<br>Nashville, TN 37203<br>(615) 736-2125<br>(615) 401-6626 (fax)<br>ellen.bowden2@usdoj.gov<br>rascoe.dean@usdoj.gov |


s/ *Stella Yarbrough*
Stella Yarbrough, BPR No. 033637
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142
syarbrough@aclu-tn.org