UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

L.W., *by and through parents and next* )
*friends, Samantha Williams and Brian* )
*Williams*, et al.*,* )
                                   )
       Plaintiffs, )
                                     )
and )     No. 3:23-cv-00376
                                     )     JUDGE RICHARDSON
UNITED STATES OF AMERICA, )     JUDGE NEWBERN
                                     )
       Plaintiff-Intervenor, )
                                     )
           v. )
                                       )
JONATHAN SKRMETTI, *et al.*, )
                                     )
       Defendants. )

**Brief of *Amici Curiae* Arkansas, Alabama, and 15 Other States
in Support of Defendants**

Nicholas R. Barry
TN Bar No. 031963
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(615) 431-9303
Nicholas.Barry@aflegal.org

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
Hannah L. Templin
  *Assistant Solicitor General*

OFFICE OF THE ARKANSAS ATTORNEY GEN-
ERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iii

INTEREST OF AMICI ................................................................................................1

ARGUMENT ..............................................................................................................1

    I.      Gender-Transition Procedures Are Not Evidence-Based. .............................1

       A.    Healthcare authorities have determined that gender-transition procedures are "experimental." ..............................................................2

       B.    The medical interest groups endorsing gender-transition procedures are biased advocates, not neutral experts. ...............................................4

    II.    SB1 Does Not Violate Equal Protection .......................................................10

       A.    SB1 does not discriminate based on sex. .........................................11

       B.    Even if SB1 classifies based on transgender identity, transgender individuals are not a suspect class triggering intermediate scrutiny. ..............15

       C.    SB1 passes intermediate scrutiny. ...................................................18

    III.   Parents Do Not Have a Substantive Right to Subject Their Children to Risky Medical Procedures .....................................................................................20

ADDITIONAL COUNSEL ......................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Adams by and through Kasper v. Sch. Bd. of St. John's Cty.*, 57 F.4th 791
(11th Cir. 2022) (en banc)........................................................................15-16, 18-20

*Application of Pres. & Directors of Georgetown College, Inc.*, 331 F.2d 1000
(D.C. Cir. 1964) (in chambers opinion)........................................................................21

*B.P.J. v. W.V. State Bd. of Educ.*, 2023 WL 111875 (S.D.W.V. Jan. 5, 2023)........................18, 20

*B.P.J. v. W.V. State Bd. of Educ.*, 2023 WL 2803113 (4th Cir. 2023)................................18

*Ballard v. United States*, 329 U.S. 187 (1946)................................................................18

*Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208................................................5

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)........................................................14-15, 17

*Brandt by and through Brandt*, 2022 WL 16957734 (8th Cir. Nov. 16, 2022)
(Stras, J., dissenting)........................................................................14-15

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)........................................16, 18

*Craig v. Boren*, 429 U.S. 190 (1976)........................................................................19

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)..............2, 10, 14, 16, 18, 21-22

*Frontiero v. Richardson*, 411 U.S. 677 (1973)................................................................17, 20

*Geduldig v. Aiello*, 417 U.S. 484 (1974)........................................................................16

*Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019)................................................................9

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)........................................................................11

*Kirchberg v. Feenstra*, 450 U.S. 455 (1981)........................................................................19

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014)................................................................6-7, 9

*Lyng v. Castillo*, 477 U.S. 635 (1986)........................................................................16

*Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976)........................................16-17

*McMain v. Peters*, 2018 WL 3732660 (D. Ore. Aug. 2, 2018)........................................12

*Michael M. v. Superior Court*, 450 U.S. 464 (1981)........................................................19

*Nguyen v. INS*, 533 U.S. 53 (2001)........................................................................18-19

ii

*Parham v. J.R.*, 442 U.S. 584 (1979) ...................................................................21

*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021) ................................14

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ...................................................21

*Reed v. Reed*, 404 U.S. 71 (1971) .......................................................................19

*San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............................16

*Stanley v. Illinois*, 405 U.S. 645 (1972) .............................................................21

*Stanton v. Stanton*, 421 U.S. 7 (1975) ................................................................19

*Titus v. Aranas*, 2020 WL 4248678 (D. Nev. June 29, 2020) .............................12

*Troxel v. Granville*, 530 U.S. 57 (2000) .............................................................21

*United States v. Virginia*, 518 U.S. 515 (1996) ..................................................19

*Vacco v. Quill*, 521 U.S. 793 (1997) ............................................................11, 15

*Washington v. Davis*, 426 U.S. 229 (1976) .........................................................15

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ...............................................21

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ..........................................................21

**Statutes**

Tenn. Code Ann. 68-33-103 ...................................................................................11

**Other Authorities**

Aaron Devor, WPATH, *History of the Association*, https://perma.cc/E2R6-XCQE ......................9

Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022),
    https://perma.cc/34VG-CVWK ................................................................... 5-6

Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*, The Free Press
    (Oct. 4, 2021), https://perma.cc/LJD6-TH7P ....................................................8

Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking
    Gender 'Care,' Threats Against Dissenting Doctors*, The Dailywire (Sept. 20, 2022),
    https://perma.cc/7ZGW-NDY4 ........................................................................5

Anna Smith Haghighi, *What To Know About Estrogen in Men*, Medical News Today
    (Nov. 9, 2020), https://perma.cc/B358-S7UW .................................................13

iii

Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery*,*'* N.Y. Times
(Sept. 26, 2022), https://perma.cc/9786-V27T .............................................................5

Claire Sissions, *Typical Testosterone Levels in Males and Females*, Medical News
Today (Jan. 6, 2023), https://perma.cc/M98N-4WG4 ..............................................13

Dr. Amy Tishelman's WPATH presentation (Sept. 18, 2022),
https://perma.cc/4M52-WG4X ....................................................................................7

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine
(June 15, 2022), https://perma.cc/ZMT2-W6DX ................................................... 7-8

Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist
Resistance*, 10 Public Relations Inquiry 295, 302 (2021)..........................................8

*Evidence review: Gender-affirming hormones for children and adolescents with
gender dysphoria*, Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021),
https://perma.cc/M8J5-MXVG ....................................................................................2

*Evidence review: Gondotrophin releasing hormone analogues for children and
adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence
(Mar. 11, 2021), https://perma.cc/93NB-BGAN ............................................... 2-3, 13

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration,
Child Abuse Fetishists*, Reduxx (May 17, 2022), https://perma.cc/NRX5-U85C .....6

Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022),
https://perma.cc/KS4N-V2GX .....................................................................................3

Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022),
https://perma.cc/RJU2-VLHT.......................................................................................3

HS England, *Interim Service Specification* 16 (Oct. 20, 2022),
https://perma.cc/N3CY-JYNY .....................................................................................3

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents:
Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307, 307-13 (2019),
https://perma.cc/D7X3-TMC4 .....................................................................................5

Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and
Gender-Diverse Children and Adolescents*, 142 Pediatrics (2018)............................5

Jayne Leonard, *What Causes High Testosterone in Women?*, Medical News Today
(Jan. 12, 2023), https://perma.cc/BT38-L79X ..........................................................13

Jennifer Block, *Gender dysphoria in young people is rising—and so is professional
disagreement*, The BMJ (Feb. 23, 2023), https://perma.cc/59HW-4J4G ............ 9-10

iv

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, The BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9...............................................4

Joint Letter from USPATH and WPATH (Oct. 12, 2022), https://perma.cc/X7ZN-G6FS.........................................................................................8

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Trans-gender Science*, Wall St. Journal (Apr. 17, 2022), https://perma.cc/KBZ4-TBN9 ...................6

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. Pediatric & Adolscent Gynecology 460 (2019), https://perma.cc/WU36-5889....................................................................................13

Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, Wash. Post (Nov. 24, 2021), https://perma.cc/A5YL-RYYY.................................8

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archives of Sexual Behavior 3353 (2021)..........................................................15, 17

Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://perma.cc/8NQA-SQ3Q ...............................................................7

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males: Current Practice and Unmet Needs*, 5 J. Endocrine Society 1, 2 (2021), https://perma.cc/E3ZQ-4PZV ...................13

Mayo Clinic, *Enlarged Breasts in Men (Gynecomastia)*, https://perma.cc/PX5W-JVVF ............14

Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV ........................................ 11-12

Nationwide Children's, *Macromastia*, https://perma.cc/PAD7-9QY2.........................................14

NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 ..............................................................................................12

Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37160, 37198 (June 19, 2020).............................................................9

Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT..................................................................... 3-4

Patrick Lappert, *Florida Medicaid Project: Surgical Procedures and Gender Dysphoria* (May 17, 2022), https://perma.cc/7JAD-3HBQ.........................................................................14

*Statement of Removal*, 23 Int'l J. of Transgender Health S259 (2022), https://perma.cc/UZ94-C9VE . .......................................................................................7

Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care*

v

*of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3 ..................................................................................3

Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7 ..................................................................................11

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017), https://perma.cc/3PNE-SQ3T ........................................................... 9-10

## INTEREST OF AMICI

Amici curiae are the States of Arkansas, Alabama, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, South Carolina, South Dakota, and Utah.  Like Tennessee, Amici are concerned about the surge in recent years of children suffering from gender dysphoria and other forms of gender-related psychological distress.  And like Tennessee, Amici are concerned because these vulnerable children are suffering greatly and need help.

The question is how to help them.  Throughout their briefs, Plaintiffs and the United States asserts that gender transition procedures—puberty blockers, cross-sex hormones, and surgical interventions—are "widely accepted and endorsed for the treatment of gender dysphoria" by several "well-established medical organizations."  Doc. 41 at 3; *accord* Doc. 33 at 3.  But those briefs—like those medical interest groups they cite—paper over widespread disagreement with these gender transition procedures.  Indeed, experts in several European countries and the State of Florida have moved away from those treatments.  And a growing number of States, including some of the Amici, have banned them altogether.  Amici thus write in support of Tennessee's similar law.

## ARGUMENT

### I.  Gender-Transition Procedures Are Not Evidence-Based.

The briefs filed by Plaintiffs and the United States might suggest that gender-transition procedures are universally endorsed—except, of course, by supposedly retrograde States like Tennessee and many of the amici States.  Indeed, Plaintiffs repeatedly describe gender-transition procedures as "evidence-based."  *See* Doc. 33 at 3.  And both briefs laud "medical organizations" that endorse gender-transition procedures.  *Id.* at 3; Doc. 41 at 3-5.  But on the first count, they're wrong; gender-transition procedures are experimental, as systematic reviews of the evidence by medical authorities in the United Kingdom, Sweden, Finland, and Norway explain.  And on the

1

second, their reliance is misplaced; as the Supreme Court recently explained, while "the position of the American Medical Association" and other medical interest groups may be relevant to a "legislative committee," it does not "shed light on the meaning of the Constitution." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) (cleaned up). That is particularly true here given that the interest groups Plaintiffs rely on suppress dissent and rebuff calls for open, systematic evidence reviews.

### A. Healthcare authorities have determined that gender-transition procedures are "experimental."

Supporters of gender-transition procedures proclaim that those procedures are well-supported and efficacious. That is far from the case. In recent years, medical authorities in the UK, Finland, Sweden, and Norway have all looked at the evidence and determined that transitioning treatments for minors are experimental.

*1. United Kingdom.* In 2020, Britain's National Institute for Health and Care Excellence (NICE) commissioned an independent review of the use of puberty blockers and cross-sex hormones to treat gender dysphoria chaired by Dr. Hilary Cass. As part of the review, the National Health Service (NHS) reviewed the scientific evidence concerning puberty blockers and cross-sex hormones for children and adolescents. *See Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021), https://perma.cc/M8J5-MXVG (hereinafter "NICE Cross-Sex Hormone Evidence Review"); *Evidence review: Gondotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021), https://perma.cc/93NB-BGAN (hereinafter "NICE Puberty Blocker Evidence Review"). That review did not inspire confidence in the procedures. It concluded that there were no "reliable comparative studies" on the "effectiveness and safety of [puberty blockers]," NICE Puberty Blocker

Evidence Review at 12, and that the safety of cross-sex hormones was similarly unknown, NICE Cross-Sex Hormone Evidence Review 14. Thus, Dr. Cass determined that "the available evidence was not strong enough to form the basis of a policy position," Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022), https://perma.cc/RJU2-VLHT, and called for experiments to *start* being conducted, Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022), https://perma.cc/KS4N-V2GX.

Because of the "uncertainties surrounding the use of hormone treatments," NHS England is now "forming proposals for prospectively enrolling children and young people being considered for hormone treatment into a formal research programme," and "will *only* commission [puberty blockers] in the context of a formal research protocol." NHS England, *Interim Service Specification* 16 (Oct. 20, 2022), https://perma.cc/N3CY-JYNY (emphasis added).

*2. Sweden.* In February 2022, following an extensive literature review, Sweden's National Board of Health and Welfare concluded that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3. Concerned that there was no "reliable scientific evidence concerning the efficacy and the safety of both treatments," that "detransition occurs among young adults," and that there has been an "unexplained increase" in minors identifying as transgender, the National Board restricted the use of puberty blockers and cross-sex hormones to strictly controlled research settings or "exceptional cases." *Id.* at 3-4.

*3. Finland.* In June 2020, Finland's Council for Choices in Healthcare in Finland also suggested changes to its treatment protocols. *See* Palveluvalikoima, *Recommendation of the*

*Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT. Though

allowing for some hormonal interventions under certain conditions, the Council lamented the lack

of evidence and urged caution in light of severe risks associated with medical intervention. "As

far as minors are concerned," the Council found, "there are no medical treatment[s] [for gender

dysphoria] that can be considered evidence-based," and "it is critical to obtain information on the

benefits and risks of these treatments in rigorous research settings." *Id.* Accordingly, the Council

concluded, "no decisions should be made that can permanently alter a still-maturing minor's men-

tal and physical development."

*4. Norway.* In March 2023, the Norwegian Healthcare Investigation Board (Ukom) re-

leased a report finding that its national guidelines for treating gender dysphoria were inadequate.

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, The

BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9. The existing 2020 guidelines had not been

based on a literature review, and the new report found "insufficient evidence for the use of puberty

blockers and cross sex hormone treatments in young people, especially for teenagers who are in-

creasingly seeking health services." *Id.* Accordingly, Ukom "recommended that updated guide-

lines should be based on a new commissioned review or existing international up-to-date system-

atic reviews, such as those conducted in 2021 by the UK's National Institute for Health and Care

Excellence." *Id.* At present, "Ukom defines such treatments as utprøvende behandling, or 'treat-

ments under trial,'"—that is, experimental. *Id.*

**B. The medical interest groups endorsing gender-transition procedures are bi-
ased advocates, not neutral experts.**

Ignoring these European evaluations, Plaintiffs and the United States point to a supposed

American "medical consensus" that gender-transition procedures are safe and effective. Doc. 41

at 21; *accord* Doc. 33 at 3. But the interest groups they identify as endorsing gender-transition

procedures are just that—interest groups. These groups come with their own point of view, their own financial interests, and their own causes—which is why WPATH recently described itself in court as "an advocacy organization[]," *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. And these groups have a strong interest in promoting gender-transition procedures, which are a "big money maker." Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender 'Care,' Threats Against Dissenting Doctors*, The Dailywire (Sept. 20, 2022), https://perma.cc/7ZGW-NDY4; *see also* Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. Times (Sept. 26, 2022), https://perma.cc/9786-V27T (reporting that double mastectomies can "cost[] anywhere from $9,000 to $17,000"). Unsurprisingly, while these organizations claim to reflect the views of the medical community, there is growing evidence that this is far from true.

*1. American Academy of Pediatrics (AAP).* Start with AAP. It would be one thing if its position statement truly reflected either the state of the science or its membership's views. Instead, the 2018 AAP statement was "written by a single doctor," who "'conceptualized,' 'drafted,' 'reviewed,' 'revised,' and 'approved' the manuscript himself." Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022), https://perma.cc/34VG-CVWK (hereinafter "Sibarium, *Hijacking*"); *see* Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics (2018). That statement outright disregarded or misrepresented several studies on gender-dysphoric children. James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307, 307-13 (2019), https://perma.cc/D7X3-TMC4. And it elicited much concern from AAP's membership.

Yet a recent resolution "submitted to the AAP's annual leadership forum to inform the academy's 67,000 members about the growing international skepticism of pediatric gender transition" was quashed by "the AAP's leadership," "[e]ven though the resolution was in the top five of interest based on votes by members cast." Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall St. J. (Apr. 17, 2022), https://perma.cc/KBZ4-TBN9 (hereinafter "Mason & Sapir, *Dubious Science*"). AAP "decried the resolution as transphobic and noted that only 57 members out of 67,000 had endorsed it," but allowed a motion supporting "affirming" interventions to go through the next week with only 53 members supporting it. *Id.* AAP even asked "the Department of Justice to investigate critics of 'gender affirming care,' arguing that they were spreading 'disinformation.'" Sibarium, *Hijacking*. As AAP member Dr. Julia Mason concluded, "AAP has stifled debate … and put its thumb on the scale … in favor of a shoddy but politically correct research agenda." Mason & Sapir, *Dubious Science.*

*2. World Professional Association for Transgender Health (WPATH).* Things are even worse at WPATH. As Dr. Stephen Levine, a psychiatrist who "helped to author the fifth version of the [WPATH] Standards of Care" has testified, "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered," and "[t]hese aspirations sometimes conflict." *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014). Those conflicting aspirations have often impacted WPATH's recommendations. In December 2021, for instance, WPATH released a draft of the updated 8th edition of its Standards of Care (SOC 8). This draft added a controversial "Eunuch" chapter and made other changes. *See* Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://perma.cc/NRX5-U85C. And though SOC 8 initially retained (some) age requirements for transitioning minors—14 years old for cross-sex hormones (down from 16 in SOC 7), 15 for

mastectomies, "and vaginoplasty and hysterectomy at 17," Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://perma.cc/8NQA-SQ3Q — WPATH issued a "correction" shortly after publication *removing* the minimum age requirements. (Remarkably, this correction has itself since been removed. *See Statement of Removal*, 23 Int'l J. of Transgender Health S259 (2022), https://perma.cc/UZ94-C9VE.) Why? According to Dr. Tishelman, lead author of the chapter on children, it was to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held legally liable for malpractice if they deviated from the standards. Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

WPATH's conflicting aspirations have also led it to stifle dissent. As Dr. Levine has explained, "[s]kepticism and strong alternative views are not well tolerated" at WPATH and "have been known to be greeted with antipathy." *Kosilek*, 774 F.3d at 78 (alteration omitted). Dr. Ken Zucker was one such professional "greeted with antipathy" by activists at WPATH and its U.S. affiliate, USPATH. Zucker is "a psychologist and prominent researcher who directed a gender clinic in Toronto" and headed the committee that developed the American Psychiatric Association's criteria for "gender dysphoria" in the DSM-5. Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022), https://perma.cc/ZMT2-W6DX (hereinafter "Bazelon, *Battle*"). The 2012 WPATH Standards of Care—SOC 7—"cited his work 15 times." *Id.* In his nearly forty years of research, Zucker discovered "that most young children who came to his clinic stopped identifying as another gender as they got older." *Id.* Instead, "[m]any of them would go on to come out as gay or lesbian or bisexual, suggesting previous discomfort with their sexuality, or lack of acceptance." *Id.* Zucker became concerned that socially transitioning children could entrench gender dysphoria that would otherwise resolve.

Zucker's position was not popular with activists at WPATH. In 2017, when USPATH hosted its inaugural conference, Zucker submitted research, "his research passed the peer review process," and he was invited to present. Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 Public Relations Inquiry 295, 302 (2021). But "[a]ctivists demanded Zucker's symposium be cancelled and for the WPATH Executive Board to provide an explanation and apology for his presence." *Id*. They won. Zucker's panels were cancelled and "[c]onference organizers and board members publicly apologized for Zucker's presence at the conference." *Id.* at 304.

A few years later, in the fall of 2021, a number of articles by and about three WPATH leaders exposed further fissures in the organization. Dr. Marci Bowers, a world-renowned vaginoplasty specialist who currently serves as president of WPATH; Dr. Erica Anderson, a clinical psychologist and a former president of USPATH; and Dr. Laura Edwards-Leeper, the founding psychologist at the first hospital-based children's gender clinic in the United States, voiced their concern that medical providers in America were transitioning minors without proper gender exploratory psychotherapy and other safeguards. *See, e.g.*, Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*, The Free Press (Oct. 4, 2021), https://perma.cc/LJD6-TH7P; Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, Wash. Post (Nov. 24, 2021), https://perma.cc/A5YL-RYYY. When Anderson, Bowers, and Edwards-Leeper went public with their concerns, USPATH and WPATH released a joint statement condemning "the use of the lay press ... as a forum for the scientific debate" over "the use of pubertal delay and hormone therapy for transgender and gender diverse youth." *See* Joint Letter from USPATH and WPATH (Oct. 12, 2022), https://perma.cc/X7ZN-G6FS. "In early November, the board of USPATH privately censured Anderson, who served as a board member. In December,

the board imposed a 30-day moratorium on speaking to the press for all board members. That month, Anderson resigned." Bazelon, *Battle*.

Because WPATH is an advocacy organization, not a neutral scientific body, the First and Fifth Circuits—and, until recently, the U.S. Department of Health and Human Services—have found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see also Kosilek*, 774 F.3d at 90; Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37160, 37198 (June 19, 2020) (warning of "rel[ying] excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding").

*3. Endocrine Society.* While there has been less public reporting about the Endocrine Society, one cause for concern is that the authorship of its guidelines for treating gender dysphoria is composed almost entirely of WPATH leaders. WPATH is an official co-author of the Endocrine Society Guidelines, and of the nine listed authors, it appears that only *one* (M. Hassan Murad) has not served as a leader in WPATH or an author of its standards of care. *See generally* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017), https://perma.cc/3PNE-SQ3T (hereinafter "Endocrine Society Guidelines"); Aaron Devor, WPATH, *History of the Association*, https://perma.cc/E2R6-XCQE (last accessed Apr. 3, 2023). Moreover, Gordon Guyatt, "who co-developed" the Grading of Recommendations Assessment, Development and Evaluation (GRADE) system for assessing evidentiary value "found 'serious problems' with the Endocrine Society guidelines, noting that the systematic reviews didn't look at the effect of the interventions on gender dysphoria itself, arguably 'the most important outcome.'" Jennifer Block, *Gender*

9

*dysphoria in young people is rising—and so is professional disagreement*, The BMJ (Feb. 23, 2023**),** https://perma.cc/59HW-4J4G. "He also noted that the Endocrine Society had at times paired strong recommendations—phrased as 'we recommend'—with weak evidence," even though "'GRADE discourages strong recommendation with low or very low quality except under very specific circumstances'" that "should be made explicit." *Id.* The Endocrine Society's guidelines do not discuss any of these exceptions. *See generally* Endocrine Society Guidelines.

* * * * *

In sum, the American medical interest groups Plaintiffs and the United States point to, like AAP, WPATH, and the Endocrine Society, are not neutral arbiters of science or medical opinion. They are *interest groups*, composed of practitioners whose livelihoods depend on being paid for the treatments at issue, so their endorsement should carry little weight. Conversely, countries that have conducted a systematic review of the evidence have concluded that gender-transition procedures are experimental and risky, certainly not "widely accepted" as Plaintiffs and the United States suggest. Doc. 41 at 3.

## II.   SB1 Does Not Violate Equal Protection

At any rate, the views of Plaintiffs' medical interest groups don't matter. For the Constitution does not require States to show that their public health regulations are met with the approval of medical organizations. Rather, such regulations are "entitled to a strong presumption of validity," and must be upheld if they have some rational basis. *Dobbs*, 142 S. Ct. at 2245, 2284 (internal quotation marks omitted). And though both Plaintiffs and the United States argue that SB1 would fail rational basis, *see* Doc. 33 at 19; Doc. 41 at 22-23, Tennessee easily wins under that standard. It has a legitimate interest in ensuring the safety of its citizens, and—if the systematic reviews conducted by European nations are any indication—there are reasons to be concerned about performing gender-transition procedures on minors. *Dobbs*, 142 S. Ct. at 2284.

10

Plaintiffs' other equal-protection arguments—that it classifies based on transgender status or sex, triggering intermediate scrutiny—fare no better. For one, SB1 classifies based on age and procedure, not transgender identity or sex. And neither procedure nor age triggers heightened review. *Vacco v. Quill*, 521 U.S. 793, 800 (1997); *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991). But even if the Plaintiffs could show that SB1 distinguishes based on transgender-identity or sex, they would still lose. Individuals who identify as transgender do not form a suspect class, so distinguishing based on transgender identity does not trigger heightened review. And any classification centers around biological differences between the sexes, not stereotypes, so SB1 passes intermediate scrutiny.

### A. SB1 does not discriminate based on sex.

*1. SB1 classifies based on procedure, not sex.* Start with the sex-classification argument, which goes something like this: under SB1, males can receive testosterone and phalloplasties, but females can't. Conversely, females can take estrogen, but males can't. Thus, "medical treatments available to a minor under SB 1 depend on the sex [of] that minor." Doc. 41 at 9.

That argument breaks down entirely when one considers each of the procedures barred. Some of SB1's applications *can't* be sex-based. For instance, puberty blockers work the same way in males and females alike, and sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for gender dysphoria. *See, e.g.*, Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7; Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited May 12, 2023). Thus, banning their use in gender-transition procedures doesn't draw any lines between the sexes; girls and boys are treated identically. The same is true of chest surgeries. SB 1 obviously doesn't prevent girls from undergoing a mastectomy to treat cancer, *see* Tenn. Code Ann. § 68-33-103(b)(1)(A), so its ban on mastectomies for gender transition can't be sex-based.

Labeling SB1's prohibition a "sex classification" has a second flaw: it (incorrectly) presumes that gender-transition procedures are identical to traditional uses of puberty blockers or hormones and similar surgeries. *See, e.g.*, Doc. 41 at 21-22. But that is not the case because these different uses have (1) different diagnoses and diagnostic criteria, (2) different goals, and (3) different risks. Thus, just as administering morphine to treat a patient's pain is not the same medical procedure as using morphine to assist a patient's suicide, the same distinction holds true here. *See, e.g.*, *McMain v. Peters*, 2018 WL 3732660, at *4 (D. Ore. Aug. 2, 2018) (prisoner seeking testosterone for PTSD not similarly situated to prisoner with Klinefelter Syndrome); *Titus v. Aranas*, 2020 WL 4248678, at *6 (D. Nev. June 29, 2020) (prisoner seeking testosterone to treat low levels not similarly situated to biologically female prisoner taking testosterone to transition).

Consider puberty blockers again. Other than treating gender dysphoria, puberty blockers are ordinarily prescribed to stop precocious puberty, in which a child begins puberty at an unusually early age. Mayo Clinic, *Precocious Puberty*. But precocious puberty is a physical abnormality that can be diagnosed through medical scans and tests, *see* NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited May 12, 2023), not an amorphous "core sense of belonging to a particular gender" that cannot be measured. Doc. 33 at 2. Indeed, the goal of using puberty blockers to treat precocious puberty is to ensure children develop at "the normal age of puberty," Mayo Clinic, *Precocious Puberty*—the exact opposite goal as when doctors use them to halt normal development in children with gender dysphoria, *see, e.g.*, Doc. 29 ¶¶ 32-33. And using puberty blockers to treat precocious puberty poses fewer risks than using them to treat gender dysphoria. Because the goal of treating precocious puberty is to let children develop at the normal time, doctors stop the blockers when the child hits "the normal pubertal age." Mayo Clinic, *Precocious Puberty*. Conversely, doctors prescribe

blockers to dysphoric children well beyond the normal age, which may risk their bone growth and social development. NICE Puberty Blocker Evidence Review at 26-32 (very low-quality evidence on the risks of puberty blockers when used to treat gender dysphoria).

The same distinctions exist between uses of hormones barred by SB1 and those that are not. Males and females normally have very different amounts of naturally occurring testosterone or estrogen. *See, e.g.*, Claire Sissions, *Typical Testosterone Levels in Males and Females*, Medical News Today (Jan. 6, 2023), https://perma.cc/M98N-4WG4. And these hormones serve very different purposes in the different sexes. In females, excess testosterone can cause infertility. Jayne Leonard, *What Causes High Testosterone in Women?*, Medical News Today (Jan. 12, 2023), https://perma.cc/BT38-L79X. Conversely, testosterone is prescribed to males to help alleviate problems with their fertility or sexual development. Maria Vogiatzi et al., *Testosterone Use in Adolescent Males: Current Practice and Unmet Needs*, 5 J. Endocrine Society 1, 2 (2021), https://perma.cc/E3ZQ-4PZV. The inverse is true of estrogen. When prescribed at an excess level to males, estrogen can cause infertility and sexual dysfunction. Anna Smith Haghighi, *What To Know About Estrogen in Men*, Medical News Today (Nov. 9, 2020), https://perma.cc/B358-S7UW. But for females, estrogen is usually prescribed to treat problems with sexual development. Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. Pediatric & Adolscent Gynecology 460 (2019), https://perma.cc/WU36-5889. Providing cross-sex hormones to a child at a higher amount than would be produced endogenously" is not the same procedure as providing naturally occurring hormones.

Or consider gender-transition mastectomies. As with all other procedures, a mastectomy performed for gender transition has a different diagnosis, different goal, and different risks from the permissible surgeries they superficially resemble. Females may undergo a mastectomy to treat

cancer or breast reduction procedures to relieve pain caused by "abnormally large breasts." Nationwide Children's, *Macromastia*, https://perma.cc/PAD7-9QY2 (last visited May 12, 2023). And males may undergo a similar procedure to remove excess breast tissue that "sometimes [causes] pain." Mayo Clinic, *Enlarged Breasts in Men (Gynecomastia)*, https://perma.cc/PX5W-JVVF (last visited May 12, 2023). But transgender chest surgeries are "not based in any medical diagnosis and do not seek to restore any form or function that may have been lost due to trauma, disease, or developmental accident." Patrick Lappert, *Florida Medicaid Project: Surgical Procedures and Gender Dysphoria* 4 (May 17, 2022), https://perma.cc/7JAD-3HBQ. Thus, they are "not ethically equivalent" to these other procedures. *Id.*

Because SB1 distinguishes between different procedures, not between different sexes, and because that distinction is perfectly rational—the different treatments have different risks and ethical concerns, especially when provided to children—SB1 is perfectly constitutional. *See Dobbs*, 142 S. Ct. at 2284.

*2. Bostock does not control.* Plaintiffs and the United States also try to argue that SB1 is barred by *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), which held that Title VII's prohibition on sex-discrimination is implicated by discrimination based on gender identity. *See* Doc. 41 at 11; Doc. 33 at 13. But "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself," *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *accord Bostock*, 140 S. Ct. at 1753. And there's ample reason to doubt that *Bostock* has any relevance for the Equal Protection Clause. The Equal Protection Clause "predates Title VII by nearly a century, so there is reason to be skeptical that [their] protections" are coextensive. *Brandt by and through Brandt*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., joined by Gruender, Erickson, Grasz, & Kobes, J.J., dissenting from the denial of rehearing en

banc); *accord Washington v. Davis*, 426 U.S. 229, 239 (1976) (declining to hold that Title VII's race discrimination standards are "identical" to the Fourteenth Amendment's). Indeed, the "text" of Title VII "is not similar in any way" to the protections in the Clause. *Brandt*, 2022 WL 16957734, at *1 n.1 (Stras, J., dissenting).

But even if *Bostock* controls, SB1 passes muster. Its restrictions do not operate based on sex, so to use the *Bostock* formulation, it is not true that but for a child's sex he or she could be given sterilizing transitioning treatments under the Act. And even if the Act did classify based on sex, that classification is tied to real biological differences, not stereotypes. *See infra* Section II.C; *Bostock*, 140 S. Ct. at 1749 (focusing on stereotypes, not biology). Such a classification is entirely permissible, and it does not implicate discrimination based on transgender status either. *Adams by and through Kasper v. Sch. Bd. of St. John's Cty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc) ("[A] policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status.").

### B. Even if SB1 classifies based on transgender identity, transgender individuals are not a suspect class triggering intermediate scrutiny.

Next, Plaintiffs and the United States argue that targeting gender transition procedures effectively targets transgender people because only transgender people seek gender transition procedures. Doc. 33 at 12-15; Doc. 41 at 12-14. The growing ranks of detransitioners refute this notion. *E.g.*, Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archives of Sexual Behavior 3353 (2021). But even if it were true, heightened scrutiny doesn't apply simply because people seeking a procedure are disproportionately (or even uniformly) members of a suspect class. *Vacco*, 521 U.S. at 800. For instance, classifications based on sex receive intermediate scrutiny, but a classification of "people seeking abortions" does not, though those people are

uniformly women. *Dobbs*, 142 S. Ct. at 2245-46 ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974))).

In any event, individuals who identify as transgender do not constitute a suspect class that receives heightened scrutiny. Aside from the obvious—race, sex, national origin, religion, etc.— the Supreme Court rarely designates suspect or quasi-suspect classes. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985). Indeed, the Court has rejected suspect classification for disability, age, and poverty. *Id.*; *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). The fact that so few classifications rise to the level of "suspect" itself casts "grave doubt" on the assertion that transgender identity does. *Adams*, 57 F.4th at 803 n.5.

Precedent explains why. Classifications are suspect when they single out "distinguishing characteristics" that have historically been divorced from "the interests the State has the authority to implement." *Cleburne*, 473 U.S. at 441 (noting that classifications attain suspect status when they have historically "provided no sensible ground for differential treatment"). Sex classifications, for example, are suspect because they often "reflect outmoded notions of the relative capabilities of men and women," rather than real differences. *Id.* at 441. Same for racial classifications. *Murgia*, 427 U.S. at 313-14. Thus, to rise to the level of suspect, a classification must single out a so-called "immutable characteristic" that has historically been the basis for deep discrimination. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (looking for (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness).

16

Transgender identity does not check these boxes. For one, it is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). To the contrary, according to Plaintiffs and the United States, individuals identify as transgender when their internal perception of who they are departs from the immutable characteristic that is their biological sex. Doc. 41 at 2; Doc. 33 at 2-3.. That necessarily takes place sometime *after* birth. And many individuals who identify as transgender alternate between gender identifications, whether it's non-binary, gender fluid, third gender, or their natal gender. Littman, *Individuals Treated for Gender Dysphoria*. That fluidity means transgender identity cannot form a protected class.

Transgender identity falls short on the other suspect-classification factors too. Individuals identifying as transgender as a class look quite "unlike" those individuals who were long denied equal protection because of their race, national origin, or gender. *Murgia*, 427 U.S. at 313-14 (rejecting age as a suspect class because the elderly have not faced discrimination "akin to [suspect] classifications"). States enshrined purposeful race and sex discrimination into their laws for decades; conversely, as the Supreme Court has explained, transgender individuals have been protected by a "major piece" of federal civil rights legislation" for nearly a half-century. *Bostock*, 140 S. Ct. at 1753. And the laws (wrongly) described as discriminating against transgender individuals are recent enactments grappling with the policy questions and potential harms to children arising from the recent spike in transgender identification. For example, the dangers inherent in taking cross-sex hormones arise when they are, by definition, administered to a person of the opposite sex—something that occurred very rarely in medicine until the advent of the "affirmative" model of treating gender dysphoria. Indeed, Tennessee enacted SB1 in direct response to the discovery that the Vanderbilt University Medical Center was risking the health of Tennessee's minors by

performing risky gender-transition procedures to "make a lot of money." *See* Doc. 112 at 1 (quoting Doc. 113-1, Ex. 1-D 0:11-0:47). To the extent that regulating to prevent that harm requires zeroing in on those individuals most likely to risk it, such a classification is a "sensible ground for differential treatment," not the sort of irrelevant grouping that warrants heightened review. *Cleburne*, 473 U.S. at 441.

### C. SB1 passes intermediate scrutiny.

Even if this Court believes that SB1 classifies by sex or that individuals who identify as transgender constitute a suspect class, the Act still does not have an equal protection problem. The Equal Protection Clause commands that "all persons *similarly situated* . . . be treated alike." *Cleburne*, 473 U.S. at 439 (emphasis added). But males and females are not similarly situated with respect to receiving sex hormones or obtaining certain surgeries. *See supra* Section II.A. So a law targeting the unique problems inherent in providing cross-sex hormones or operating on one sex can't ignore those biological realities. *Dobbs*, 142 S. Ct. at 2245-46. Nor does the Constitution require it to. To the contrary, "fail[ing] to acknowledge ... basic biological differences ... risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001); *Ballard v. United States*, 329 U.S. 187, 193 (1946). And a transgender identity doesn't obviate sex-based harms. *Accord Adams*, 57 F.4th at 809-10 (upholding single-sex bathroom policy); *B.P.J. v. W.V. State Bd. of Educ.*, 2023 WL 111875, at *7 (S.D.W.V. Jan. 5, 2023) (upholding single-sex sports policy), *enjoined pending appeal*, 2023 WL 2803113 (4th Cir. 2023).

Biological differences are "the driving force behind the Supreme Court's sex-discrimination jurisprudence." *Adams*, 57 F.4th at 803 n.6. Indeed, "the biological differences between males and females are the reasons intermediate scrutiny," not strict, "applies in sex-discrimination cases in the first place." *Id.* at 809. Intermediate scrutiny prevents States from legislating based on "overbroad generalizations about the different talents, capacities, or preferences or males or

females"—generalizations that have no basis in biology. *United States v. Virginia*, 518 U.S. 515, 533 (1996). For instance, States cannot presume that women don't like competition, that they have less skill in managing or distributing property, or that they mature faster. *See, e.g.*, *id.* at 541; *Kirchberg v. Feenstra*, 450 U.S. 455, 459-60 (1981); *Reed v. Reed*, 404 U.S. 71, 74 (1971); *Craig v. Boren*, 429 U.S. 190, 192 (1976); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975).

But applying intermediate scrutiny, rather than strict, ensures that distinctions based on "enduring" and "[i]nherent differences" between the sexes survive. *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Indeed, such distinctions are, by their nature, substantially related to the relevant governmental interest and have thus been upheld time and time again. Consider *Michael M. v. Superior Court*, which upheld a statutory-rape statute that prohibited sex with a minor female only. 450 U.S. 464, 466 (1981). The Court explained that that classification was permissible because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse. Only women may become pregnant." *Id.* at 471; *accord Nguyen*, 533 U.S. at 58.

In short, biology matters, and legislatures aren't required to ignore difference rooted biology. Rather, when preventing harms unique to one sex, legislatures can and should take sexual differences into account.

Indeed, two recent decisions demonstrate that classifications grounded in biological reality survive intermediate scrutiny, even in claims brought by transgender people. *Adams*, 57 F.4th 803 n.3 (analysis about sex-based intermediate scrutiny would be the same if transgender individuals were a suspect class). In *Adams*, the Eleventh Circuit, sitting en banc, upheld a school's policy separating bathrooms by biological sex. *Id.* at 796. That court acknowledged that schools have a legitimate interest in "protecting the privacy interests of students" in "shielding one's body from

the opposite sex." *Id.* at 803 n.6 & 805. Because that interest was grounded in real, physical differences between the sexes, the court concluded that the sex classification satisfied intermediate scrutiny. *Id.* at 807. And the school's interest didn't change even though the transgender student identified as a member of the opposite sex because that student's self-identification could not change the "immutable characteristic[s] of biological sex" that underpinned the school's privacy interests. *Id.* at 803 n.6, 809 (citing *Frontiero*, 411 U.S. at 686).

Similarly, in *B.P.J. v. West Virginia Board of Education*, a district court upheld West Virginia's law prohibiting biological males from playing girls' sports, even if they identify as transgender. 2023 WL 111875, at *7. That's because "[w]hether a person has male or female sex chromosomes," not what gender he or she identifies as, "determines many of the physical characteristics relevant to athletic performance." *Id.* And "males [generally] outperform females because of inherent physical differences between the sexes." *Id.* To further its "interest in providing equal athletic opportunities for females," the State could "legislate sports rules" based on biological sex. *Id.* at *7-8. So too, Tennessee can legislate based on sex to prevent sex-based harms.

## III. Parents Do Not Have a Substantive Right to Subject Their Children to Risky Medical Procedures

The Plaintiffs' substantive-due-process claim likewise fails. Gender transition procedures are a recent invention not deeply rooted in our nation's history and traditions, so the Constitution does not establish a right to obtain them. And Plaintiffs wisely do not argue that it does. *See generally* Doc. 1. Still, they try to smuggle a right-to-gender-transition-procedures claim in through a backdoor: a nominally different substantive-due-process argument that parents have the right to make medical decisions for their children and thus to sign them up for gender transition procedures.

Plaintiffs' argument here is unavailing. True, the Supreme Court has said parents have a general substantive-due-process interest in raising their children their children. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (visitation); *Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (custody); *Wisconsin v. Yoder*, 406 U.S. 205, 231-32 (1972) (religious education). But in the medical context that at most means that the parents may stand in the shoes of their child and make medical choices children lack the legal capacity to make. *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Indeed, "a [S]tate is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham*, 442 U.S. at 603-04; *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (noting that "the [S]tate as parens patriae may restrict the parent's control ... in many ... ways"). Parents cannot exempt children from compulsory vaccination; they do not have a constitutional right to expose their child "to ill health or death." *Id.* at 166-67. And they cannot deny their children medical treatment for serious illness or injury. *Application of Pres. & Directors of Georgetown College, Inc.*, 331 F.2d 1000, 1007 (D.C. Cir. 1964) (in chambers opinion). If parents truly had a right to make health and medical decisions for their children notwithstanding state law, none of this could be true.

Indeed, restrictions on other procedures confirm that parents do not possess such a right. If the State can permissibly ban abortion, parents don't have a separate substantive-due-process right to get their teenage daughter an abortion. *Cf. Dobbs*, 142 S. Ct. at 2257 (no right to abortion). If the State can ban euthanasia, parents can't ask a doctor to aid in their terminally ill son's suicide. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 710 (1997) (no right to assisted suicide). And if substantive due process does not prevent States from barring dangerous gender transition procedures, parents have no right to put their preteen on puberty blockers. Parents may have a

(qualified) right to decide which lawful medical procedures their children receive; they do not have the right to expand the menu of options.

The parents' claim really boils down to a policy disagreement with the State.  *See* Doc. 1 ¶ 167 ("Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on the appropriate course of medical treatment.").  But Tennessee—like several European countries and many other States—weighs the (known) risks and (unproven) benefits very differently.  And under our Constitution, that's Tennessee's call to make.  *Dobbs*, 142 S. Ct. at 2284.

\* \* \* \* \*

Whatever Plaintiffs claim, there is no evidence that gender-transition procedures are safe or efficacious. And the Constitution does not require States like Tennessee to permit those procedures anyway. To the contrary, the Constitution leaves this controversial public health issue in the hands of States—even if Plaintiffs and the United States disagree.  *Dobbs*, 142 S. Ct. at 2245, 2284.  Because the responsibility to choose among divergent medical views rests with the State, not this Court, this Court should deny both requests for a preliminary injunction and allow Tennessee to enforce SB1.

Respectfully submitted on this 6th day of June, 2023,

Steve Marshall
    *Attorney General*
Edmund G. LaCour Jr.*
    *Solicitor General*
A. Barrett Bowdre*
    *Principal Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

/s/ Nicholas R. Barry
Nicholas R. Barry
Member of Tennessee Bar
TN Bar No. 031963

AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(615) 431-9303
Nicholas.Barry@aflegal.org

Tim Griffin
    *Attorney General*
Nicholas J. Bronni*
    *Solicitor General*
Dylan L. Jacobs*
    *Deputy Solicitor General*
Hannah L. Templin*
    *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ARKANSAS
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Amici Curiae*

**pro hac vice* motion forthcoming

(Additional Amici Counsel listed below)

## ADDITIONAL COUNSEL

ASHLEY MOODY
Florida Attorney General

CHRIS CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS W. KOBACH
Kansas Attorney General

DANIEL CAMERON
Kentucky Attorney General

JEFF LANDRY
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

ANDREW BAILEY
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MIKE T. HILGERS
Nebraska Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

SEAN D. REYES
Utah Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2023, the undersigned filed the foregoing document via this Court's electronic filing system, which sent notice of such filing to the following counsel of record:

| COUNSEL OF RECORD | PARTY REPRESENTED |
|---|---|
| Stella Yarbrough<br>Lucas Cameron-Vaughn<br>Jeff Preptit<br>ACLU Foundation of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>Tel.: 615-320-7142<br>syarbrough@aclu-tn.org<br>lucas@aclu-tn.org<br>jpreptit@aclu-tn.org<br><br>Joshua A. Block<br>Chase Strangio<br>American Civil Liberties Union Founda-<br>tion 125 Broad Street, Floor 18<br>New York, NY 10004<br>Tel.: 212-549-2593<br>jblock@aclu.org<br>cstrangio@aclu.org<br><br>Sruti J. Swaminathan<br>Lambda Legal Defense and Education Fund,<br>Inc.<br>120 Wall Street, 19th<br>Floor New York, NY<br>10005  Tel.: 212-809-<br>8585<br>sswaminathan@lambdalegal.org<br><br>Tara Borelli<br>Lambda Legal Defense and Education Fund,<br>Inc.<br>1 West Court Square, Ste. 105<br>Decatur, GA 30030<br>Tel.: 404-897-1880<br>tborelli@lambdalegal.org | Plaintiffs L.W., Samantha Williams, Brian Williams, John Doe, Jane Doe, James Doe, Ryan Doe, Rebecca Doe, and Susan N. Lacy |

Joseph L. Sorkin
Dean L. Chapman, Jr.
Kristen W. Chin
Richard J. D'Amato
Theodore James Salwen
Christopher J. Gessner
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036 Tel.: 212-872-1000
jsorkin@akingump.com dchap-
man@akingump.com kris-
ten.chin@akingump.com
rdamato@akingump.com jsal-
wen@akingump.com
cgessner@akingump.com

Elizabeth D. Scott
Akin Gump Strauss Hauer & Feld LLP 2300
N. Field Street, Suite 1800
Dallas, TX 75201
Tel.: 214-969-2800
edscott@akingump.com

David Bethea
Akin Gump Strauss Hauer & Feld LLP Rob-
ert S. Strauss Tower
2001 K Street N.W. Washington, DC 20006
Tel.: 202-887-4000
dbethea@akingump.com

| | |
|---|---|
| Ellen B. McIntyre<br>Rascoe Dean<br>U.S. Attorney's Office for the Middle District of Tennessee<br>719 Church Street, Suite 300<br>Nashville, TN 37203 ellen.bowden2@usdoj.gov<br>rasco.dean@usdoj.gov<br><br>Alyssa C. Lareau<br>United States Department of Justice<br>Federal Coordination and Compliance Section 950 Pennsylvania Avenue NW<br>4CON<br>Washington, DC 20530<br>(202) 305-2994<br>Alyssa.Lareau@usdoj.gov<br><br>Coty Montag<br>United States Department of Justice<br>Federal Coordination and Compliance Section 950 Pennsylvania Avenue NW<br>4CON<br>Washington, DC 20530<br>(202) 305-2222<br>Coty.Montag@usdoj.gov<br><br>Gloria Yi<br>United States Department of Justice<br>Federal Coordination and Compliance Section 950 Pennsylvania Avenue NW<br>4CON<br>Washington, DC 20530<br>(202) 616-3975<br>Gloria.Yi@usdoj.gov<br><br>Tamica Daniel<br>United States Department of Justice<br>Housing and Civil Enforcement Section<br>950 Pennsylvania Avenue NW<br>4CON<br>Washington, DC 20530<br>(202) 598-9636<br>Tamica.Daniel@usdoj.gov | Plaintiff-Intervenor United States of America |

| | |
|---|---|
| Adam Karl Mortara<br>Lawfair LLC<br>40 Burton Hills Blvd<br>Suite 200<br>Nashville, TN 37215<br>(773) 750-7154<br>mortara@lawfairllc.com<br><br>Brooke Ashley Huppenthal<br>Office of Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202<br>615-741-2471<br>brooke.huppenthal@ag.tn.gov<br><br>Cameron Norris<br>Consovoy McCarthy PLLC<br>1600 Wilson Blvd., Ste. 700<br>Arlington, VA 22209<br>(703)-243-9423<br>cam@consovoymccarthy.com<br><br>Clark Lassiter Hildabrand<br>Tennessee Attorney General's Office<br>P O Box 20207<br>Nashville, TN 37202-0207<br>615-253-5642<br>clark.hildabrand@ag.tn.gov<br><br>Ryan Nicole Henry<br>Tennessee Attorney General's Office<br>500 MLK Jr., Blvd.<br>Nashville, TN 37243<br>(615) 532-2935<br>ryan.henry@ag.tn.gov<br><br>Steven James Griffin<br>Tennessee Attorney General's Office<br>P O Box 20207<br>Nashville, TN 37202-0207<br>(615) 741-9598<br>steven.griffin@ag.tn.gov | Defendants, Jonathan Skrmetti, Tennessee Department of Health, Ralph Alvarado, Tennessee Board of Medical Examiners, Melanie Blake, Stephen Loyd, Randall E. Pearson, Phyllis E. Miller, Samantha McLerran, Keith G. Anderson, Deborah Christiansen, John W. Hale, John J. McGraw, Robert Ellis, James Diaz-Barriga, Jennifer Claxton, Logan Grant, 26 Family Policy Councils |

Tiffany H. Bates
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tiffany@consovoymccarthy.com

Trenton Meriwether
Tennessee Attorney General's Office
301 6th Ave N.
Nashville, TN 37243
904-536-6026
trenton.meriwether@ag.tn.gov

*/s/ Nicholas R. Barry*
Nicholas R. Barry (BPR# 031963)

*Counsel for State Amicus*