# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| L.W., by and through her parents and next friends, Samantha Williams and Brian Williams, *et al.*, <br><br> *Plaintiffs*, <br><br> and <br><br> UNITED STATES OF AMERICA, <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, *et al.*, <br><br> *Defendants*. | Case No. 3:23-cv-00376 <br><br> District Judge Richardson <br><br> Magistrate Judge Newbern |

**REPLY IN SUPPORT OF PLAINTIFF-INTERVENOR UNITED STATES' MOTION FOR A PRELIMINARY INJUNCTION [ECF 40]**

The United States moved for a preliminary injunction to prevent the enforcement of Tennessee Senate Bill 1, 2023 Tenn. Pub. Acts § 68-33-101, *et seq.* (2023) ("SB 1"), a law that bars transgender youth from accessing medically necessary care. Defendants present a number of unavailing arguments to suggest that the United States is not entitled to this relief. The case law makes clear that: (1) SB 1 violates the Equal Protection Clause of the Fourteenth Amendment; and (2) the United States can seek statewide relief, and a preliminary injunction would avoid irreparable harm. Thus, the United States requests that the Court grant its motion.

I. <u>**The United States Has Demonstrated a Clear Likelihood of Success on the Merits**</u>.

The United States has demonstrated a clear likelihood of success on its equal protection claim. SB 1 discriminates on the basis of sex; heightened scrutiny applies; and the law cannot survive heightened scrutiny or any level of review.

    A.    **SB 1 Discriminates on the Basis of Sex**

Discrimination because of transgender status is sex discrimination under the Equal Protection Clause. *Smith v. City of Salem*, 378 F.3d 566, 576-77 (6th Cir. 2004). Defendants nonetheless argue that SB 1 does not discriminate on the basis of sex because: (1) it treats the sexes equally; (2) the analysis of *Bostock v. Clayton Cnty.*, 140 S. Ct. 1746 (2020), does not apply here; and (3) sex stereotyping does not apply. None of these arguments is persuasive.

First, a policy or statute need not mandate different treatment for men or women to discriminate on the basis of sex in violation of the Equal Protection Clause; that is not the only form of sex discrimination that can trigger heightened scrutiny. *See Smith*, 378 F.3d at 572-75. A classification based on sex assigned at birth triggers heightened scrutiny for purposes of the equal protection analysis. *See, e.g.*, *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) ("Because the minor's sex at birth determines whether or not the minor can receive certain types

of medical care under the law, Act 626 discriminates on the basis of sex."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-10 (4th Cir. 2020). For example, this Court has observed that a policy that determines who is permitted to use bathrooms based on their sex assigned at birth constitutes a sex-based classification. *D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 2022 WL 16639994, at *7-8 (M.D. Tenn. Nov. 2, 2022). As one district court aptly observed, "[i]f one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex." *Doe v. Ladapo*, --- F. Supp. 3d ---, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023). In the Title VII context, the Sixth Circuit has held that a law can discriminate where it provides different treatment based on sex assigned at birth. *See Equal Employment Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 572-75 (6th Cir. 2018) (stating that where a transgender employee would not have been fired if she were assigned female at birth confirms that the employer impermissibly considered sex).[1]

Second, as the Supreme Court observed in *Bostock*, 140 S. Ct. at 1746, transgender discrimination is sex discrimination. *Bostock* applies to the equal protection analysis, as this Court has noted. ECF 108 at PageID 910. None of the three cases cited by Defendants support a

---

[1] Even though some transgender minors do not receive the medical care at issue in this litigation, SB 1 is still a sex-based classification that discriminates against transgender minors in violation of the Equal Protection Clause. Defendants' reliance on *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), to claim otherwise is misplaced. Those cases involve a condition (pregnancy) or medical procedure (abortion) that only one sex can undergo. Consequently, the laws at issue in these cases effectively denied insurance coverage or a medical procedure to *everyone* whereas, here, only transgender minors are so denied. In addition, the laws at issue in *Geduldig* and *Dobbs* did not, on their face, involve sex-based classifications as SB 1 does. Therefore, heightened scrutiny would have applied in those cases only if the law was pretext for invidious discrimination. *See Dobbs*, 142 S. Ct. at 2245-46 (quoting *Geduldig*, 417 U.S. at 496 n.20). In contrast, here, SB 1 applies to medical treatment that more than one sex can undergo. And based on its text, SB 1 allows non-transgender youth to access gender-affirming medical care and denies the same care to transgender youth. Were that not enough, the law is also the product of the State's intent to target transgender minors for invidious discrimination. *See* ECF 41 at PageID 526-28.

contrary conclusion. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), involved the interpretation of the language "because of" in the Age Discrimination in Employment Act and did not concern any claims of sex discrimination. *Id.* at 324. Two other cases, *Titus v. Aranas*, No. 3:18-cv-00146-MMD-CLB, 2020 WL 4248678 (D. Nev. June 29, 2020), and *McMain v. Peters*, No. 2:13-cv-01632-AA, 2018 WL 3732660 (D. Ore. Aug. 2, 2018), which involved non-transgender *pro se* prisoners' efforts to obtain testosterone (or testosterone replacement therapy), did not allege discrimination on the basis of sex assigned at birth. These inapposite cases have no bearing on the equal protection analysis in this case and are not instructive here.

Third, Defendants' claim that sex stereotyping cannot apply in the medical context is also unavailing. The Sixth Circuit has held that discrimination against a transgender person for having a "more feminine appearance" than expected of a person assigned male at birth constituted impermissible sex stereotyping. *Smith*, 378 F.3d at 568, 571-74. Thus, when necessary medical care is prohibited only when a transgender person uses it to *appear* more in alignment with their identity (*i.e.*, more feminine or more masculine) in conflict with expectations for their sex assigned at birth, that prohibition is clearly grounded in sex stereotypes. *Id.* at 577.[2]

---

[2] Defendants attempt to shock the Court with scenarios they purport would flow from applying the well-established theory of sex stereotyping here. These scenarios include procedures that have no medical purpose (*e.g.*, inserting fertilized eggs in people who lack uteruses or female genital mutilation) and stand in stark contrast to this case. Moreover, Defendants' argument ignores the multi-step analysis for Equal Protection Clause claims. Where, as in Defendants' scenarios, a person suffers little to no harm if a law denies them access to an elective procedure that goes against well-recognized standards of care, a court may determine that the law survives the appropriate level of scrutiny. But here, where transgender youth are harmed by being denied access to medically necessary care that is consistent with standards of care in the United States, this Court may determine that the law cannot survive any level of scrutiny.

3

Case 3:23-cv-00376   Document 157   Filed 06/12/23   Page 4 of 14 PageID #: 2612

### B. Transgender People are a Quasi-Suspect Class

Ample case law supports the principle that transgender people constitute a quasi-suspect class. *See, e.g.*, *Grimm*, 972 F.3d at 611-13 (collecting cases); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020) (finding "that transgender individuals are a quasi-suspect class entitled to heightened scrutiny"); *see also Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016).

An analysis of the factors set forth in *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), and other cases compels this conclusion. First, courts have repeatedly recognized the historic discrimination against transgender people. *See*, *e.g.*, *Highland Local Sch. Dist.*, 208 F. Supp. 3d at 874 ("[T]here is not much doubt that transgender people have historically been subject to discrimination including in . . . access to healthcare."). Second, the defining characteristic prong is satisfied here because the language of the statute clearly restricts medical care for only transgender youth. Third, Defendants fail to recognize that an immutable characteristic is not required for a group to be recognized as a quasi-suspect class; the characteristic need only be distinguishing, which it is here. *See*, *e.g.*, *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 720-21 (D. Md. 2018). Finally, the political power prong is satisfied here because, among other reasons, many states including Montana, Oklahoma, Nebraska, Florida, and Texas passed laws in 2023 targeting transgender people and gender-affirming care. Additionally, transgender people represent "a tiny minority of the population, whose members are stigmatized for their gender non-conformity in a variety of settings," which demonstrates that they are a politically powerless minority group. *Highland Local Sch. Dist.*, 208 F. Supp. 3d at 874. For these reasons, transgender people are a quasi-suspect class. *See M.A.B.*, 286 F. Supp. 3d at 721.

Defendants are incorrect to suggest that *Ondo v. City of Cleveland*, 795 F. 3d 597 (6th Cir. 2015), compels a contrary conclusion. *Ondo* does not create a rule that limits quasi-suspect classes. The court there simply noted that the Supreme Court has not yet decided that a group with traits not ascertainable at the moment of birth is a quasi-suspect class. *Id.* at 609.[3] *Ondo* does not foreclose the possibility of other quasi-suspect classes; in fact, a district court within the Sixth Circuit found that transgender people constitute a quasi-suspect class after *Ondo* was decided. *See Ray*, 507 F. Supp. 3d at 937.

### C. SB 1 Cannot Survive Heightened Scrutiny or Any Level of Review

Defendants fail to demonstrate that SB 1 can survive heightened scrutiny. Defendants' argument that SB 1 is connected to the State's concern for the health of transgender youth and the administration of gender-affirming care at Vanderbilt University Medical Center ("VUMC") fails. Defendants are unable to justify why Tennessee would wholesale ban medical care supposedly out of concern for the health of transgender youth but not show the same care and concern for non-transgender youth who can access the same procedures. The scope of SB 1 is also telling. Instead of focusing its response on the alleged actions of VUMC, or enacting some guardrails to care as Finland, Sweden, and the United Kingdom have done (referred to collectively by Defendants under the misnomers "European medical community" or "medical consensus in Europe"),[4] Tennessee enacted a blanket, statewide ban on access to medical care

---

[3] To be clear, the Supreme Court precedent does not require such traits—a quasi-suspect class may have "obvious, immutable, *or* distinguishing characteristics." *Lyng*, 477 U.S. at 638 (emphasis added); *see also M.A.B.*, 286 F. Supp. 3d at 721.

[4] Defendants point to changes in access to gender-affirming care in the United Kingdom, Sweden, and Finland. But none of these countries has banned gender-affirming care as Tennessee has (not even England's National Health Services with the recently announced changes to its policy for puberty blockers, as NHS will still give puberty blockers in certain circumstances and will conduct further research, *see* https://www.upi.com/Top_News/World-News/2023/06/11/nhs-england-puberty-blockers-transgender-children/9881686499198/), and

5

that applies solely and specifically to transgender minors seeking to treat their gender dysphoria, regardless of the medical provider. And given that Tennessee introduced and passed SB 1 amongst the backdrop of several concurrent and similarly constructed gender-affirming care bans in several other states across the country, Defendants' stated concern about VUMC rings hollow.[5]

Defendants fail to offer any persuasive justifications for SB 1. The State characterizes gender-affirming care as harmful. In doing so, Tennessee ignores the agreement of all applicable major medical associations in the United States (*e.g.*, WPATH, the Endocrine Society, and the American Academy of Pediatrics) that gender-affirming care is helpful and clinically indicated for some transgender minors. *See* ECF 41 at PageID 528-29.[6] Defendants also argue that the

---

they more closely align with Endocrine Society and World Professional Association for Transgender Health ("WPATH") standards. *See Brandt*, 47 F.4th at 671; *Ladapo*, 2023 WL 3833848, at *14; Expert Rebuttal Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C [ECF 142] ¶ 14, 19 (stating that "no European country has banned gender-affirming medical care as has Tennessee" and that "Defendants' experts do not provide a systematic review of European policies; they selectively reference policies that they believe support their position"); Expert Rebuttal Declaration of Jack Turban, MD, MHS ("Turban Rebuttal Decl.") [ECF 144] ¶ 5 (stating that "Defendants' experts fail to emphasize that none of these countries have banned gender-affirming medical care for adolescents with gender dysphoria as Tennessee does" and that "the select countries referenced have changed the way in which gender-affirming care is being delivered").

[5] Defendants argue that VUMC's recitation of the financial benefits of providing gender-affirming care to transgender youth means that the care is delivered solely for profit, devoid of individualized medical assessments. Defendants have not provided corresponding evidence that VUMC's recognition of potential profits as an added benefit of providing the care—surely not a foreign concept in the United States medical system—caused VUMC to recommend and provide non-medically necessary treatments. Defendants have also provided no evidence that this concern with a single provider justifies the wholesale ban of the treatments, or why existing legal and professional safeguards would not suffice to curb practices where a provider allegedly prescribes non-medically necessary care exclusively for financial reasons.

[6] *E.g.*, Turban Rebuttal Decl. ¶ 5 ("In the United States, the major relevant expert medical organizations [citing several] explicitly oppose such bans."). For example, Dr. Adkins stated that "puberty blockers can be an essential tool to improve the health and well-being of some transgender adolescents with gender dysphoria" and described how, in her clinical experience, she has seen improvement in her patients' mental health, anxiety levels, depression, interactivity

6

WPATH standards are not well-established because they have changed over time. ECF 135 at PageID 2317. They then inexplicably analyze the Minor Plaintiffs' care and conclude that it does not conform to WPATH standards from 25 years ago, well before any of the Minor Plaintiffs were born. *Id.* This exercise is fruitless. As is typical in the medical field, the standards of care have changed in response to more information about treating gender dysphoria.[7] The fact that WPATH has updated its standards of care makes it more reliable, not less. Other courts have agreed that the WPATH standards are well-established. *See Brandt*, 47 F.4th at 670-71; *Ladapo*, 2023 WL 3833848, at *3-6; *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1145-48 (M.D. Ala. 2022). The State's apparent rejection of this overwhelming medical consensus cannot serve as an exceedingly persuasive justification for the sex-based classification. *See Brandt*, 47 F.4th at 670. Consequently, SB 1 cannot survive heightened scrutiny. And given that SB 1 creates a "broad and undifferentiated disability on a single named group," *Romer v. Evans*, 517 U.S. 620, 632 (1996), it cannot survive even rational basis review.

**II.     The United States Has Met All Necessary Requirements to Seek Statewide Relief and a Preliminary Injunction Would Avoid Irreparable Harm.**

    **A. The United States Is Entitled to Seek Statewide Relief**

As the Court has already determined, the United States has satisfied the requirements for intervention under 42 U.S.C. § 2000h-2 ("Section 902"), which does not require an independent cause of action or a separate source of standing to pursue appropriate relief for a Fourteenth Amendment violation. The Court should therefore reject Defendants' meritless invitation to revisit its order granting the United States' motion to intervene and impose extraneous and

---

at school and with peers, school performance as a result of medical treatment. Expert Rebuttal Declaration of Deanna Adkins, MD ("Adkins Rebuttal Decl.") [ECF 141] ¶ 12; *see also id.* ¶ 26.
[7] Expert Declaration of Deanna Adkins, MD [ECF 29] ¶ 25; Expert Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C [ECF 30] ¶ 29; Expert Declaration of Aron Janssen, M.D. [ECF 31] ¶ 32; Adkins Rebuttal Decl. ¶ 11.

improper requirements on intervention. *See* ECF 135 at PageID 2323-27 (arguing that the United States must satisfy other requirements such as identifying another cause of action, demonstrating standing, and identifying injury aside from constitutional harm). Now that the Court has granted the intervention motion, the text of Section 902 is clear with respect to the scope of the remedies that are available to the United States. Section 902 provides that "[i]n such action the United States shall be entitled to the same relief as if it had instituted the action." The United States is therefore entitled to seek the requested statewide relief. *See Spangler v. United States*, 415 F.2d 1242, 1246 (9th Cir. 1969) (rejecting any interpretation of Section 902 that "would restrict the right of the United States to seek full and complete relief" as it "would not protect the public interest in achieving full compliance with the constitution").[8]

Defendants' reading of Section 902 to require the United States to state an additional, separate cause of action or that it does not itself provide the United States with the necessary standing would render Section 902 meaningless and merely duplicative of other causes of action, which defies the purpose of the statute and relevant canons of statutory construction. *See*, *e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute, we are obliged to give effect, if possible to every word Congress used."); *Lemon v. Bossier Parish Sch. Bd.*, 240 F. Supp. 709, 715 (W.D. La. 1964) (rejecting an interpretation of Section 902 that would require the

---

[8] Defendants attempt to soften the import of *Spangler* by suggesting that the court relied on the existence of another civil rights statute as creating the cause of action. ECF 135 at PageID 2323. A careful reading of *Spangler* clearly reveals that the United States did not rely on anything other than Section 902 to independently seek relief necessary to address the alleged violation, and that the court simply referenced the existence of this alternative cause of action that allowed for the same relief to reject any possible reading that Section 902 somehow limited the relief the United States may seek. *Spangler*, 415 F.2d at 1246. It is inaccurate for Defendants to contend the United States must identify a statute independent of Section 902 to seek the requested statewide preliminary injunction, independent of any relief also sought by Private Plaintiffs. *See Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-31 (1976) (finding that the United States could pursue statewide relief even after the original plaintiffs disappeared).

8

United States to separately meet requirements found outside of the statute). Defendants cannot limit the United States' ability to seek the requested statewide relief by imposing additional requirements outside of Section 902.[9]

### B. Defendants' Assertion that this Court Cannot Fashion Emergency Relief to Address the Identified Irreparable Harm Is Without Merit

"When reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 346, 373 (1976)). Indeed, Defendants cite *A.M.C. v. Smith*, which expressly describes how a constitutional right being "threatened or impaired" can count as irreparable harm to justify a preliminary injunction. 620 F. Supp. 3d 713, 731 (M.D. Tenn. 2022) (denying a preliminary injunction, however, where plaintiffs did not allege impending irreparable injury or need for immediate injunctive relief).[10]

Defendants further contend that there is no irreparable harm here since (1) the limited private right of action created by SB 1, § 68-33-105, may continue in effect; and (2) if a

---

[9] Defendants' other cited cases are inapplicable to the United States' exercise of Section 902 to ensure enforcement of constitutional rights. *See* ECF 135 at PageID 2325-27 (citing cases, for example, concerning states' ability to sue the United States for its COVID-19 or immigration policies and the ability of a creditor to seek prioritization in debt collection). For example, Defendants cite to *Comm. on Judiciary of U.S. H.R. v. McGahn*, 973 F.3d 121, 123 (D.C. Cir. 2020), to assert that "this Court 'should not ignore Congress's carefully drafted limitations on' the US' authority to intervene." ECF 135 at PageID 2327. But *McGahn* had nothing to do with the United States' enforcement of constitutional rights through Section 902, and only addressed whether the congressional committee could seek judicial enforcement of a subpoena.

[10] Defendants suggest that at least some constitutional violations of the Fourteenth Amendment do not necessarily amount to irreparable harm, because "[m]inors do not have a fundamental right to access the prohibited treatments. Nor does Intervenor argue that parents and physicians are denied equal protection of the laws." ECF 135 at PageID 2324 n.14. The United States' claim is that SB 1 violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates against transgender minors on the basis of their sex and transgender status by denying them—and only them—the option to even consider and access medically necessary care. There is no doubt that if SB 1 goes into effect, this constitutional violation will cause irreparable harm. *See* ECF 41 at PageID 533-34.

9

preliminary injunction is later rescinded, Defendants could seek to enforce the liability provisions of SB 1 for the time period when the injunction was in place. Defendants incorrectly assume that this Court cannot appropriately grant emergency relief to address the full scope of irreparable harm at risk here. Indeed, the Court, in its discretion, can tailor injunctive relief that appropriately addresses the liability threat health care providers and others face as a result of SB 1. *See*, *e.g.*, *Bassett v. Snyder*, 951 F. Supp. 2d 939, 972-73 (E.D. Mich. 2013) (noting, in an equal protection challenge, that "[t]o provide effective relief, the injunction must prohibit the defendant from enforcing" the challenged act, as "[a]n injunction applicable only to the named plaintiffs would be impractical and difficult to enforce"); *see also LaMarca v. Turner*, 995 F.2d 1526, 1543 (11th Cir. 1993) (district courts have broad discretion to fashion equitable relief to target the existing wrong); *Wagner v. Taylor*, 836 F.2d 566, 575-76 (D.C. Cir. 1987) ("District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.").[11] Additionally, Defendants' threat of future enforcement cannot mean that irreparable harm does not exist—indeed, no one could ever prove irreparable harm if true. This Court should reject such logical fallacies, as it can, and should, grant the emergency relief requested by the United States.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a preliminary injunction.

Dated: June 12, 2023                             Respectfully submitted,

HENRY C. LEVENTIS                                KRISTEN CLARKE

---

[11] The most imminent, concrete harm SB 1 poses is Defendants' enforcement through §§ 68-33-106, 107, whereas the private right of action set forth in § 68-33-105 is conditioned on a minor who received the treatment banned by SB 1, or the minor's parent who did not consent to such treatment, to bring suit in the future in the event that they believe they were harmed.

10

| United States Attorney<br>Middle District of Tennessee | Assistant Attorney General<br>Civil Rights Division |
|---|---|
| s/ *Rascoe Dean*<br>RASCOE DEAN<br>B.P.R. # 034209<br>ELLEN BOWDEN MCINTYRE<br>B.P.R. #023133<br>Assistant United States Attorney<br>719 Church Street, Suite 3300<br>Nashville, TN 37203<br>Telephone: (615) 736-5151<br>Facsimile: (615) 401-6626<br>Email: Rascoe.Dean@usdoj.gov<br>Email: Ellen.Bowden2@usdoj.gov | CHRISTINE STONEMAN<br>Chief, Federal Coordination and<br>Compliance Section<br><br>COTY MONTAG (DC Bar No. 498357)<br>Deputy Chief, Federal Coordination and<br>Compliance Section<br><br>s/ *Gloria Yi*<br>TAMICA DANIEL (DC Bar No. 995891)<br>Trial Attorney<br>Housing and Civil Enforcement Section<br>GLORIA YI (NY Bar No. 4873824)<br>ALYSSA C. LAREAU (DC Bar No. 494881)<br>Trial Attorneys<br>Federal Coordination and Compliance Section<br>United States Department of Justice<br>Civil Rights Division<br>950 Pennsylvania Avenue NW – 4CON<br>Washington, DC 20530<br>Tel.: (202) 598-9636<br>Tamica.Daniel@usdoj.gov<br>Gloria.Yi@usdoj.gov<br>Alyssa.Lareau@usdoj.gov<br><br>*Attorneys for Plaintiff-Intervenor United States of America* |

**CERTIFICATE OF SERVICE**

I certify that on June 12, 2023, a true and correct copy of the foregoing was served via the Court's CM/ECF system, if registered.

| | |
|---|---|
| Tara L. Borelli, Esq.<br>Lambda Legal Defense and Education Fund, Inc.<br>1 West Court Square, Suite 105<br>Decatur, GA 30030<br>Email: tborelli@lambdalegal.org | Sruti J. Swaminathan, Esq.<br>Lambda Legal Defense and Education Fund, Inc.<br>120 Wall Street, 19th Floor<br>New York, NY 10005<br>Email: sswaminathan@lambdalegal.org |
| Chase Strangio, Esq.<br>Joshua A. Block, Esq.<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br>Email: cstrangio@aclu.org<br>Email: jblock@aclu.org | Stella Yarbrough<br>American Civil Liberties Union of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>Email: syarbrough@aclu-tn.org |
| Jeff Preptit, Esq.<br>Lucas Cameron-Vaughn, Esq.<br>ACLU (Nashville Office)<br>P.O. Box 120160<br>Nashville, TN 37212<br>Email: jpreptit@aclu-tn.org<br>Email: lucas@aclu-tn.org | Elizabeth D. Scott<br>Akin Gump Strauss Hauer & Feld LLP<br>2300 N. Field Street, Suite 1800<br>Dallas, TX 75201<br>Email: edscott@akingump.com |
| Christopher J. Gessner, Esq.<br>David Bethea, Esq.<br>Akin, Gump, Strauss, Hauer & Feld LLC<br>(DC Office)<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Email: cgessner@akingump.com<br>Email: dbethea@akingump.com | Dean L. Chapman Jr.<br>Joseph L. Sorkin, Esq.<br>Kristen W. Chin, Esq.<br>Richard J. D'Amato, Esq.<br>Theodore James Salwen, Esq.<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Email: dchapman@akingump.com<br>Email: jsorkin@akingump.com<br>Email: kristen.chin@akingump.com<br>Email: rdamato@akingump.com<br>Email: jsalwen@akingump.com |

| | |
|---|---|
| Steven J. Griffin, Esq.<br>Trenton M. Meriwether, Esq.<br>Clark L. Hildabrand, Esq.<br>Ryan N. Henry, Esq.<br>Brooke A. Huppenthal, Esq.<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>Email: steven.griffin@ag.tn.gov<br>Email: Trenton.meriweather@ag.tn.gov<br>Email: clark.hildabrand@ag.tn.gov<br>Email: ryan.henry@ag.tn.gov<br>Email: brooke.huppenthal@ag.tn.gov | Cameron T. Norris, Esq.<br>Tiffany H. Bates, Esq.<br>Consovoy McCarthy PLLC<br>1600 Wilson Blvd., Ste 700<br>Arlington, VA 22209<br>Email: cam@consovoymccarthy.com<br>Email: tiffany@consovoymccarthy.com |
| Adam Karl Mortara, Esq.<br>Lawfair LLC<br>40 Burton Hills Blvd., Suite 200<br>Nashville, TN 37215<br>Email: mortara@lawfairllc.com | |

s/ <i>Gloria Yi</i><br>
Trial Attorney<br>
Civil Rights Division